# EXHIBIT B

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **SHEBA ETHIOPIAN RESTAURANT, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **CIVIL ACTION FILE** |
| | ) | **NO.** 17CV4864 |
| **DEKALB COUNTY, GEORGIA, JOSEPH** | ) | |
| **COX, in his official capacity as Fire Marshal,** | ) | |
| **and ANDREW BAKER, in his official** | ) | |
| **capacity as Director of Planning and** | ) | |
| **Sustainability, ZACHARY WILLIAMS,** | ) | |
| **in his official capacity Acting Finance** | ) | |
| **Director,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## VERIFIED PETITION FOR WRIT OF MANDAMUS AND
## COMPLAINT FOR INJUNCTIVE RELIEF

COMES NOW, Plaintiff, SHEBA ETHIOPIAN RESTAURANT, INC., ("Plaintiff") in

the above-styled matter, by and through counsel, and submits its Complaint against Defendants,

DEKALB COUNTY, GEORGIA, JOSEPH COX, ANDREW BAKER, and ZACHARY

WILLIAMS (hereinafter sometimes referred to collectively as "County Defendants"). The

Plaintiff seeks an injunction requiring the County to allow Plaintiff to continue its business

operations for a night club located at 1594 Woodcliff Drive, Suite G, Atlanta, DeKalb County

Georgia ("Subject Property"), pending outcome of various administrative appeals and court

actions concerning the Subject Property and also seeks a writ of mandamus requiring Joseph

Cox, DeKalb County Fire Marshal, to lift a cease and desist order, requiring Andrew Baker,

Director of Planning and Sustainability to reinstate Plaintiff's Certificate of Occupancy, and

requiring Zachary Williams, Acting Finance Director, to issue a 2017 Occupational Tax

Certificate to Plaintiff. In support of this Petition the Plaintiff shows this Court the following:

## INTRODUCTION

1.     This suit challenges the actions of the Defendants in precipitously shutting down Plaintiff's restaurant/nightclub, which has been in operation for more than 19 years, and revoking, denying, or terminating all permits and licenses necessary to continued operations immediately on March 25, 2017, without providing Plaintiff an opportunity to appeals these decisions and present evidence contrary to that relied upon by County officials.

## PARTIES

2.     Plaintiff, SHEBA ETHIOPIAN RESTAURANT, INC., is a Georgia Corporation which, at all times relevant to this action and since 1998, has operated a licensed eating establishment pursuant to Sections 4-109 and 4-146 of the DeKalb County Alcohol Ordinance at 1594 Woodcliff Drive, Suite G, Atlanta, DeKalb County, Georgia 30329.

3.     Defendant,  DEKALB COUNTY, GEORGIA, (hereinafter alternatively "County") is a political subdivision of the State of Georgia; is a lawful entity which may sue and be sued; is subject to the jurisdiction and venue of this Court and may be served with process through its Chief Executive Officer, Michael Thurmond at 1300 Commerce Drive, 6th Floor, Decatur, Georgia, 30030.

4.     Defendant, JOSEPH COX, is the DeKalb County Fire Marshal, whose department has the responsibility, *inter alia*,  to conduct fire and life safety inspections of existing buildings and structures, review plans and specifications for proposed buildings and structures,  and may be served at 330 West Ponce de Leon Avenue, 4th  floor, Decatur, Georgia 30030.

5.    Defendant, ANDREW BAKER, is the DeKalb County Director of Planning and Sustainability, whose department , *inter alia*, has the responsibility to regulate zoning, land development and construction activities, permitting, inspections and to enforce County codes, and may be served at 330 West Ponce de Leon Avenue, 3rd floor, Decatur, Georgia 30030.

6.    Defendant, ZACHARY WILLIAMS, is the Acting Finance Director for DeKalb County, whose department, *inter alia,* handles the administrative processing of all alcoholic beverage license applications and occupational tax certificate applications for businesses in DeKalb County, and may be served at 1300 Commerce Drive, 6th floor, Decatur, Georgia 30030.

## JURISDICTION AND VENUE

7.    Jurisdiction and venue are proper in this Court.

8.    The Court has the power to issue injunctions pursuant to O.C.G.A. Section 9-5-1 *et. seq.* and O.C.G.A. Section 9-11-65.

9.    The Court has the power to issue a mandamus nisi pursuant to O.C.G.A. § 9-6-20 *et seq.*

## FACTUAL AND PROCEDURAL BACKGROUND

10.    Plaintiff has been licensed in DeKalb County as an eating establishment entitled to provide dining, alcoholic beverage service, musical entertainment and customer dancing since 1998. A copy of the original building permit evidencing same is attached hereto and incorporated by this reference as Exhibit A.

11.    At all times relevant to this matter, the property on which Plaintiff's business is located was zoned C-1 pursuant to the Zoning Ordinance.

12.    At all times relevant to this matter, Plaintiff had the required alcoholic beverage licenses, occupational tax certificates and certificate of occupancy to operate its business and at no time

has Plaintiff changed its status from an eating establishment with live entertainment to another use.

13.    Since opening Plaintiff has served alcohol until 3:55 a.m. Monday through Friday and until 2:55 a.m. Saturday and Sunday, as permitted by the DeKalb County Alcohol Ordinance.

14.    Prior to November 18, 2008, there was no zoning or alcohol code designation for nightclubs.  Restaurants providing live entertainment such as dancing and d.j.'s or live music were licensed and classified as "eating establishments" under the alcohol code and "restaurant" under the Zoning Ordinance. A copy of the relevant Alcohol Code provisions is attached hereto and incorporated by this reference as Exhibit Q.

15. On November 18, 2008, Plaintiff's use of the Subject Property was a use permitted of right under the DeKalb County Zoning Ordinance, namely a "restaurant" or "eating establishment with live entertainment providing dining, alcoholic beverage service, and musical entertainment.

16.    On November 18, 2008, pursuant to Ordinance No. 08-23 the DeKalb County Board of Commissioners amended the Zoning Ordinance to require, *inter alia,* that "late night establishments and night clubs" located within 1500 feet of the property line of residential property secure a special land use permit.  A copy of the codified ordinance evidencing this action is attached hereto and incorporated by this reference as Exhibit B.

17.    Ordinance 08-23 provided for the grandfathering of existing "late night establishments or nightclubs operating pursuant to validly issued business and liquor licenses issued prior to November 18, 2008" as legal non-conforming uses.

18.     Because at the time of Ordinance 08-23's adoption, Plaintiff routinely remained opened for business until 3 or 4 in the morning, it fit within the definition of "late night establishment" (hereinafter sometimes "LNE") in Ordinance 08-23: "any establishment licensed to dispense alcoholic beverages for consumption on the premises where the establishment is open for use by patrons beyond 12:30 a.m."

19.     Plaintiff's business also fit within the definition of "night club" at the time Ordinance 08-23 was adopted: "a commercial establishment dispensing alcoholic beverages for consumption on the premises and in which dancing and musical entertainment is allowed, where music may be live, disc jockey, karaoke, and or non-acoustic." The definitional sections of the Zoning Ordinance are attached hereto as Exhibit C.

20.     Since opening its business in 1998, in conjunction with food and alcohol, Plaintiff has routinely provided live music, DJ music and, although there is no designated dance floor, dancing for patrons.

21.     Plaintiff's business is a legally non-conforming use, grandfathered pursuant to the provisions of Ordinance 08-23 with a vested right to continue operating a restaurant with alcohol, music and live entertainment after 12:30.

22.     After adoption of Ordinance 08-23 DeKalb County formed a Late Night Establishment Task Force whose sole mission was to monitor the activities of Late Night Establishments and aggressively enforce codes in a campaign to close LNE's in DeKalb County.  Several LNE's have been closed as a result of this ongoing campaign.

23.    Prior to December 29, 2016, for more than 18 years, Plaintiff operated its business on the Subject Property without any citations from DeKalb County for code violations.

24.    In December of 2016, Plaintiff received its renewed alcoholic beverage licenses for 2017 from DeKalb County allowing it to serve beer, wine and spirits seven days a week, including late night pouring. A copy of the issued licenses are attached hereto as Exhibit D.

25.    In November or December of 2016, Plaintiff applied for renewal of its Occupational Tax Certificate (often generically referred to as "business license") for 2017.

26.    As part of the Occupational Tax Certificate renewal application, for the first time since opening for business, Plaintiff was required by DeKalb County to complete a "letter of entertainment" form which, *inter alia*, requested that applicant's state by checking a box whether the business is a "late night establishment" and whether it is a "night club".

27.    Plaintiff completed the form and was approved for "grandfathering as an LNE" December 2, 2016.  A copy of the Letter of Entertainment is attached hereto and incorporated by this reference as Exhibit E.

28.    More than 4 months later, Plaintiff has not received its renewed Occupational Tax Certificate for 2017.

29.    Beginning on December 29, 2016, Plaintiff began receiving regular visits from representatives of the DeKalb County Fire Marshal's Office and Code Enforcement Division of the Department of Planning and Sustainability.

30.    Between December 29, 2016 and March 25, 2017, Plaintiff received a total of 10 citations to the Magistrate Court of DeKalb County for alleged code violations.

31.     The citations were for alleged fire code violations, including but not limited to,
overcrowding by exceeding purported occupancy limits, use of sparklers and open flames, failure
to comply with orders given, and failure to permit construction. A copy of the citations is
attached hereto and incorporated by this reference as Exhibit F.

32.     Citations were also issued to Plaintiff for alleged violation of LNE and night club
regulations and "operating outside the letter of entertainment". Copies of these citations are
included in Exhibit F.

33.     In an effort to resolve the citations, Plaintiff immediately secured building plans for the
small vestibule construction precipitating the citations for "failure to permit construction" on
January 4, 2017, and submitted them to DeKalb County. A copy of the plans submitted are
attached hereto and incorporated by this reference as Exhibit G. 35.On January 23, 2017, without
notice, representatives of the Fire Marshal showed up at the Subject Property and issued a new
occupancy load card to Plaintiff stating that the new load was 99 occupants.

34.     The action of the Fire Marshal on January 23, 2017, was done in spite of Plaintiff's
statement that his original occupancy load was 199 and in spite of a total lack of evidence from
the Fire Marshal as to the permitted load.

35.     In an effort to resolve the alleged fire code citations, Plaintiff submitted a sprinkler
proposal to the County on February 16, 2017, a proposal which he understood from the Fire
Marshal would address the occupancy load issue and allow occupants up to more than 200
persons on the subject Property. A copy of the sprinkler proposal is attached hereto and
incorporated by this reference as Exhibit H. The County refused to process the sprinkler proposal
stating that it would be a waste of effort for Plaintiff to do so because the use of the business had

changed and it would not be permitted to operate as a nightclub with sprinklers without a Special Use Permit.

36.     In a further effort to resolve the alleged code violations, Plaintiff engaged counsel who sought a meeting with the Fire Marshal's office through written communication on January 27, 2017.  A copy of this communication is attached hereto and incorporated by this reference as Exhibit I.

37.     In spite of these efforts to directly address the alleged code violations, the County Defendants continued to make site inspections and issue citations and refused to meet with Plaintiff or his counsel.

38.      On March 6, 2017, a representative of the Fire Marshal, and on March 20, 2017, the Fire Marshal himself informed County Defendants that "the FMO's jurisdictional reach is for the life safety items only" and Plaintiff "is making progress to become compliant" with submission of the sprinkler proposal.  A copy of these communications is attached hereto and incorporated by this reference as Exhibit J.

39.     In spite of the Fire Marshal's communications above, on March 25, 2017, the Fire Marshal issued "Notice of Fire Hazard" to Plaintiff requiring Plaintiff's business to "shut down immediately".  A copy of this Notice is attached hereto and incorporated by this reference as Exhibit K. The issuance of such a Notice exceeded the authority of the Fire Marshal and was an ultra vires and void act.

40.     The Notice of Fire Hazard instructs Plaintiff to gain approvals from the Fire Marshal or the Planning and Sustainability Department prior to reopening.

41.     Plaintiff has been unable to reopen its business since it was shut down March 25, 2017, in spite of repeated efforts to engage and satisfy the County Defendants.

42.     On April 21, 2017, fully four and ½ months after Plaintiff's application to renew its Occupational Tax Certificate, Defendant Andrew Baker advised Plaintiff via letter that its 2017 Occupational Tax Certificate was being denied due to purported and repeated code violations; that Plaintiff's Certificate of Occupancy was being revoked due to repeated code violations and a purported change of use; and that any grandfathered use Plaintiff was entitled to was being terminated due to the revocation of the business license and purported change in use. A copy of Mr. Baker's letter is attached hereto and incorporated by this reference as Exhibit L.

43.     The actions of Defendants deprive Plaintiff of vested and valuable property rights and interfere with its contractual/business relationships without any hearing or opportunity to challenge the basis for Defendants' shutting down of the business, revocation and denial of licenses.

## COUNT I-MANDAMUS

44.     Section 15-45 (c) of the DeKalb County Code of Ordinances provides that upon denial of an application seeking renewal of an Occupational Tax Certificate, "the director of finance shall provide written notification of such decision to the applicant or holder of the certificate within five (5) calendar days" and Section 15-46 provides the right to appeal such decision within fifteen calendar days to a "certificate review board".

45.     The Certificate Review Board identified as the appropriate body to whom an aggrieved party is to appeal, on information and belief, has never been constituted and does not exist. A copy of Sections 15-45 and 15-46 is attached hereto and incorporated by this reference as Exhibit M.

46.     Sections 7-33(e)(5) and 7-35(f) of the DeKalb County Code of Ordinances provide for the revocation of certificates of occupancy by the building official where it is alleged there have

been changes to the type of permitted use or the premises are "found to be in violation" of local, state or federal laws.

47.     Section 7-40 of the DeKalb County Code of Ordinances provides that if an unsafe condition, such as a fire hazard is found, the building official for DeKalb County is to serve the owner of the building a written notice describing the condition and to advise the owner of steps needed to make the structure safe.

48.     Appeals from decisions of the Director of Planning and Sustainability concerning unsafe conditions and revocations of certificates of occupancy are to be made to the Technical Board of Appeals pursuant to Section 7-16(m) of the DeKalb County Code of Ordinances.

49.     The Technical Board of Appeals referenced in Section 7-16 has never been constituted and does not exist.  A copy of the relevant provisions of Chapter 7 of the DeKalb County code is attached hereto and incorporated by this reference as Exhibit N.

50.     The Zoning Ordinance provides in Section 27-4.2.32 (E) that an LNE or nightclub must comply with provisions of a non-existent Division of Article 4, and an establishment may lose its grandfathered legal nonconforming status if an unspecified license is revoked.  A copy of this section is attached hereto and incorporated by this reference as Exhibit O.

51.     Section 27-7.5.2 provides for the appeal of administrative decisions such as one to terminate an LNE licensee's grandfathered status through an appeal to the Zoning Board of Appeals.

52.     Appeals to the Zoning Board stay all legal action except under very limited circumstances.  Section 27-7.5.2. A copy of this section is attached hereto and incorporated by this reference as Exhibit P.

53.     Plaintiff has a clear legal right to appeal the actions of Defendants set forth herein.

54.     Defendants intentionally interfered with and deprived Plaintiff of its rights to appeals and hearings under the DeKalb County Code of Ordinances by closing Plaintiff's business prior to notice and expiration of appeal rights. Defendants intentionally delayed the processing of permit and certificate applications and the issuance of an administrative decision from which Plaintiff could appeal until Defendants had shut down the business.

55.     Defendants have refused to follow the law and provide Plaintiff notice of its appeal rights and a hearing before shutting its business down, and in so doing have robbed Defendant of an opportunity to defend itself by responding to the allegations contained in the Baker's revocation letter. Instead, Defendants elected to exceed their authority by summarily shutting down Plaintiff's business, intentionally failing to process Plaintiff's Occupational Tax Certificate application in an expeditious and timely manner, and summarily deciding without providing Plaintiff any opportunity to rebut their decision that somehow Plaintiff had changed its use to a non-conforming one - thereby depriving Plaintiff of substantial property rights and wreaking havoc on its business operations – all in flagrant violation of Plaintiff's clear rights to  hearings before duly constituted review boards under DeKalb County's Codes and rights to due process under the United States and Georgia Constitutions.

56.     Defendants have acted without substantial justification.

57.     Defendants have arbitrarily and capriciously violated the rights of Plaintiff.

58.     Plaintiff has no remedy other than mandamus to obtain relief.

59.     Plaintiff has no adequate remedy at law especially since two of the Boards designated under the DeKalb County Code of Ordinances have never been constituted and do not exist.

60.     Mandamus is appropriate in this case because, if granted, it would compel Defendants to do what they are required by law to do – vacate the illegal Notice of Fire Hazard requiring the

shut down of Plaintiff's business, process the pending Building Permit application and accept

Plaintiff's application for sprinkler installation at the Subject Property , reinstate Plaintiff's

Certificate of Occupancy and grandfathered status as a night club, issue the 2017 Occupational

Tax Certificate, allow Plaintiff to continue operating under its preexisting valid alcohol license,

occupational tax certificate, and grandfathered status until a final decision, if any,  is made to

sustain Andrew Baker's notice of revocation and until the expiration of  Plaintiff's time to appeal

any negative decisions to this Court.

## COUNT II-COMPLAINT FOR INJUNCTIVE RELIEF

61.     Petitioner hereby incorporates paragraphs 1-60 as if fully restated herein.

62.     As a result of Defendant' drastic and illegal actions, Plaintiff  has suffered, is suffering,

and unless a temporary restraining order ("TRO") is issued, will continue to suffer, immediate

and irreparable injury, loss and damage. Specifically, Plaintiff:

  (a) Has lost/will continue to lose approximately $80,000 in gross revenue each and every
       month the Sheba Ethiopian Restaurant is closed;

  (b) Is in danger of losing contracts and employees necessary to run the business; and

  (c) Is suffering, and will continue to suffer, grievous damage/loss to its reputation.

63.     As demonstrated from the above facts, unless Defendants are immediately restrained

from preventing Plaintiff from operating its business pending the outcome of the various appeals

to which Plaintiff is entitled Sheba will continue to lose large amounts of revenue and suffer

immediate and irreparable injury/loss to its assets (e.g. the contractual relationships with location

owners) as well as irreparable injury to its reputation.

64.     Plaintiff is also entitled to an interlocutory injunction restraining Defendants preventing

Plaintiff from operating its business pending the outcome of the various appeals to which

Plaintiff is entitled Sheba will continue to lose large amounts of revenue and suffer immediate and irreparable injury/loss to its assets (e.g. the contractual relationships with location owners) as well as irreparable injury to its reputation.

65.     An interlocutory injunction is necessary in this case to preserve the status quo while this Court adjudicates the merits of Plaintiff's Petition for Writ of Mandamus.

66.     There is a substantial likelihood that Plaintiff will suffer irreparable injury without an injunction. Specifically, without an injunction Plaintiff will effectively be out of business, and the revenue that it has already lost due to the illegal actions of Defendants will be compounded exponentially.

67.     The threatened injury to Plaintiff outweighs any possible harm to Defendants, since the injunction would require only that Defendants comply with their legal duty to provide Plaintiff with the hearings mandated by the DeKalb County Code of Ordinances before depriving it of its Certificate of Occupancy, Occupational Tax Certificate and its grandfathered status.

68.     There is a substantial likelihood that Plaintiff will prevail on the merits of its Mandamus Petition. The legal right to have pending applications for a building permit and sprinkler installation processed could not be any clearer, the Fire Marshal clearly exceeded his authority to shut the Plaintiff's business down before providing the required opportunity to appeal and challenge the basis for the shut down; the Plaintiff is clearly entitled to appeal the decision concerning its nonconforming status to the Zoning Board of Appeals before action is taken to terminate it;  and the failure to constitute and provide a Technical Board of Appeals for the hearing of appeals from notices of unsafe conditions and revocation  of certificates of occupancy voids any decision to do so until such time as a Board is duly constituted and available.

69.     Granting the interlocutory injunction will not disserve the public interest. On the

contrary, to not grant it would have the appearance of ratifying Defendants' illegal conduct, further emboldening them to disregard the DeKalb County Code of Ordinances and the constitutional rights of licensees, and in all probability, result in more abuses.

WHEREFORE, Plaintiff prays for the following:

1) That the Court issue a temporary restraining order prohibiting the Defendant from preventing Plaintiff from operating its business pending the outcome of the various appeals to which Plaintiff is entitled;

2) That the Court set down at the earliest possible time a hearing on Plaintiff's request for an interlocutory injunction;

3) That upon said hearing the Court issue an interlocutory injunction prohibiting Defendant from preventing Plaintiff from operating its business pending the outcome of the various appeals to which Plaintiff is entitled;

4) That upon a final hearing on Plaintiff's Petition for Writ of Mandamus the Court grant the Writ and order Defendant to vacate the illegal Notice of Fire Hazard requiring the shut down of Plaintiff's business, process the pending Building Permit application and accept Plaintiff's application for sprinkler installation at the Subject Property , reinstate Plaintiff's Certificate of Occupancy and grandfathered status as a night club, issue the 2017 Occupational Tax Certificate, allow Plaintiff to continue operating under its preexisting valid alcohol license, occupational tax certificate, and grandfathered status until a final decision, if any, is made to sustain Andrew Baker's notice of revocation and until the expiration of Plaintiff's time to appeal any negative decisions to this Court.

5) That all costs of litigation incurred by Plaintiff, including attorney's fees, be taxed against Defendant; and

6)   Such other further relief as the Court deems just.


Respectfully submitted this 28th day of  April, 2017.

<div style="text-align: right;">

BEGNER & BEGNER, P.C.

*/s/ Alan I. Begner*
**ALAN I. BEGNER**
Georgia Bar No.: 046975


*/s/ Eric A. Coffelt*
**ERIC A. COFFELT**
Georgia Bar No.: 252705

</div>

Begner & Begner, P.C.
5180 Roswell Road
South Building, Suite 100
Atlanta, Georgia 30342
(404) 531 – 0103
(404) 531 – 0107 (*facsimile*)
*E-mail*: ecoffelt@begnerlaw.com


**DUNLAVY LAW GROUP, LLC**


**LINDA I. DUNLAVY**
Georgia Bar No. 339596


1026 B Atlanta Avenue
Decatur, Georgia 30030
ldunlavy@dunlavylawgroup.com
Telephone:   (404) 371-4101
Facsimile:   (404) 371-8901

Attorneys for Plaintiffs



**DeKalb County**
**Department of Plannning & Sustainability**

**Non-Residential Building Permit**

DV100X

To schedule Inspections call: 404-371-3010. Use the Permit Information below when scheduling inspections.

**Project**

Permit Type: D-STRUCT    Permit Number: 1043HB133858    Phone No. of Record(770)938-3922
Project:BRIARCLIFF STATION RE Work Type: ALTERATIONS TO EXISTING STRUC Construction Type: N/A
Inspection Zone: 2    Occupancy Type: RETAIL OR MERCANTILE    Septic:    N/A

**Property**

Address: 1594 WOODCLIFF DR G ATLANTA , GA 30329 18 152 01 052    Parcel ID: 18 152 01 052    Lot#:
Zoning : C-1    Rezoning: N/A    Land Use: N/A    Census:    216.03    District: 02    06
Setbacks: Front:  N/A    Rear:    N/A    Left:    N/A    Right:    N/A
Easement:  No Description

**Applicant's**

| Owner | Applicant | Contractor |
|---|---|---|
| RETAIL CENTERS, LTD | NEBYOU  TETERA | NEBYOU  TETERA |
| 5 CONCOURSE PKY | 1594 WOODCLIFF DR | 1594 WOODCLIFF DR |
| ATLANTA. GA 30328 | ATLANTA. GA 30329 | ATLANTA. GA 30329 |
|  | (770)938-3922 | (770)938-3922 |

Business License: N/A    Trade License:

**Work Detail Description:**

| Lot Size: | 0 | Exterior Finish: | N/A |
|---|---|---|---|
| Stories: | 0 | Roof Finish: | N/A |
| Finished floor area: | 2575 Square Feet | Outdoor Living Space: | Square Feet |
| Basement: | Square Feet | # Baths: | 0 |
| Garage: | 0 Square Feet | # Kitchens: | 0 |
| # Rooms: | 0 | | |
| Building Valuation: | $5,000 | Plan Number: | 7690 |

**Other Permits Required:**

No Other Permits

**INSPECTION REQUIRED:**

S-FINAL,S-FRAMING

**Holds:**

**Other Requirements:**

N/A

**Applicant/Owner/Contractor**

| | | |
|---|---|---|
| | SEWER TAP FEE: | $2,110.00 |
| | CONVERSION OVERRIDE FEE: | $75.00 |
| NEBYOU  TETERA | Total Fee: | $2,185.00 |
| 1594 WOODCLIFF DR | Permit Tech: | VVENNIN |
| ATLANTA. GA 30329 | Cashier: | CONVERSION |
| | Date: | 10/06/1997 |

**Comments:**

ALTER
CONST TYPE = DRYWALL/METAL STUDS
PLAN NO = 97Z1318/000000
RETAIL  CZ FIRE APPROVAL BY D. NELSON 12/5/97    BOA C.O. MAILED OUT 1/26/98. KDG
    ADM PARKING    41 SPACES- RESTAURANT ADDITION  031486  SHEBA..RESTURANT.. RESTURANT..
INTERIOR TENANT FINISH ONLY..  OK FOR B.P. ONLY..R. GARNER 10-3-97..  H. DEPT CHECKLIST, STATEMENT OF
ENTERTAINMENT ATTACHED..  PER PLANS APPROVED 7/18/85.  PLBG PERMIT 97P05589 VOIDED PER RELEASE

**EXHIBIT**

**A**

# DEKALB COUNTY

## BOARD OF COMMISSIONERS

### BUSINESS AGENDA / MINUTES

**MEETING DATE: November 18, 2008**

| ITEM NO. |
|---|

| HEARING TYPE |
|---|
| ACTION |

| ACTION TYPE |
|---|
| ORDINANCE |

**SUBJECT:** An ordinance to define late night establishment and authorize or permit their establishment in eight (8) zoning districts, O-I, O-D, OCR, C-1, C-2, M, PC-2 and PC-3 and related supplemental regulations.

| **DEPARTMENT:** Board of Commissioners |
|---|

| **PUBLIC HEARING:** NO |
|---|

| **ATTACHMENT:** YES, 14 pages |
|---|

| **INFORMATION CONTACT:** | Jeff Rader, Commissioner, District 2 |
|---|---|
| **PHONE NUMBER** | (404) 371-2863 |

**PURPOSE:** To enact an amendment to chapter 27 of the Code of DeKalb County to define nightclubs, to authorize their establishment in eight (8) zoning districts, O-I, O-D, OCR, C-1, C-2, M, PC-2 and PC-3 and to provide supplemental regulations.

**NEED/IMPACT:**

DeKalb County's zoning ordinance does not currently provide for the location of nightclubs in any zoning district other than in parts of the Stonecrest and I-20 Corridor Area Overlay Districts. The code does not currently provide comprehensive land use regulation of nightclubs within the County and the emergence of such establishments in proximity to residential neighborhoods has caused concern about the impact of such establishments on the County's quality of life.

This proposed amendment will authorize night clubs and late night establishments in O-I, O-D, OCR, C-1, C-2, M, PC-2 and PC-3 and require a special land use permit where such establishments are proposed to be established within 1500 feet of property used for residential purposes

**RECOMMENDATION(S):** Adopt ordinance

| EXHIBIT |
|---|
| B |

November 18, 2008
08-23

September 8, 2008

# AN ORDINANCE

## AN ORDINANCE TO AMEND THE CODE OF DEKALB COUNTY, GEORGIA, CHAPTER 27, PERTAINING TO THE DEFINITION OF LATE NIGHT ESTABLISHMENTS, PERMITTING AND AUTHORIZING LATE NIGHT ESTABLISHMENTS AND NIGHTCLUBS WITHIN, O-D, O-I, OCR, C-1, C-2, PC-2, PC-3 AND M ZONING DISTRICTS AND RELATED SUPPLEMENTAL REGULATIONS AND FOR OTHER PURPOSES.

**WHEREAS**, DeKalb County's public health, safety, and general welfare require the harmonious, orderly, and progressive management of a variety of land uses;

**WHEREAS**, parts of the community have evolved from suburban bedroom communities to semi-urban neighborhoods because of their proximity to transportation corridors, but such residential neighborhoods, nevertheless require protection from incompatible land uses; and

**WHEREAS**, the DeKalb County Board of Commissioners finds that establishments serving alcohol late at night have a tendency to generate pernicious secondary effects like increased noise, traffic, crime and large volumes of people and thus have the capacity to create a nuisance or otherwise disturb residents of neighborhoods located in close proximity to the late night establishment; and

**WHEREAS**, the DeKalb County Board of Commissioners finds that these amendments will ensure that neighborhoods in close proximity to late night establishments and nightclubs are protected from such increased noise, traffic and incompatible uses; and

**WHEREAS**, the DeKalb County Board of Commissioners wants to ensure that there are ample opportunities for a diversity of nightlife opportunities for County residents and regulating the location of such establishments as proposed in this ordinance will protect the public health, safety and welfare; and

September 8, 2008

# LATE NIGHT ESTABLISHMENT - NIGHTCLUB ORDINANCE

## Late night establishments:

- This amendment establishes a specific definition for businesses that serve alcohol past 12:30 a.m. They will be called "late night establishments" which will be defined as "any establishment licensed to dispense alcoholic beverages for consumption on the premises where such establishment is open for use by patrons beyond 12:30 a.m."

- In C-1, C-2, OD, OI or an M zoning district, this amendment requires **new** "late night establishments" to obtain a special land use permit (SLUP) (i.e. individual approval by the BOC) prior to operating if they will located 1500 feet or less from residentially zoned property.

- In PC-2, PC-3, or OCR, this amendment requires **new** "late night establishments" to obtain a SLUP prior to operating no matter where they are located.

- In granting a SLUP the BOC reviews criteria related to the impact of the proposed business on surrounding land use, and if approved, could impose additional requirements, parking, buffering, or conduct of business stipulations as conditions of approval.

- Existing businesses are "grandfathered" as required by Georgia law, but those rights are not absolute.[1]

## Nightclubs:

- This amendment does not repeal the definition of "nightclub" as "a commercial establishment dispensing alcoholic beverages for consumption on the premises and in which dancing and musical entertainment is allowed".

- In C-2, OD, OI or an M zoning district, this amendment requires **new** "nightclubs" to obtain a special land use permit (SLUP) (i.e. individual approval by the BOC) prior to operating if they will located 1500 feet or less from residentially zoned property.

- In PC-2, PC-3, or OCR, this amendment requires **new** "night clubs" to obtain a SLUP prior to operating no matter where they are located.

- In C-1, this amendment prohibits new nightclubs.

- In granting a SLUP the BOC reviews criteria related to the impact of the proposed business on surrounding land use, and if approved, could impose additional requirements, parking, buffering, or conduct of business stipulations as conditions of approval.

---

[1] The lay person's term is grandfathering but this status is legally referred to as legal nonconforming and is regulated in Section 27-936 through 27-945

1

September 8, 2008

- Existing businesses are "grandfathered" as required by Georgia law, but those rights are not absolute.

- This amendment does not change how nightclubs or late night establishments are addressed in the various overlay districts. For example, nightclubs remain prohibited in the Northlake and Tucker Overlay zoning districts.

## Criteria:

- The 19 different criteria used by the BOC in granting a SLUP are listed in Sec. 27-873.

- Distance to be measured from the boundary line of the property proposed to be used as a late night establishment to the boundary line of property zoned for residential use along a straight line which describes the shortest distance…between the two property lines [Sec. 27-746 (d) 1,2,3]

- Parking: One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces [Sec. 27-604 (g)—same requirement for each category]

## Operations

- Any business operating prior to the adoption or operational date of this ordinance with business and liquor license shall be considered a legal non-conforming use. [Chap 27: Article IV, division 5]

- If in existence and operating prior to effective date of this ordinance, business is not required to obtain SLUP. [Sec. 27-746 (c )]

- Such establishments shall be required to comply with the ordinance in regard to cessation, expansion, movement, enlargement or other alteration of the late night establishment. [ Sec. 27-746 (c)]

- "Grandfathered" establishments lose their status if their alcohol license is revoked. [Sec. 27- 746]

## Companion Chapter 4 ordinance changes

- The posted license must show all SLUP conditions on the license in a public place.[4-54]

- Increased penalties when illegal actions occur on site including: noise, building, or fire safety code violations. [4-55]

September 8, 2008

# WHERE ARE NIGHTCLUBS AND LATE NIGHT ESTABLISHMENTS ALLOWED IF THE SEPTEMBER 8, 2008 DRAFT IS ENACTED?

| | | | |
|---|---|---|---|
| OI | LNE | Accessory to hotel/motel | 1500 ft SLUP |
| | Nightclub | Accessory to hotel/motel | 1500 ft. SLUP |
| OD | LNE | Accessory to hotel/motel | 1500 ft SLUP |
| | Nightclub | Accessory to hotel/motel | 1500 ft. SLUP |
| OCR | LNE | Authorized use | SLUP everywhere |
| | Nightclub | Authorized use | SLUP everywhere |
| C-1 | LNE | Authorized use | 1500 ft. SLUP |
| | Nightclub | Prohibited use | |
| C-2 | LNE | Authorized use | 1500 ft. SLUP |
| | Nightclub | Authorized use | 1500 ft. SLUP |
| M | LNE | Authorized use | 1500 ft. SLUP |
| | Nightclub | Authorized use | 1500 ft. SLUP |
| PC-2 | LNE | Authorized use | SLUP everywhere |
| | Nightclub | Authorized use | SLUP everywhere |
| PC-3 | LNE | Authorized use | SLUP everywhere |
| | Nightclub | Authorized use | SLUP everywhere |

September 8, 2008

## Overlays:

| | | | |
|---|---|---|---|
| **Emory Village** | LNE | Authorized | underlying zoning[2] |
| | Nightclub | Authorized | underlying zoning |
| **Brookhaven** | LNE | Authorized | underlying zoning |
| | Nightclub | Authorized | underlying zoning |
| **Candler** | LNE | Authorized | underlying zoning |
| | Nightclub | Authorized | underlying zoning |

Nightclubs and LNE's are not specifically mentioned but would be prohibited in C-1 and C-2 because Candler Road limits uses in C-1 and C-2 to the listed uses in the overlay.

### Enacted January 8, 2008

| | | | |
|---|---|---|---|
| **I-20** | LNE | Authorized | underlying zoning |
| | Nightclub | Authorized | Tier I only |

In the I-20 Overlay "nightclub" is used for the first time, nightclubs are allowed in Tier I but with only a maximum of 10,000 square feet of floor space as approved by planning development.

### Enacted March 25, 2008[3]

| | | | |
|---|---|---|---|
| **Tucker** | LNE | Authorized | underlying zoning |
| | Nightclub | Prohibited | |

In Tucker Overlay nightclubs are specifically mentioned and prohibited.

---

[2] The term "underlying zoning" means that the overlay allows uses in the underlying zoning district so nightclubs and late night establishments will be allowed in the same manner as the underlying zoning on that property. That means that a nightclub in Emory Village property zoned C-2 is allowed but will need a SLUP if at or within 1500 feet of residentially zoned property. Since some of the overlays were enacted prior to this LNE/nightclub initiative those overlays do not mention LNE's and nightclubs by name.

[3] The first drafts of the nightclub ordinance circulated to planning are dated February 6, 2008 even though the nightclub ordinance was not formally introduced for consideration by the Board of Commissioners until March 25, 2008.

4

September 8, 2008

## Enacted May 20, 2008

| Northlake | LNE Nightclub | Authorized Prohibited | underlying zoning |

In Northlake Overlay nightclubs are specifically mentioned and prohibited.

## Enacted July 16, 2008

| Stonecrest | LNE Nightclub | Authorized use Tier I only Authorized use Tier I only | underlying zoning |

Nightclubs and late night establishments are specifically prohibited by name in the rest of the Stonecrest Overlay.

## Yet to be enacted June 10, 2008 draft

| Scottdale | LNE Nightclub | Authorized use Tier I only Authorized use Tier I only | underlying zoning |

Nightclubs and late night establishments are not specifically prohibited by name but would be prohibited in all Tiers except Tier I where they would be allowed if allowed in the underlying zoning district.

September 8, 2008

WHEREAS, the DeKalb County Board of Commissioners finds that these amendments will enhance the County's ability to appropriately regulate the location of late night establishments and nightclubs throughout the unincorporated area of the County by requiring late night establishments in the O-I, O-D, C-1, C-2, and M zoning districts to obtain a special land use permit if they will be located at, or within 1500 feet of residentially zoned property and by requiring nightclubs in the O-I, O-D, C-2, and M zoning districts to obtain a special land use permit if they will be located at, or within 1500 feet of residentially zoned property; and

WHEREAS, the DeKalb County Board of Commissioners finds that requiring all late night establishments and nightclubs to obtain a special land use permit if such an establishments are going to be located within the OCR, PC-2 or PC-3 zoning district appropriately balances the opportunity for nightlife in a mixed use development with the fact that late night establishments and nightclubs in a mixed use development will be in very close proximity to residences and are not similarly situated to stand alone late night establishments and nightclubs.

NOW THEREFORE, be it ordained by the Board of Commissioners of DeKalb County, Georgia, and it is hereby ordained by the authority of same, that Chapter 27 of the Code of DeKalb County, is hereby amended as follows:

## PART I. ENACTMENT

*Section 27—31 is amended to add a definition of late night establishment in alphabetical order to read as follows:*

### Sec. 27-31. Definitions.

*Late night establishment means any establishment licensed to dispense alcoholic beverages for consumption on the premises where such establishment is open for use by patrons beyond 12:30 a.m.*

\*\*\*

*Section 27-489. (O-I Office Institution District), is amended to add late night establishment in alphabetical order as authorized accessory uses of land and structures by deleting section 27-489 and adding a new section 27-489 to read as follows:*

2

September 8, 2008

***

## Sec. 27-489.  Accessory uses and structures.

The following accessory uses of land and structures shall be authorized in the O-I (Office-Institution) District:

(a)  Ambulance service, where accessory to a hospital.

(b)  Late night establishment, where accessory to a hotel or motel, unless the late night establishment is located at, or within fifteen hundred (1500) feet of any land zoned for residential use in which case a special permit shall be required.

(c)  Nightclub, where accessory to a hotel or motel, unless the late night establishment is located at, or within fifteen hundred (1500) feet of any land zoned for residential use in which case a special permit shall be required.

(d)  Parking lot and parking garage.

(e)  Restaurant, where accessory to a hotel or motel.

(f)  Retail liquor store where accessory to a hotel, motel or high-rise office building.

(g)  Retail use where accessory to a high-rise apartment building or high-rise office building, provided that all such uses shall be located on the ground floor of such high-rise building and shall be entered from the interior lobby of said building, and said accessory retail uses shall be designed and scaled to meet the needs of the tenants of the building and their guests.

(h)  Signs are allowed in accordance with the provisions of Chapter 21 and this chapter.

***

Section 27-490(c) is amended to authorize late night establishments pursuant to a special land use permit by adding subsection (c)(9) and (10) to read as follows:

## Sec. 27-490. Special permits.

***

(9)  Late night establishment, where accessory to a hotel or motel which is located at, or within fifteen hundred (1500) feet of any land zoned for residential use.

(10) Nightclub, where accessory to a hotel or motel which is located at, or within fifteen hundred (1500) feet of any land zoned for residential use.

3

September 8, 2008

***

*Section 27-496 is amended by inserting off street parking requirements for late night establishments in alphabetical order by deleting section 27-496 and substituting a new section 27-496 in lieu thereof to read as follows:*

***

### Sec. 27-496. Off-street parking requirements.

Off-street parking requirements for uses and structures authorized and permitted in the O-I (Office-Institution) District are as follows:

(a) *Ambulance service, where accessory to a hospital:* One (1) parking space for each vehicle plus one (1) additional space for each two (2) administrative or service employees.

(b) *Cultural facilities, funeral home, and other places of assembly:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for seating.

(c) *Child day care center and kindergarten:* One (1) space for each two hundred (200) square feet of floor area.

(d) *Convent or monastery:* One (1) space for each two hundred (200) square feet of floor area within the principal structure.

(e) *Dwelling, multifamily:* Two (2) spaces for each dwelling unit, except that multifamily dwellings in the RM-HD district shall provide one and five-tenths (1.5) spaces for each dwelling unit.

(f) *Fraternity and sorority house:* One (1) space for each bed.

(g) *Hospital, nursing care facility, and similar institutional use:* One (1) space for each two (2) beds.

(h) *Hotel and motel:* One and twenty-five hundredths (1.25) spaces for each unit.

(i) *Late night establishment:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(j) *Nightclub:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(k) *Noncommercial club or lodge:* One (1) space for each one hundred (100) square feet of floor area.

September 8, 2008

(l) *Office and clinic:* One (1) space for each two hundred fifty (250) square feet of floor area.

(m) *Place of worship:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for public worship.

(n) *Public swimming pool, golf course, neighborhood recreation center, or similar use:* Twenty (20) spaces except that an eighteen-hole golf course shall have forty (40) spaces.

(o) *Private swimming pool, golf course, neighborhood recreation center, or similar use:* One (1) space for each five (5) members but no less than twenty (20) spaces except that golf courses shall provide a minimum of twenty (20) spaces for each nine (9) holes.

(p) *Restaurant where accessory to hotel or motel:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(q) *Retail use accessory to high-rise apartment building or high-rise office building, and personal service uses:* Five and five-tenths (5.5) spaces for each one thousand (1,000) square feet of floor area.

(r) *School, private elementary and middle:* Two (2) spaces for each classroom.

(s) *School, private high:* Five (5) spaces for each classroom.

(t) *Schools and colleges, including vocational schools:* Ten (10) spaces for each classroom.

\*\*\*

*Section 27-519 (O-D Office Distribution District) is amended to add late night establishment and nightclub in alphabetical order as authorized accessory uses of land and structures by deleting section 27-519 and adding a new section 27-519 to read as follows:*

\*\*\*

## Sec. 27-519.  Accessory uses and structures.

The following accessory uses of land and structures shall be authorized in the O-D (Office-Distribution) District:

5

September 8, 2008

(a)   Late night establishments, where accessory to a hotel or motel, unless the late night establishment is located at, or within fifteen hundred (1500) feet of any land zoned for residential use in which case a special permit shall be required.

(b)   Nightclub, where accessory to a hotel or motel, unless the late night establishment is located at, or within fifteen hundred (1500) feet of any land zoned for residential use in which case a special permit shall be required.

(c)   Parking lots and parking garages.

(c)   Restaurant, where accessory to a hotel or motel.

(d)   Retail liquor store where accessory to a hotel, motel or high-rise office building.

(e)   Signs in accordance with the provisions of Chapter 21 and this chapter.

*Section 27-520(c) is amended to authorize late night establishments and nightclubs pursuant to a special land use permit by adding subsection (c)(3) and (4) to read as follows:*

## Sec. 27-520. Special permits.

***

(3)   Late night establishment, where accessory to a hotel or motel located at, or within fifteen hundred (1,500) feet of any land zoned for residential use

(4)   Nightclub, where accessory to a hotel or motel located at, or within fifteen hundred (1,500) feet of any land zoned for residential use.

***

*Section 27-524 is amended by inserting off street parking requirements for late night establishments and nightclubs in alphabetical order by deleting section 27-524 and substituting a new section 27-524 in lieu thereof to read as follows:*

## Sec. 27-524. Off-street parking requirements.

Off-street parking requirements for uses and structures authorized and permitted in the O-D (Office-Distribution) District are as follows:

(a)   *Cultural facilities, and other places of assembly:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for seating.

(b)   *Hotel and motel:* One and twenty-five hundredths (1.25) spaces for each unit.

September 8, 2008

(c) *Offices and clinics:* One (1) space for each two hundred fifty (250) square feet of floor area.

(d) *Late night establishment*: One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(e) *Nightclub*: One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces

(f) *Place of worship:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for public worship.

(g) *Public swimming pool, golf course, neighborhood recreation center, or similar use:* Twenty (20) spaces except that an eighteen-hole golf course shall have forty (40) spaces.

(h) *Private swimming pool, golf course, neighborhood recreation center, or similar use:* One (1) space for each five (5) members but no less than twenty (20) spaces except that golf courses shall provide a minimum of twenty (20) spaces for each nine (9) holes.

(i) *Restaurant where accessory to hotel or motel:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(ij) *Retail uses accessory to hotel, motel, or high-rise office building, and personal service uses:* Five and five-tenths (5.5) spaces for each one thousand (1,000) square feet of floor area.

(k) *Retail uses, personal service uses, and other commercial and general business uses, but not including food stores:* Four (4) spaces for each one thousand (1,000) square feet of floor area.

(l) *School, private elementary and middle:* Two (2) spaces for each classroom.

(m) *School, private high:* Five (5) spaces for each classroom.

(n) *Schools and colleges, including vocational schools:* Ten (10) spaces for each classroom.

\*\*\*

September 8, 2008

*Section 27-540 is amended to authorize late night establishments and nightclubs pursuant to a special land use permit by adding subsection (c)(2) and (3) to read as follows:*

### Sec. 27-540. Special Permits.

\*\*\*

(2)  Late night establishments.

(3)  Nightclubs.

\*\*\*

*Section 27-546 is amended by inserting off street parking requirements for late night establishment and nightclub in alphabetical order by deleting section 27-546 and substituting a new section 27-546 in lieu thereof to read as follows:*

\*\*\*

### Sec. 27-546. Off-street parking requirements.

Off-street parking requirements for uses and structures authorized and permitted in the OCR (Office-Commercial-Residential) District are as follows:

(a)  *Child day care center and kindergarten:* One (1) space for each two hundred (200) square feet of floor area.

(b)  *Convent or monastery:* One (1) space for each two hundred (200) square feet of floor area within the principal structure.

(c)  *Dwellings, multifamily:* One and seventy-five one hundredths (1.75) spaces for each dwelling unit.

(d)  *Food stores:* One (1) space for each one hundred (100) square feet of floor space.

(e)  *Late night establishment:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(f)  *Nightclub:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(g)  *Offices and clinics:* One (1) space for each two hundred fifty (250) square feet of floor area.

(h)  *Place of worship:* One (1) space for each three (3) seats in the largest assembly room utilized for public worship, or, where fixed seats are not utilized, one (1) space

for each twenty-five (25) square feet of floor area in the largest assembly room used for public worship.

(i) *Private swimming pool, neighborhood recreation center, or similar use:* One (1) space for each five (5) members but no less than twenty (20) spaces except that golf courses shall provide a minimum of twenty (20) spaces for each nine (9) holes.

(j) *Recreational facilities:*

    (1) *Without fixed seating:* One (1) space for each two hundred (200) square feet of floor area.

    (2) *With fixed seating:* One (1) space for each three (3) seats.

(k) *Restaurant:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(l) *Retail uses, personal service uses, and other commercial and general business uses, but not including food stores:* Four (4) spaces for each one thousand (1,000) square feet of floor area.

(m) *Schools, commercial vocational:* Ten (10) spaces for each classroom.

(n) *Shopping center:* Four (4) spaces for each one thousand (1,000) square feet of floor area.

(o) *Theaters and other places of assembly:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for seating.

\*\*\*

    *Section 27-578 (C-1 Local Commercial District) is amended to authorize late night establishment in alphabetical order as a principal use of land and structures by deleting section 27-578 and substituting a new section 27-578 to read as follows:*

### Sec. 27-578. **Principal Uses and Structures.**

    The following principal uses of land and structures shall be authorized in the C-1 (Local Commercial) District:

(a) Animal hospital, veterinary clinic, pet supply store, animal grooming shop, and boarding and breeding kennel.

(b) Art gallery and art supply store.

September 8, 2008

(c)  Automobile, boat, and trailer sales and service as follows:

(1)  Automobile and truck sales.
(2)  Automobile service station.
(3)  Automobile, truck, and trailer lease and rentals.
(4)  Automobile, truck, and trailer lease and rentals as accessory to an automobile service station.
(5)  Automobile wash service.
(6)  Boat sales.
(7)  Minor automobile repair and maintenance.
(8)  Retail automobile parts and tire stores.
(9)  Trailer salesroom and sales lot.

(d)  Bank, credit union and other similar financial institution.

(e)  Business service establishment.

(f)  Child day care center and kindergarten.

(g)  Communications uses as follows:

(1)  Radio and television broadcasting station.
(2)  Telephone business office.

(h)  Community facilities as follows:

(1)  Cultural facilities.
(2)  Noncommercial club or lodge.
(3)  Utility structure necessary for the transmission or distribution of service (section 27-770).

(i)  Dwellings:

(1)  Shelter for homeless persons.
(2)  Transitional housing facility.

(j)  Education uses as follows:

(1)  Vocational schools.
(2)  Private elementary, middle or high school.
(3)  Specialized non-degree schools.

(k)  Late night establishments, unless the late night establishment is located at, or within fifteen hundred feet of any land zoned for residential use in which case a special permit shall be required.

(l)  Lodging uses, as follows:

    (1)  Bed and breakfast inn.
    (2)  Hotel.
    (3)  Motel.

(m)  Movie theater, bowling alley, and other recreational facilities where such activities are wholly enclosed within a building.

(n)  Office uses as follows:

    (1)  Accounting office.
    (2)  Engineering and architectural office.
    (3)  Building and construction contractor.
    (4)  Financial services office.
    (5)  Insurance office.
    (6)  Legal office.
    (7)  Medical office.
    (8)  Real estate office
    (9)  Wholesale sales office.

(o)  Parking, as follows:

    (1)  Commercial parking lot.
    (2)  Commercial parking garage.

(p)  Place of worship.

(q)  Restaurants, as follows:

    (1)  Drive-through restaurant.
    (2)  Restaurant.
    (3)  Restaurant accessory to a hotel or motel.

(r)  Retail sales as follows, but not including adult entertainment establishment and not including adult service facility:

    (1)  Apparel and accessories store.
    (2)  Book, greeting card, and stationery store.
    (3)  Camera and photographic supply store.
    (4)  Computer and computer software store.
    (5)  Convenience store.
    (6)  Farm and garden supply store.
    (7)  Florist.
    (8)  Food stores including bakeries.

September 8, 2008

(9)   Furniture, home furnishings and equipment store.
(10)  General merchandise store.
(11)  Gift, novelty, and souvenir store.
(12)  Hardware store.
(13)  Hobby, toy and game store.
(14)  Jewelry store.
(15)  Liquor store, including retail liquor store as accessory use to hotels, motels, and high-rise office
(16)  Music and musical equipment store.
(17)  News dealers and newsstand.
(18)  Office supplies and equipment store.
(19)  Pharmacies and drugstore.
(20)  Quick copy printing store.
(21)  Radio, television and consumer electronics store.
(22)  Specialty store.
(23)  Sporting goods and bicycle sale.
(24)  Variety store.
(25)  Video tape sales and rental store.

(s)  Retail sales, building supplies and farm equipment, as follows:

(1)   Electrical supply store.
(2)   Farm equipment.
(3)   Lumber, hardware and other building materials establishments.
(4)   Paint, glass and wallpaper store.
(5)   Plumbing, heating and air-conditioning equipment establishments.

(t)  Services, medical and health, as follows:

(1)   Health service clinic.
(2)   Medical and dental laboratories.
(3)   Offices of health service practitioners.
(4)   Pharmacy.
(5)   Private ambulance and emergency medical services.

(u)  Services, personal, as follows:

(1)   Barbershop, beauty shop, and similar personal service establishments.
(2)   Coin-operated laundry and dry-cleaning store.
(3)   Funeral home.
(4)   Laundry and dry-cleaning establishment and pickup station.
(5)   Linen and diaper service, garment pressing, alteration and repair.
(6)   Personal care home, congregate.
(7)   Personal care home, family.
(8)   Personal care home, group.
(9)   Personal care home, registered.

12

September 8, 2008

(10)   Photographic studios.

(v)   Services, repair, as follows:

(1)   Home appliance repair and service.
(2)   Jewelry repair service.
(3)   Radio, television and similar home appliance repair service.
(4)   Furniture upholstery and repair shop within shopping center.
(5)   Shoe repair store.

(w)   Shopping center.

(x)   Taxi stand and taxi dispatching office.

(y)   Tennis center, club and facilities.

\* \* \*

Section 27-580 is amended to authorize late night establishments pursuant to a special land use permit in the C-1 (Local Commercial District) by adding subsection (c)(5) to read as follows:

### Sec. 27-580. Special Permits.

\*\*\*

(5)   Late night establishment where located at, or within fifteen hundred (1,500) feet of any land zoned for residential use.

\*\*\*

Section 27-585 is amended by inserting off street parking requirements for a late night establishment in alphabetical order by deleting section 27-585 and substituting a new section 27-585 in lieu thereof to read as follows:

### Sec. 27-585. Off-street parking requirements.

Off-street parking requirements for uses and structures authorized and permitted in the C-1 (Local Commercial) District are as follows:

(a)   *Ambulance service:* One (1) parking space for each vehicle plus one (1) additional space for each two (2) administrative or service employees.

(b)   *Automobile, minor repair and maintenance establishments:* One (1) space for each one hundred fifty (150) square feet of floor space.

13

September 8, 2008

(c) *Automobile service station:* Three (3) spaces for each service bay, with minimum of ten (10) spaces required.

(d) *Child day care center and kindergarten:* One (1) space for each two hundred (200) square feet of floor area.

(e) *Food store:* One (1) space for each one hundred (100) square feet of floor space.

(f) *Hotel, motel, and bed and breakfast inn:* One and twenty-five one hundredths (1.25) spaces for each unit.

(g) *Lodge, fraternal or social organization:* One (1) space for each one hundred (100) square feet of floor area.

(h) *Late night establishment:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(i) *Office and clinic:* One (1) space for each two hundred fifty (250) square feet of floor area.

(j) *Place of worship:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for public worship.

(k) *Recreational facilities:*

    (1) *Without fixed seating:* One (1) space for each two hundred (200) square feet of floor area;

    (2) *With fixed seating:* One (1) space for each three (3) seats.

(l) *Restaurant:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(m) *Restaurant, drive-through, without seating area for patrons:* One (1) space for each one hundred (100) square feet of floor area, but not less than ten (10) spaces.

(n) *Retail uses, personal service uses, and other commercial and general business uses, but not including food stores:* Five and five-tenths (5.5) spaces for each one thousand (1,000) square feet of floor area.

(o) *School, private elementary and middle:* Two (2) spaces for each classroom.

(p) *School, private high:* Five (5) spaces for each classroom.

(q) *School, commercial vocational:* Ten (10) spaces for each classroom.

(r)  *Shopping center:*  Five and five-tenths (5.5) spaces for each one thousand (1,000) square feet of floor area.

(s)  *Theater, funeral home, and other places of assembly:*  One space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for seating.

(t)  *Temporary outdoor social, religious, entertainment or recreation activity or flea market:*  One (1) space for each one hundred (100) square feet of space used for such activity.

***

Section 27-598 (C-2 General Commercial District) is amended to authorize late night establishment and nightclub in alphabetical order as principal uses of land and structures by deleting section 27-598 and substituting a new section 27-598 to read as follows:

## Sec. 27-598. Principal uses and structures.

The following principal uses of land and structures shall be authorized in the C-2 (General Commercial) District:

(a)  Animal hospital, veterinary clinic, pet supply store, animal grooming shop, and boarding and breeding kennel.

(b)  Art gallery and art supply store.

(c)  Automobile, boat, and trailer sales and service as follows:

    (1)  Automobile and truck sales.
    (2)  Automobile repair and paint shop.
    (3)  Automobile service station.
    (4)  Automobile, truck, and trailer lease and rentals.
    (5)  Automobile, truck, and trailer lease and rentals as accessory to an automobile service station.
    (6)  Automobile upholstery shop.
    (7)  Automobile wash service.
    (8)  Boat sales.
    (9)  Minor automobile repair and maintenance.
    (10) Retail automobile parts and tire store.
    (11) Storage yard for damaged automobiles or confiscated automobiles.
    (12) Tire retreading and recapping.
    (13) Trailer salesroom and sales lot.

(d)  Bank, credit union and other similar financial institution.

15

September 8, 2008

(e)  Check cashing establishment.

(f)  Commercial recreation and entertainment:

(1)  Adult entertainment establishments. (See also section 27-732).
(2)  Adult service facility.
(3)  Bowling alley.
(4)  Drive-in theater.
(5)  Go-cart concession.
(6)  Golf course.
(7)  Golf driving range or batting cage facility.
(8)  Miniature golf course.
(9)  Movie theater.
(10) Recreation grounds and facilities.
(11) Recreational facilities carried on wholly within a permanently enclosed building.
(12) Tennis center, club and facilities.

(g)  Communications uses, as follows:

(1)  Radio and television broadcasting station.
(2)  Telephone business office.

(h)  Community facilities, as follows:

(1)  Cultural facilities.
(2)  Noncommercial club or lodge.
(3)  Fraternal club or lodge.
(4)  Utility structure necessary for the transmission or distribution of service (section 27-770).

(i)  Construction contractors, as follows:

(1)  General building contractor.
(2)  Heavy construction contractor.
(3)  Special trade contractor.

(j)  Dwellings, as follows:

(1)  Shelter for homeless persons.
(2)  Transitional housing facility.

(k)  Education uses as follows:

(1)  Vocational school.

(2)   Private elementary, middle or high school.
(3)   Specialized non-degree schools.

(l)   Late night establishment, unless the late night establishment is located at, or within fifteen hundred (1500) feet of any land zoned for residential use in which case a special permit shall be required.

(m)   Nightclub, unless the late night establishment is located at; or within fifteen hundred (1500) feet of any land zoned for residential use in which case a special permit shall be required.

(n)   Lodging, as follows:

(1)   Hotel.
(2)   Motel.

(o)   Manufacturing uses, as follows:

(1)   Light malt beverage manufacturer.
(2)   Light manufacturing establishment.

(p)   Office uses as follows:

(1)   Accounting office.
(2)   Engineering and architectural office.
(3)   Financial services office.
(4)   Insurance office.
(5)   Legal office.
(6)   Medical office.
(7)   Real estate office.

(q)   Pawn shop.

(r)   Place of worship.

(s)   Printing establishments, as follows:

(1)   Bookbinding and related work.
(2)   Photoengraving, typesetting, electrotyping and stereotyping.
(3)   Publishing and printing establishment.

(t)   Restaurant, drive-through restaurant facilities, and restaurant accessory to a motel.

(u)   Retail sales as follows:

(1)   Apparel and accessories store.

September 8, 2008

   (2)  Book, greeting card, and stationery store.
   (3)  Camera and photographic supply store.
   (4)  Commercial greenhouse or plant nursery.
   (5)  Convenience store.
   (6)  Farm and garden supply store.
   (7)  Florist.
   (8)  Food stores including bakeries.
   (9)  Fuel dealers, manufacturers and wholesalers.
 (10)  Furniture, home furnishings and equipment store.
 (11)  General merchandise store.
 (12)  Gift, novelty, and souvenir store.
 (13)  Hardware store.
 (14)  Hobby, toy and game store.
 (15)  Jewelry store.
 (16)  Music and musical equipment store.
 (17)  News dealer and newsstand.
 (18)  Office supplies and equipment store.
 (19)  Pharmacy and drug store.
 (20)  Quick copy printing store.
 (21)  Retail liquor store, both independent stores and stores accessory to hotels, motels and high-rise office buildings.
 (22)  Shopping center.
 (23)  Specialty store.
 (24)  Sporting goods and bicycle sales.
 (25)  Variety store.
 (26)  Video tape sales and rental store.

(v)  Services, personal, as follows:

   (1)  Barbershop, beauty shop, and similar personal service establishments.
   (2)  Business service establishment.
   (3)  Coin-operated laundry and dry-cleaning store and pickup station.
   (4)  Dry-cleaning plant.
   (5)  Funeral home.
   (6)  Linen and diaper service, garment pressing, alteration and repair.
   (7)  Outdoor advertising service.
   (8)  Personal care home, congregate.
   (9)  Personal care home, family.
 (10)  Personal care home, group.
 (11)  Personal care home, registered.
 (12)  Photographic studios.

(w)  Services, repair, as follows:

   (1)  Heavy repair service and trade shop.
   (2)  Home appliance repair and related service.

(3)  Jewelry repair store.
(4)  Radio, television and home electronics repairs.
(5)  Shoe repair store
(6)  Upholstery, furniture and major appliance repair.

\*\*\*

*Section 27-600 is amended to authorize late night establishments and nightclubs pursuant to a special land use permit by adding subsection (c)(3) and(4) to read as follows:*

## Sec. 27-600. Special Permits.

\*\*\*

(3)  Late night establishment where located at, or within fifteen hundred (1,500) feet of any land zoned for residential use

(4)  Nightclub where located at, or within fifteen hundred (1,500) feet of any land zoned for residential use

\*\*\*

*Section 27-604 is amended by inserting off street parking requirements for late night establishments and nightclubs in alphabetical order by deleting section 27-604 and substituting a new section 27-604 in lieu thereof to read as follows:*

## Sec. 27-604. Off-street parking requirements.

Off-street parking requirements for uses and structures authorized and permitted in the C-2 (General Commercial) District are as follows:

(a)  *Adult entertainment establishments and adult service facilities:*  One (1) parking space for each seventy-five (75) square feet of floor area in the building.

(b)  *Automobile repair garage:*  One (1) space for each one hundred fifty (150) square feet of floor space.

(c)  *Automobile service station:*  Three (3) spaces for each service bay, with minimum of ten (10) spaces required.

(d)  *Bowling alley:*  Five (5) spaces for each alley.

(e)  *Food store:*  One (1) space for each one hundred (100) square feet of floor space.

September 8, 2008

(f) *Hotel and motel:* One and twenty-five one-hundredths (1.25) spaces for each unit.

(g) *Late night establishment:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(h) *Nightclub:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(i) *Lodge, fraternal or social organization:* One (1) space for each one hundred (100) square feet of floor area.

(j) *Office and clinic:* One (1) space for each two hundred fifty (250) square feet of floor area.

(k) *Place of worship:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for public worship.

(l) *Public swimming pool, golf course, neighborhood recreation center, or similar use:* Twenty (20) spaces except that an eighteen-hole golf course shall have forty (40) spaces.

(m) *Private swimming pool, golf course, neighborhood recreation center, or similar use:* One (1) space for each five (5) members but no less than twenty (20) spaces except that golf courses shall provide a minimum of twenty (20) spaces for each nine (9) holes.

(n) *Recreational facilities:*

   (1) *Without fixed seating:* One (1) space for each two hundred (200) square feet of floor area.

   (2) *With fixed seating:* One (1) space for each three (3) seats.

(o) *Restaurant:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(p) *Restaurant, drive-through, without seating area for patrons:* One (1) space for each one hundred (100) square feet of floor area, but not less than ten (10) spaces.

(q) *Retail uses, personal service uses, and other commercial and general business uses, but not including food stores:* Five and five-tenths (5.5) spaces for each one thousand (1,000) square feet of floor area.

(r) *School, private elementary and middle:* Two (2) spaces for each classroom.

September 8, 2008

(s) *School, private high:* Five (5) spaces for each classroom.

(t) *Schools and colleges, including trade and vocational schools:* Ten (10) spaces for each classroom.

(u) *Shopping center:* Five and five-tenths (5.5) spaces for each one thousand (1,000) square feet of floor area.

(v) *Theater, auditorium, funeral home, gymnasium, stadium and other places of assembly:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for seating.

(w) *Temporary outdoor social, religious, entertainment or recreation activity or flea market:* One (1) space for each one hundred (100) square feet of space used for such activity.

\*\*\*

Section 27-618 (M Industrial District) is amended to authorize late night establishment and nightclub in alphabetical order as principal uses of land and structures by deleting section 27-618 and substituting a new section 27-618 to read as follows:

## Sec. 27-618. Principal uses and structures.

The following principal uses of land and structures shall be authorized in the M (Industrial) District:

(a) Agriculture and forestry uses as follows:

    (1) Agricultural produce stand.
    (2) Commercial greenhouse or plant nursery.
    (3) Dairy.
    (4) Field crops, production of.
    (5) Fruits, tree nuts, and vegetables, production of.
    (6) Livestock.
    (7) Temporary or portable sawmills.

(b) Animal care facilities as follows:

    (1) Animal hospital and veterinary clinic.
    (2) Boarding and breeding kennel.
    (3) Dog grooming shop.

(c) Automotive and boat and trailer sales and service uses as follows:

21

September 8, 2008

   (1)  Automobile and truck sales establishment.
   (2)  Automobile parking lots or parking garages, commercial.
   (3)  Automobile repair and paint shop.
   (4)  Automobile service station.
   (5)  Automobile, truck, and trailer lease and rental establishment.
   (6)  Automobile, truck, and trailer lease and rental establishment, as an accessory use to an automobile service station.
   (7)  Automobile upholstery shop.
   (8)  Automobile wash service.
   (9)  Boat sales establishment.
 (10) Minor automobile repair and maintenance shop.
 (11) Retail automobile parts and tire store.
 (12) Tire retreading and recapping establishment.
 (13) Trailer salesrooms and sales lot.

(d)  Building materials and farm equipment establishments as follows:

   (1)  Electrical supply store.
   (2)  Farm equipment establishment.
   (3)  Lumber, hardware, and other building materials establishment.
   (4)  Paint, glass, and wallpaper store.
   (5)  Plumbing and heating equipment dealer.

(e)  Check cashing establishment.

(f)  Child day care center.

(g)  Commercial recreation and entertainment establishments as follows:

   (1)  Adult entertainment establishments. (See also section 27-732).
   (2)  Adult service facilities.
   (3)  Recreational facilities and entertainment activities carried on wholly within permanently enclosed buildings.

(h)  Communications facilities as follows:

   (1)  Radio and television broadcasting station.
   (2)  Telephone business office.

(i)  Community facilities as follows:

   (1)  Golf course and clubhouse, private.
   (2)  Neighborhood recreation center or swimming pool.
   (3)  Noncommercial club or lodge.
   (4)  Fraternal club or lodge.

    (5)  Utility structure necessary for the transmission or distribution of service (section 27-770).

(j)  Construction contractors as follows:

    (1)  General building contractor.
    (2)  Heavy construction contractor.
    (3)  Special trade contractor.

(k)  Education:

    (1)  College and university industry-associated research and training facilities.
    (2)  Vocational school.
    (3)  Private elementary, middle, or high school.

(l)  Late night establishment, unless the late night establishment is located at, or within fifteen hundred (1500) feet of any land zoned for residential use in which case a special permit shall be required.

(m)  Nightclub, unless the late night establishment is located at, or within fifteen hundred (1500) feet of any land zoned for residential use in which case a special permit shall be required.

(n)  Lodging uses as follows:

    (1)  Hotel.
    (2)  Motel.

(o)  Manufacturing, as follows:

    (1)  Light malt beverage manufacturer.
    (2)  Light manufacturing establishment.

(p)  Places of worship.

(q)  Printing establishments, as follows:

    (1)  Bookbinding and related establishments.
    (2)  Photoengraving, typesetting, electrotyping and stereotyping.
    (3)  Publishing and printing establishment.

(r)  Restaurant, drive through.

(s)  Restaurant where accessory to a motel.

(t)  Retail trade establishments, as follows:

      (1)  Accessory retail sales and services.
      (2)  Fuel and ice dealers, manufacturers and wholesalers.
      (3)  Incidental retail sales of goods produced and processed on the premises.
      (4)  Retail liquor store, as accessory use to hotel, motel, and high-rise office building.

(u)  Services, personal, as follows:

      (1)  Barbershop and beauty shop.
      (2)  Business service establishment.
      (3)  Dry cleaning plant.
      (4)  Funeral home.
      (5)  Laundry and dry cleaning pickup station.
      (6)  Linen and diaper service, garment pressing, alteration and repair.
      (7)  Miscellaneous personal services.
      (8)  Outdoor advertising services.
      (9)  Power laundries.
      (10) Research and testing facilities and laboratories.

(v)  Services, repair, as follows:

      (1)  Heavy repair services and trade shop.
      (2)  Home appliance repair and related service.
      (3)  Jewelry repair.
      (4)  Light repair service.
      (5)  Radio and television repair.
      (6)  Upholstery, furniture and major appliance repair.

(w)  Services, medical and health, as follows:

      (1)  Private ambulances and medical services.
      (2)  Clinic and pharmacy.
      (3)  Medical and dental laboratory.
      (4)  Offices of health service practitioners.
      (5)  Nursing care facilities.

(x)  Services, other, as follows:

      (1)  Engineering and architectural office.
      (2)  Finance, real estate, insurance office and financial institution.

(y)  Transportation and storage uses as follows:

      (1)  Automobile parking.
      (2)  Heliport.

September 8, 2008

    (3)  Self-storage warehouse.
    (4)  Storage yard.
    (5)  Taxi stand and dispatching agency.
    (6)  Transportation equipment and vehicle storage and maintenance.
    (7)  Warehousing and storage.

  (z)  Wholesale trade as follows:

    (1)  Wholesale sales office.
    (2)  Wholesale trade and distribution establishment.

\*\*\*

*Section 27-620 is amended to authorize late night establishments and nightclubs pursuant to a special land use permit by adding subsection (c)(8) and (9) to read as follows:*

### Sec. 27-620. Special Permits.

\*\*\*

  (8)  Late night establishment where located at, or within fifteen hundred (1,500) feet of any land zoned for residential use.

  (9)  Nightclub where located at, or within fifteen hundred (1,500) feet of any land zoned for residential use.

\*\*\*

*Section 27-625 is amended by inserting off street parking requirements for late night establishments and nightclubs in alphabetical order by deleting section 27-625 and substituting a new section 27-625 in lieu thereof to read as follows:*

### Sec. 27-625. Off-street parking requirements.

Off-street parking requirements for uses and structures authorized and permitted in the M (Industrial) District are as follows:

(a)  *Adult entertainment establishments and adult service facilities:*  One (1) parking space for each seventy-five (75) square feet of floor area in the building. (See section 27-732, Adult entertainment establishments).

(b)  *Ambulance services, delivery services and other similar services:*  One (1) parking space for each vehicle plus one (1) additional space for each two (2) administrative or service employees.

25

September 8, 2008

(c) *Automobile repair garages:* One (1) space for each one hundred fifty (150) square feet of floor space.

(d) *Automobile service stations:* Three (3) spaces for each service bay, with minimum of ten (10) spaces required.

(e) *Bowling alleys:* Five (5) spaces for each alley.

(f) *Child day care centers:* One (1) space for each two hundred (200) square feet of floor area.

(g) *Funeral homes and other places of assembly:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for seating.

(h) *Hotels and motels:* One hundred and twenty-five hundredths (1.25) spaces for each unit.

(i) *Industrial, manufacturing, and commercial establishments not involving retail sales:* One (1) space for each two thousand (2,000) square feet of floor area.

(j) *Late night establishment:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(k) *Nightclub:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(l) *Lodges, fraternal or social organizations:* One (1) space for each one hundred (100) square feet of floor area.

(m) *Nursing care facilities, and similar institutional uses:* One (1) space for each two (2) beds.

(n) *Offices and clinics:* One (1) space for each two hundred fifty (250) square feet of floor area.

(o) *Place of worship:* One (1) space for each three (3) seats in the main auditorium, or, where fixed seats are not utilized, one (1) space for each twenty-five (25) square feet of floor space in the largest assembly room utilized for public worship.

(p) *Public swimming pools, golf courses, neighborhood recreation centers, or similar uses:* Twenty (20) spaces except that an eighteen-hole golf course shall have forty (40) spaces.

September 8, 2008

(q)  *Private swimming pools, golf courses, neighborhood recreation centers, or similar uses:*  One (1) space for each five (5) members but no less than twenty (20) spaces except that golf courses shall provide a minimum of twenty (20) spaces for each nine (9) holes.

(r)  *Recreational facilities:*

    (1)  *Fixed seating:*  One (1) space for each two hundred (200) square feet of floor area.

    (2)  *With fixed seating:*  One (1) space for each three (3) seats.

(s)  *Restaurants:*  One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(t)  *Restaurants, drive-through, without seating area for patrons:*  One (1) space for each one hundred (100) square feet of floor area, but not less than ten (10) spaces.

(u)  *Retail uses, personal service uses, and other commercial and general business uses:*  Five and five-tenths (5.5) spaces for each one thousand (1,000) square feet of floor area.

(v)  *Schools, private elementary and middle:*  Two (2) spaces for each classroom.

(w)  *Schools, private high:*  Five (5) spaces for each classroom.

(x)  *Schools and colleges, including trade and vocational schools:*  Ten (10) spaces for each classroom.

(y)  *Temporary outdoor social, religious, entertainment or recreation activity or flea market:*  One (1) space for each one hundred (100) square feet of space used for such activity.

(z)  *Wholesale or jobbing establishments and similar uses:*  One (1) space for each two hundred (200) square feet of floor area devoted to sales or display plus one (1) space for each two thousand (2,000) square feet of gross storage area.

\*\*\*

Section 27-649.5 (PC Pedestrian Community District) is amended to authorize late night establishments and nightclubs pursuant to a special land use permit by adding subsection (c)(10) and (11) to read as follows:

## Sec. 27-649.5. Special Permits.

\*\*\*

(10)  Late night establishment in PC-2 and PC-3.

September 8, 2008

(11)   Nightclub in PC-2 and PC-3.

***

*Section 27-649.11 is amended by inserting off street parking requirements for late night establishments in alphabetical order by deleting section 27-649.11 and substituting a new section 27-649.11 in lieu thereof to read as follows*

### Sec. 27-649.11. Off-street parking requirements.

(a)   Off-street parking requirements for uses and structures are authorized and permitted, as follows:

(1)   *Adult day care facility:* Four (4) spaces.

(2)   *Child day care facility:* Four (4) spaces.

(3)   *Dwellings:*

(A)   *Single-family detached:* Two (2) spaces.
(B)   *Single-family attached:* Two (2) spaces.
(C)   *Multi-family:* One (1) space for every dwelling unit and one-half (0.5) parking space for each bedroom.

(4)   *Elementary, middle or high school:*

(A)   *Elementary, middle school:* Two (2) spaces for each classroom.
(B)   *High school:* Five (5) spaces for each classroom.

(5)   *Kindergarten:* One (1) space per two hundred (200) square feet of floor area.

(6)   *Neighborhood recreation club:* One (1) space for each five (5) members, but no less than twenty (20) spaces.

(7)   *Late night establishment:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(8)   *Nightclub:* One (1) space for each seventy-five (75) square feet of floor area, but not less than ten (10) spaces.

(9)   *Personal care home, congregate:* One (1) space for every four (4) authorized residents.

(10) *Personal care home, family:* Four (4) spaces.

(11) *Personal care home, group:* Four (4) spaces.

28

September 8, 2008

(12) *Personal care home, registered:* Four (4) spaces.

(13) *Place of worship:* One (1) space for each five (5) seats in the largest assembly room used for public worship or where fixed seats are not used, one (1) space for each fifty (50) square feet of floor space in the largest assembly room used for public worship.

(14) *Other uses:* One (1) parking space for every three hundred (300) square feet of gross building area.

(b)  Shared-parking is encouraged and may result in permitted reductions of off-street parking requirements. Parking facilities within the parcel may be shared if multiple uses cooperatively establish and operate parking facilities and if these uses generate parking demands primarily when the remaining uses are not in operation, so that the above stated off-street parking requirements for each use are met or exceeded during said use's operational hours. Applicants may make application to the director of planning for authorization for shared-parking. Applicants shall include proof of a written formal shared-parking agreement between all applicants.

(c)  All parking lots for commercial, office, civic, institutional, or public uses shall be located at the rear or side of the building. If located at the side, the lot shall be screened through the use of solid street walls or landscaping to reduce visual impact. Street walls shall be a minimum of five (5) feet in height and a maximum of six (6) feet in height and shall provide a minimum of eighty (80) percent opacity. Street walls shall not consist of chain link fencing with plastic inserts. Acceptable materials for street walls will include, but not be limited to, wood slats, brick or pierced brick garden walls.

\*\*\*

*Section 27-649.15 is amended by deleting the existing subsections 27.649.15(b)(4) and inserting new subsection 27-649.15(b) (4) to read as follows*

## Sec. 27-649.15. Development standards for PC-2 District.

(b)

\*\*\*

(2) All uses authorized in C-1 (Local Commercial) District except those uses identified in sections 27-578(a), 27-578(c)(1), (3), (4), (5), (6), (8), (9), 27-578(j), 27-578(m), 27-578(p), and 27-578(s), as amended.

\*\*\*

(4) All uses authorized in C-2 (General Commercial) District except those uses identified in Sections 27-598(a), 27-598(c)(1), (2), (4), (5), (6), (7), (8), (10),

September 8, 2008

(11), (12), 27-598(f)(1), (2), (5), 27-598(i), 27-598(o), 27-598(q), 27-598(u)(9), and 27-598(w)(1).

\*\*\*

Section 27-649.15 is amended by deleting the existing subsection 27.649.16(d)(3) and inserting a new subsection 27-649.16(d)(3) to read as follows

## Sec. 27-649.16. Development standards for PC-3 District.

\*\*\*

(d)

\*\*\*

(3)   All uses authorized in C-2 (General Commercial) District except those uses identified in Sections 27-598(a), 27-598(c)(1), (2), (4), (5), (6), (7), (8), (10), (11),(12),27-598(f)(1),(2), (5), 27-598(i), 27-598(o), 27-598(q), 27-598(u)(9), and 27-598(w)(1).

\*\*\*

## Sec. 27-746.  Late night establishments.

The following regulations shall apply to all late night establishments in DeKalb County:

(a)   The regulations that follow and that otherwise are contained in this Code of Ordinances regarding late night establishments and nightclubs are intended to afford protection to residential uses and other uses so as to protect the public health, safety and welfare while respecting and providing adequate opportunities for nightlife in the county.

(b)   Late night establishments and nightclubs shall be subject to all of the following standards:

(1)   Parking facilities within a lot may be shared if multiple uses cooperatively establish and operate parking facilities and if these uses generate parking demands primarily when the remaining uses are not in operation. Applicants shall make an application to the director of planning or designee for authorization for shared parking.  Applicants shall include proof of a written formal shared-parking agreement between the applicant and all affected property owners.  Shared parking arrangements may be approved by the director of planning or designee upon determination that the above stated off-street parking requirements for each use are met during said use's operational hours.

September 8, 2008

(2)     Valet parking shall not be used to satisfy the requirement to meet applicable parking standards.

(3)     Methods of traffic circulation, ingress and egress shall be consistent with best management practices as approved by the transportation division of the county's public works department.

(c)     For the purpose of determining whether a late night establishment or nightclub requires a special land use permit, the distance of fifteen hundred feet shall be measured from the boundary line of the property proposed to be used as a late night establishment or nightclub to the boundary line of property zoned for residential use.

(d)     Every special land use permit application for a late night establishment or nightclub shall include a scaled drawing of the location of the proposed premises, showing the distance measured in feet from the boundary line of the property proposed to be used as a late night establishment or nightclub to the boundary line of property zoned for residential use. Such drawing shall be certified by a registered land surveyor or professional engineer. For the purposes of this section, distance shall be measured in feet as follow:

(1)     From the property line of the land upon which the late night establishment or nightclub is located;

(2)     To the property line of the land which is zoned for a residential use;

(3)     Along a straight line which describes the shortest distance either vertically or horizontally between the two property lines.

(e)     Any late night establishment or nightclub operating pursuant to a validly issued business and liquor license issued prior to the effective date of this ordinance, 11-18-2008 shall be a legal non-conforming use as defined in article IV, division 5 of this chapter.   No late night establishment or nightclub currently operating under a valid license issued prior to the effective date set forth in this section shall be required to secure a special land use permit from the board of commissioners in order to continue operation.   Such establishments shall be required to comply with the applicable provisions of article IV, division 5 of this chapter regarding cessation, expansion, movement, enlargement or other alteration of the late night establishment or nightclub. After adoption of this subsection on __11-18-2008__, if a licensee is operating a legal nonconforming late night establishment or nightclub at a particular location pursuant to chapter 27 of this code, and such license is revoked, upon revocation, the legal nonconforming status of the licensee at that particular location shall be terminated. *(Note to Clerk and Codifier; please insert actual date this ordinance is adopted by the board of commissioners.)*

31

September 8, 2008

(f)     After adoption of this subsection on _____, if a licensee is operating a legal nonconforming late night establishment or nightclub at a particular location pursuant to chapter 27 of this code, and such license is revoked, upon revocation, the legal nonconforming status of the licensee at that particular location shall be terminated. *(Note to Clerk and Codifier; please insert actual date this ordinance is adopted by the board of commissioners.)*

## PART II. EFFECTIVE DATE

This ordinance shall become effective upon adoption by the Board of Commissioners and approval by the Chief Executive Officer.

## PART III. SEVERABILITY

Should any section or provision of this ordinance be declared by a court of competent jurisdiction to be invalid or unconstitutional, such decision shall not affect the validity of the ordinance as a whole nor any part thereof other than the part so declared to be invalid or unconstitutional. All ordinances or resolutions, or parts thereof, in conflict with this ordinance are repealed.

**ADOPTED** by the DeKalb County Board of Commissioners, this 18 day of November _____, 2008.

_____
**KATHIE GANNON**
Presiding Officer
Board of Commissioners
DeKalb County, Georgia

September 8, 2008

**APPROVED** by the Chief Executive Officer of DeKalb County, this <u>9</u> day of <u>December</u>, 2008.

_Vernon Jones_

**VERNON JONES**
Chief Executive Officer
DeKalb County, Georgia

ATTEST:

MICHAEL J. BELL
Ex-Officio Clerk
Board of Commissioners and
Chief Executive Officer
DeKalb County, Georgia

**APPROVED AS TO FORM:**

WILLIAM J. LINKOUS, III
County Attorney

**APPROVED AS TO SUBSTANCE:**

PATRICK EJIKE
Director, Planning & Development

I, the undersigned, _Barbara H. Sanders_ Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board meeting lawfully assembled on this ___ day of _____ 2008

And same appears in Minutes of said Board this day of _____.

Clerk of Commissioners
DeKalb County, Georgia

33

Sec. 9.1.3. - Defined terms.

ADA: The Americans with Disabilities Act.

"A" weighted sound level: The sound level reported in units of dB(A) approximating the response of human hearing when measuring sounds of low to moderate intensity as measured using the "A" weighting network with a sound level meter meeting the standards set forth in ANSI S1.4-1983 or its successors.

Abandonment: The relinquishment, discontinuance and cessation of a use, other than as a result of government action, for any continuous period of time as may be provided in this chapter.

Abutting: Having property or district lines in common. This does not include property separated by a road or right-of way.

Accessory building: A building detached from the principal building located on the same lot and customarily incidental and subordinate in area, extent, and purpose to the principal building or use.

Accessory dwelling unit: See Dwelling unit, accessory.

Accessory equipment: See section 4.2.57.B.

Accessory structure: A structure detached from the principal building and located on the same lot and customarily incidental and subordinate in area, extent, and purpose to the principal building or use. Compare with Building, primary.

Accessory use: A use of land or building or structure or portion thereof customarily incidental and subordinate to the principal use of the land or building and located on the same lot with the principal use. See article 4 for supplemental regulations.

Active recreation: Leisure activities, usually performed with others, often requiring equipment and taking place at prescribed places, sites, or fields. The term "active recreation" includes, but is not limited to, swimming, tennis, and other court games, baseball and other field sports, golf and playground activities.

Adaptive reuse: Buildings and sites constructed and developed originally for one (1) use but converted to or repurposed for a use not traditionally occupying the building or development form. For example, the conversion of former hospital or school buildings to residential use, or the conversion of an historic single-family home to office use.

Adjoining property: A property that touches or is directly across a street, easement or right-of-way (other than an interstate, principal arterial, urban freeway/expressway or urban principal arterial) from the subject property.

Adult day care center: An establishment operated by any person with or without compensation for providing for the care, supervision, and oversight only during day-time hours of seven (7) or more adults who are elderly, physically ill or infirm, physically handicapped, or mentally handicapped. This may also include recreational and social activities for said persons.



EXHIBIT
C

Adult day care facility: An establishment operated by any person with or without compensation for providing for the care, supervision, and oversight only during day-time hours of six (6) or fewer adults who are elderly, physically ill or infirm, physically handicapped, or mentally handicapped. This may also include recreational, cultural and social activities for said persons.

Adult entertainment establishment: Any one (1) or any combination of the following:

Adult bookstore: An establishment having a substantial or significant portion of its stock in trade, books, printed materials, magazines or other periodicals or novelty items which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas or an establishment with a segment or section, comprising at least five (5) percent of its total floor space, devoted to the sale or consisting of said printed material or novelty items which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas.

Adult business: An establishment other than those expressly specified in this section, where employees or patrons expose specified anatomical areas or engage in specified sexual activities.

Adult mini-motion picture theater: An enclosed building, or enclosed or semi-enclosed room or booth within an enclosed building, with a capacity of less than fifty (50) persons, used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to specified anatomical areas for observation by patrons therein.

Adult motion picture arcade: Any place to which the public is permitted or invited wherein coin or slug-operated or electronically, electrically or mechanically controlled still or motion picture machines, projectors or other image-producing devices are maintained to show images to five (5) or fewer persons per machine at any one (1) time and where the images so displayed are distinguished or characterized by an emphasis on matter depicting or describing specified sexual activities or specified anatomical areas.

Adult motion picture theater: An enclosed building with a capacity of fifty (50) or more persons, used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas for observation by patrons therein.

Adult video store: An establishment having a substantial or significant portion of its stock in trade, videotapes, movies, CD ROMS, or other reproductions, whether for sale or rent, which are distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas or an establishment with a segment or section, comprising at least five (5) percent of its net sales from said videos which are characterized or distinguished by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas.

Erotic entertainment/dance establishment: A nightclub, theater or other establishment which features live performances by dancers, entertainers, strippers or similar entertainers, where such performances are distinguished or characterized by an emphasis on specified sexual activities or specified anatomical areas. These establishments are also regulated pursuant to chapter 4, section 4-104 of the Code of DeKalb County.

Escort bureau, introduction services: Any business, agency or persons who, for fee, commission, hire, reward, profit or other consideration furnishes or offers to furnish names of persons or who introduces, furnishes or arranges for persons who may accompany other persons to or about social affairs, entertainments or places of amusements, or who may consort with others about any place of public resort or within any private quarters.

Lingerie modeling studio: An establishment wherein a patron directly or indirectly is charged a fee or required to make a purchase in order to view entertainment or activity which consists of persons exhibiting or modeling lingerie or similar undergarments.

Adult service facility: A commercial establishment in which the patron directly or indirectly is charged a fee to engage in private, personal contact with employees, patrons, or personnel primarily for entertainment purposes, using steam rooms or other devices or equipment provided by the establishment, and that is not otherwise regulated as an adult entertainment establishment or massage establishment.

Affordable housing: Housing that has a sale price or rental amount that is within the means of a household that may occupy middle, moderate, or low-income housing. In the case of dwelling units for sale, housing that is affordable means housing in which mortgage, amortization, taxes, insurance, and condominium or association fees, if any, together constitute no more than twenty-eight (28) percent of such gross annual household income for a household of the size which may occupy the unit in question. In the case of dwelling units for rent, housing that is affordable means housing for which the rent and utilities constitute no more than thirty (30) percent of such gross annual income for a household of the size that may occupy the unit in question.

Aggrieved person: A person who either (a) is the applicant or the owner of property that is the subject of an application or a decision by a county administrative official; or (b) has a substantial interest in an action appealed from and that is in danger of suffering special damage or injury not common to all property owners similarly situated. For the sole purpose of appealing a final decision of the DeKalb County Zoning Board of Appeals to DeKalb County Superior Court the term "aggrieved person" shall also mean a member of the governing authority of DeKalb County, as that term is defined by section 1 or the Organizational Act of DeKalb County, in whose district the subject property is located and whose substantial interest is his/her responsibility to insure faithful administration of the law.

Agricultural activities: Activities performed in order to cultivate the soil, produce crops, or raise livestock.

Agricultural produce stand: A temporary building or structure used for the retail sales of fresh fruits, vegetables, flowers, herbs, or plants and may include accessory sales of other unprocessed foodstuffs, home processed food products such as jams, jellies, pickles, sauces, or baked goods, and home-made handicrafts.

Alcohol outlet: A retail establishment that sells beer, wine or distilled liquor for off-site consumption. Includes retail stores, less than twenty-five thousand (25,000) square feet, that may sell beer and/or wine, as well as other products.

All-weather material: A hard surface, dust-free material, capable of withstanding normal weather conditions during ordinary use without substantial deterioration. Gravel, rock, or screenings alone, without use of a petroleum or cement binder, does not meet the definition of an all-weather material.

Alley: A minor way, which is used primarily for vehicular service access to the back or side of properties otherwise fronting on a street.

Alternative energy production: An energy production site or facility that is dedicated to the commercial production of electricity by means of wind, solar, biomass, grease, oil, or other non-petroleum energy source.

Alternative fuel vehicle: A vehicle that runs on a fuel other than "traditional" petroleum fuels (petrol or diesel) including: biodiesel, denatured alcohol, electricity, hydrogen, methanol, mixtures containing up to eighty-five (85) percent methanol or denatured ethanol, natural gas, and propane (liquefied petroleum gas).

Amateur radio service: Radio communication services, including amateur satellite service and amateur service, which are for the purpose of self-training, intercommunication, and technical investigations carried out by duly licensed amateur radio operators solely for personal aims and without pecuniary interest, as defined in title 47, Code of Federal Regulations, Part 97 and regulated there under.

Amateur radio service antenna structure: A tower and antenna for radio transmission and reception which is maintained by a licensed amateur radio operator as an accessory structure.

Ambulance service facility: A privately owned facility for the dispatch, storage, and maintenance of emergency care vehicles.

Amenity: A natural or man-made feature that enhances a particular property, increasing aesthetics and desirability to the owner or community.

Amplified sound reproduction device: Any device capable of producing, reproducing or emitting sounds by means of any loudspeaker or amplifier.

Amusement park: An outdoor recreation facility, which may include structures and buildings, where there are various devices for entertainment, including rides, booths for the conduct of games or sale of items, and buildings for shows and entertainment.

Animal: Any vertebrate member of the animal kingdom, excluding humans.

Animal hospital: A place where animals or pets are given medical or surgical treatment and are cared for during the time of such treatment. Use of an animal hospital as a kennel shall be limited to short-term boarding and shall be only incidental to such hospital use.

Animal shelter/rescue center: A facility used to house or contain stray, homeless, abandoned, or unwanted animals and that is owned, operated, or maintained by a public organization or by an established humane society, animal welfare society, society for the prevention of cruelty to animals, or other non-profit organization devoted to the welfare, protection, and humane treatment of animals.

ANSI: The American National Standards Institute.

Antenna: See section 4.2.57.B.

Antique shop: A place offering antiques for sale. An antique, for purposes of this chapter, shall be a work of art, piece of furniture, decorative object, or the like, of or belonging to the past, at least thirty (30) years old.

Apartment: See Dwelling, multifamily.

Apartment unit: One (1) or more rooms with a private bath and kitchen facilities comprising an independent, self-contained dwelling unit in a building containing four (4) or more dwelling units.

Apiary: A place where beehives of honey bees are kept.

Apiculture: See Beekeeping.

Apparel store: A retail store where clothing is sold, such as department stores, dry goods and shoe stores, and dress, hosiery, and millinery shops.

Appeal: A review authorized by this chapter of any final order, requirement, or decision of the planning director or designee that is based on or made in the enforcement of this chapter.

Applicant: A person who acts in his or her own behalf or as the agent of a property owner, who seeks a zoning decision, or who seeks a decision regarding a permit or approval by the director of planning.

Arcade: An area contiguous to a street or plaza that is open and unobstructed to a height of not less than twelve (12) feet and that is accessible to the public at all times.

Archaeological resource: Any material remains of past human culture or activities which are of archaeological interest, including, but not limited to the following: basketry, bottles, carvings, graves, human skeletal materials, pit houses, pottery, rock intaglios, rock paintings, soapstone quarries, structures or portions of structures, tools, weapons, weapon projectiles, or any portion or piece of any of the foregoing items. Non-fossilized and fossilized paleontological specimens, or any portion or piece thereof, shall not be considered archaeological resources under the regulations of this chapter, unless found in archaeological context. No item shall be deemed to be an archaeological resource under the regulations of this chapter unless such item is at least two hundred (200) years of age.

Art, private: A work or collection, usually displayed in a gallery or curated space, that is owned by a private individual or entity.

Art, public: Any visual work of art located so as to be visible in a public, county-owned area; on the exterior of any county-owned facility; within any county owned facility in areas designated as public areas, lobbies, or public assembly areas; or on non-county property if the work of art is installed or financed, either wholly or in part, with county funds or grants procured by the county. Such public art shall not contain characteristics of an advertising sign.

Art gallery: An establishment engaged in the sale, loan, or display of art books, paintings, sculpture, or other works of art. This definition does not include libraries, museums, or non-commercial art galleries.

Articulated façade: A building elevation that faces a street and that is constructed with a variety of surfaces, materials, colors, projections, recesses, or similar features.

Asphalt manufacturing: An industrial facility used for the production of asphalt, concrete, or asphalt or concrete products that are used in building or construction, and that includes facilities for the administration or management of the business, the stockpiling of bulk materials used in the production process or of finished products manufactured on the premises, or the storage and maintenance of required equipment, but does not include the retail sale of finished asphalt or concrete products.

Assembly hall: A meeting place at which civic, educational, political, religious, or social groups assemble regularly or occasionally; including but not limited to schools, churches, theaters, auditoriums, funeral homes, stadiums, and similar places of assembly.

Assisted living facility: A multi-family structure whose occupants are fifty-five (55) years of age or older, or where each unit is occupied by at least one (1) person who is fifty-five (55) years of age, and where occupants receive assistance with daily living activities.

Atrium: An open hall lighted from above, into which rooms open at one (1) or more levels.

Attic: An open space at the top of a house just below the roof; often used for storage.

Authorized (permitted) use: Any use allowed by right in a zoning district and subject to the restrictions applicable to that zoning district.

Automobile: A self-propelled, free-moving vehicle, which is licensed by the appropriate state agency as a passenger vehicle. For the purpose of this chapter, the term "automobile" shall include motorcycles, scooters, small trucks used for daily passenger trips, sports utility vehicles (SUVs), and similar passenger vehicles or any vehicle classified by the Georgia Department of Driving Services as a Class "C" vehicle.

Automobile and truck rental and leasing: A business that rents or leases automobile or light trucks, and may store the automobiles and trucks on the same site as the business office.

Automobile brokerage: The business of providing services for the purchase or leasing of a vehicle, whether non-commercial or commercial and including trailers and R.V.s. The brokered vehicles are not stored on the same lot as that on which the business office is located. A vehicle brokerage may find the desired vehicle, negotiate the price or lease contract, manage paperwork associated with the sale or lease, or secure financing for the sale or lease of the vehicle.

Automobile dealership: See Automobile sales.

Automobile mall: A single location that provides sales space and centralized services for a number of automobile dealers and may include related services as auto insurance dealers and credit institutions that provide financing opportunities.

Automobile manufacture: A facility engaged in the manufacture of passenger cars, light trucks, and/or light commercial vehicles.

Automobile parts or tire store: A building that is used for the retail sale of new or used parts or tires for non-commercial vehicles. This term does not include outdoor storage yards.

Automobile recovery and storage: A facility that provides temporary outdoor storage of Class "C" passenger vehicles and motorcycles that are intended to be claimed by the titleholders or their agents.

Such storage includes vehicles that have been towed, or that will be transported to a repair shop or will be subject to an insurance adjustment after an accident. See Vehicle storage and Tow service.

Automobile rental and leasing: A business that rents or leases automobiles.

Automobile repair and maintenance, major: A business that services passenger vehicles including the dismantling and repair of engines, transmissions, carburetors, drive shafts, and similar major vehicle parts, the provision of collision repair services including body frame straightening and body part replacement, or the painting or re-painting of passenger vehicles and motorcycles. Major automobile repair establishments may also perform minor automobile repairs.

Automobile repair and maintenance, minor: A business that repairs, replaces, or services tires, ignitions, hoses, spark plugs, and other minor vehicle parts as part of the regular upkeep of passenger vehicles and motorcycles, and may perform regular maintenance such as brake repair and replacement, lubrication, or replacement of small or incidental automobile parts. Minor automobile repair and maintenance may also, as an accessory function, include automobile detailing, including the application of paint protectors, the cleaning or polishing of a vehicles interior, exteriors, or engine, and the installation of aftermarket parts and accessories such as tinting, alarms, sound systems, spoilers, sunroofs or headlight covers. Minor automobile repair and maintenance does not include the dismantling and repair of engines, transmissions, or drive shafts, the provision of collision repair services including body frame straightening and body part replacement, or the painting or re-painting of passenger vehicles. Minor automobile repair does not include automobile car washes where vehicles are washed and/or waxed either by hand or by mechanical equipment.

Automobile sales: A business establishment that engages in the retail sale or the leasing of new or used automobiles, small passenger trucks, motorcycles, or other passenger vehicles. Such merchandise may be stored on the same lot as that on which the business office is located. An automobile sales dealership may be located in an automobile mall. See Automobile mall, Automobile brokerage.

Automobile service station: A building, structure, or land used primarily for the sale of automotive fuels such as gasoline. This term includes the following accessory uses: convenience stores; the sale of incidental vehicle parts and fluids such as motor oil, coolant, windshield wipers, seat or floor pads; and minor automobile repair as defined in this chapter.

Automobile upholstery shop: A building in which automobile seats are re-covered or re-upholstered. For the purposes of regulating home occupations, an automobile upholstery shop shall be considered to be major automobile repair.

Automobile wash/wax service: A building, structure, or land that is used for the washing, waxing, cleaning, or detailing of automobiles as defined in this article. The service may be enclosed in a building or conducted outdoors, includes mobile wash/wax service, and may be a principal or accessory use.

Automobile wrecking yard: See Salvage yard.

Awning: A roof-like cover, usually of canvas or plastic, which can fold, collapse and retract, extended over or before places like storefront, window, door or deck as a shelter from the sun, rain, or wind.

Balcony: A horizontal flat surface that projects from the wall of a building, is enclosed by a parapet or railing, and is entirely supported by the building.

Bank: A facility for the custody, loan, or exchange of money; for the extension of credit; and for facilitating the transmission of funds.

Barber shop: An establishment or place of business within which the practice of barbering is engaged in or carried on by one (1) or more barbers.

Basement: A space having one-half (0.5) or more of its floor-to-ceiling height below the average finished grade of the adjoining ground and with a floor-to-ceiling height of not less than six and one-half (6.5) feet.

Beauty salon: A commercial building, residence, or other building or place where hair cutting or styling or cosmetology is offered or practiced on a regular basis for compensation. This term includes the training of apprentices under the regulation of such training by the appropriate licensing board.

Bed and breakfast: Accessory use of a single-family detached dwelling by the homeowner who resides in the dwelling, to provide sleeping accommodations to customers. Breakfast may also be provided to the customers at no extra cost. For the purpose of this definition, the term "customer" means a person who pays for the sleeping accommodations for fewer than thirty (30) consecutive days.

Bedroom: A private room planned and intended for sleeping, separated from other rooms by a door, accessible to a bathroom without crossing another bedroom, and having a closet.

Beekeeping: The maintenance of honey bee colonies, commonly in hives, by humans.

Beer growler: A retail alcohol outlet that pours craft beers from a tap into re-usable containers for off-site consumption. This term does not include distilled liquor sales. See Alcohol outlet.

Beer or malt beverage: Any alcoholic beverage obtained by fermentation of any infusion or decoction of barley, malt, hops or any other similar product, or any combination of such products in water, containing up to fourteen (14) percent alcohol by volume, and including ale, porter, brown, stout, lager beer, small beer and strong beer. The term "malt beverage" does not include sake, known as Japanese rice wine.

Best management practices (BMP): Activities, procedures, structures or devices, systems of regulations and activities, or other measures that prevent or reduce pollution of the waters of the United States. BMPs are intended to: a) control soil loss, protect natural features such as trees, and reduce water quality degradation; b) control drainage from outside storage of materials; c) minimize adverse impacts to surface and groundwater flow and circulation patterns, and to the chemical, physical, and biological characteristics of streams and wetlands; and d) control industrial plant site runoff, spillage, leaks, sludge or waste disposal.

Blight: A state or result of being blighted or deteriorated; dilapidation or decay. A structure is blighted when it exhibits objectively determinable signs of deterioration sufficient to constitute a threat to human health, safety, and public welfare such as inadequate public or community services, vacant land with debris, litter, lack of utilities, accumulation of trash and junk or general disrepair including but not limited to peeling paint, broken windows, deteriorating wood. Also see chapter 18, article III of the Code.

Block: An area of land bounded by a street, or by a combination of streets and public parks, cemeteries, railroad right-of-way, exterior boundaries of a subdivision, shorelines of waterways, or corporate boundaries. In cases where the platting is incomplete or disconnected, the director of planning may delineate the outline of the block.

Blockface: That portion of a block or tract of land facing the same side of a single street and lying between the closest intersecting streets.

Board of commissioners: The seven-member legislative branch of DeKalb County.

Boarding house: A building containing one (1) or more lodging units but not more than twenty (20) lodging units, all of which offer non-transient lodging accommodations, available only at weekly or longer rental rates to the general public. Meals may only be provided from a single central kitchen and compensation for such meals, if provided, shall be included in the weekly or longer rental rate. No restaurant, meeting, reception, or banquet facilities shall be provided.

Borrow pit: A pit from which sand, gravel or other construction material is taken for use as fill in at another location.

Boutique hotel in the Emory Village Overlay District: A hotel having a maximum of sixteen (16) guest rooms and with no guest rooms located on the sidewalk level.

Brewpub: A commercial business which conducts the retail sale of beer (malt beverages with alcohol content as defined by federal law) which is brewed on the premises in compliance with applicable state and federal laws. Such establishments may also include restaurants as an accessory use. See also Light malt beverage manufacturing.

Broker: A party that mediates between a buyer and a seller.

Buffer: That portion of a lot set aside for open space and/or visual screening purposes, pursuant to a condition or conditions imposed by the board of commissioners in the enactment of a conditional zoning ordinance or special land use permit or by the zoning board of appeals in the grant of a variance, to separate different use districts, or to separate uses on one (1) property from uses on another property of the same use district or a different use district. Any such buffer shall not be graded or otherwise disturbed, and all trees and other vegetation shall remain, provided that additional trees and other plant material may be added to such landscaped buffer.

Buildable area: The area of a lot remaining after all setback requirements, including buffers, have been met.



Figure 9.1      Buildable Area

Building: Any structure having a roof supported by columns or walls and intended for the shelter, housing, or enclosure of any individual, animal, process, equipment, goods, or materials of any kind.

Building, accessory: See Accessory building.

Building coverage: The maximum area of the lot that is permitted to be covered by buildings, including principal structures, structured parking and roofed accessory structures. For the purposes of this chapter, building coverage does not include wooden decks, stone walkway and patios set without grout, and pervious, permeable, or porous pavements.

Building entrance feature: An architecturally designed element for entrances and exits of the building.

Building footprint: The outline of the total area covered by a building's perimeter at the ground level.



Figure 9.2    Illustration of Building Footprint

Building form: A design term that refers to the shape and/or configuration of a building and the space created by the building. Attributes of building form may include: the building relationship to the street, sidewalk, and/or other buildings and uses; the general usage of floors (office, residential, retail) which influence form; height, and/or; physical elements of the building (such as stoops, porches, entrances, materials, window coverage).

Building frontage: The maximum width of a building measured in a straight line parallel with the abutting street or fronts upon a public street, a customer parking area, or pedestrian mall, and has one (1) or more entrances to the main part of the building or store.

Building height (as to all structures with the exception of single-family detached dwellings): The vertical distance from the average finished grade to the top of the highest roof beams on a flat or shed roof, the deck level on a mansard roof, and the average distance between the eaves and the ridge level for gable, hip, and gambrel roofs. See article 5.

Building height (as to single-family detached dwellings): The vertical distance from the front-door threshold of the proposed residential structure to the highest point of the roof of the structure. See article 5.

Building mass: The overall visual impact of a structure's volume; a combination of height and width, and the relationship of the heights and widths of the building's components.

Building materials supply establishment: A facility for the sales of materials used in the construction of a building such as cement, brick, steel, etc.

Building, primary or principal: A structure in which is conducted the principal use of the lot on which it is located.

Building scale: The relationships of the size of the parts of a structure to one another and to humans.

Building width: The distance from the exterior face of the building siding as measured from side to side.



Figure 9.3    Illustration of Building Width

Build-to-line in the Emory Village Overlay District: The line generally parallel to the front lot line as established in Table A: of the Emory Village Overlay District.

Bulkhead: A structural panel just below display windows on storefronts. Bulkheads can be both supportive and decorative in design. Bulkheads from the 19th century are often of wood construction with rectangular raised panels while those of the 20th century may be of wood, brick, tile, or marble construction.

Bury pit: A place where construction waste or refuse caused by the dismantling of a building or structure is dumped and covered with soil.

Bus rapid transit (BRT): A permanent, integrated transit system that uses buses or specialized vehicles on roadways or dedicated lanes to transport passengers to their destinations.

Business service establishment: An entity primarily engaged in rendering services to businesses on a fee or contract basis, including the following and similar services: advertising and mailing; building maintenance; employment services; management and consulting services; protective services; commercial research; development and testing; photo finishing; and personal supply services.

Business vehicle: Vehicle, or heavy construction equipment, or trailer used to transport passengers or property in furtherance of a commercial enterprise. Business vehicle may include, but is not limited to: pick-up trucks with exterior equipment storage, passenger vans, passenger vehicles with or without logos or advertisements identifying the commercial enterprise, ambulances, limousines, taxi cabs, tow trucks, earthmoving machinery such as bobcats and bulldozers, dump trucks, flatbed trucks, box vans, any vehicle with a trailer attached to it, tractors, "dually" trucks (pick-up trucks with four (4) wheels on the rear axle), heavy construction equipment, and semi-tractor cabs whether or not a trailer is attached.

"C" weighted sound level: The sound level reported in units of dB(C) as measured using the "C" weighting network with a sound level meter meeting the standards set forth in ANSI S1.4-1983 or its successors.

Campus style development: A development type which is primarily characterized by having several separate buildings on one (1) site, unified through design and landscape elements.

Canopy: A protective roof-like covering, often of canvas, mounted on a frame over a walkway or door.

Canopy tree: A deciduous tree whose mature height and branch structure provide foliage primarily on the upper half of the tree. The purpose of a canopy tree is to provide shade to adjacent ground areas.

Car wash: A facility for washing, waxing, and cleaning of passenger vehicles, recreational vehicles, or other light duty equipment.

Car wash, self-service: A car wash wherein operating functions are performed entirely by an operator owner with the use of washing, waxing, and drying equipment supplemented with manual detailing by the operator owner.

Cat: A feline that has reached the age of six (6) months.

Catering establishment: An establishment in which the principal use is the preparation of food and meals on the premises, and where such food and meals are delivered to another location for consumption.

Cellar: A space having less than one-half (0.5) or more of its floor-to-ceiling height below the average finished grade of the adjoining ground or with a floor-to-ceiling height of less than six-and-one-half (6.5) feet.

Cemetery: Property used for the interring of the dead. See Georgia cemetery regulations.

Chapel: See Place of worship.

Check cashing facility: A person, business or establishment licensed by the State of Georgia pursuant to O.C.G.A. § 7-1-700 et seq. that for compensation engages, as a principal use, in the business of cashing checks, warrants, drafts, money orders, or other commercial paper serving the same purpose. "Check cashing facility" does not include a state or federally chartered bank, savings association, credit union, or industrial loan company.

Child caring institution: A building(s) in which housing, meals, and twenty-four-hour continuous watchful oversight for children under the age of eighteen (18) are provided and which facility is licensed or permitted as a child caring institution by the State of Georgia. The term "child caring institution" shall not include a "child day care center or facility."

Child caring institution, community: A child caring institution that offers care to seven (7) or more children.

Child caring institution, group: A child caring institution that offers care to between four (4) and six (6) children.

Child day care center: An establishment operated by any person with or without compensation providing for the care, supervision, and protection of seven (7) or more children who are under the age of eighteen (18) years for less than twenty-four (24) hours per day, without transfer of legal custody.

Child day care facility: An establishment operated by any person with or without compensation providing for the care, supervision, and protection of six (6) or fewer children who are under the age

of eighteen (18) years for less than twenty-four (24) hours per day, without transfer of legal custody. For the purpose of computing the number of children within the child day care facility, all children who are related by blood, marriage, adoption or guardianship to the person or persons operating the facility shall be included.

Church: See Place of worship.

Cistern: An underground reservoir or tank for storing rainwater.

Clinic, health services: A facility or institution, whether public or private, principally engaged in providing services for health maintenance, diagnosis or treatment of human diseases, pain, injury, deformity or physical condition, including but not limited to a general hospital, diagnostic center, treatment center, rehabilitation center, extended care center, nursing home, intermediate care facility, outpatient laboratory, or central services facility serving one or more such institutions.

Club, private: A group of people organized for a common purpose to pursue common goals, interests, or activities and characterized by definite membership qualifications, payment of fees and dues, regular meetings, and a constitution and bylaws, such as country clubs and golf clubs, but excluding places of worship, personal service facilities, adult entertainment establishments, and adult service facilities which shall be defined and regulated as otherwise provided herein. Private club shall also mean, where the context requires, the premises and structures owned or occupied by members of such group within which the activities of the private club are conducted.

Clubhouse: A structure in which the activities of a private club are conducted.

Cluster housing development: A development that permits a reduction in lot area provided there is no increase in overall density of development, and in which all remaining land area is perpetually and properly protected, maintained and preserved as undivided open space or recreational or environmentally sensitive areas.

Code: The Code of DeKalb County, as revised, 1988.

Coliseum: A large building with tiers of seats for spectators at sporting or other recreational events.

Collector street: A street or road designated as a collector street in the DeKalb County Transportation and Thoroughfare Plan.

College: A post-secondary institution for higher learning that grants associate or bachelor degrees and may also have research facilities and/or professional schools that grant master and doctoral degrees. This shall also include community colleges that grant associate or bachelor degrees or certificates of completion in business or technical fields.

Collocation: See section 4.2.57.B.

Colonnade: A series of columns placed at regular intervals, usually supporting a roof.

Columbarium: A structure with niches for the placement of cinerary urns.

Commercial district: Any parcel of land which is zoned for any commercial use including regional commercial centers, neighborhood and community oriented stores, shopping centers and other

developed centers where commercial land uses predominate. Such districts would include O-I, O-I-T, C-2, NS, and C-1.

Commercial parking garage/structure: A covered or sheltered structure of one (1) or more stories designed, constructed and used for the parking of motor vehicles for profit.

Commercial parking lot: An uncovered or unsheltered structure of one (1) or more stories designed, constructed and used for the parking of motor vehicles for profit.

Commercial solid waste: All types of solid waste generated by stores, offices, restaurants, warehouses, and other non-manufacturing activities, excluding residential and industrial wastes.

Common open space: Open space designed for common use by all property owners in the development.

Common ownership: Ownership as recognized by law of real property by one (1) or more persons, their parents, brothers, sisters, children over the age of eighteen (18), spouses or any association, firm, corporation or partnership in which such person or spouse is a corporate officer, partner or is a stockholder with an ownership interest of ten (10) or more percent.

Community garden: See Urban garden.

Community living arrangement: See Personal care home.

Compact design: The design of a structure and or development that encourages efficient land use and the preservation of open space, usually via building more vertically, and by minimizing surface parking.

Compatible (as used in article 2, purpose and intent for each established district): Land development that is consistent with existing, identified physical elements in proximity to that land development, such as architectural style, building mass, building scale, land uses, and landscape architecture.

Complainant: Any person who has registered a noise or code complaint with an authorized enforcement agency that he or she is the recipient of noise or nuisance on a protected property category. A complainant must have an interest in the protected property as an owner, tenant, or employee.

Complete or complete application: When used in conjunction with an application under this zoning ordinance, the term "complete" shall mean containing all of the required elements, information, fees, approvals or other materials as set forth in this zoning ordinance, other applicable provisions of the Code of DeKalb County as Revised 1988, state law, and in the most recent checklist previously issued by the director of planning.

Composting: The controlled biological decomposition of organic matter into a stable, odor-free humus.

Comprehensive plan: The DeKalb County Comprehensive Plan adopted by the board of commissioners as it may be amended from time to time, which divides the unincorporated areas of the county into land use categories and which constitutes the official policy of the county regarding long-term planning and use of land.

Case 1:17-cv-04400-SCJ   Document 26-2   Filed 06/01/18   Page 72 of 222

Concert hall: An open, partially enclosed, or fully enclosed facility used or intended to be used primarily for concerts, spectator sports, entertainment events, expositions, and other public gatherings. Typical uses and structures include concerts, conventions, exhibition halls, sports arenas, and amphitheaters.

Conditional approval: The imposition of special requirements, whether expressed in written form or as a site plan or other graphic representation, made a requirement of development permission associated with a particular parcel or parcels of land and imposed in accordance with the terms of this chapter.

Condominium: A building, or group of buildings, in which dwelling units, offices, or floor area are owned individually, and the structure, common areas, and facilities are owned by all the owners on a proportional, undivided basis in compliance with Georgia Law.

Condominium unit: A unit intended for any type of use with individual ownership, as defined in the Georgia Condominium Act, together with the undivided interest in the common elements appertaining to that unit.

Connectivity ratio: A ratio of links to nodes in any subdivision.

1.

The connectivity ratio shall be the number of street links divided by the number of nodes or end links, including cul-de-sac heads.

2.

A link shall be any portion of a street, other than an alley, defined by a node at either end. Stub-outs to adjacent property shall be considered links. For the purpose of determining the number of links in a development, boulevards, median-divided roadways, and divided entrances shall be treated the same as conventional two-way roadways.

3.

A node shall be the terminus of a street or the intersection of two (2) or more streets. Any curve or bend of a street that exceeds seventy-five (75) degrees shall receive credit as a node. Any curve or bend of a street that does not exceed seventy-five (75) degrees shall not be considered a node. A divided entrance shall only count once.

Case 1:17-cv-04400-SCJ    Document 26-2    Filed 06/01/18    Page 73 of 222



Figure 9.4    Example 1: Does not meet ratio

(13 links / 11 nodes = 1.18)

Figure 9.5    Example 2: Modified ratio

(16 links / 11 nodes = 1.45)

Conservation area: Any area designated as containing physical features of natural, historical, social, cultural, architectural, or aesthetic significance to be restored to or retained in its original state or enhanced to promote existing natural habitat.

Conservation easement: A restriction or limitation on the use of real property which is expressly recited in any deed or other instrument of grant or conveyance executed by or on behalf of the owner of the land described therein and whose purpose is to preserve land or water areas predominantly in their natural scenic landscape or open condition or in an agricultural farming, forest or open space use.

Construction: Any site preparation, assembly, erection, repair, alteration or similar action, including demolition of buildings or structures.

Continuing care retirement community: A residential facility providing multiple, comprehensive services to older adults. Such facility normally contains a combination of independent living units, assisted living, and skilled nursing care units as defined herein. Such facilities generally provide support services, such as meals, laundry, housekeeping, transportation, and social and recreational activities.

Continuous sound: Any sound with duration of more than one (1) second, as measured with a sound level meter set to the "slow" meter response.

Contractor, general: A contractor or builder engaged in the construction of buildings like residences or commercial structures.

Contractor, heavy construction: A contractor or builder engaged in the heavy construction activities such as paving, highway construction, landscaping, and utility construction.

Contractor, special trade: Industries in the special trade contractors subsector engage in specialized construction activities, such as plumbing, painting, and electrical work.

Convalescent home: A nursing care facility.

Convenience store: Any retail establishment offering for sale items such as household items, newspapers and magazines, prepackaged food products, sandwiches and other freshly prepared foods, and beverages, for off-site consumption. When a convenience store sells unopened alcoholic beverages, it is also considered to be an alcohol outlet. A convenience store may also include accessory fuel pumps.

Convent: A building or buildings used as both a place of worship and as a residence, operated as a single housekeeping unit, solely by and for a group of women who have professed vows in a religious order and who live together as a community under the direction of a local supervisor designated by the order.

Cornice: Any horizontal member, structural or nonstructural, of any building, projecting outward from the exterior walls at the roof line, including eaves and other roof overhang.

Corridor: A broad geographical band that follows a general directional flow connecting major sources of trips that may contain a number of streets, highways, and transit route alignments.

Cottage development: Small detached dwelling units arranged on a single site whereby the dwelling units are arranged so that each unit faces a common open space.

County: DeKalb County, Georgia, a political subdivision of the State of Georgia. When appropriate to the context, the term "county" also includes authorized officers, employees and agents thereof.

County solid waste: Any solid waste derived from households, including garbage, trash, and sanitary waste in septic tanks and means solid waste from single family, duplex, and multifamily residences, hotel and motels, picnic grounds and day use recreation areas. The term includes yard trimmings and commercial solid waste but does not include solid waste from mining, agricultural, or silvicultural operations or industrial processes or operations.

County solid waste disposal facility: Any facility or location where the final deposition of any amount of county solid waste occurs, whether or not mixed with or including commercial or industrial solid waste, and includes, but is not limited to, county solid waste landfills and county solid waste thermal treatment technology facilities.

County solid waste landfill: A disposal facility where any amount of county solid waste, whether or not mixed with or including commercial waste, industrial waste, nonhazardous sludge, or small quantity generator hazardous waste, is disposed of by means of placing an approved cover thereon.

Cremation: The reduction of a dead human body or a dead animal body to residue by intense heat.

Crematorium: A location containing properly installed, certified apparatus intended for use in the act of cremation. Crematoriums do not include establishments where incinerators are used to dispose of toxic or hazardous materials, infectious materials or narcotics.

Cultural facility: A building or structure that is primarily used for meetings, classes, exhibits, individual study, referral services, informational and entertainment presentations, and other similar programs oriented around the customs and interests of a specific group of people, including but not limited to an immigrant, ethnic, or national minority group, or the heritage of defined geographic region. Movies, theater performances and similar entertainment may occur in a cultural facility, but the purpose of the cultural facility is not to provide a venue solely for such entertainment. A cultural facility may be programmed, managed, or operated by a public, private, or non-profit entity.

Curb cut: A curb break, or a place or way provided for the purpose of gaining vehicular access between a street and abutting property.

Dairy: A commercial establishment for the manufacture, processing, or sale of dairy products.

Dance school: A school where classes in dance are taught to four (4) or more persons at a time.

Day: Unless otherwise stated, day or days refer to calendar days.

Day spa: See Health spa.

Decay resistant wood: Wood harvested from tree species that are known to have extractives in the heartwood which are toxic to fungi.

Decibel (dB): The unit for the measurement of sound pressure based upon a reference pressure of twenty (20) micropascals (zero (0) decibels), i.e., the average threshold of hearing for a person with very good hearing.

Deciduous tree: A tree that loses all of its leaves for part of the year.

Deficiencies: Exterior conditions or signs of neglect within a conservation subdivision and within the Stonecrest Area Overlay District that contributes to nuisances, hazards, or unkempt appearances, such as, but not limited to: uncut or overgrown grass or weeds, peeling paint, severe corrosion, or wood rot; accumulation of trash or debris; fallen, dead, dying, damaged, or diseased trees or shrubbery; severe erosion; stagnant pools of water; broken inoperable, or severely damaged benches, seating, paving, walls, fences, gates, signs, fountains or other structures, furnishings or equipment which is intended for decoration or use by the public. This definition shall only be applicable to the Stonecrest Area Overlay District regulations and the conservation subdivision regulations.

Demolition: Any dismantling, destruction or removal of buildings, structures, or roadways whether man-made or natural occurring both above and below ground.

Demolition of an infill building: The destruction and removal of an existing building or structure in whole or in part whether such destruction and removal involves removal of all or part of the prior foundation.

Density: The number of dwelling units per gross acreage of land.

Dental clinic: See Office, dental.

Department of community affairs (DCA): The state department that provides a variety of community development programs to help the state's communities realize their growth and development goals.

Department store: A business which is conducted under a single owner's name wherein a variety of unrelated merchandise and services are housed enclosed and are exhibited, and sold directly to the customer for whom the goods and services are furnished.

Deterioration: A condition of a building or a portion of a building characterized by holes, breaks, rot, crumbling, cracking, peeling, rusting, or other evidence of physical decay, neglect, lack of maintenance, or excessive use.

Development permit: Any permit that authorizes land disturbance for the use, construction thereon or alteration of any real property within the unincorporated limits of the county.

Development of regional impact (DRI): A large-scale development that is likely to have regional effects beyond the local government jurisdiction in which it is located and meets the DCA requirements for review.

Director of planning: The Director of the Department of Planning and Sustainability of DeKalb County, or his/her designee.

Director of public works: The Director of the Public Works Department of DeKalb County, or his/her designee.

Dispatch office: An office used exclusively for the communication and dispatch of taxis, ambulances, limousines and similar vehicles, with no fleet parking or storage allowed.

Disposal facility: Any facility or location where the final deposition of solid waste occurs including, but is not limited to, landfills and solid waste thermal treatment technology facilities.

Dog: A canine that has reached the age of six (6) months.

Dog day care: Any premises containing four (4) or more dogs, where dogs are dropped off and picked up daily between the hours of 7:00 a.m. and 7:00 p.m. for temporary care on site and where they may be groomed, trained, exercised, and socialized, but are not kept or boarded overnight, bred, sold, or let for hire. Use as a kennel shall be limited to short-term boarding and shall be only incidental to such dog day care. See Kennel, commercial.

Dog grooming: The hygienic care and cleaning of a dog, as well as enhancement of a dog's physical appearance.

Dormitory: A building intended or used principally for sleeping accommodations where such building is related to an educational or public institution, including religious institutions, and located on the campus of that institution.

Dripline: A vertical line extending from the outermost edge of the tree canopy or shrub branch to the ground.

Drive-in theater: An open lot or part thereof, with its appurtenant facilities, devoted primarily to the showing of moving pictures on a paid admission basis to patrons seated in automobiles.

Drive-through facility: A business establishment so developed that its retail or service character includes a driveway approach or parking spaces for motor vehicles so as to serve patrons while in the motor vehicle rather than within a building or structure.

Drive-through restaurant: A retail establishment where food and/or drinks are prepared and may be consumed by customers within the principal building, or may be ordered and picked up from an exterior service window that serves customers while in their automobiles. The term "drive-through restaurant" includes restaurants that serve customers at an exterior walk-up service window.

Driveway: A private roadway providing access for vehicles to an individual lot, parking space, garage, dwelling, or other structure.

Dry cleaning agency: An establishment or agency maintained for the pickup and delivery of dry cleaning and/or laundry without the maintenance or operation of any laundry or dry-cleaning equipment or machinery on the premises.

Dry cleaning plant: An establishment for dry cleaning or laundry where the operation, equipment and machinery is on site.

Durable materials: Materials that can resist wear, tear and decay from use, time and other conditions like weather.

Dwelling, mobile home: See Mobile home.

Dwelling, multi-family: See Dwelling unit, multi-family.

Dwelling, single-family: A building designed for and containing one (1) dwelling unit.

Dwelling, single-family attached: A dwelling unit located in a building in which multiple units are attached by a common party wall.

Dwelling, single-family detached: A dwelling unit on an individual lot unattached to another dwelling unit.

Dwelling, single-family detached condominiums in the Residential Neighborhood Conservation District: Single family detached dwelling units which are owned under the condominium form of ownership such that there are no individual lots associated with the units and the common areas are held in common ownership by a condominium association.

Dwelling, three-family or triplex: A building designed for and containing three (3) dwelling units.

Dwelling, two-family or duplex: A building designed for and containing two (2) dwelling units.

Dwelling, urban single-family: Residential buildings that share similar configuration to townhouse developments; however, they may be attached or detached and may have lot lines that coincide with the building envelope.

Dwelling unit: One (1) or more rooms, designed, occupied, or intended for occupancy as a separate living quarters, with cooking, sleeping, and bathroom facilities provided within the dwelling unit for the exclusive use of a single family maintaining a household.

Case 1:17-cv-04400-SCJ   Document 26-2   Filed 06/01/18   Page 78 of 222

Dwelling unit, accessory: A dwelling unit located on the same lot as a single-family dwelling, either within or attached to the single-family dwelling, or detached, and is a separate, complete housekeeping unit with a separate entrance, kitchen, sleeping area, and full bathroom facilities.

Dwelling unit, efficiency or studio: A self-contained residential unit consisting of not more than one (1) room together with a private bath and kitchen facilities.

Dwelling unit, multi-family: One (1) or more rooms with a private bath and kitchen facilities comprising an independent, self-contained residential unit in a building containing four (4) or more dwelling units.

Dyeworks: A facility or workshop where the process of applying a comparatively permanent color to fiber, yarn or fabric takes place.

Edifice: A building or a structure, especially one (1) of imposing appearance or size, which has a roof and walls and stands permanently in one (1) place.

Elevation: An architectural term referring to the view of a building seen from one (1) side; it is a flat representation of one (1) façade. This is the most common view used to describe the external appearance of a building. Each elevation is labeled in relation to the yard it faces (front, rear or side).

Elevation height: Above sea level or ground level. See Grade, existing.

Emergency work: Any work or action necessary to deliver essential services including, but not limited to, repairing water, gas, electricity, telephone, sewer facilities, or public transportation facilities, removing fallen trees on public rights-of-way, dredging navigational waterways, or abating life-threatening conditions.

Emory Village Regulating Plan in the Emory Village Overlay District: The document entitled "Emory Village Regulating Plan" prepared for the Alliance to Improve Emory Village by Tunnell-Spangler-Walsh & Associates, dated March 23, 2007, and incorporated herein by this reference.

Emory Village Revitalization Plan in the Emory Village Overlay District: The plan prepared for the Alliance to Improve Emory Village by Peter Drey & Company, dated September 25, 2002.

Enclosed area: Surrounded by a fence or walls, sheltered by a structure with a roof and no side walls, but not located within a building.

Encroachment: A building or some portion of it, or a wall or fence, which extends beyond the land of the owner and illegally intrudes upon land of an adjoining owner, a street or an alley.

Environmental contamination: A presence of hazardous substance(s) in the environment. From the public health perspective, environmental contamination is addressed when it potentially affects the health and quality of people living or working nearby.

Exceptional topographical restrictions: The physical condition of a lot or parcel, determined by the contours of the land itself, which may inhibit or alter the compliant status of an existing or proposed structure.

Explosive manufacture or storage: The manufacture or storage of any chemical compound mixture or device, the primary and common purpose of which is to function by explosion with substantially

simultaneous release of gas and heat, the resulting pressure being capable of producing destructive effects.

Exterior insulation and finishing system (EIFS): A type of building exterior wall cladding system that provides exterior walls with an insulated finished surface and waterproofing in an integrated composite material system.

Extraneous sound: A sound of high intensity and relatively short duration which is neither part of the neighborhood residual sound, nor comes from the sound source under investigation.

Façade: One exterior side of a building, usually, but not always, the front. In this chapter and the design standards, it may be synonymous with architectural elevation. In architecture, the façade of a building is often the most important from a design standpoint, as the façade elements of wall face, parapet, fascia, fenestration, and canopy establish the architectural aesthetic of a building creating the public realm.

Façade, primary: Refers to the exterior building wall considered the front and features the main entrance to the building. Synonymous with front façade.

Fair market value: The price a property would likely bring if offered for sale in the marketplace.

Fairgrounds: An area of land use including but not limited to: agricultural related office buildings, animal shows and judging, carnivals, circuses, community meeting or recreational buildings and uses, concerts, food booths and stands, games, rides, rodeos, sales and auctions, storage, and theaters. Fairgrounds do not include racetracks or motorized contests of speed.

Family: One (1) or more individual(s) related by blood, marriage, adoption, or legal guardianship, or not more than three (3) unrelated individuals, who live together in a single dwelling unit and who function as a single housekeeping unit, have established ties and familiarity with each other, jointly use common areas, interact with each other, and share meals, household activities, expenses and responsibilities. This definition shall include three (3) or fewer mentally handicapped, developmentally disabled persons, and other handicapped persons, as defined in the Fair Housing Act, 42 U.S.C. § 3601 et seq., living as a housekeeping unit and otherwise meeting the definition of "family" herein. For the purposes of calculating the number of persons who live in a dwelling, family members who are related by blood or legal status shall count as one (1) person.

Family day care home: A private residence in which a business, registered by the State of Georgia, is operated by any person who receives pay for supervision and care for fewer than twenty-four (24) hours per day, not more than six (6) persons who are not residents in the same private residence. For purposes of this zoning ordinance, a family day care home may be operated as a home occupation, subject to the requirements of this zoning ordinance.

Family-oriented entertainment venues: Places of entertainment intended to serve families.

Farm equipment and supplies sales establishment: Establishments selling, renting, or repairing agricultural machinery, equipment, and supplies for use in soil preparation and maintenance, the planting and harvesting of crops, and other operations and processes pertaining to farming and ranching.

Farmer's market: A market, usually held out-of-doors, in public spaces, where farmers and other vendors can sell produce or value added products.

Farming, active: The growing of crops, plants, and trees. The term also includes the maintaining of horses, livestock, or poultry for the residents' needs or use, and the sale of agricultural products grown on the premises.

Fascia: A type of roof trim mounted on exposed rafter ends or top of exterior walls to create a layer between the edge of the roof and the outside.

Fat rendering: Any processing of animal byproducts into more useful materials, or more narrowly to the rendering of whole animal fatty tissue into purified fats like lard or tallow.

Fee simple: Absolute title to land, free of any other claims against the title, which one can sell or pass to another by will or inheritance. Fee simple ownership includes the land immediately underneath a unit, and may or may not include land in front of and behind a building.

Fee simple condominium declaration: An official affidavit filed with DeKalb County attesting to the fact that the owner of a condominium development that was the subject of a site development plan approved prior to August 31, 2012, no longer intends to sell units in the subject development as condominiums and will offer for sale such units as fee simple condominium units and that otherwise the development shall conform to a previously approved condominium development plan consisting of the same units along with the same related facilities on the same tract of land as the previously approved condominium development.

Fee simple condominium development: A development where the owner of a unit possesses fee simple interest to the exterior walls and roof of the unit, as well as fee simple interest to the land lying immediately beneath the unit and coincident with the external walls of such unit as depicted on a recorded final plat. A fee simple condominium unit must be a part of an approved development in which all other land consists of privately owned common areas, utilities, streets, parking, stormwater management, landscaping and other facilities that are owned by all unit owners on a proportional, undivided basis in compliance with Georgia law and subject to a mandatory property owners association organized in accordance with Georgia law.

Fence: A structure designed to provide separation and security constructed of materials including chain link, wire, metal, artistic wrought iron, vinyl, plastic and other such materials as may be approved by the director of planning.

Fenestration: The arrangement, proportioning, and design of windows and doors in a building.

Fertilizer manufacture: The manufacture and storage of organic and chemical fertilizer, including manure and sludge processing.

Fitness center: Building or portion of a building designed and equipped for the conduct of sports, exercise, leisure time activities, or other customary and usual recreational activities, operated for profit or not-for-profit and which can be open only to bona fide members and guests of the organization or open to the public for a fee but specifically excluding adult service facilities. Accessory uses which support the principal use can include therapy treatments such as massage, mediation and other healing arts. This term shall not include hospitals or other professional health care establishments separately licensed as such by the State of Georgia.

Flea market: An occasional or periodic market held in an open area or structure where groups of individual sellers offer goods for sale to the public.

Floodplain: Land within the special flood hazard area (SFHA) or covered by the "future-conditions" flood as defined in chapter 14 of the DeKalb County Code.

Floodway: The channel of a stream, river, or other watercourse and the adjacent areas that must be reserved in order to discharge the special flood hazard area (SFHA) flood without cumulatively increasing the water surface elevation more than a designated height.

Floor area: The gross heated horizontal areas of the floors of a building, exclusive of open porches and garages, measured from the interior face of the exterior walls of the building. For non-residential construction, net floor area is measured as the usable, heated floor space and gross floor area is measured as the total floor space.

Floor area of accessory building: The gross horizontal areas of the floors of an accessory building, measured from the exterior faces of the exterior walls of the accessory building.

Floor area ratio (FAR): The relationship between the amount of gross floor area permitted in a building (or buildings) and the area of the lot on which the building stands. FAR is computed by dividing the gross floor area of a building or buildings by the total area of the lot. For purposes of this calculation, parking areas or structures shall not be included in floor area.



Figure 9.6        Illustration of Floor Area Ratio (FAR)

Florist: An enclosed retail business whose principal activity is the selling of plants which were grown off-site.

Forestry: Establishments primarily engaged in the operation of timber tracts, tree farms, forest nurseries, the gathering of forest products, or in performing forest services.

Fortunetelling: Fortunetelling shall include all forms of foretelling, including, but not limited to, palm reading, casting of horoscopes, and tea leaf reading.

Fraternal organization: A group of people formally organized for a common interest, usually cultural, religious, or entertainment, with regular meetings and formal written membership requirements. See also Club.

Fraternity house: A building containing sleeping rooms, bathrooms, common rooms, and a central kitchen and dining room maintained exclusively for fraternity members and their guests or visitors and affiliated with an institution of higher learning.

Freestanding wall: A wall or an upright structure of masonry, wood, plaster, or other building material standing on its own foundation and not attached to any part of a building.

Freeway: A multiple-lane roadway carrying local, regional, and interstate traffic of relatively high volumes which permits access only at designated interchanges and is so designated in the comprehensive plan.

Freight service: An establishment primarily engaged in undertaking the transportation of goods and people for the compensation, and which may in turn make use of other transportation establishments in effecting delivery. This definition includes parking lots for overnight truck storage, and such establishments as commercial distribution services, freight forwarding services, and freight agencies.

Frequency: The time rate of repetition of sound waves in cycles per second, reported as Hertz (Hz), also referred to as "pitch."

Frontage, lot: The horizontal distance for which the boundary line of a lot and a street right-of-way line are coincident.

Front façade: See Façade, primary.

Fuel and ice dealers, manufactures and wholesaler: An establishment primarily engaged in the sale to consumers of ice, bottled water, fuel oil, butane, propane and liquefied petroleum gas, bottled or in bulk, as a principal use.

Funeral home: A building used for the preparation of deceased humans for burial or cremation and display of the deceased and rituals connected therewith before burial or cremation, including the storage of caskets, funeral urns, funeral vehicles, and other funeral supplies, and where allowed by use standards, crematoriums. See Crematorium.

Furniture sales and showroom: A retail trade establishment primarily engaged in the sale and exhibition of furniture or home decoration items.

Garage: A part of a residential building or a separate structure on the same lot as the residence designed to be used for the parking and storage of vehicles that belong to the residents or visitors of the building.

Garage, parking: See Parking garage or Parking structure.

Gas regulator station: An assemblage of equipment which reduces, regulates, and meters natural gas pressure in the transmission line, holder, main, pressure vessel, or the compressor station piping. This may include auxiliary equipment such as valves, control instruments, or control lines as well as piping.

General business office: Any building or part of a building in which one (1) or more persons are employed in the management or direction of an agency, business or organization, but excludes such uses as retail sales, manufacturing, assembly or storage of goods, or assembly and amusement.

Gift shop: A retail store where items such as art, antiques, jewelry, books, and notions are sold.

Glue manufacture: The manufacturing of glue, epoxy, sealant or other adhesives.

Go-cart: A small low motor vehicle, with four (4) wheels and an open framework, used for racing.

Go-cart concession: A place, usually sheltered, where patrons can purchase snacks or food accessory to go-cart racing.

Go-cart track: A track or network of tracks used for the racing of go-carts.

Golf course: A tract of land laid out with at least nine (9) holes for playing a game of golf and improved with tees, green, fairways, and hazards. A golf course may include a clubhouse, restrooms, driving range and shelters as accessory uses.

Grade, average finished. The average level of the finished surface of the ground adjacent to the exterior walls of the building determined by dividing the sum of the elevation of the highest point and the elevation of the lowest point by two (2).

Grade, existing: The elevation of the ground surface before development.

Grade, finished: The final grade of the ground surface after development.

Grassed playing fields: Reasonably flat and undeveloped recreation areas intended for a variety of informal recreational uses, including but not limited to: walking, kite-flying, flying disc-throwing, and recreational games of soccer, softball, or cricket. In the creation of grassed playing fields, minimal grading may be used; however, specimen trees may not be damaged or removed. Grassed playing fields may not include recreation areas with amenities for a particular sport, such as baseball diamonds or golf courses.

Gravel pit: An open land area where sand, gravel, and rock fragment are mined or excavated for sale or off-site use. Gravel pit includes sifting, crushing, and washing as part of the primary operation. To excavate the rock, blasting also may be necessary.

Grazing land, pasture land: Any open land area used to pasture livestock in which suitable forage is maintained over eighty (80) percent of the area at all times of the year.

Greenhouse, commercial: A retail or wholesale business whose principal activity is the selling of plants grown on the site and having outside storage, growing, or display.

Greenspace: Undeveloped land that has been designated, dedicated, reserved, or restricted in perpetuity from further development, which is not a part of an individual residential lot.

Grid pattern: A continuous web of streets in which most streets terminate at other streets to form multiple vehicular and pedestrian connections. Streets are to be laid out with primarily linear features, but the grid may be broken by circles, ovals, diagonals, and natural curves to add visual interest.

Grocery store: A store where most of the floor area is devoted to the sale of food products for home preparation and consumption, which typically also offers other home care and personal care products, and which is substantially larger and carries a broader range of merchandise than convenience stores.

Ground cover: Small plants such as salal, ivy, ferns, mosses, grasses, or other types of vegetation, that normally cover the ground and include trees of less than six (6) inches caliper.

Group homes: See Child caring institution, Personal care homes, Transitional housing facility.

Gym: See Fitness center.

Hardscape: The inanimate elements of landscaping, especially any masonry work or woodwork. For instance, stone walls, concrete or brick patios, tile paths, wooden decks and wooden arbors would all be considered part of the hardscape.

Hardship: A condition of significant practical difficulty in developing a lot because of physical problems relating solely to the size, shape or topography of the lot in question, which are not economic difficulties and which are not self-imposed.

Hardware store: A facility of thirty thousand (30,000) or less square feet gross floor area, primarily engaged in the retail sale of various basic hardware lines, such as tools, builders' hardware, plumbing and electrical supplies, paint and glass, house wares and household appliances, garden supplies, and cutlery.

Health spa: A nurturing, safe, clean commercial establishment, which employs professional, licensed therapists whose services include massage and body or facial treatments. Private treatment rooms are provided for each client receiving a personal service. Massage treatments may include body packs and wraps, exfoliation, cellulite and heat treatments, body toning, waxing, aromatherapy, cleansing facials, medical facials, nonsurgical face lifts, electrical toning, and electrolysis. Hydrotherapy and steam and sauna facilities, nutrition and weight management, spa cuisine, and exercise facilities and instruction may be provided in addition to the massage and therapeutic treatment services. Full service hair salons, make-up consultation and application and manicure and pedicure services may be provided as additional services.

Heavy industrial: See Industrial, heavy.

Heavy manufacturing: See Industrial, heavy.

Heavy vehicle repair: Major or minor repair of non-passenger vehicles that are classified by the Georgia Department of Driving Services as a Class E, F, or Commercial vehicle.

Heliport: An area, either at ground level or elevated on a structure, licensed by the federal government or an appropriate state agency and approved for the loading, landing, and takeoff of helicopters and including auxiliary facilities, such as parking, waiting room, fueling, and maintenance equipment.

High-rise building or structure: A building of any type of construction or occupancy having floors used for human occupancy located more than fifty-five (55) feet above the lowest floor level having building access of three (3) stories or greater unless otherwise defined by individual zoning or overlay district.

High-rise in the I-20 Corridor Overlay District: A building in the I-20 Corridor Overlay District that is nine (9) or more stories in height.

High-rise in the Stonecrest Area Overlay District: A building in the Stonecrest Area Overlay District that is eleven (11) or more stories in height.

Historic: A building, structure, site, property or district identified as historic by the DeKalb County Historic Preservation Commission, the DeKalb County Historic Resources Survey, the Comprehensive Plan, by listing on the Georgia or National Register of Historic Places, by listing as a National Historic Landmark, or determined potentially eligible for listing in the National Register of

Historic Places as a result of review under Section 106 of the National Historic Preservation Act, as amended.

Hobby, toy and game store: A retail establishment for sale and exhibition of items related to hobbies such as arts and crafts materials, toys, or items related to games.

Home improvement center: A facility greater than thirty thousand (30,000) square feet gross floor area, primarily engaged in the retail sale of various basic hardware lines, such as tools, builders' hardware, plumbing and electrical supplies, paint and glass, house wares and household appliances, garden supplies, and cutlery.

Home occupation: An occupation carried on by an occupant of a dwelling unit as a secondary use of the dwelling that is incidental to the primary use of the dwelling unit for residential purposes and is operated in accordance with the provisions of this chapter. Home occupation does not include "private educational use" as defined in this chapter.

Home stay bed and breakfast residence: A single-family dwelling in which is provided not more than two (2) rooms for not more than four (4) people for overnight rental and a morning meal to transient persons for compensation on a nightly basis by the occupant of said dwelling.

Hospice: Any facility that provides coordinated program of home care with provision for inpatient care for terminally ill patients and their families. This care is provided by a medically directed interdisciplinary team, directly or through an agreement under the direction of an identifiable hospice administration. A hospice program of care provides palliative and supportive medical and other health services to meet the physical, psychological, social, spiritual, and special needs of patients and their families, which are experienced during the final stages of terminal illness and during dying and bereavement.

Hospital: An institution, licensed by the state department of health, providing primary health services and medical or surgical care to persons, primarily inpatients, suffering from illness, disease, injury, deformity, and other abnormal physical or mental conditions, and including as an integral part of the institution, related facilities such as laboratories, outpatient facilities, or training facilities.

Hotel/motel: An establishment providing, for a fee, sleeping accommodations and customary lodging services, including maid service, the furnishing and upkeep of furniture and bed linens, and telephone and desk service. Related ancillary uses may include but shall not be limited to conference and meeting rooms, restaurants, bars, and recreational facilities. See also Boutique hotel in the Emory Village Overlay District.

Hotel/motel, extended stay: Any building containing six (6) or more guest rooms rented or leased for sleeping purposes for periods less than one (1) month, but in excess of one (1) week, and that contain kitchen facilities for food preparation including, but not limited to, refrigerators, stoves, and ovens.

Household pet: A domestic animal that is customarily kept for pleasure rather than utility or profit and that is normally kept within a residence for personal use and enjoyment including domestic dogs, domestic cats, domestic potbellied pigs, canaries, parrots, parakeets, domestic tropical birds, hamsters, guinea pigs, lizards and turtles. Household pet does not include livestock, poultry, and snakes, nor does it include hybrids of animals normally found in the wild.

Impervious surface: A surface that either prevents or retards the entry of surface water into the soil mantle and causes surface water to run off in greater quantities or at an increased flow rate when compared to natural, undeveloped soil mantle. Common impervious surfaces include, but are not limited to, roofs, walkways, patios, driveways, parking lots, storage areas, paved areas, pavement graveled areas, packed or oiled earthen materials or other surfaces which similarly impede the natural infiltration of surface waters. Open uncovered flow control or water quality treatment facilities shall not be considered as impervious surfaces. See Lot coverage for exemptions.

Impulsive sound: A single pressure peak or a single burst (multiple pressure peaks) that has a duration of less than one (1) second characterized with an abrupt onset and rapid decay.

INCE: The Institute of Noise Control Engineering.

Industrial district: Any parcel of land which is zoned for industrial use including property used for light and heavy distribution, warehouses, assembly, manufacturing, quarrying, truck terminals and landfills. Such districts include M and M-2 districts.

Industrial, heavy: The building or premises where the following or similar operations are conducted: processing, creating, repairing, renovating, painting, cleaning, or assembly of goods, merchandise, or equipment, including the wholesale or distribution of said goods, merchandise, or equipment when not conducted wholly within a building or other enclosed structure or when such operations generate measurable dust, vibrations, odor, glare or emissions beyond the property on which said building or structure is located.

Industrial, light: The following or similar operations: processing, creating, repairing, renovating, painting, cleaning, or assembly of goods, merchandise, or equipment, other than light malt beverages, including the wholesale or distribution of said goods, merchandise, or equipment, when conducted wholly within a building or other enclosed structure, and when such operations generate no measurable dust, vibrations, odor, glare or emissions beyond the property on which said building or structure is located.

Industrial solid waste: Solid waste generated by manufacturing or industrial processes or operations that is not a hazardous waste as defined herein. Such wastes include, but are not limited to, waste resulting from the following manufacturing processes: electric power generation; fertilizer and agricultural chemicals; food and related products and by-products; inorganic chemicals; iron and steel products; leather and leather products; nonferrous metal and foundry products; organic chemicals; plastics and resins; pulp and paper; rubber and miscellaneous plastic products; stone, glass, clay and concrete products; textiles; transportation equipment; and water treatment. This term does not include mining waste or oil and gas waste.

Industrialized building: Any structure or component thereof which is wholly or in substantial part made, fabricated, formed, or assembled in manufacturing facilities for installation or assembly and installation on a building site and has been manufactured in such a manner that all parts or processes cannot be inspected at the installation-site without disassembly, damage to, or destruction thereof.

Infill building: Any building built or proposed to be built on an infill lot.

Infill development: A development surrounded by or in close proximity to areas that are substantially or fully developed.

Infill lot:

A vacant lot of record in an infill overlay zoning district created by the demolition of an existing residential structure for the replacement of that structure with new construction;

Any lot intended for use as a site for a single family dwelling that is created by act of subdivision which, at the time of final plat approval, is in whole or in part within the boundaries of a residential infill overlay district; or

Any lot within a residential infill overlay district that, at the time it is zoned, has no principal building and which is subsequently proposed as a site for a single family dwelling.

Infill lot (in the Sagamore Hills Overlay District): A conforming lot of record or nonconforming lot of record in a residential zoning district on which the demolition of an existing residential building has occurred or is proposed.

Intermediate care home: A facility which admits residents on medical referral; it maintains the services and facilities for institutional care and has an agreement with a physician or dentist who will provide continuing supervision including emergencies; it complies with rules and regulations of the Georgia Department of Human Resources or state agency as may have jurisdiction. The term "intermediate care" means the provision of food, including special diets when required, shelter, laundry and personal care services, such as help with dressing, getting in and out of bed, bathing, feeding, medications and similar assistance, such services being under appropriate licensed supervision. Intermediate care does not normally include providing care for bed-ridden patients except on an emergency or temporary basis.

Intermodal freight terminal: An industrial establishment in which freight is transferred in containers from truck to railroad cars for transportation.

Inter-parcel access: A physical way or means to facilitate movement of pedestrians and/or vehicles between adjacent lots (that is, "lot-to-lot access") without generating additional turning movements on a public street.

Jewelry repair shop: Establishment primarily engaged in the provision of jewelry repair services to individuals.

Junk vehicle: Any vehicle which is non-operable, or any vehicle which does not bear a current license plate.

Junkyard: Any lot or lot and building(s) in combination which is utilized for the parking, storage or disassembling of junk vehicles; storage, bailing or otherwise dealing in bones, animal hides, scrap iron and other metals, used paper, used cloth, used plumbing fixtures, old refrigerators and other old household appliances, and used brick, wood or other building materials. These uses shall be considered junkyards whether or not all or parts of these operations are conducted inside a building or in conjunction with, in addition to or accessory to other uses of the premises.

Keeping of chickens: The breeding, boarding, and caring of chickens for personal or agriculture use, or raised for sale and profit.

Keeping of livestock: The breeding, boarding and caring of livestock for personal or agricultural use, or raised for sale and profit.

Keeping of pigeons: The breeding, boarding, and caring of pigeons for personal or agriculture use, or raised for sale and profit.

Kennel, breeding: A kennel where no more than ten (10) dogs, registered with a nationally recognized registration organization, over the age of six (6) months are owned, kept or harbored for the purpose of breeding purebred or pedigreed dogs, provided, however, this definition shall not apply to zoos or to animal hospitals operated by a veterinarian, duly licensed under the law.

Kennel, commercial: An establishment for the boarding, caring for and keeping of dogs over the age of six (6) months other than a breeding kennel or a noncommercial kennel.

Kennel, noncommercial: An establishment for the boarding, caring for and keeping of more than three (3) but not more than ten (10) dogs over the age of six (6) months, not for commercial purposes.

Kidney dialysis center: An establishment where a process of dialysis, an artificial process of getting rid of waste and unwanted water from blood, is carried out for the patients whose kidneys have been damaged or lost kidney function.

Kindergarten: An establishment operated by any person wherein compensation is paid for providing for the care, supervision, instruction, and protection of seven (7) or more children who are under the age of seven (7) years for less than twenty-four (24) hours per day, without transfer of legal custody. For the purpose of this zoning ordinance, a kindergarten school is considered to be a child day care center or facility.

Kiosk: A freestanding structure upon which temporary information and/or posters, notices, and announcements are posted.

Kitchenette: A small, compact apartment kitchen, often part of another room utilized for different activities.

Kitchen facilities: A room used to prepare food containing, at a minimum, a sink and a stove or oven.

Laboratories (medical/dental): A facility offering diagnostic or pathological testing and analysis of diagnostic tests related to medical or dental care industry.

Land use: A description of how land is occupied or utilized.

Landfill: An area of land on which or an excavation in which solid waste is placed for permanent disposal and which is not a land application unit, surface impoundment, injection well, or compost pile.

Landscape area: An area set aside from structures and parking which is developed with natural materials (i.e., lawns, trees, shrubs, vines, hedges, bedding plants, rock) and decorative features, including paving materials, walls, fences, and street furniture.

Landscape business: A business whose primary operation is the sale and installation of organic and inorganic material, plants, pine straw and other limited accessory products for the landscape industry and the storage and use of associated landscape vehicles and equipment.

Landscape strip: A strip intended to be planted with trees, shrubs, or other vegetation. Same as landscape zone.

Landscaped space: The areas of a parking lot which are planted with trees, shrubs and ground cover, plazas, fountains and other hardscape elements and similar features which are located within such parking lot and which are generally accessible to patrons or the general public during normal business hours.

Large-scale retail: A singular retail or wholesale user who occupies no less than sixty thousand (60,000) square feet of gross floor area.

Late-night establishment: Any establishment licensed to dispense alcoholic beverages for consumption on the premises where such establishment is open for use by patrons beyond 12:30 a.m.

Laundry: A facility used or intended to use for washing and drying of clothes and fabrics.

Laundry, coin operated: A self-service laundry facility where clothes are washed and dried by washing and drying machines that require coins to operate.

Laundry pick-up station: A facility where clothes and linens are dropped off for laundry or dry cleaning and where clothes and linen are picked up once they are cleaned. These facilities do not perform dry cleaning on site. See Dry cleaning agency.

Leachate collection system: A system at a landfill for collection of the leachate which may percolate through the waste and into the soils surrounding the landfill.

Leasing office: A facility where commercial or residential spaces available for renting are exhibited, or where documents related to the lease agreements are prepared. This facility may also be used to collect rent or used by occupants to report needs of services or other support.

Library: A public facility, a room or building, for the exhibition and use, but not sale of literary, scientific, historical, musical, artistic or reference materials.

Light industrial: See Light manufacturing establishment.

Light malt beverage manufacturer: A malt beverage manufacturer licensed as a brewpub per O.C.G.A. § 3-5-36 or licensed as a brewery per O.C.G.A. § 3-5-24. All state and federal licensing and regulatory requirements shall be met prior to the approval of a certificate of occupancy for this use. See also Brewpub.

Light manufacturing: See Industrial, light.

Liner building: A specialized building, parallel to the street, which is designed to conceal areas like a parking lot, parking deck or loading docks.

Liquor store: See Alcohol outlet.

Live-work unit: A structure or portion of a structure that combines residential living space with an integrated work space used principally by the occupant of the unit.

Livestock: Domestic animals and fowl customarily kept on a farm including horses, mules, donkeys, cows, cattle, sheep, goats, ducks, geese and turkeys.

Lodge: A membership organization that holds regular meetings and that may, subject to other regulations controlling such uses, maintain dining facilities, serve alcohol, or engage professional entertainment for the enjoyment of dues paying members and their guests. There are no sleeping facilities. This definition shall not include fraternities or sororities. (See also fraternal organization.)

Lodging unit: One (1) or more rooms, designed, occupied, or intended for occupancy as a separate living quarter, with sleeping, and bathroom facilities provided within the lodging unit for the exclusive use of a single family maintaining a household.

Lot: A portion or parcel of land intended as a unit for transfer of ownership or for development or both, intended to be devoted to a common use or occupied by a building or group of buildings devoted to a common use, and having principal frontage on a public road or an approved private road or drive.

Lot area: The total area within the lot lines of a lot, excluding any street rights-of-way.

Lot, buildable area of: See Buildable area.

Lot, conforming: A designated parcel, tract, or area of land which meets the lot area, lot width and street frontage requirements of this chapter.

Lot, contiguous (as used in section 8.1.4): Lots adjoining the rear or either side of the lot(s).

Lot, corner: A lot abutting upon two (2) or more streets at their intersection or upon two (2) parts of the same street.



Figure 9.7 Corner Lots

Lot coverage: That portion of a lot that is covered by buildings, structures, driveways or parking areas, and any other impervious surface. For purposes of calculating lot coverage, wooden decks, stone walkways and patios set without grout, or pervious, permeable, or porous pavements shall be considered pervious.

Lot, double-frontage: A lot that abuts two (2) parallel streets or that abuts two (2) streets that do not intersect at the boundaries of the lot. A double-frontage lot may also be referred to as a through lot.

Case 1:17-cv-04400-SCJ    Document 26-2    Filed 06/01/18    Page 91 of 222



Figure 9.8        Double Frontage Lots

Lot, flag: A tract or lot of land of uneven dimensions in which the portion fronting on a street is less than the required minimum width required for construction of a building or structure on that lot. A flag lot may also be referred to as a panhandle lot.

Lot, interior: A lot, other than a corner lot, abutting only one (1) street.

Lot, irregular: A lot of such a shape or configuration that technically meets the area, frontage, and width to depth requirements of this ordinance but meets these requirements by incorporating unusual elongations, angles, curvilinear lines unrelated to topography or other natural land features.



Figure 9.9        Irregular lots

Lot of record: A lot which is part of a subdivision, a plat of which has been recorded in the Office of the Clerk of Superior Court of DeKalb County, Georgia, or a parcel of land described by metes and bounds, the plat or description of which has been recorded in said office.

Lot of record, nonconforming: A designated parcel, tract, or area of land legally existing at the time of the enactment of this chapter or amendment of this chapter which does not meet the lot area, lot width, or public or private street frontage and access requirements of this chapter.

Lot remnant: Any portion or portions of a lot not suitable for building because of its size and remaining after the transfer of other portions of said lot to adjoining lots.

Lot, substandard: A designated parcel, tract, or area of land created after the time of enactment of this chapter or amendment of this chapter which does not meet the lot area, lot width, or public or private street frontage and access requirements of this chapter. Such a lot is illegal except where created by governmental action in which case such lot shall have the status of a nonconforming lot of record.

Lot width: The horizontal distance measured at the building line between the side lines of a lot, measured at right angles along a straight line parallel to the street, or in case of a curvilinear street, parallel to the chord of the arc.

Low-rise in the I-20 Corridor Overlay District: A building in the I-20 Corridor Overlay district that is one (1) to four (4) stories in height.

Low-rise in the Stonecrest Area Overlay District: A building in the Stonecrest Area Overlay district that is one (1) to three (3) stories in height.

Lumber supply establishment: A facility for manufacturing, processing, and sales uses involving the milling of forest products to produce rough and finished lumber and other wood materials for use in other manufacturing, craft, or construction processes.

Mail room: A room in an office which mail and package shipments are prepared and deliveries accepted.

Major automobile repair and maintenance shop: See Automobile repair, major.

Major modification: See section 4.2.57.B.

Major modification to zoning conditions: See article 7.

Major thoroughfare: A street, road or highway shown as a major thoroughfare in the DeKalb County Transportation and Thoroughfare Plan.

Manufactured home, class I: A single-family dwelling unit that is constructed in accordance with the Federal Manufactured Home Construction and Safety Standards and bears an insignia issued by the U.S. Department of Housing and Urban Development, or a single family dwelling unit that, if constructed prior to applicability of such standards and insignia requirements, was constructed in conformity with the Georgia State Standards in effect on the date of manufacture.

Manufactured home, class II: A single-family dwelling unit meeting the requirements of a Manufactured Home Class I and, in addition, bears the insignia of the Southern Standard Building Code Congress International.

Manufacturing, heavy: See Industrial, heavy.

Manufacturing, light: See Industrial, light.

Massage establishment: Any business properly licensed under section 15-266 of the Code of DeKalb County that is established for profit and employs one (1) or more massage therapists, operates or maintains for profit one (1) or more massage apparatus, and which, for good or valuable consideration, offers to the public facilities and personnel for the administration of massages, within the meaning of said section 15-266. This term shall not include hospitals or other professional health care establishments separately licensed as such by the State of Georgia.

Materials recovery facility: A handling facility that provides for the extraction of recoverable materials, materials suitable for use as a fuel or soil amendment, or any combination of such materials.

Mausoleum: A building containing above-ground tombs.

Meat processing: A building where live animals are killed and processed; and/or a building where meat, poultry, or eggs are cooked, smoked, or otherwise processed or packed but does not include a butcher shop or rendering plant.

Medium and high density residential zoning districts. Any of the following zoning districts: R-SM, MR-1, MR-2, HR-1, HR-2, and HR-3.

Mid-rise in the I-20 Corridor Overlay District: A building in the I-20 Corridor Overlay district that is five (5) to eight (8) stories in height.

Mid-rise in the Stonecrest Area Overlay District: A building in the Stonecrest Area Overlay district that is four (4) to ten (10) stories in height.

Mine:

1.

A cavity in the earth from which minerals and ores are extracted; and

2.

The act of removing minerals and ores from the earth.

Mineral extraction and processing: Extraction and processing of metallic and nonmetallic minerals or materials, including rock crushing, screening, and the accessory storage of explosives.

Mini-warehouse: A building or group of buildings in a controlled-access and secured compound that contains varying sizes of individual, compartmentalized and controlled-access stalls or lockers for the storage of customers' goods or wares, and may include climate control.

Miniature golf course: A novelty version of golf played with a putter and a golf ball on a miniature course, typically with artificial playing surfaces, and including obstacles such as bridges and tunnels.

Mining: Extraction of minerals, including solids, such as coal and ores; liquids, such as crude petroleum; and gases, such as natural gases. The term mining includes quarrying; ground-water diversion; soil removal; milling, such as crushing, screening, washing, and floatation; and other preparation customarily done at the mine site as part of a mining activity.

Minor automobile repair and maintenance shop: See Automobile repair, minor.

Minor modification to zoning conditions: See article 7.

Minor thoroughfare: A street, road or highway shown as a minor thoroughfare in the DeKalb County Transportation and Thoroughfare Plan.

Mixed-use building or development: A development which incorporates a variety (two (2) or more) of land uses, buildings or structures, that can include both primary residential uses and primary nonresidential uses which are part of the same development. Such uses may include, but not be limited to, residential, office, commercial, institutional, recreational or public open space, in a compact urban setting that encourages pedestrian oriented development that can result in measurable reductions in traffic impacts. Such a development would have interconnecting pedestrian and vehicular access and circulation.

Mixed-use zoning districts: Any of the following zoning districts: MU-1, MU-2, MU-3, MU-4, and MU-5.

Mobile home : A structure, transportable in one (1) or more sections, which, in the traveling mode, is eight (8) body feet or more in width or forty (40) body feet or more in length, when erected on site, is three hundred twenty (320) or more square feet in floor area, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems contained therein; and manufactured prior to June 15, 1976.

Mobile home lot: A parcel of land, approved pursuant to the subdivision requirements of chapter 14 of the Code, in a mobile home park which is intended and used for the placement of a single mobile home and for the exclusive use of its occupants.

Mobile home park: A parcel of land which has been planned and improved pursuant to the requirement of this chapter and chapter 14 of the Code for the placement of mobile homes for non-transient use.

Mobile home sales: Exhibition and sale of mobile homes.

Mobile home stand: That part of a mobile home lot which has been reserved for the placement of a mobile home for non-transient use.

Modular home: A factory-manufactured single family dwelling which is constructed in one (1) or more sections and complies with the definition of "industrialized building."

Monastery: A building or buildings used as both a place of worship and as a residence, operated as a single housekeeping unit, solely by and for a group of men who have professed vows in a religious order and who live together as a community under the direction of a local supervisor designated by the order.

Monopole: See section 4.2.57.B.

Mortuary: An establishment in which the deceased are prepared for burial or cremation. The facility may include a crematory, a chapel for the conduct of funeral services and spaces for funeral services and informal gatherings or display of funeral equipment.

Mosque: See Place of worship.

Motel: See Hotel.

Motel in the Scottdale Area Compatible Use Overlay District: A building:

1.

In which lodging or board and lodging are provided for at least twenty-one (21) transient guests for compensation;

2.

With an office supervised by a person in charge at all hours; and

3.

Where ingress and egress to and from all rooms is not made from a lobby or an office but may be made directly from outdoors, a street, or a parking lot.

Muffler: A sound-dissipative device or system for lessening the sound of the exhaust of an internal combustion machine where such a device is part of the normal configuration of the equipment.

Multi-family dwelling: See Dwelling unit, multi-family.

Multi-family dwelling, supportive living: Four (4) or more dwelling units in a single building or group of buildings which are designed for independent living for persons with disabilities of any kind and in which are provided supportive services to the residents of the complex but which supportive services do not constitute continuous twenty-four-hour watchful oversight, and which does not require licensure as a personal care home by the Office of Regulatory Services of the State of Georgia Department of Human Resources.

Multi-use property: Any distinct parcel of land that is being used for more than one (1) land use purpose.

Museum: A building or structure that is primarily used as a repository for a collection of art or natural, scientific, or literary objects, and is intended and designed so that members of the public may view the collection, with or without an admission charge, and which may include as an accessory use the sale of goods to the public or educational activities.

Natural state: That condition that arises from or is found in nature and not modified by human intervention; not to include artificial or manufactured conditions.

Nature preserve: An area or a site with environmental resources intended to be preserved and remain in a predominately natural or undeveloped state to provide resource protection and possible opportunities for passive recreation and environmental education for present and future generations in their natural state.

Neighborhood: An area of the county within which residents share a commonality of interests including distinct physical design and street layout patterns, a shared developmental history, distinct

housing types, or boundaries defined by physical barriers such as major roads and railroads or natural features such as creeks or rivers.

Neighborhood residual sound level: That measured value that represents the summation of the sound from all of the discrete sources affecting a given site at a given time, exclusive of extraneous sounds, and those from the source under investigation. Neighborhood residual sound level is synonymous with background sound level. Neighborhood residual sounds are differentiated from extraneous sounds by the fact that the former are not of a relatively short duration, although they are not necessarily continuous.

New construction on an infill lot: The replacement of an existing residential building or structure with a new building, structure or an addition that increases the usable square footage in the building, structure or addition.

News dealer: A person who sells newspapers and magazines as a retailer.

News stand: A temporary structure, manned by a vendor that sells newspapers, magazines, and other periodicals.

Nightclub: A commercial establishment dispensing alcoholic beverages for consumption on the premises and in which dancing and musical entertainment is allowed, where music may be live, disc-jockey, karaoke, and/or non-acoustic.

Node: A concentration of population, retail, and employment within a well-defined area that has a diverse mix of land uses and a pedestrian and transit orientation.

Noise control officer: A county employee or agent who has received noise enforcement training and is currently certified in noise enforcement.

Noise sensitive facility: Any facility whose operations may be detrimentally impacted by excessive sound levels. Such facilities include but are not limited to schools, hospitals, and places of worship.

Nonconforming characteristic(s) of building or structure: A building or structure, legally existing on the effective date of this chapter, but which fails to comply with one (1) or more of the district or general non-use development regulations adopted under the terms of this chapter which are applicable to said building or structure, including, but not limited to, setbacks, lot frontage, lot area, building height limitations, off-street parking or loading, buffers, landscaping or any other applicable development regulation.

Nonconforming use of land: A use of land, legally existing on the effective date of this chapter, but which is not an authorized use under the terms of this chapter in the district in which such land is located.

Nonconforming use of land and building(s), or nonconforming use of land and structure(s): A use of land and building(s) or land and structure(s), in combination, legally existing on the effective date of this chapter, but which is not an authorized use of land and building(s) or land and structure(s), in combination, under the terms of this chapter in the district in which such use is located.

Nonconforming use requiring special exception or special land use permit: A use of land, or land and building(s) or structure(s) in combination, legally existing on the effective date of this chapter, but which is not an authorized use under the terms of this chapter in the district in which such use is

located but is permitted only upon approval of a special exception or special land use permit by the appropriate body.

Nonresidential development: All commercial, office, institutional, industrial and similar lands and uses.

Non-residential zoning district: Any of the following zoning districts: NS, C-1, C-2, O-I-T, O-I, O-D, M and M-2.

Non-transient lodging accommodations: Long-term or permanent sleeping accommodations offered to persons as a residence, domicile, or settled place of abode.

Nursery, plant: An establishment for the growth, display, and/or sale of plants, shrubs, trees, and materials used in indoor or outdoor planting, conducted within or without an enclosed building.

Nursing care facility: An establishment providing inpatient nursing and rehabilitative services to patients who require health care but not hospital services, where such services have been ordered by and under the direction of a physician and the staff includes a licensed nurse on duty continuously with a minimum of one (1) full-time registered nurse on duty during each day shift. Included are establishments certified to deliver skilled nursing care under the Medicare and Medicaid programs. The term includes convalescent homes with continuous nursing care, extended care facilities, skilled nursing homes and intermediate care nursing homes.

Nursing home: A facility which admits patients on medical referral only and for whom arrangements have been made for continuous medical supervision; maintains the services and facilities for skilled nursing care, rehabilitative nursing care, and has an agreement with a physician and dentist who will be available for any medical and/or dental emergency and who will be responsible for the general medical and dental supervision of the patients; and complies with rules and regulations of the Georgia Department of Human Resources or state agency with jurisdiction as may be reorganized.

Office, dental: A building used exclusively by dentists and similar personnel for the treatment and examination of patients solely on an outpatient basis, provided that no overnight patients shall be kept on the premises.

Office, medical: A building or floor used exclusively by physicians, dentists, and similar personnel for the treatment and examination of patients solely on an outpatient basis, provided that no overnight patients shall be kept on the premises.

Office, professional: An office for the use of a person or persons generally classified as professionals, such as architects, engineers, attorneys, accountants, doctors, dentists, chiropractors, psychiatrists, psychologists, and the like.

Office park: A large tract of land that has been planned, developed, and operated as an integrated facility for a number of separate office buildings and supporting ancillary uses with special attention to circulation, parking, utility needs, aesthetics, and compatibility.

Office supply store: A facility established where office supplies, furniture and technology regularly used in offices are exhibited and sold.

Office use in the Emory Village Overlay District: All uses currently authorized in article 3, division 24 that are not expressly prohibited in that district.

Official zoning map or maps: The zoning map(s) of DeKalb County which are adopted with and incorporated by reference as a part of this chapter and amendments to the official zoning map are synonymous with and commonly referred to as rezonings..

One-part commercial block style: A single-story building that has a flat roof, a façade that is rectangular in shape, and in which the fenestration in the façade is equal to seventy-five (75) percent of the width of the front façade of the building.

Open space: A portion of a development project or lot that is intended to be free of buildings or parking lots. Open space may be in its natural state or improved with recreation amenities.

Open space, clubhouse or pool amenity area: An open space that can be found in a neighborhood park, mini-park or alone as an amenity area for the residents of a developed community. Clubhouse/pool areas can include swimming pools, group activity rooms, outdoor eating areas, and/or exercise stations, and must meet all applicable building and health codes.

Open space, enhanced: A planned open area suitable for relaxation, recreation or landscaping which may be held in common or private ownership, provided that all residents of the development in which the open space is located shall have a right to enter and use the open space. Such enhanced open spaces may include walkways, patios, recreational amenities, picnic pavilions, gazebos and water features. See article 5 for types of open space functions considered "enhanced."

Open space, green: An informal area for passive use bound by streets or front facing lots, typically between five hundred (500) square feet and one (1) acre, which is small, civic, surrounded by buildings, natural in its details, and may be used to protect specimen trees and provide for conservation functions.

Open space, greenway: An open space that typically follows natural or constructed features such as streams or roads and is designed to incorporate natural settings such as creeks and significant stands of trees, and is used for transportation, recreation, and environmental protection. Greenways are natural (i.e., informally planted) in their details except along rights-of-way, and may contain irregular topography.

Open space, neighborhood park: An open space designed for active or passive recreation use.

Open space, playground or tot lot: An open space that provides play areas for toddlers and children as well as open shelter and benches, which is located in a neighborhood, or as part of a larger neighborhood or community park and urban center, including retail shopping areas.

Open space, plaza: An open space paved in brick or another type of impervious surface that provides passive recreation use adjacent to a civic or commercial building.

Open space, pocket park: An open space that provides active recreational facilities, most often in an urban area that is surrounded by commercial buildings or houses on small lots, and is typically less than one-quarter (¼) of an acre.

Open space, square: An open space used to emphasize important places, intersections, or centers, bounded by streets or front-facing lots, typically between five hundred (500) square feet and one (1) acre.

Operator: A person who conducts a home occupation, has majority ownership interest in the home occupation, lives full-time in the dwelling on the subject property, and is responsible for strategic decision and day to day operation of the home occupation.

Ordinary maintenance: See section 4.2.57.B.

Ornamental metal: Any metalwork that serves as adornment and/or non-structural purposes during construction of a building.

Outdoor advertising service: A service to provide advertisements visible in the outdoors such as billboards.

Outdoor amusement enterprise: Any outdoor place that is maintained or operated for provision of entertainment or games of skill to the general public for a fee where any portion of the activity takes place outside of a building, including but not limited to a golf driving range, archery range, or miniature golf course. This use does not include a stadium or coliseum.

Outdoor display: An outdoor arrangement of items or products for sale, typically not in a fixed location capable of rearrangement, designed for advertising or identifying a business, product or service.

Outdoor manufacturing: A facility established for manufacturing activities that takes place outside an enclosed building.

Outdoor storage: The keeping, in an unenclosed area, of any goods, material, or merchandise associated with a land use. Storage does not include the parking of any vehicles or outdoor display of merchandise. This term includes outdoor work areas. See Vehicle storage yard.

Outdoor theater: An outdoor open space where dramatic, operatic, motion picture, or other performance, for admission to which entrance money is required takes place.

Overstory tree: Any self-supporting woody plant of a species that normally achieves an overall height at maturity of thirty (30) feet or more.

Package store: Any facility established for the sale of package liquor, for off-premises consumption. See also Alcohol outlets.

Parapet: That portion of a wall that extends above the roof line.

Parcel: See Lot.

Parking or park: The standing of a vehicle, whether occupied or not, other than temporarily for the purpose of and while actually engaged in loading or unloading of property or passengers.

Parking, valet: Parking of vehicles by an attendant provided by the establishment for which the parking is provided.

Parking aisle: An area within a parking facility intended to provide ingress and egress to parking spaces.

Parking bay: The clear space containing one (1) or two (2) rows of parking stalls and a parking aisle.

Parking garage: A covered or sheltered structure designed, constructed and used for the parking of motor vehicles.

Parking lot: Any area designed for temporary storage of motor vehicles by the motoring public in normal operating condition, whether for a fee or as a free service.

Parking space: A paved area of not less than one hundred twenty (120) square feet (small car space) or not less than one hundred fifty-three (153) square feet (large car space) space with dimensions of not less than eight (8) feet wide by fifteen (15) feet deep (small cars) or eight (8) feet six (6) inches wide by eighteen (18) feet deep (large cars), the exclusive purpose of which is for the parking of a vehicle.

Parking structure: A structure or portion thereof composed of one (1) or more levels or floors used exclusively for the parking or storage of motor vehicles. A parking structure may be totally below grade (as in an underground parking garage) or either partially or totally above grade with those levels being either open or enclosed.

Pasture land: See Grazing land.

Path: A paved or structurally improved walkway that provides access to areas within a development.

Paved: A structurally improved surface supporting the intended or allowed uses of traffic. An area may be covered by asphalt, concrete, permeable pavement or permeable pavement system that is acceptable to the director of planning. For the purposes of a driveway for the parking of automobile (s), two (2) paved tire tracks with an unpaved area between them shall be considered paved.

Pavement, permeable: Pavement materials including pervious asphalt and concrete, interlocking pavers, modular pavers, and open-celled paving or similar materials that allow the infiltration of water below the pavement surface. Pavement must support the expected loading and traffic.

Pawn shop: Any entity engaged in whole or in part in the business of lending money on the security of pledged goods (as that term is defined in O.C.G.A. § 44-12-130(5)), or in the business of purchasing tangible personal property on a condition that it may be redeemed or repurchased by the seller for a fixed price within a fixed period of time, or in the business of purchasing tangible personal property from persons or sources other than manufacturers or licensed dealers as part of or in conjunction with the business activities described in this paragraph. Includes title pawn.

Pedestrian oriented: A density, layout and infrastructure that encourages walking and biking within a subdivision or development, including short setbacks, front porches, sidewalks, and bike paths.

Pedestrian zone in the Northlake Overlay District: That portion of a sidewalk area that offers a clear and unobstructed pathway which provides a safe travel lane for pedestrians within the public right-of-way.

Permitted use: Any use which can be undertaken without approval by the designated authority of a special land use permit, special exception, or special administrative permit which is required by the terms of this chapter.

Personal assistance services: Assistance to an individual with, or supervision of self-administration of, medication, ambulation, and transfer from location to location, and/or essential activities of daily living, such as eating, bathing, grooming, dressing, and toileting.

Personal care home: A building(s) in which housing, meals, personal assistance services, and twenty-four-hour continuous watchful oversight for adults are provided and which facility is licensed or permitted as a personal care home by the State of Georgia. The term "personal care home" shall not include a "child care institution," "transitional housing," a "rehabilitation housing facility," a "rooming house," or a "boarding house." "Personal care home" includes a "community living arrangement," which is an establishment licensed by the State of Georgia and providing a residence for adults receiving care for mental health, development disabilities, and/or addictive diseases.

Personal care home, community: A personal care home that offers care to seven (7) or more persons.

Personal care home, group: A personal care home that offers care to between four (4) and six (6) persons.

Personal services establishment: An establishment primarily engaged in providing services involving the care of a person or providing personal goods where the sale at retail of such goods, merchandise, or articles is only accessory to the provision of such services, including barber shops, beauty shops, tailor shops, laundry shops, dry cleaning shops, shoe repair shops, and similar uses, but specifically excluding adult service facilities and adult entertainment establishments.

Pervious area: An area maintained in its natural condition, or covered by a material that permits infiltration or percolation of water into the ground.

Pervious pavers: A range of sustainable materials and techniques for permeable pavements with a base and sub-base that allow the movement of stormwater through the surface.

Pet: See Household pet.

Pet cemetery: Property used for the interring of dead domestic animals.

Pet shop: A retail sales establishment primarily involved in the sale of domestic animals, such as dogs, cats, fish, birds, and reptiles, excluding exotic animals and livestock.

Pharmacy (retail): A place where drugs and medicines are legally prepared and dispensed and which is licensed by the state.

Phased development: A development project that is constructed in increments, each stage being capable of meeting the regulations of this chapter independently of the other stages.

Physical therapy facility: A facility where service of developing, maintaining, and restoring maximum movement and functional ability is provided to individuals.

Pitch of roof lines: The ratio of the rise to the run of a roof.

Place of worship: A lot or building wherein persons assemble for religious worship and which is maintained and controlled by a religious body organized to sustain public worship. The term shall also include any of the following accessory uses and buildings: schools, religious education, social gathering rooms, food service facilities, indoor and outdoor recreation facilities, child day care center, kindergarten, parsonage, rectory or convent and columbarium.

Plainly audible: Any sound that can be detected by a person using his or her unaided hearing faculties.

Planned industrial center: An industrial development planned with multiple buildings for industrial users.

Planning director: See director of planning.

Plant material: Material derived from plants.

Planting strip: A strip of land intended to contain plant materials for the purpose of creating visual and physical separation between uses or activities.

Plat:

1.

A map representing a tract of land, showing the boundaries and location of individual properties and streets;

2.

A map of a subdivision or a site plan.

Pervious surface: An area that allows water to enter the soil mantle at a natural rate of flow. Compare with Impervious surface.

Porch, enclosed: A porch attached to the main building, which is covered by a roof.

Porch, open: A porch that is not covered by a roof.

Portable storage container: Any non-motorized vehicle, trailer or fully enclosed container intended for the temporary storage of items until relocated to another location or a long-term storage facility. Storage containers include but are not limited to PODS, Pack-Rats and similar containers.

Porte-cochere: A porch or a structure attached to a residence and erected over a driveway, not exceeding one (1) story in height and open on two (2) or more sides.

Post office: A public facility that contains service windows for mailing packages and letters, post office boxes, offices, vehicle storage areas, and sorting and distribution facilities for mail.

Poultry: Domestic fowl including chickens, duck, turkeys and geese raised for food (either meat or eggs) or profit.

Primary building: See Building, primary or principal. Compare with Accessory structure.

Primary conservation area: That portion of a site in the R-NC (Neighborhood Conservation) District for which application is made for cluster housing development which consists of areas that are unbuildable due to the presence of wetlands, floodplains, steep slopes, or other similar environmental conditions.

Primary material: The building material comprising the acceptable, dominant portion of a building exterior façade, as defined by standards within this ordinance. Compare with Secondary material.

Primary street: A street with access control, channelized intersections, and restricted parking that collects and distributes traffic to and from minor arterials.

Principal structure: The building in which the principal use of the lot is located.

Principal use: The primary or predominant use of any lot.

Printing and publishing establishments: An establishment providing printing, blueprinting, photocopying, engraving, binding, or related services.

Printing and publishing establishments (limited): A printing establishment providing convenience mailing, photocopying and accessory retail-oriented services, not exceeding five thousand (5,000) square feet of floor area.

Priority open space in the Emory Village Overlay District: Those areas indicated as "priority open space parking credit zone" on the Emory Village Regulating Plan.

Private ambulance service: A privately-owned facility for the dispatch, storage and maintenance of emergency medical care vehicles; transportation via ambulance; the provision of out-of-hospital emergency medical care to a patient from or in an ambulance; the trip to the site of a patient for the purpose of providing transport or out-of-hospital emergency medical care; the trip to or from any point in response to a medical emergency dispatch from the 9-1-1 Center.

Private club: See Club, private.

Private drive: A drive or road on privately owned property, by an individual or a group of owners who share the use and maintain the road without assistance from a government agency. A private drive has not been transferred to a governing entity. An easement of use on the private drive or road shall permit use by the public. A private drive is allowed to be exempt from the public street regulations of chapter 14 of the Code, but shall meet dimensional requirements established in article 5.

Private educational use: The instruction, teaching or tutoring of students by an occupant of a residential dwelling as a secondary use of the dwelling that is incidental to the primary use of the dwelling unit for residential purposes. No articles or products shall be sold on the premises other than by telephone. Such instruction, teaching or tutoring shall be limited to a maximum of three (3) students at a time, excluding children residing in the dwelling, and shall be limited to the hours of 9:00 a.m. to 9:00 p.m. Such private educational use shall be allowed as a permitted use in all districts where home occupations are allowed but private educational uses shall be subject to the supplemental regulations in article 4.

Private industry solid waste disposal facility: A disposal facility which is operated exclusively by and for a private solid waste generator for the purpose of accepting solid waste generated exclusively by said private solid waste generator.

Private restrictive covenants: Private restrictions on the use of land or structures imposed by private contract, such as subdivision covenants.

Private right-of-way: Any street, avenue, boulevard, road, highway, sidewalk, alley or easement that is not owned, leased, or controlled by a governmental entity.

Private road: See Private drive.

Private street: An access way similar to and having the same function as a public street, providing access to more than one (1) property but held in private ownership. Private streets, when authorized, shall be developed in accordance with the specifications for public streets established in the Code.

Produce: Products from farms and gardens such as fruits, vegetables, mushrooms, herbs, grains, legumes, nuts, shell eggs, honey or other bee products, flowers, nursery stock, livestock food products (including meat, milk, yogurt, cheese and other dairy products), and seafood.

Production, field crops: Establishment for commercial agricultural field and orchard uses including production of field crops; may also include associated crop preparation services and harvesting activities, such as mechanical soil preparation, irrigation system construction, spraying, crop processing, and sales in the field not involving a permanent structure.

Production, fruits, tree nuts, and vegetables: Establishment for commercial agricultural field and orchard uses including production of fruits, tree nuts and vegetables.

Prohibited uses: Anything not expressly permitted within this zoning ordinance or by resolution. Examples may include structures, land uses, materials, or development control parameters.

Public art: See Art, public.

Public right-of-way: Any street, avenue, boulevard, road, highway, sidewalk, alley or easement that is owned, leased, or controlled by a governmental entity.

Public space in the I-20 Corridor Overlay District: Space located on the exterior of buildings in the I-20 Corridor Overlay District that is available and accessible to the general public. Public space may include, but is not limited to, natural areas, green space, open space, riparian zones, lakes and pools, paths, multipurpose trails, outdoor recreation areas, lawns, landscape strips and other improved landscaped areas, common areas, plazas, terraces, patios, observation decks, fountains, sidewalks, transitional buffer zones and other outdoor public amenities. Space provided as result of the pedestrian circulation requirement shall be credited to the requirement for public space. Such public space is required at ground level, and buildings may not occupy such public space above a height of one (1) story. Exterior public spaces shall not include areas used for vehicles, except for incidental service, maintenance or appropriate emergency access only.

Public space in the Stonecrest Area Overlay District: Space located on the exterior of buildings in the Stonecrest Area Overlay District that is available and accessible to the general public. Public space may include, but is not limited to, natural areas, greenspace, open space, riparian zones, lakes and ponds, paths, multipurpose trails, outdoor recreation areas, lawns, landscape strips and other improved landscaped areas, common areas, plazas, terraces, patios, observation decks, fountains, sidewalks, transitional buffer zones and other outdoor public amenities. Space provided as result of the pedestrian circulation requirement shall be credited to the requirement for public space. Such public space is required at ground level, and buildings may occupy such space above a height of one (1) story. Exterior spaces shall not include areas used for vehicles, except for incidental service, maintenance or appropriate emergency access only.

Public uses: Land or structures owned by a federal, state or local government, including but not limited to a board of education, and used by said government for a necessary governmental function.

Quarry: A mine where rock, ore, stone, or similar materials are excavated for sale or for off-site use. Quarry includes rock crushing, asphalt plants, the production of dimension stone, and similar activities.

Quick copy and printing store: A facility established for the reproduction and printing of written or graphic materials on a custom order basis for individuals or businesses.

Rainwater harvesting: Gathering, or accumulating and storing, of rainwater from roof, ground or other catchments in order to reduce or avoid use of water from mains or from water sources like lakes and rivers.

Recovered materials: Those materials which have a known use, reuse, or recycling potential; can be feasibly used, reused, or recycled; and have been diverted or removed from the solid waste stream for sale, use, reuse, or recycling, whether or not requiring subsequent separation and processing.

Recovered materials center: A facility in which materials that would otherwise become solid waste are collected, separated, or processed and reused or returned to use in the form of raw materials or products.

Recovered materials processing: Activity of preparing source-separated recoverable materials, such as newspapers, glassware, and metal cans, including collecting, storing, flattening, crushing, or bundling prior to shipment to others who will use those materials to manufacture new products. The materials are stored on-site in bins or trailers for shipment to market. "Processing" shall mean the preparation of material for efficient shipment by such means as baling, compacting, flattening, grinding, crushing, mechanical sorting, or cleaning.

Recreation: The refreshment of body and mind through forms of play, amusement, or relaxation. The recreational experience may be active, such as boating, fishing, and swimming, or may be passive, such as enjoying the natural beauty of the shoreline or its wildlife.

Recreation, active: See Active recreation.

Recreation, indoor: A commercial recreational land use conducted entirely within a building, including arcade, arena, art gallery and studio, art center, assembly hall, athletic and health clubs, auditorium, bowling alley, club or lounge, community center, conference center, exhibit hall, gymnasium, library, movie theater, museum, performance theater, pool or billiard hall, skating rink, swimming pool, tennis court.

Recreation, outdoor: A recreational land use conducted outside of a building, including athletic fields; miniature golf, skateboard park; swimming, bathing, wading and other therapeutic facilities; tennis, handball, basketball courts, batting cages, trampoline facilities.

Recreation, passive: Recreation that involves existing natural resources and has a minimal impact on the existing condition of the resources.

Recreation club: A not-for-profit association of people organized for the purpose of providing recreation facilities and programs and characterized by certain membership qualifications, payment of fees and dues, and a charter or bylaws. Recreation club shall also mean, where the context requires, the premises and structures owned or occupied by members of such association within which the activities of the recreation club are conducted.

Recreational vehicle: Any vehicle, whether or not motorized, that is intended for personal recreational use and not intended for daily transportation. Such vehicles may include, but are not limited to Class A and C motor homes, campervans, bus conversions, boats, military surplus vehicle, all-terrain vehicles (ATVs), and similar vehicles intended for recreational purposes. Pick-up trucks with a fully enclosed bed that are used for daily transportation do not qualify as recreational vehicles.

Recreational vehicle park: A commercial use providing space and facilities for motor homes or other recreational vehicles for recreational use or transient lodging. Uses where unoccupied recreational vehicles are offered for sale or lease, or are stored, are not included.

Recreational vehicle/boat sales and service: A facility established for the exhibition, sale, and repair of recreational vehicles/boats.

Recycling collection point: A neighborhood drop-off point for the temporary storage of recyclables.

Recycling plant: See Recovered material center or processing.

Rehabilitation housing facility: An establishment primarily engaged in inpatient care of a specialized nature with staff to provide diagnosis and/or treatment.

Repair, small household appliance: A business established to provide a service of repairing small household appliances like microwaves, etc.

Replacement: See section 4.2.57.B.

Research and training facilities: Any facility owned by a private party, institution or government where research and training activities related to various fields like science, arts, etc. are conducted.

Residence hall: See Dormitory.

Residential component: The primarily residential portion of a development that may contain a mix of single family detached, single family attached and multi-family dwelling units and may include small scale, non-residential uses.

Residential zoning district: Any of the following zoning districts: RE, R-LG, R-100, R-85, R-75, R-60, MHP, R-NC, R-SM, MR-1, MR-2, HR-1, HR-2, HR-3, MU-1, MU-2, MU-3, MU-4, and MU-5.

Residential use: The occupation of a building and land for human habitation.

Restaurant: An establishment where food and drink are prepared, served, and consumed primarily within the principal building.

Restaurant, drive-through: An establishment where food and drink are prepared which may be consumed within the principal building or which may be ordered and picked up from a service window for off-site consumption.

Retail: The sale of goods, wares or merchandises directly to the end-consumer.

Retail use in the Emory Village Overlay District: All uses currently authorized in article 4 that are not expressly prohibited in that district.

Retail warehouse/wholesale: An establishment exceeding seventy thousand (70,000) square feet of gross floor area and offering a full range of general merchandise to the public, and may include gasoline.

Retaining wall: A structure constructed and erected between lands of different elevations to protect structures and/or to prevent erosion.

Riding stable: A building where horses and ponies are sheltered, fed, or kept.

Right-of-way line: The limit of publicly owned land or easement encompassing a street or alley.

Rooming house: See Boarding house.

Salvage yard: Land and/or buildings used for the dismantling, cutting up, compressing or other processing of waste items or materials, such as scrap, paper, metal, tires, large household appliances, such as washing machines or refrigerators, automobiles or other vehicles, or inoperable machinery. Salvaged materials may be stored outdoors or in a building and may be sold wholesale or retail. Typical uses include paper and metal salvage yards, used tire storage yards, or retail and/or wholesale sales of used automobile parts and supplies. This term includes junk yards.

Sand pit: A surface mine or excavation used for the removal of sand, gravel, or fill dirt for sale or for use off-site.

Satellite television antenna: An apparatus capable of receiving but not transmitting television, radio, or cable communications from a central device transmitting said communications.

Sawmill: A facility where logs or cants are sawn, split, shaved, stripped, chipped, or otherwise processed to produce wood products, not including the processing of timber for use on the same lot by the owner or resident of that lot.

Sawmill, temporary or portable: A facility where sawing related machines are installed on the site temporarily to run as sawmill, but which can be moved by removing and reinstalling the machines to some other site.

School, elementary: Public, private or parochial school offering education for first through fifth grade.

School, high: Public, private or parochial school for the ninth through twelfth grades.

School, middle: Public, private or parochial school offering education for sixth through eighth grade.

School, parochial: School run by a church or parish and engages in religious education in addition to the conventional education.

School, private: Any building or group of buildings, the use of which meets state requirements for elementary, middle, or high school education and which use does not secure the major part of its funding from any governmental agency.

School, public: A building or group of buildings used for educational purposes, which meets state requirements for elementary, middle, or high school education, and that is funded by a government agency.

School, specialty: A school specializing in teaching martial arts, dance, music, visual arts and similar fields.

School, vocational: A specialized instructional establishment that provides on-site training of business, commercial, and/or trade skills or specialized curriculum for special needs individuals or the arts. This classification excludes establishments providing training in an activity that is not otherwise permitted in the zone.

Screening fence: An opaque structure designed to provide a visual barrier constructed of materials including wood, chain link with wood or plastic inserts, metal, vinyl, plastic and other such materials as may be approved by the director of planning.

Secondary conservation area: That portion of a site for which application is made for cluster housing development which consists of those areas of land which are outside the primary conservation area but which are environmentally sensitive, historically or culturally significant, scenic, or which possess other unusual attributes that merit conservation.

Secondary material: Complimentary building material allowed by zoning standards. Compare with Primary material.

Secondhand store: A facility for retail or consignment sales of previously used merchandise, such as clothing, household furnishings or appliances, sports/recreational equipment. This classification does not include secondhand motor vehicles, parts, or accessories.

Self-service car wash: See Car wash, self-service.

Semi-nude: The exposure of one (1) or more, but not all, of the following: human genitals or pubic region, buttocks, or female breasts below a point immediately above the top of the areola.

Senior housing: A multiple-family building or detached dwelling unit, or a combination of both housing types, which is occupied by at least one (1) person who is fifty-five (55) years of age or older per dwelling unit. Also called Senior Living.

Senior living: See Senior housing.

Service area: An outdoor work area associated with a commercial use, including work areas where goods and products are assembled, constructed, or repaired but not permanently stored.

Service organization: A voluntary non-profit service club or organization where members meet regularly to perform charitable works or raise money for charitable works.

Service use in the Emory Village Overlay District: All uses currently authorized in article 3, division 24 that are not expressly prohibited in that district.

Setback: The minimum horizontal distance required between the property line and the principal building or structure on a lot or any projection thereof except the projections allowed pursuant to article 5.

Sexually-oriented business: See Adult entertainment establishment.

Case 1:17-cv-04400-SCJ Document 26-2 Filed 06/01/18 Page 109 of 222

Shared parking: Parking shared by two (2) or more lots or uses for which the peak parking demands are not at the same time, and parking that can reasonably be shared by such lots or uses. The number of parking spaces in a shared parking facility is less than the combined total of the required minimum number of spaces for each individual use.

Shelter for homeless persons: A building or buildings in which is provided overnight housing and sleeping accommodations for one (1) or more persons who have no permanent residence and are in need of temporary, short-term housing assistance, and in which may also be provided meals and social services including counseling services. Compare with Transitional housing facility.

Shoe repair: An establishment where shoes and boots are repaired remodeled or rebuilt by skilled shoe repairers. The establishment may also mend items like handbags and luggage.

Shopping center: A group of at least two (2) commercial establishments typically planned, constructed, and managed as a single entity, with on-site parking for customers and employees, and with delivery of goods separate from customer access.

Shrub: A woody plant, smaller than a tree, consisting of several small stems from the ground or small branches near the ground. It may be deciduous or evergreen.

Sidewalk: A hard surface, ADA compliant, clear pathway that does not include any street furniture.

Sidewalk level in the Emory Village Overlay District: A building story having a finished floor within one (1) vertical foot above or below the adjacent build-to-line and a minimum depth of thirty (30) feet, excluding parking levels.

Sight triangle: A triangular area of visibility required on a corner of a roadway intersection to allow for the safe operation of vehicles, trains, pedestrians, and cyclists in the proximity of intersecting streets, rail lines, sidewalks, and bicycle paths.



Figure 9.10    Sight Triangles

Single-family attached: See Dwelling unit, single-family attached.

Single-family zoning district: Any of the following zoning districts: RE, R-LG, R-100, R-85, R-75, R-60, MHP, and R-N(c)

Site: The lot, area of a lot, or assemblage of lots subject to development.

Case 1:17-cv-04400-SCJ   Document 26-2   Filed 06/01/18   Page 110 of 222

Site plan: That plan required to acquire a development, construction or building permit which shows the means by which the developer will conform to applicable provisions of this chapter and other applicable ordinances.

Soldier course: A course of upright bricks with their narrow faces showing on the wall surface.

Solid waste: Any garbage or refuse; sludge from a wastewater treatment plant, water supply treatment plant, or air pollution control facility; and other discarded material including solid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations and community activities, but does not include recovered materials; solid or dissolved materials in domestic sewage; solid or dissolved materials in irrigation return flows or industrial discharges that are point sources subject to permit under 33 U.S.C. Section 1342; or source, special nuclear, or byproduct material as defined by the Federal Atomic Energy Act of 1954, as amended (68 State. 923).

Solid waste handling: The storage, collection, transportation, treatment, utilization, processing, or disposal of solid waste or any combination of such activities.

Solid waste handling facility: A facility primarily used for the storage, collection, transportation, treatment, utilization, processing, or disposal, or any combination thereof, of solid waste.

Solid waste thermal treatment technology facility: Any solid waste handling facility, the purpose of which is to reduce the amount of solid waste to be disposed of through a process of combustion, with or without the process of waste to energy.

Solid waste transfer facility: A facility or site at which temporary storage and transfer of solid waste from one (1) vehicle or container to another, generally of larger capacity, occurs prior to transportation to a point of processing or disposal. A solid waste transfer facility is an intermediary point between the location(s) of waste generation (e.g., households, businesses, industries) and the site (s) of ultimate processing or disposal.

Sorority house: A building containing sleeping rooms, bathrooms, common rooms, and a central kitchen and dining room maintained exclusively for sorority members and their guests or visitors and affiliated with an institution of higher learning.

Sound level meter: An instrument that conforms to ANSI S1.4-1983 or its successors.

Special administrative permit: A written authorization granted by the director of planning for a use of land pursuant to an application which that official is authorized to decide, in cases where a permit is required, pursuant to the procedures and criteria contained in article 7.

Special events facility: A building and/or premises used as a customary meeting or gathering place for personal social engagements or activities, where people assemble for parties, weddings, wedding receptions, reunions, birthday celebrations, other business purposes, or similar such uses for profit, in which food and beverages may be served to guests. This definition shall not include places of worship.

Special exception: The approval by the zoning board of appeals of an application which that board is authorized to decide as specified within a zoning district pursuant to the procedures and criteria contained in article 7 of this chapter.

Special land use permit: The approval of a use of land that the board of commissioners is authorized to decide as specified within a zoning district pursuant to the procedures and criteria contained in article 7 of this chapter.

Special permit: A special administrative permit, special exception, or special land use permit.

Specialty store: A store, usually retail, that exhibits and sells specific or specialized types of items or brand. For example, a specialty store may sell cellular phones or organic food, or video games exclusively.

Specified anatomical areas shall include any of the following:

1.

Less than completely and opaquely covered human genitals or pubic region, buttocks, or female breasts below a point immediately above the top of the areola; or

2.

Human male genitalia in a discernibly turgid state, even if completely or opaquely covered.

Specified sexual activities shall include any of the following:

1.

Actual or simulated intercourse, oral copulation, anal intercourse, oral anal copulation, bestiality, direct physical stimulation of unclothed genitals, flagellation or torture in the context of a sexual relationship, or the use of excretory functions in the context of a sexual relationship, and any of the following sexually-oriented acts or conduct: analingus, buggery, coprophagy, coprophilia, cunnilingus, fellatio, necrophilia, pederasty, pedophilia, sapphism;

2.

Clearly depicted human genitals in a state of sexual stimulation, arousal or tumescence;

3.

Use of human or animal ejaculation, sodomy, oral copulation, coitus, or masturbation;

4.

Fondling or touching of nude human genitals, pubic regions, buttocks or female breasts;

5.

Masochism, erotic or sexually oriented torture, beating or the infliction of pain;

6.

Erotic or lewd touching, fondling or other sexually-oriented contact with an animal by a human being;

7.

Human excretion, urination, menstruation, vaginal or anal irrigation.

Sporting goods store: A store that exclusively exhibits and sells items related to sports including, but not limited to, instruments, gears, shoes, and clothes.

Stadium: A structure with tiers of seats rising around a field or court, intended to be used primarily for the viewing of athletic events. The structure may also be used for entertainment and other public gathering purposes, such as conventions, circuses, or concerts.

State: The State of Georgia.

Steady tonal quality: Sound emissions comprised of a single frequency or a narrow cluster of frequencies, which may be referred to as a whine, hum or buzz, with measured sound levels not fluctuating by more than plus or minus three (3) dBA.

Stealth telecommunications facility: See section 4.2.57.B.

Stepback: A step-like recession in the profile of a building, whereby the exterior wall surface of each successive story is located farther towards the interior of the building than the exterior wall of the story below it. Stepbacks may result from the transitional height plane requirement. See Transitional height plane.

Stoop: A small porch, platform, or staircase leading to the entrance of a house or building.

Storage building: Any structure that is used for storage and does not have a door or other entranceway into a dwelling unit and that does not have water fixtures within its confines, the use of which is limited solely to storage of inanimate objects.

Stormwater management facility: Those structures and facilities that are designed for the collection, conveyance, storage, treatment and disposal of stormwater runoff into and through the drainage system.

Story: That portion of a building, other than a basement, included between the surface of any floor and the surface of the floor next above or, if there is no floor above, the space between the floor and the ceiling next above. Each floor or level in a multistory building used for parking, excluding a basement, shall be classified as a story.

Street furniture zone in the Northlake Overlay District: That portion of a sidewalk area that is intended to enhance that street's physical character and used by pedestrians, such as benches, trash receptacles, kiosks and newspaper racks.

Street, public: Any right-of-way set aside for public travel deeded to the county and any right-of-way which has been accepted for maintenance as a street by the county.

Street right-of-way line: The dividing line between a lot, tract or parcel of land and a street right-of-way.

Structure: Anything constructed or erected with a fixed location on the ground, or attached to something having a fixed location on or in the ground. This does not include telephone poles and utility boxes.

Structure, accessory. See Accessory structure.

Subdivision: As defined in chapter 14 of the Code.

Subdivision, major: All subdivisions not classified as minor subdivisions, including, but not limited to, subdivisions of five (5) or more lots, or any size subdivision requiring any new street, public or private.

Subdivision, minor: A division of land into not more than four (4) lots, provided:

1.

A minor subdivision does not require the construction of any public improvements including street, sidewalks, sewer or water lines and street trees.

2.

All lots and any remaining tract shall be consistent with all applicable requirements of this zoning ordinance, including lot size, setbacks, frontage on a public road, width to depth ratio, and lot width.

3.

At the time of filing of a subdivision plat, the property owner shall be required to show all possible lots which are permitted to be created through minor subdivision provisions of this zoning ordinance.

4.

All driveway permits shall be subject to the review of the DeKalb County Department of Transportation and Development or the State of Georgia Department of Transportation.

Supplemental zone: The additional sidewalk area other than the required sidewalk used to support outdoor dining or other amenities.

Support structure(s): See section 4.2.57.B.

Supportive living: A non-institutional, independent group living environment that integrates shelter and service needs of functionally impaired and/or socially isolated elders who do not need institutional supervision and/or intensive health care.

Sustainable development: A development that maintains or enhances economic opportunity and community well-being while protecting and restoring the natural environment upon which people and economies depend. Sustainable development meets the needs of the present without compromising the ability of future generations to meet their own needs.

Synagogue: See Place of worship.

Tandem parking: A parking space within a group of two (2) or more parking spaces arranged one (1) behind the other such that the space nearest the street serves as the only means of access to the other space(s).

Tattoo parlors and piercing studios: An establishment whose principal business activity, is the practice of one (1) or more of the following: (1) placing of designs, letters, figures, symbols, or other marks upon or under the skin of any person, using ink or other substances that result in the permanent coloration of the skin by means of the use of needles or other instruments designed to contact or puncture the skin; (2) creation of an opening in the body of a person for the purpose of inserting jewelry or other decoration.

Taxi stand: A reserved area where taxis or cabs are parked.

Telecommunications antenna: See section 4.2.57.B.

Telecommunications facility/tower: See section 4.2.57.B.

Telecommunications tower: See section 4.2.57.B.

Telecommunications tower or antenna height: See section 4.2.57.B.

Telephone exchange building: A building used exclusively for the transmission and exchange of telephone messages. The term shall not include wireless telecommunication towers or antennas.

Temple: See Place of worship.

Temporary outdoor sales or event, seasonal: Outdoor sales of products associated with seasons, holidays and agricultural seasons.

Temporary produce stand: A temporary vending structure used for the sale and/or display of seasonal produce.

Tennis courts, play and recreation areas, community: A public or private facility for the playing of tennis, swimming, or other type of outdoor recreation, including related retail sales and an accessory restaurant. This term does not include amenities for a subdivision or other form of housing.

Theater: A structure used for dramatic, operatic, dance, or music performances, or the rehearsal and presentation of other similar performing arts events, or for motion pictures, for which an admission fee is charged. Such establishments may include related services such as food and beverage sales and other concessions.

Threshold: The top of the subfloor in the opening that is designated as the front door of a dwelling.

Thrift store: A for-profit or non-profit business or organization that engages or specializes in the sale or resale of previously owned or used goods. This term includes antique shops, consignment stores, and secondhand stores.

Tire retreading and recapping: Businesses that primarily repair and retread automotive tires.

Total sound level: That measured level which represents the summation of the sounds from the sound source under investigation and the neighborhood residual sounds which affect a given place at a given time, exclusive of extraneous sound sources.

Tow service: Establishment that provides for the removal and temporary storage of vehicles, but does not include disposal, permanent disassembly, salvage, or accessory storage of inoperable vehicles. See also Automobile recovery and storage.

Townhouse: One (1) of a group of three (3) or more single-family dwelling units, attached side-by-side by a common wall. See Dwelling, single-family.

Townhouse, stacked: Multi-family building with the appearance of a townhouse (side-by-side attached), but which has multiple dwelling units whereby a unit is located above or below another.

Trailer: Any non-motorized vehicle or wheeled attachment designed to be towable, including, but not limited to landscape utility trailers, horse trailers, storage trailers, campers, recreational vehicle trailers designed for temporary living quarters while traveling or camping, fifth-wheel trailers, pop-up campers, transport trailers, and boat trailers.

Transit: The conveyance of persons or goods from one (1) place to another by means of a local, public transportation system.

Transit oriented development (TOD): Moderate and high-density mixed-use development which is located along transit routes and encourages pedestrian use of public transportation.

Transitional buffer zone: A natural or planted buffer area between two (2) different land uses which is intended to provide protection between said land uses and which meets the criteria for said buffer specified in article 5.

Transitional height plane: A geometric plane that establishes the maximum permitted height of a building in a district that allows a greater density than that of an adjoining lower-density residential district. The transitional height plane shall begin at a point thirty-five (35) feet above setback or transitional buffer line, whichever is furthest from the property line, then extend at an upward angle of forty-five (45) degrees over the lot of the building.



Figure 9.11    Transitional Height Plane

Transitional housing facility: A building or buildings in which is provided long-term but no permanent living accommodations for more than six (6) persons who have no permanent residence and are in need of long-term housing assistance. Compare with Homeless shelter.

Transparent material: Any material which allows light to be transmitted and objects to be seen clearly and with definition.

Transportation equipment and storage or maintenance (vehicle): Any building, premises or land in which or upon which is the storage or maintenance of motor freight vehicles or equipment, without services provided, such as those provided by a truck stop. Compare with Truck terminal.

Tree: Any living, self-supporting, woody perennial plant which has a trunk caliper of two (2) inches or more measured at a point six (6) inches above the ground and which normally attains a height of at least ten (10) feet at maturity usually with one (1) main stem or trunk and many branches.

Tree canopy: The area directly beneath the crown and within the outermost edges of the branches and leaves of a tree.

Truck stop: Any building, premises, or land in which or upon which a business, service, or industry involving the maintenance, servicing, storage, or repair of commercial vehicles is conducted or rendered, including the dispensing of motor fuel or other petroleum products directly into such commercial vehicles and the sale of accessories or equipment for trucks and similar commercial vehicles. A truck stop may also include overnight accommodations and restaurant facilities primarily for the use of truck crews.

Truck terminal: An area and building where vehicles load and unload cargo and freight and where the cargo and freight may be broken down or aggregated into smaller or larger loads for transfer to other vehicles or modes of transportation.

Turnaround: A space, as in a driveway, permitting the turning around of a vehicle.

Two-part commercial block style: A building of two (2) stories or greater in height that has a flat roof and is characterized by a horizontal division of the building façade into two (2) distinct zones. These zones may be similar in design but shall be clearly separated from one another. The ground floor level of the building shall contain fenestration equal to seventy-five (75) percent of the width of the front façade of the building.

Universal barrier: A type of root barrier for street trees.

Understory tree: A deciduous or evergreen tree which attains a mature height of no greater than thirty (30) feet.

University: See College.

Upper stories in the Emory Village Overlay District: All stories located above the sidewalk level.

Urban garden: A lot, or any portion thereof, managed and maintained by a person or group of persons, for growing and harvesting, farming, community gardening, community-supported agriculture, or any other use, which contributes to the production of agricultural, floricultural, or horticultural products for beautification, education, recreation, community or personal use, consumption, sale, or donation. An urban garden may be a principal or accessory use on lots including, but not limited to, those

owned by individuals, non-profit organizations, and public or private institutions like universities, colleges, school districts, hospitals, and faith communities. This definition excludes gardens accessory to an individual's residence.

Usable satellite signals: Satellite signals from all major communications satellites that, when viewed on a conventional television set, are at least equal in picture quality to those received from local commercial television stations by way of cable television.

Usable open space: See Open space, usable.

Use: The purpose or activity for which land or buildings are designed, arranged, or intended or for which land or buildings are occupied or maintained.

Utility: Any public or private agency that provides for the generation, transmission or distribution of electricity, gas, water, stormwater, wastewater, communication, transportation, or other similar service, excluding those utilities that are public uses.

Valet: See Parking, valet.

Value added products: Prepared farm products such as baked goods, jams and jellies, canned vegetables, dried fruit, syrups, salsas, salad dressings, flours, coffee, smoked or canned meats or fish, sausages, or other prepared foods.

Van service: A commercial or not-for-profit service in which the provider offers transportation service to clients from their home to another destination, such as a medical service facility or other destination.

Variance: Permission to depart from the requirements of this chapter pursuant to the requirements of article 7.

Vehicle storage yard: A building or land that is used principally for long-term parking of any class of passenger or non-passenger vehicles, including but not limited to automobile fleets associated with commercial business, delivery trucks or other commercial vehicles, or associated with government operations such as school buses, postal delivery trucks, or sanitation trucks. The term "vehicle storage yard" includes off-site parking of commercial vehicles such as those used in light or heavy landscaping or construction, but does not include transportation vehicle such as semi-tractor trailers. A vehicle storage yard may include minor repair of the vehicles as an accessory use. Compare with Auto recovery and storage.

Vehicle trip: A vehicular movement either to or from the subject property by any vehicle used in a home occupation, any vehicle associated with a home occupation, or any customer or client vehicle.

Vehicular use area: Any portion of a site or a property, paved or unpaved, designed to receive or accommodate vehicular traffic, including the driving, parking, temporary storage, loading, or unloading of any vehicle.

Veterinary clinic: See Animal hospital.

Videotape sales and rental store: An establishment primarily engaged in the retail rental or lease of video tapes, films, CD-ROMs, laser discs, electronic games, cassettes, or other electronic media. Sales

of film, video tapes, laser discs, CD-ROMs, and electronic merchandise associated with VCRs, video cameras and electronic games are permitted accessory uses.

Viewshed: The total visible area from an identified observation position or positions.

Village center: The central shopping or gathering place within a traditional neighborhood which contains commercial uses and open space and which may contain public space.

Village open space in the Emory Village Overlay District: That portion of the Emory Village Overlay District, whether on public or private property, which is open and unobstructed from ground level to the sky, with the exception of natural foliage or accessory recreational facilities or walkways, which is accessible to all persons occupying a building on the lot and is not a part of the roof of any portion of any building specifically excluding areas for vehicular use, including, but not limited to driveways and parking lots. Priority village open space that appears on the Emory Village Regulating Plan, dated March 23, 2007, is included within this definition.

Wall: A structure used as a solid retaining, screening, or security barrier constructed of materials including brick, stone, concrete, concrete block, ceramic tile or other aggregate materials and other such materials.

Wall plane: An area of a wall between a wall offset and another wall offset or a corner.

Waste to energy facility: A solid waste handling facility that provides for the extraction and utilization of energy from county solid waste through a process of combustion.

Weekday: The time period of the week that begins at 7:00 a.m. on each Monday and ends at 6:00 p.m. on each Friday.

Weekend: The time period of each week that begins at 6:00 p.m. on each Friday and ends at 7:00 a.m. on each Monday.

Wetlands: An area of land meeting the definition of "wetlands" set forth in 33 C.F.R. Part 328.3(b) of the Code of Federal Regulations, as amended, and that is subject to federal, state or local regulations governing land meeting that definition.

Wind turbine: A turbine, a rotating machine which mounted on a tower, is used to capture energy from the wind to produce electricity.

Wine store in the Emory Village Overlay District: A specialty store selling fortified and fermented wine, malt beverages and related paraphernalia, including food and related reading material.

Workforce housing: For-sale housing that is affordable to those households earning eighty (80) percent of median household income for the Atlanta Metropolitan Statistical Area (MSA) as determined by the current fiscal year HUD income limit table at the time the building is built.

Xeriscape: A landscape designed and maintained with the principles that promote good horticultural practices and efficient use of water and is characterized by the use of vegetation that is drought-tolerant or of low water use in character.

Yard: That area of a lot between the principal building and adjoining lot lines, unoccupied and unobstructed by any portion of a structure from the ground upward, except as otherwise provided herein.

Yard sale: The temporary residential sale of tangible personal property, such as but not limited to, household items, clothing, tools, toys, recreational equipment, or other used or secondhand items normally found in and about the home. This definition includes the terms estate sale, if held outside, garage sale, basement sale, carport sale, moving sale, or rummage sale. This temporary use may be conducted by an individual, multiple persons, churches, social civic or charitable organizations, a neighborhood group, church or civic association.

Yard, corner side: An open-space area of a corner lot between the exterior side lot line and the required exterior side building setback line, extending between the front building setback line and the rear building setback line.

Yard, front: An area extending across the total width of a lot between the front lot line and the building. With respect to limitations within the front yard, there can only be one (1) front yard.

Yard, interior side: A yard extending between the front and rear yards and being that area between the side lot line, where the side lot line is coincidental with the side or rear lot line of an adjacent lot, and that line or lines established by the side wall or walls of the principal structure.

Yard, rear: A yard extending across the total width of a lot between side lot lines and being that area between the rear lot line and that line or lines established by the rear wall or walls of the principal structure projected to intersect the side lot lines.

Yard, side: A yard extending between the front and rear yards and being that area between the side lot lines and the principal structure.



Figure 9.12    Illust

Zero lot line: When location of a building in such manner that one (1) or more of building's exterior wall is allowed to rest directly on the lot line or property boundary.

Zoning decision: Final legislative action by a local government which results in:

1.

The adoption of a zoning ordinance;

2.

The adoption of an amendment to a zoning ordinance which changes the text of the zoning ordinance;

3.

The adoption of any amendment to a zoning ordinance which rezones the property from one zoning classification to another;

4.

The adoption of an amendment to a zoning ordinance by a municipal local government which zones property to be annexed into the municipality;

5.

The grant of a permit relating to a special use of property, as defined in O.C.G.A. § 36-66-3, and as may hereafter be amended by Georgia law; or

6.

Denial of the aforementioned ordinances or permits.

( Ord. No. 15-06 , 8-25-2015)

I; the undersigned, Barbara H. Sanders Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board meeting lawfully assembled on this ___ day of August 2015

And same appears in Minutes of said Board this day of _____ 2015

Clerk of Commissioners
DeKalb County, Georgia

# DEKALB COUNTY PRIVILEGE LICENSE

Not Refundable

Not Transferable

Trade Name: SHEBA ETHIOPIAN RESTAURANT
Corp. Name: SHEBA ETHIOPIAN REST, INC
Licensee:  SOLOMON S ABEBE
Location:   1594 WOODCLIFF DR  STE 4
            ATLANTA GA 30329-

This license authorizes the licensee
to sell  BEER, WINE AND LIQUOR
for consumption on premises only.
Fee paid: $4,900.00
Date Issued: Jan. 1, 2017

**LICENSE NO.    201101**
EXPIRES: DECEMBER 31,  2017

SHEBA ETHIOPIAN RESTAURANT

SHEBA ETHIOPIAN RESTAURANT
1594 WOODCLIFF DR NE STE G
ATLANTA GA 30329-3133

THIS LICENSE MUST BE DISPLAYED
Internal Audit and Licensing

\* VALID MONDAY THRU SATURDAY ONLY \*
Hours of operation established in DeKalb Co. code

This license is a mere privilege subject to be
revoked and annulled, and is subject to any future
ordinance which may be enacted.

# DEKALB COUNTY SUNDAY SALES PERMIT

Not Refundable

Not Transferable

Trade Name: SHEBA ETHIOPIAN RESTAURANT
Corp. Name: SHEBA ETHIOPIAN REST, INC
Licensee:  SOLOMON S ABEBE
Location:   1594 WOODCLIFF DR  STE 4
            ATLANTA GA 30329-

This license authorizes the licensee
to sell  BEER, WINE AND LIQUOR
for consumption on premises only.
Fee paid: $1,100.00
Date Issued: Jan. 1, 2017

**PERMIT NO.    201101**
EXPIRES: DECEMBER 31,  2017

SHEBA ETHIOPIAN RESTAURANT

SHEBA ETHIOPIAN RESTAURANT
1594 WOODCLIFF DR NE STE G
ATLANTA GA 30329-3133

THIS LICENSE MUST BE DISPLAYED
Internal Audit and Licensing

\* VALID FOR SUNDAY SALES ONLY \*
Hours of operation established in DeKalb Co. code

This license is a mere privilege subject to be
revoked and annulled, and is subject to any future
ordinance which may be enacted.
---BOARD OF COMMISSIONERS OF DEKALB COUNTY

**EXHIBIT**

**D**



# DeKalb County Department of Planning & Sustainability

Lee May
**Interim Chief Executive Officer**

Andrew A. Baker, AICP
**Director**

This is to certify that this document is a true
of the records in our system *John Reid*

*Grand fathering Renewie*
*for LNE, No Any Myl*

## Letter of Entertainment
READ ALL INSTRUCTIONS BEFORE COMPLETING THIS FORM

1. Both the tenant and property owner are required to sign the form.
2. All signatures must be original. Fax and Xerox signatures are not acceptable.
3. Both signatures must be individually notarized (two seals, two stamps, etc.).
4. *Agents (holding companies, property managers, attorneys, etc.) signer for property owner must attach any and all documentation necessary to prove they have authorization to act on behalf of the owner.  Failure to provide such information **will delay** approval of all permits and licenses necessary to open this business.

| DEPARTMENT USE ONLY |
|---|
| TAX ID # _____ |
| AP # _____ |

Name of business: **SHEBA ETHIOPIAN RESTAURANT**

Address of business: **1594 Woodcliff Dr Suite C Atlanta, Ga. 303**

## EACH OF THE FOLLOWING QUESTIONS MUST BE ANSWERED COMPLETELY:

**(A) Are you going to have entertainment?** ☑ Yes   ☐ No
If "yes", is it going to be "<u>Adult Entertainment</u>" as defined by the DeKalb County Zoning and Adult Entertainment licensing and alcohol beverage ordinances?   ☐ Yes   ☐ No

**(B) Is this a sit down restaurant only?**   ☑ Yes   ☐ No
<u>Definition of Restaurant:</u> An establishment where food and drink are prepared, served, and consumed primarily within the principal building.

**(C) Is this a late night establishment?**   ☑ Yes   ☐ No
<u>Definition of Late Night Establishment:</u> Any establishment licensed to dispense alcoholic beverages for consumption on premises where such establishment is open for use by patrons beyond 12:30 a.m.

**(D) Is this a nightclub:**   ☐ Yes   ☑ No
<u>Definition of Nightclub:</u> A commercial establishment dispensing alcoholic beverages for consumption on the premises and in which dancing and musical entertainment is allowed.

Describe in detail the entertainment and business operation you are going to have, <u>include hours of operation</u>:

**St Mon, Day throu Fri, Sat   11Am – 3:55Am**
**Sit Sunday   11Am  2:55Am**

I, THE UNDERSIGNED, DO HEREBY AFFIRM THAT I HAVE ANSWERED THE ABOVE QUESTIONS AND STATEMENTS TRUTHFULLY AND ACCURATELY AND I UNDERSTAND THAT THE BUILDING PERMIT(S) AND CERTIFICATE(S) OF OCCUPANCY ISSUED IN RELATION TO THIS "ENTERTAINMENT STATEMENT" ARE CONDITIONED ON THE ANSWERS TO THE ABOVE QUESTIONS AND STATEMENTS.

ALSO UNDERSTAND THAT SHOULD I, IN THE FUTURE, OFFER ENTERTAINMENT OR ANY USE NOT EXPRESSLY PERMITTED AS DEFINED BY THE DEKALB COUNTY ZONING, ALCOHOL BEVERAGE AND ADULT ENTERTAINMENT LICENSING ORDINANCES, AND OR CHANGE THE USE OF THE ESTABLISHMENT FROM THE APPROVED PERMITTED USE, THAT MY CERTIFICATE OF OCCUPANCY SHALL BE IMMEDIATELY NULL AND VOID.

Sworn to and subscribed before me this
day of _December_ 20_17_
_____
Notary Public

Sign _____
Tenant or authorized agent

(Print/Type name) _Solomon Abebe_
Henry Loeber + Associates As Receiver for
Scarlett + Associates, Inc.

Sworn to and subscribed before me this _2_
day of _December_ 20_17_
_____
Notary Public

Sign _____  for the Receiver
Property owner or authorized agent

(Print/Type name) _Charlie Stanford_

***PLEASE NOTE:** The County will not be held responsible for failure to comply with #4:

OFFICIAL SEAL
MARY ELLEN TOMTER
Notary Public, Georgia
FULTON COUNTY
My Commission Expires
JUNE 19, 2018

de Leon Avenue – Suites 100-500 – Decatur, Georgia – 30030
[Planning Fax] (404) 371-4556 [Development Fax] (404) 371-3007

| EXHIBIT |
|---|
| E |

Blumberg No. 5137



**CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION**

DEKALB COUNTY, STATE OF GEORGIA                    CITATION NUMBER **029601**

NAME: _Sheba Ethiopian Restaurant_
     LAST              FIRST         MIDDLE

ADDRESS _1594_ _Woodcliff Dr_ _Suite G_
       NUMBER     STREET NAME         APARTMENT NO.

_Atlanta_ _Ga_ _30329_
CITY       STATE       ZIPCODE

| SEX | DOB | ID/LICENSE NUMBER | STATE | HT | WT |
|---|---|---|---|---|---|

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH, CONTRARY TO LAW, IN THAT:

ON THE _4_ DAY OF _Feb_ 20_17_ AT _4_ AM / PM IN UNINCORPORATED DEKALB COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE:

SECTION / CODE _27-4.2.32_ TITLE OF SECTION / _Adult Board Establishment_

REMARKS _Operating outside of the letter of Entertainment ( )_

WARNING NOTICE ISSUED ☐

PLACE OF OFFENSE: _1594 Woodcliff Dr Suite G_

THIS _4_ DAY OF _Feb_, 20_7_

OFFICER/INSPECTOR (PRINT) _P Brown_ BADGE NO. _____

**YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY GEORGIA LOCATED AT:**
**3630 CAMP CIRCLE, DECATUR GA 30032**

ON THE _7_ DAY OF _March_, 20_17_, AT _2:00_ AM / PM

(   ) I HAVE THIS DAY SERVED THE DEFENDANT, _____ PERSONALLY WITH THE FOREGOING CITATION THIS _____ DAY OF _____, 20_____.

(   ) I HAVE THIS DAY SERVED THE DEFENDANT, _____, A CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____,
AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____, 20_____.

_Refuse to sign_
VIOLATOR SIGNATURE     PHONE NUMBER     SERVING AGENT NAME/TITLE

FAILURE TO APPEAR MAY RESULT IN A WARRANT FOR YOUR ARREST

WHITE COPY COURT    YELLOW COPY VIOLATOR    PINK CASE FILE    GREEN FILE

VIOLATOR _(sidebar)_
VIOLATION _(sidebar)_
SUMMONS _(sidebar)_
SERVICE _(sidebar)_

EXHIBIT
F

Blumberg No. 5137



## CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION

DEKALB COUNTY, STATE OF GEORGIA                    CITATION NUMBER **026556**

NAME: Atebe                Solomon                         S
LAST               FIRST                         MIDDLE

ADDRESS 3060        Wyntree Vl.                         APARTMENT NO.
NUMBER      STREET NAME

Peachtree Corners      GA              30071
CITY          STATE              ZIPCODE

M  6-18-68   053660389    GA  5'11"   180
SEX   DOB     ID/LICENSE NUMBER   STATE   HT    WT

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE
THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH,
CONTRARY TO LAW, IN THAT:

ON THE 25 DAY OF March 2017 AT 3.30 AM/PM IN UNINCORPORATED DEKALB
COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE.

13-40            Fire Code Violations
SECTION / CODE              TITLE OF SECTION

REMARKS  Failure to comply with
orders given
2012 IFC 109.3.2

WARNING NOTICE ISSUED ☐  Sheba Ethiopian Rest

PLACE OF OFFENSE: 1594 Woodcliff Dr.

THIS 25 DAY OF March , 20 17

OFFICER/INSPECTOR (PRINT) John Jewett        BADGE NO. 321

YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY
GEORGIA LOCATED AT:
**3630 CAMP CIRCLE, DECATUR GA 30032**

ON THE 25 DAY OF April , 20 17 , AT 9:00 AM/PM

( X ) I HAVE THIS DAY SERVED THE DEFENDANT, Solomon Atebe PERSONALLY
WITH THE FOREGOING CITATION THIS 25 DAY OF March , 20 17.

( ) I HAVE THIS DAY SERVED THE DEFENDANT, _____, A

CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____.

AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____, 20____.

refused to
sign                          Jewett
VIOLATOR SIGNATURE    PHONE NUMBER    SERVING AGENT NAME/TITLE

**FAILURE TO APPEAR MAY RESULT IN A WARRANT FOR YOUR ARREST**

WHITE COPY-COURT    YELLOW COPY-VIOLATOR    PINK CASE FILE    GOLDEN FILE

*Vertical left margin labels:* VIOLATOR · VIOLATION · SUMMONS · SERVICE



## CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION

DEKALB COUNTY, STATE OF GEORGIA                 CITATION NUMBER **026555**

NAME: Ababe                Solomon              S
      LAST                    FIRST                MIDDLE

ADDRESS 3060        Wyntre Dr.
     NUMBER        STREET NAME                    APARTMENT NO.

Peachtree      GA              30071
CITY          STATE          ZIPCODE

Corners
M  6-18-1968  053660389    GA  5' 11" 180
SEX   DOB      ID/LICENSE NUMBER   STATE   HT   WT

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE
THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH,
CONTRARY TO LAW, IN THAT:

ON THE 25 DAY OF March 20 17 AT 3:30 AM/ PM IN UNINCORPORATED DEKALB
COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE:

12-40         Fire Code Violations
SECTION / CODE              TITLE OF SECTION

REMARKS Overcrowding over issued
occupant load limit

2012 IFC - 107.5

WARNING NOTICE ISSUED ☐    Shebba City Hall 259

PLACE OF OFFENSE: 1594 Woodcliff Dr.

THIS 25 DAY OF March , 20

OFFICER/INSPECTOR (PRINT)  John Jewett   BADGE NO. 

**YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY
GEORGIA LOCATED AT:**
**3630 CAMP CIRCLE, DECATUR GA 30032**

ON THE 25 DAY OF April , 20 17 AT 9:00 AM/ PM

( ✓ ) I HAVE THIS DAY SERVED THE DEFENDANT, _____ PERSONALLY
WITH THE FOREGOING CITATION THIS 25 DAY OF _____ , 20 ____

( ) I HAVE THIS DAY SERVED THE DEFENDANT, _____ A

CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____ ,

AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____ , 20 ____ .

VIOLATOR SIGNATURE      PHONE NUMBER    SERVING AGENT NAME/TITLE

FAILURE TO APPEAR MAY RESULT IN A WARRANT FOR YOUR ARREST
WHITE COPY: COURT    YELLOW COPY: VIOLATOR    PINK: CASE FILE    AMBER: FILE

VIOLATOR

VIOLATION

SUMMONS

SERVICE



## CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION

DEKALB COUNTY, STATE OF GEORGIA          CITATION NUMBER **026556**

NAME: Ababe          Solomon          S
LAST          FIRST          MIDDLE

ADDRESS 3060          Wyntree Dr.          APARTMENT NO.
NUMBER          STREET NAME

Peachtree Corners          GA          30071
CITY          STATE          ZIPCODE

M   6-18-68   053660389   GA   5'11"   180
SEX   DOB   ID/LICENSE NUMBER   STATE   HT   WT

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH, CONTRARY TO LAW, IN THAT:

ON THE 25 DAY OF March 20 17 AT 5:30 AM/PM IN UNINCORPORATED DEKALB COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE.

12-40          Fire Code Violations
SECTION / CODE          TITLE OF SECTION

REMARKS Failure to comply with
orders given
2012 IFC 109.3.2

WARNING NOTICE ISSUED ☐   Sheba Ethiopian Rest

PLACE OF OFFENSE: 1594 Woodcliff Dr.

THIS 25 DAY OF March , 20 17

OFFICER/INSPECTOR (PRINT) John Jewett          BADGE NO. 321

**YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY GEORGIA LOCATED AT:**
**3630 CAMP CIRCLE, DECATUR GA 30032**

ON THE 25 DAY OF April , 20 17 , AT 9:00 AM/ PM

( X ) I HAVE THIS DAY SERVED THE DEFENDANT, Solomon Ababe PERSONALLY
WITH THE FOREGOING CITATION THIS 25 DAY OF March , 20 17 .

( ) I HAVE THIS DAY SERVED THE DEFENDANT, _____ , A

CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____

AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____ , 20 _____

Refused to          Jewett
sign
VIOLATOR SIGNATURE          PHONE NUMBER          SERVING AGENT NAME/TITLE

FAILURE TO APPEAR MAY RESULT IN A WARRANT FOR YOUR ARREST.

WHITE COPY: COURT          YELLOW COPY: VIOLATOR          PINK COPY: FILE

VIOLATOR / VIOLATION / SUMMONS / SERVICE



**CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION**

DEKALB COUNTY, STATE OF GEORGIA — CITATION NUMBER 026448

**VIOLATOR**

NAME: Tefera (LAST) Nebyu (FIRST) Shimels (MIDDLE)

ADDRESS: 2810 4 (NUMBER) Plantation Dr., NE (STREET NAME) (APARTMENT NO.)

Atlanta (CITY) GA (STATE) 30324 (ZIPCODE)

M (SEX) 12-19-64 (DOB) 02995399 (ID/LICENSE NUMBER) GA (STATE) 5'4" (HT) 130 (WT)

**VIOLATION**

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH, CONTRARY TO LAW, IN THAT:

ON THE 27 DAY OF January 20 17 AT ~~2:00~~ 2:50 (AM)/PM IN UNINCORPORATED DEKALB COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE.

12-40 (SECTION / CODE) Fire Code Violations (TITLE OF SECTION)

REMARKS

Failure to permit construction. ~~of wall~~

In violation of 2012 IFC Sec. 105.4.1

Dekalb County Code of Ordinances Chapter 7

WARNING NOTICE ISSUED ☑

PLACE OF OFFENSE: 1594 Woodcliff Dr., NE Ste. 6

THIS 27 DAY OF January, 20 17

OFFICER/INSPECTOR (PRINT) John Jewett BADGE NO. 321

**SUMMONS**

YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY GEORGIA LOCATED AT:
**3630 CAMP CIRCLE, DECATUR GA 30032**

ON THE 28 DAY OF February, 20 17 AT 9:00 (AM) PM

**SERVICE**

(✓) I HAVE THIS DAY SERVED THE DEFENDANT, Nebyu Tefera PERSONALLY WITH THE FOREGOING CITATION THIS 27 DAY OF Jan, 20 17

( ) I HAVE THIS DAY SERVED THE DEFENDANT, ______, A CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH ______, AN OFFICER/AGENT OF SAID CORPORATION THIS ____ DAY OF ______, 20___.

[signature] (VIOLATOR SIGNATURE) 678/485-55?? (PHONE NUMBER) Jewett (SERVING AGENT NAME/TITLE)

[illegible]

## CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION

DEKALB COUNTY, STATE OF GEORGIA          CITATION NUMBER 026449

NAME  Tefera               Nebyu          Shimels
      LAST               FIRST              MIDDLE

ADDRESS 8104    Plantation Dr., NE
        NUMBER    STREET NAME              APARTMENT NO.

Atlanta      GA        30324
CITY      STATE        ZIPCODE

M    12-19-64   029953599    GA    5'04"    130
SEX   DOB    ID/LICENSE NUMBER   STATE   HT    WT

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE
THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH,
CONTRARY TO LAW, IN THAT.

ON THE 27 DAY OF January 20 17 AT 1:50 AM PM IN UNINCORPORATED DEKALB
COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE:

12-40          Fire Code Violations
SECTION / CODE       TITLE OF SECTION

REMARKS
Failure to remove or provide
fire/flame propagation performance
certification
2012 LSC, NFPA 101 - 10.3.1

WARNING NOTICE ISSUED ☐

PLACE OF OFFENSE: 1594 Woodcliff Dr., NE Ste. G

THIS 27 DAY OF Jan. 20 17

OFFICER/INSPECTOR (PRINT) John Jewett      BADGE NO. 321

YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY
GEORGIA LOCATED AT:
3830 CAMP CIRCLE, DECATUR GA 30032

ON THE 28 DAY OF February 20 17 AT 9:00 AM PM

( ✓ ) I HAVE THIS DAY SERVED THE DEFENDANT, Nebyu Tefera PERSONALLY

WITH THE FOREGOING CITATION THIS 27 DAY OF January, 20 17.

(    ) I HAVE THIS DAY SERVED THE DEFENDANT, _____ A

CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____

AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____, 20 _____

Nebyu          678/485-85w          Jewett
VIOLATOR SIGNATURE    PHONE NUMBER     SERVING AGENT NAME/TITLE



## CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION

DEKALB COUNTY, STATE OF GEORGIA     CITATION NUMBER 026450

VIOLATOR

NAME: Tefera          Nebyu          Shimels
LAST          FIRST          MIDDLE

ADDRESS 504,28104  Plantation Dr., Ne          APARTMENT NO.
NUMBER     STREET NAME          30324

CITY Atlanta     STATE GA     ZIPCODE 30324

M  12-19-64  029953599  GA  5'4"  130
SEX  DOB  ID/LICENSE NUMBER  STATE  HT  WT

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE
THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH,
CONTRARY TO LAW, IN THAT:

ON THE 27 DAY OF January 20 17 AT 7:50 AM / PM IN UNINCORPORATED DEKALB
COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE:

12-40          Fire Code Violations
SECTION / CODE          TITLE OF SECTION

REMARKS

Occupant Load over limit
95 issued, in Fire Hazard
Notice

2012 IFC & NFPA 101, 2012 CSC

WARNING NOTICE ISSUED ☑

PLACE OF OFFENSE: 1599 Woodcliff Dr.

THIS 27 DAY OF Jan , 20 17

OFFICER/INSPECTOR (PRINT) Jewett          BADGE NO. 321

YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY
GEORGIA LOCATED AT:
3630 CAMP CIRCLE, DECATUR GA 30032

ON THE 28 DAY OF February 20 17 AT 9:00 AM / PM

( ✓ ) I HAVE THIS DAY SERVED THE DEFENDANT, Nebyu Tefera          PERSONALLY

WITH THE FOREGOING CITATION THIS 27 DAY OF January , 20 17

(    ) I HAVE THIS DAY SERVED THE DEFENDANT, _____ A

CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____

AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____ , 20 ___

_____  6/485 5500  Jewett
VIOLATOR SIGNATURE  PHONE NUMBER  SERVING AGENT NAME/TITLE



## CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION

DEKALB COUNTY, STATE OF GEORGIA          CITATION NUMBER **026553**

**VIOLATOR**

NAME: _Alake_ _____ _Chris_ _____ _S_

LAST                    FIRST                    MIDDLE

ADDRESS _3060_ _____ _Water M_ _____

NUMBER          STREET NAME                    APARTMENT NO.

_Decatur_ _GA_ _____ _30011_

CITY / ___          STATE                    ZIPCODE

_M_ _6-18-6_ _066089_ _GA_ _5'11_ _160 lbs_

SEX    DOB    ID/LICENSE NUMBER    STATE    HT    WT

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH, CONTRARY TO LAW, IN THAT:

**VIOLATION**

ON THE _11_ DAY OF _Febru_ 20_17_ AT _3 :_ _AM_ / PM IN UNINCORPORATED DEKALB COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE:

_12-40_ _____ _Ga Cod. Violation_

SECTION / CODE          TITLE OF SECTION

REMARKS _Unsafe cap___ Cover issued_
_O/L in m_
_2012 IFC + NFPA 1 2-3.6.C_

_Shrba Ethiopian Rest_

WARNING NOTICE ISSUED ☐

PLACE OF OFFENSE: _1544 Woodcliff Dr_

THIS _11_ DAY OF _February_, 20_17_

OFFICER/INSPECTOR (PRINT) _Jewett H_ _____ BADGE NO. _321_

**SUMMONS**

YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY GEORGIA LOCATED AT:
**3630 CAMP CIRCLE, DECATUR GA 30032**

ON THE _28_ DAY OF _February_, 20_17_ AT _9:00_ AM / PM

**SERVICE**

( ✓ ) I HAVE THIS DAY SERVED THE DEFENDANT, _Sub_ _HE E_ _____ PERSONALLY WITH THE FOREGOING CITATION THIS _11_ DAY OF _February_, 20_17_

( ) I HAVE THIS DAY SERVED THE DEFENDANT, _____, A

CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____

AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____, 20 ___

_____          _____          _Jewett / Fmc_

VIOLATOR SIGNATURE    PHONE NUMBER    SERVING AGENT NAME/TITLE

*FAILURE TO APPEAR MAY RESULT IN A WARRANT FOR YOUR ARREST*

WHITE COPY: COURT    YELLOW COPY: VIOLATOR    PINK: CASE FILE    AMBER: FILE



## CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION

DEKALB COUNTY, STATE OF GEORGIA                    CITATION NUMBER **026554**

**VIOLATOR**

NAME: *Abebe*          *Soloman*          *C*
       LAST               FIRST            MIDDLE

ADDRESS *3660*          *Wyntree Dr.*
       NUMBER      STREET NAME               APARTMENT NO.

*Peachtree*          *GA*          *30011*
CITY         STATE              ZIPCODE

*M*   *6-8-68*   *053660389*   *GA*   *150*   *120/15*
SEX   DOB    ID/LICENSE NUMBER    STATE   HT   WT

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH, CONTRARY TO LAW, IN THAT:

**VIOLATION**

ON THE *11* DAY OF *February*, 20*17* AT *3:30* AM / PM IN UNINCORPORATED DEKALB COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE:

*27.4*          *Fire Code Violation*
SECTION / CODE            TITLE OF SECTION

REMARKS *Use of portable like item*
*indoor Not premise without approvals*
*against IFC Sections Sec. 6.36*
            *308.3*
            *3.8.37*

WARNING NOTICE ISSUED ☒   *1571 Woodcliff Rd*

PLACE OF OFFENSE: *Sheba Ethiopian Rest*

THIS *11* DAY OF *February*, 20*17*

OFFICER/INSPECTOR (PRINT) *Jewell*          BADGE NO. *321*

**SUMMONS**

YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY, GEORGIA LOCATED AT:
**3630 CAMP CIRCLE, DECATUR GA 30032**

ON THE *28* DAY OF *March*, 20*17* AT *9:00* AM / PM

**SERVICE**

( ✓ ) I HAVE THIS DAY SERVED THE DEFENDANT *Abebe Soloman* PERSONALLY WITH THE FOREGOING CITATION THIS *11* DAY OF *February*, 20*17*

( ) I HAVE THIS DAY SERVED THE DEFENDANT, _____, A CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____ AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____, 20 ___

*[signature]*          *[signature]*          *Jason HMJ*
VIOLATOR SIGNATURE   PHONE NUMBER   SERVING AGENT NAME/TITLE

*FAILURE TO APPEAR MAY RESULT IN A WARRANT FOR YOUR ARREST*

WHITE COPY: COURT   YELLOW COPY: VIOLATOR   PINK: CASE FILE   AMBER: FILE



## CODE ORDINANCE CITATION, SUMMONS AND ACCUSATION

DEKALB COUNTY, STATE OF GEORGIA       CITATION NUMBER **025099**

**VIOLATOR**

NAME: *Sheba Ethiopian Restaurant*
    LAST           FIRST        MIDDLE

ADDRESS *1594*  *Wordcliff Dr*   *Suite 6*
    NUMBER    STREET NAME        APARTMENT NO.

*Atlanta*  *Ga*     *30329*
CITY    STATE         ZIPCODE

| SEX | DOB | ID/LICENSE NUMBER | STATE | HT | WT |
|-----|-----|-------------------|-------|----|----|

THE UNDERSIGNED STATES THAT HE / SHE HAS JUST AND REASONABLE GROUNDS TO BELIEVE THAT THE PERSON NAMED HEREIN HAS COMMITTED THE OFFENSE(S) HEREIN SET FORTH, CONTRARY TO LAW, IN THAT:

ON THE *4* DAY OF *Feb* 20*17* AT ___ AM / PM IN UNINCORPORATED DEKALB COUNTY THE ABOVE DID COMMIT THE FOLLOWING OFFENSE:

*27-42.32*  *Late-night establishments*
SECTION / CODE    TITLE OF SECTION

**VIOLATION**

REMARKS *Operating outside of the hours of entertainment. (Still operating at 4 am)*
*4.75 am*

WARNING NOTICE ISSUED ☐

PLACE OF OFFENSE: *1594 Wordcliff Dr. Suite 6*

THIS *7* DAY OF *Feb* 20 *17*

OFFICER/INSPECTOR (PRINT) *J Brown*    BADGE NO. *1053*

**SUMMONS**

YOU ARE HEREBY ORDERED TO APPEAR AT THE MAGISTRATE COURT OF DEKALB COUNTY GEORGIA LOCATED AT:
**3630 CAMP CIRCLE, DECATUR GA 30032**

ON THE *7* DAY OF *March* 20*17* AT *2* : *00* AM **(PM)**

**SERVICE**

( ) I HAVE THIS DAY SERVED THE DEFENDANT, _____ PERSONALLY

WITH THE FOREGOING CITATION THIS _____ DAY OF _____, 20 _____.

( ) I HAVE THIS DAY SERVED THE DEFENDANT, _____, A

CORPORATION, PERSONALLY BY LEAVING THE FOREGOING CITATION WITH _____

AN OFFICER/AGENT OF SAID CORPORATION THIS _____ DAY OF _____, 20 _____.

*Richard Sean*
VIOLATOR SIGNATURE    PHONE NUMBER    SERVING AGENT NAME/TITLE

*FAILURE TO APPEAR MAY RESULT IN A WARRANT FOR YOUR ARREST*

WHITE COPY: COURT    YELLOW COPY: VIOLATOR    PINK: CASE FILE    ORDER: FILE

# SHEBA ETHIOPIAN RESTAURANT
## 1594 WOODCLIFF DR N.E ATLANTA, GA 30329

**APPLICABLE CODE**

- INTERNATIONAL BUILDING CODE (IBC) 2012 EDITION WITH GEORGIA STATE AMENDMENTS
- NATIONAL ELECTRIC CODE (NEC) 2014 EDITION
- INTERNATIONAL FUEL GAS CODE 2012 EDITION WITH GEORGIA STATE AMENDMENTS
- INTERNATIONAL MECHANICAL CODE 2012 EDITION WITH GEORGIA STATE AMENDMENTS
- INTERNATIONAL PLUMBING CODE, 2012 EDITION WITH GEORGIA STATE AMENDMENTS
- INTERNATIONAL ENERGY CONSERVATION CODE 2009 EDITION
- INTERNATIONAL FIRE CODE, 2012 EDITION WITH GEORGIA STATE AMENDMENTS
- GEORGIA ACCESSIBILITY CODE (120-3-20), 2012 EDITION
- NATIONAL FIRE PROTECTION ASSOCIATION (NFPA) 101 LIFE SAFETY CODE, 2012 EDITION WITH GEORGIA AMENDMENTS
- U.S DEPARTMENT OF JUSTICE, 2010 A.D.A STANDARD FOR ACCESSIBILITY DESIGN

**CODE ANALYSIS**

- SINGLE STORY STRIP MALL
- CONSTRUCTION ... TYPE 11A
- OCCUPANCY GROUP ... A2
- NO OF SUITES ... 2 SUITE PROVIDED
- TRAVEL DISTANCE ... 32 MAX
- GROSS SQUARE FOOTAGE ... 1,944 SF
- OCCUPANCY SEPARATION ... 1 .HR PER 20

**SCOPE OF PROJECT**

- TENANT PLANS TO BUILD VESTIBULE TO CONSERVE ENERGY
- NO MECHANICAL ALTERATION
- NO ELECTRICAL ALTERATION
- NO PLUMBING ALTERATION
- NO STRUCTURAL ALTERATION

**GENERAL NOTES**

1. ALL DESIGN AND MATERIAL SHALL BE TO DEKALB COUNTY STANDARDS AND SHALL ADHERE TO U.S IRA REGULATIONS
2. ALL DRAWINGS SHOWN UNLESS INDICATED OTHERWISE ARE TO FACE OF CMU
3. DO NOT SCALE DRAWINGS
4. ALL CONSTRUCTION MUST CONFORM TO DEKALB COUNTY STANDARDS AND WHETHER OR NOT REVIEW COMMENTS WERE MADE
5. NOTIFY INSPECTOR 24 HOURS PRIOR TO CONSTRUCTION
6. PROJECT INTERIOR OF SPACE FROM INCLEMENT WEATHER DURING CONSTRUCTION
7. CONTRACTOR SHALL OBTAIN ALL PERMITS BEFORE CONSTRUCTION BEGINS
8. CONTRACTOR WILL REMOVE ALL DEBRIS FROM SITE AFTER CONSTRUCTION
9. CONTRACTOR WILL CLEAN SITE DAILY OF DEBRIS
10. ALL DEBRIS AND UNACCEPTABLE MATERIALS SHALL BE HAULED AWAY AND LEGALLY DISPOSED OF OFF SITE BY THE CONTRACTOR. CONTRACTOR WILL DEBRIS AND UNACCEPTABLE MATERIALS WILL BE ON SITE WILL NOT BE ALLOWED
11. CONTRACTOR WILL VERIFY ALL DIMENSIONS AND RELATED SITE CONDITIONS PRIOR TO CONSTRUCTION
12. CONTRACTOR SHALL OBSERVE ALL NATIONAL, STATE LOCAL CODES DURING CONSTRUCTION
13. CONTRACTOR VERIFY LOCATION OF ALL UTILITIES AND STRUCTURAL ELEMENTS NOT SHOWN ON DRAWINGS PRIOR TO START OF WORK

**VICINITY MAP**



**KEY PLAN**





GEORGIA
PE 32?726
(TOP SECTION)
ENGINEER MESSAY NEGASH

Esheheru Nobe 1/4/2017

93180?

SHEBA ETHIOPIAN RESTAURANT
1594 WOODCLIFF DR N.E
ATLANTA, GA 30329

ENGINEERING DESIGN WORKS
MESSAY NEGASH
Tel 404-668-2367

| No. | Description | Date |
|-----|-------------|------|
|     |             |      |
|     |             |      |
|     |             |      |
|     |             |      |
|     |             |      |

SOLOMON ABEBE
AND NEBYOU TEFERA
6783588859
6784855500
**COVER PAGE**

| Project number | 03-17 |
|---|---|
| Date | 01/04/2017 |
| Drawn by | MN |
| Checked by | GA |
| Scale | |

**A-00**

**EXHIBIT G**



EXISTING FLOOR PLAN
1/8" = 1'-0"

SHEBA ETHIOPIAN
RESTAURANT
1594 WOODCLIFF DR N.E
ATLANTA, GA 30329

ENGINEERING DESIGN WORKS
MESSAY NEGASH
Tel. 404-966-2357

| No. | Description | Date |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

SOLOMON ABEBE
AND NEBYOU TEFERA
6783588859
6784855500

EXISTING FLOOR
PLAN

| Project number | 03-17 |
| --- | --- |
| Date | 01/04/2017 |
| Drawn by | MN |
| Checked by | GA |

A-01

| Scale | 1/8" = 1'-0" |



PROPOSED FLOOR PLAN
1/8" = 1'-0"



2   PARTITION WALL
    3/16" = 1'-0"



SHEBA ETHIOPIAN
RESTAURANT
1594 WOODCLIFF DR N.E
ATLANTA, GA 30329

ENGINEERING DESIGN WORKS
MESSAY NEGASH
Tel 404-966-2357

| No. | Description | Date |
|-----|-------------|------|
|     |             |      |
|     |             |      |
|     |             |      |
|     |             |      |
|     |             |      |
|     |             |      |
|     |             |      |
|     |             |      |

SOLOMON ABEBE
AND NEBYOU TEFERA
6783588859
6784855500

PROPOSED
FLOOR PLAN

| Project number | 03-17 |
|----------------|-------|
| Date | 01/04/2017 |
| Drawn by | MN |
| Checked by | GA |

A-02

| Scale | As indicated |

# WEST GEORGIA FIRE EXTINGUISHER, INC.
## 770 KINGSBRIDGE RD. CARROLLTON, GA. 30117
### (770) 836-0578   FAX (770) 830-8448



www.westgeorgiafire.com



February 16, 2017

SHEBRA Ethiopian Restaurant
1594 Woodcliff Dr. NE
Atlanta, GA 303029

Contact:  Solomon Abebe
Phone:   678-358-8859
Email:   solatli@hotmail.com

## WE ARE PLEASED TO OFFER THE FOLLOWING PROPOSAL

| QTY. | DESCRIPTION | PRICE | Total |
|------|-------------|-------|-------|
| 1 | Labor to Install Sprinkler Coverage for Restaurant | | $6,200.00 |
| 1 | Materials for Sprinkler Coverage | | $6,200.00 |
| 1 | Dekalb County Permit/Drawings/Plan Review | | $1,000.00 |
| 1 | Lift Rental (ceiling Heights are above 12 ft) | | $2,000.00 |
| Total | | | $15,700.00 |

We appreciate the opportunity to be of service. If we can be of any further assistance, or if you have any questions, please do not hesitate to call.

Labor is quoted during normal business hours Monday – Friday 8:00am to 5:00pm. This proposal is based on site plans, site visit and without existing sprinkler coverage in suite. This option is to tie into existing main line in adjacent suite. If approved by Fire Marshal and building owner, to tie in to the existing riser calculations, access to riser room and adjacent suite will be required. Customer to provide accessibility throughout suite while work is in progress. Exclusions: 120VAC circuits, underground work, water main tap, coring through wall, fire caulking, painting, and HVAC alternations. Payment terms: Deposit 50% and 50% at completion of work. 12 month Warranty shall commence at completion of project for labor and materials only which are furnished by W.G.F.E., Inc. Drawing approval, and start date is subject to approval of AHJ. Work to commence after drawing, and plan review by AHJ has been approved. Please allow 4-6weeks for drawings, plan reviews, material orders before scheduling start dates.

Thank you,

Seth Bullard
Service Sales Representative
West Georgia Fire Extinguisher, Inc.

3-2-17   Recived Deposit $7850.00

Check # 12237 (SB)

If proposal is acceptable please sign and return via email or fax

Signature:  Solomon Abebe

Print Name:  Solomon Abebe

EXHIBIT
H

Blumberg No. 5127

**Cc:** Hakim Hilliard; solatl@hotmail.com
**Subject:** Queen of Sheba at 1594 Woodcliff Dr, NE

Good afternoon, Mr. Jewett:

We have not spoken in some time, but I was contacted this afternoon by the owner of Queen of Sheba Restaurant regarding a visit you made to his establishment today.

Specifically, I understand that you conducted a general inspection and found no violations, but issued a temporary load capacity number of 99 persons. The owner advised that his capacity is 199 persons and has been for the entire 19 years he has been in business at this location, but he is under the impression that you rejected this number based upon his failure to produce a certificate from the DeKalb County Fire Department. I also understand that you warned that you will be visiting the establishment this weekend and if you find that there are more than 99 persons inside you will be taking action against the restaurant.

Notwithstanding the obvious impact of such a dramatic action taken to reduce the capacity of this restaurant by 100 persons, the owner is interested in being in complete and total compliance. This said, I hope that you will work with him/us over the course of the next couple of days to resolve this issue promptly so as not to harm his continuing business operations. In this regard, we would respectfully request that you assist us in the following manner:

1. Confirm that you have been unable to locate proof of the 199 person load capacity that was provided to this business 19 years ago. While the business should have this documentation, it seems unsconscionable that your department would have no record itself. Hopefully it is available in your office. If in fact it has been lost by DeKalb County, it also seems unfair that the business would be punished in the interim, as it has been by your action to provide a random capacity load that severely restricts this business.



EXHIBIT

I

2. If you are unable to find the relevant information in your files, please provide direction on what the business needs to do to properly address the capacity issue right away.

3. Please let us know when you are able to meet with us to discuss this matter, this week.  Again, your actions are extremely injurious to the business and we want to address your concerns before the end of the week.  We hope you will be willing to accommodate us.  (Parenthetically, I also represent Desta Restaurant, another Ethiopian Restaurant you inspected today, and we wil lbe meeting with building officials regarding that establishment on Friday morning.  Perhaps you can be a part of that meeting and we can resolve both of these issues simultaneously.)

I look forward to your prompt response.  As always, thanks very much for your assistance.

Thank you.

M. Hakim Hilliard, Esquire
The Hilliard Firm, LLC
260 Peachtree Street, NW, Suite 401
Atlanta, Georgia 30303
404.389.9085 (wk)
404.797.5525 (cell)
404.963.0220 (fax)
hhilliard@thehilliardfirm.com
www.thehilliardfirm.com

**Reid, John**

| | |
|---|---|
| **From:** | Cox, Joseph K. |
| **Sent:** | Monday, March 20, 2017 9:20 AM |
| **To:** | Jewett, John |
| **Subject:** | FW: After hours nightclub on briarcliff rd |

Please forward correspondence below to Late Night Task Force for follow-up.

Thanks,
Chief Cox

---

**From:** Cox, Joseph K.
**Sent:** Monday, March 20, 2017 9:21 AM
**To:** Burden, Antonio
**Cc:** Fullum, Darnell D.
**Subject:** RE: After hours nightclub on briarcliff rd

Received.
FMO is currently working with this location for fire code compliance, including installation of sprinkler system.
We have also limited maximum occupancy to 99 until sprinkler system is installed.
The issues below are outside FMO's jurisdictional scope, however, they will be referred to the Late Night Establishment Task Force for follow up.

Regards,
Chief Cox

---

**From:** Burden, Antonio
**Sent:** Monday, March 20, 2017 8:09 AM
**To:** Cox, Joseph K.
**Cc:** Fullum, Darnell D.
**Subject:** Fwd: After hours nightclub on briarcliff rd

Chief Cox
   Please see below.

Thanks

Sent from my iPhone

Begin forwarded message:

> **From:** "Rader, Jeff" <jrader@dekalbcountyga.gov>
> **Date:** March 20, 2017 at 7:58:21 AM EDT
> **To:** "Burden, Antonio" <aburden@dekalbcountyga.gov>, "Conroy, James"
> <JWConroy@dekalbcountyga.gov>, "Baker, Andrew" <aabaker@dekalbcountyga.gov>
> **Subject: FW: After hours nightclub on briarcliff rd**

EXHIBIT
J

Blumberg No. 5137

1

**Reid, John**

| | |
|---|---|
| **From:** | Jewett, John |
| **Sent:** | Monday, March 06, 2017 10:08 AM |
| **To:** | Adams, David; Baker, Andrew; Brannon, Hubert; Cox, Joseph K.; Edwards, Rodney D.; Etiwe, Philip; Fullum, Darnell D.; Reid, John; Spann, Madolyn; Washington, Larry; Clark, Tonza |
| **Subject:** | Sheba Restaurant |
| **Attachments:** | sheba sprinkler contract.jpg |

Good Morning,

FYI

I wanted to make you all aware of some information we received regarding "Sheba Restaurant"

As discussed in our previous meeting, Sheba Restaurant is making progress to become compliant the issues from a fire hazard we issued.  They have procured a sprinkler contractor.

The sprinkler system will satisfy the requirements of the 2012 LSC - Assembly with "Nightclub" designation having a sprinkler system.  The FMO's jurisdictional reach is for the life safety items only.

If you have any further questions, please don't hesitate to ask.

Thanks.

**John Jewett, Inspector**
**DeKalb County Fire Rescue**
**Fire Marshal Division**
**330 W. Ponce de Leon Ave.**
**Decatur, GA 30030**

**Office - 404.371.2470**
**Fax – 404.687.2430**

1



# DEKALB COUNTY FIRE RESCUE DEPARTMENT
## NOTICE OF FIRE HAZARD

D.P.S.# _____

DATE _3-25-2017_

NAME _Sheba Ethiopian Restaurant_

ADDRESS _1594 Woodcliff Dr._

Inspection of the premises located at _____

You are hereby requested to correct the following conditions on or before _Immediately_

Cease use of building/business immediatel. Prior to re opening gain approvals from our office & planning & sustainability prior to re opening.

- Failure to comply with previous orders & notices issued  2012 IFC Sec 109.3.2

**EXHIBIT**

**K**

Blumberg No. 5137

_refused to sign_

Received by Owner/Occupant

_J. Cox_ _____ Chief

_J. Jewett_ _____ Inspector

_____ Station ____

Compliance Date



**DeKalb County, Georgia**

Chief Executive Officer
Michael L. Thurmond

Board of Commissioners

District 1
Nancy Jester

District 2
Jeff Rader

District 3
Larry Johnson

District 4
Steve Bradshaw

District 5
Mereda Davis Johnson

District 6
Kathie Gannon

District 7
Gregory Adams

April 20, 2017

**VIA USPS AND EMAIL**
Solomon Abebe
3060 Wyntree Dr.
Peachtree Corners, GA 30071

Dear Mr. Abebe,

This letter is to inform you that the following decisions have been made with respect to Sheba Ethiopian Restaurant ("Sheba") and the premises located at 1594 Woodcliff Drive, Atlanta, GA (the "Premises"): (1) Sheba's 2017 application for a business occupation tax certificate is denied and its 2016 certificate is revoked due to repeated code violations and public safety concerns, (2) Sheba's certificate of occupancy is revoked due to a change in the type of permitted use without approval and due to repeated code violations and public safety concerns, and (3) any legal nonconforming status that Sheba may have enjoyed is hereby terminated due to change of use and due to the revocation of Sheba's business occupation tax certificate.

(1)

Sheba's application for a 2017 Business Occupation Tax Certificate is hereby denied pursuant to DeKalb County Code ("Code") Section 15-45(a)(2). Under Section 15-45(a)(2), a business occupation tax certificate shall be denied if "the premises covered by the Business Occupation Tax Certificate are found to be in violation of any codes or ordinances of the County." Sheba has repeatedly violated several code provisions, including:

- On December 29, 2016, DeKalb County Fire and Rescue issued a citation for:
    - Failure to permit construction

- On January 27, 2017, DeKalb County Fire and Rescue issued citations for:
    - Overcrowding
    - Failure to permit construction
    - Failure to provide fireproofing information

- On February 4, 2017, DeKalb County Code Enforcement issued citations for:
    - Operating after 3:55 a.m.
    - Serving alcohol after hours
    - Failure to comply with ingress and egress requirements

**EXHIBIT**

**L**

- On February 11, 2017, DeKalb Fire and Rescue issued citations for:
  - Overcrowding
  - Sparklers / open flame without a permit

- On March 25, 2017, DeKalb County Fire and Rescue issued citations for:
  - Overcrowding
  - Failure to comply with previous orders issued, including open flame without a permit

Due to these continuing and ongoing violations[1] and due to public safety concerns, the acting Finance Director hereby denies Sheba's 2017 business occupation tax certificate and revokes Sheba's 2016 certificate. Sheba has the right to appeal this revocation within 15 days to the Certificate Review Board in accordance with the appeal process set out in Section 15-46.

(2)

Sheba's certificate of occupancy is hereby revoked for repeated code violations and for a change in the type of permitted use without approval. DeKalb County Code Section 7-33(e)(5) provides that a certificate of occupancy shall be revoked if the premises are in violation of other applicable code sections. As noted above, Sheba has repeatedly violated applicable code sections concerning open flames, pyrotechnics, and overcrowding, among other things.

A certificate of occupancy shall also be revoked pursuant to DeKalb County Code Section 7-33(e)(2) if the premises changes the type of permitted use without approval. During its inspections, DeKalb Fire and Rescue, has determined that Sheba was operating as a nightclub. Therefore, the Planning & Sustainability Director has determined that Sheba has not been operating as a restaurant but rather as a nightclub.

Due to Sheba's continuing violations, change of use, and public safety concerns, the Planning & Sustainability Director hereby revokes Sheba's certificate of occupancy. Because the decision concerns a type of use under the zoning ordinance, Sheba has the right to appeal this decision within 15 days to the Zoning Board of Appeals in accordance with DeKalb County Code Section 27-7.5.2(b).

(3)

Any grandfathered or legal nonconforming status that Sheba may have enjoyed is hereby terminated due to the revocation of Sheba's business license and due to a change in permitted use. Section 27-4.2.32(e) provides that upon the revocation of a business or liquor license, the legal nonconforming status of a late night establishment shall be terminated. Furthermore, Section 27-8.1.5 provides that a nonconforming use shall not be changed to another

---

[1] Guilty pleas were entered for failure to permit construction, two counts of overcrowding, one count of failure to provide fireproofing information, one count of sparklers/open flames without a permit, and several citations are still pending adjudication.

nonconforming use. As noted above, the Planning & Sustainability Director has determined that Sheba has not been operating as a restaurant but rather as a nightclub.

Due to the revocation of Sheba's business license and public safety concerns, the Planning & Sustainability Director terminates any grandfathered status or right to operate as a nonconforming use. Sheba has the right to appeal this decision within 15 days to the Zoning Board of Appeals in accordance with DeKalb County Code Section 7.5.2(b).

Please let me know if you have any further questions or concerns.

Sincerely,

Zachary L. Williams
Chief Operating Officer and Acting Finance Director

Andrew A. Baker
Director – Planning & Sustainability Department

ARTICLE II. - BUSINESS OCCUPATION TAXES[2]

Footnotes:

--- **(2)** ---

**Editor's note—** Ord. No. 95-08, § 1, adopted June 13, 1995, amended Art. II, in its entirety, to read as herein set out. Prior to inclusion of said ordinance, Art. II pertained to similar subject matter. See the Code Comparative Table.

**Cross reference—** Bonds for septic tank installers required prior to issuance of business license, § 13-247.

**State Law reference—** Occupation taxes generally O.C.G.A. § 48-13-1 et seq.

Sec. 15-26. - Generally.

(a) Each person engaged in a business, trade, profession or occupation whether with a location within the county, exclusive of incorporated municipalities, or in the case of an out of state business with no location in Georgia exerting substantial efforts within the unincorporated part of the county pursuant to O.C.G.A section 48-13-7 shall pay an occupational tax for said business, trade, profession or occupation.

(b) Occupation taxes shall be based upon gross receipts in combination with profitability ratio and number of employees. The profitability ratio for the type of business will be determined from nationwide averages derived from statistics, classifications or other information published by the United States Office of Management and Budget, the United States Internal Revenue Service or successor agencies of the United States.

(c) A schedule of specific business occupation taxes, as adopted from time to time by the board of commissioners is on file in the office of the clerk of the board of commissioners, and shall be levied and collected in the amount and manner specified by this article.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-27. - Definitions of terms used in this article.

(a) Wherever the term "county" is used in this article, it shall be construed to mean the unincorporated area of DeKalb County, Georgia.

(b) Other terms used in this article:

   (1) *Administrative fee* is a component of the occupational tax which approximates the cost of handling and processing the occupational tax.

   (2) *Business* where used in this article shall be held to mean any person, sole proprietor, partnership, corporation, trade, profession, occupation or other entity and the efforts or activities associated thereby for the purposes of raising revenue or producing income.

   (3) *Employee* means an individual whose work is performed under the direction and supervision of the employer and whose employer withholds FICA, federal income tax, or state income tax from such individual's compensation or whose employer issues to such individual for purposes of documenting compensation a form I.R.S. W-2 but not a form I.R.S. 1099.



EXHIBIT

M

(4) *Gross receipts* means total revenue of the business or practitioner for the period, including without being limited to the following: total income without deduction for the cost of goods sold or expenses incurred; gain from trading in stocks, bonds, capital assets, or instruments of indebtedness; proceeds from commissions on the sale of property, goods, or services; proceeds from fees charged for services rendered; proceeds from rent, interest, royalty, or dividend income; and from all other income whatsoever arising from or growing out of the conduct of the business, trade, profession or occupation without any deduction whatsoever, except that gross receipts shall not include the following: sales, use, or excise taxes; sales returns, allowances, and discounts; interorganizational sales or transfers between or among the units of a parent-subsidiary controlled group of corporations as defined by 26 U.S.C. section 1563 (a)(1), between or among the units of a brother-sister controlled group of corporations as defined by 26 U.S.C. section 1563 (a)(2), or between or among wholly owned partnerships or other wholly owned entities; payments made to a subcontractor or independent agent; governmental and foundation grants, charitable contributions or the interest income derived from such funds, received by a non profit organization which employs salaried practitioners otherwise covered by this article, if such funds constitute eighty (80) percent or more of the organization's receipts; and proceeds from sales to customers outside the geographical boundaries of the State of Georgia.

(5) *Location* or *office* shall include any structure or any vehicle of a business or practitioner of a profession or occupation which has a location or office where a business, profession, or occupation is conducted, but shall not include a temporary or construction work site which serves a single customer or project or delivery vehicles of a business or practitioner of a profession or occupation which has a location or office.

(6) *Occupation tax* means a tax levied on persons, partnerships, corporations or other entities for engaging in an occupation, trade, profession or business for revenue raising or income producing purposes.

(7) *Regulatory fees* means payments, whether designated as license fees, permit fees or by another name, which are required as an exercise of police power and as a part of or as an aid to regulation of an occupation, profession or business. Regulatory fees shall not include an administrative fee. Regulatory fees do not include development impact fees as defined by paragraph 8 of O.C.G.A. section 36-71-2 or other costs or conditions of zoning or land development.

(8) *Dominant line* means the type of business within a multiple line business that the greatest amount of income is derived from.

(9) *Person* wherever used in this article shall be held to include sole proprietors, corporations, partnerships, nonprofit or any other form of business organization.

(10) *Practitioner of profession or occupation* is one who by state law requires state licensure regulating such profession or occupation. This definition shall not include a practitioner who is an employee of a business, if the business pays an occupation tax.

(11) *Director* means the director of finance or his or her designee.

(12) *Applicant* or *holder* means the applicant for, or holder of, a business occupation tax certificate, and shall include the business and any legally or organizationally related entity to which the occupational tax certificate applies.

(Ord. No. 95-08, § 1, 6-13-95; Ord. No. 95-13, 8-22-95; Ord. No. 22-03, Pt. 1, 8-26-03)

Sec. 15-28. - Registration of name of business; payment of taxes required

(a) No person shall be engaged in, pursue or carry on any business within the unincorporated portion of the county, in any manner without having registered the name of the business with the finance department and either paid the taxes as provided by this article or produced evidence of occupational tax payment to another jurisdiction in the State of Georgia or proof of payment of a local business occupation tax in another state which purports to tax the business' or practitioner's sales or services

in this state. The county shall not require an occupation tax on those receipts that were taxed by occupation tax in other states.

(b)   At the time of business registration, such person shall also identify to the finance department the line or lines of business that the business conducts. Classification of businesses for occupation tax purposes shall be based on the dominant line of business conducted.

(c)   Each separate business trade name shall be subject to the provisions of this article and shall fully comply with all county code requirements before engaging in, pursuing or carrying on any business within the county.

(d)   Failure or refusal to provide information requested by the county for the purpose of classification, assessment or levying of occupation taxes, regulatory fees or administrative costs or regarding the site of a location or office and taxes or fees paid to other local governments shall be punished as a misdemeanor and shall be subject to the provisions of county code section 2-41 Titled Authority to issue summonses.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-29. - Estimation of gross receipts; filing of returns.

(a)   All occupation taxes levied by this article are levied on the amount of business transacted during the current calendar year and the number of employees to be employed in the business conducted. However, for convenience of both the county and the taxpayer those businesses subject to the occupational tax shall on or before February 1 file with the finance department's business occupation tax section a return showing all gross receipts of that business during the preceding calendar year ending on December 31. This return showing preceding calendar year gross receipts shall be used as an estimate of gross receipts for making payments on the occupation tax for the current calendar year. The number of employees reported for the current year's business operations may be based upon the number of employees employed in the business conducted during the previous year. Applicants or owners engaged in the business shall be reported as employees of the business. For continuing businesses, the return required on or before February 1 showing the business' preceding year's actual gross receipts and number of employees shall also be used to adjust the estimated return for the same period. Differences will be billed or credited to the business' occupational tax billing as required. Should a business not continue or terminate during the year, such business shall notify the finance department's business occupation tax section and file a final return reporting the actual number of employees and those gross receipts not previously reported.

(b)   Where a business subject to the occupation tax for the calendar year has been conducted for only a part of the preceding year, the amount of gross receipts for such part shall be set forth in said return. Said return shall also show a figure putting the receipts for such part of a year on an annual basis with the part-year receipts bearing the same ratio to the whole-year gross receipts as the part year bears to the whole year. Said figure shall be used as the estimate of the gross receipts of the business for the current calendar year in establishing the business tax liability.

(c)   If a business is to begin on or after January 1 of the occupation tax year, the tax on such business shall be due and payable on the date of the commencement of the business and shall be based upon estimated gross receipts of the business from the date of commencement until the end of the calendar year. The business shall also file the required registration form and shall pay the administrative fee required by this article. Notwithstanding the foregoing, if a lawyer begins business after January 1 of the occupation tax year, the tax and administrative fee on such business shall be due and payable on December 31 of the year in which the business begins. Any lawyer failing to pay the occupation tax and administrative fee within one hundred twenty (120) days after December 31 shall be considered delinquent and shall be subject to and shall pay a ten (10) percent penalty of the amount of tax or fee due and interest as provided by state law. Such penalty shall be assessed in full on May 1 of the year following the tax year in addition to interest on delinquent occupational taxes and administrative fees.

In addition, a list of all delinquent lawyers may be sent to the State Bar of Georgia. Section 1-10 of this Code shall not apply to violations of this chapter by lawyers.

(d)   The county shall not require the payment of more than one (1) occupational tax for each location that a business or practitioner shall have nor shall the county require a business to pay an occupational tax for more than one hundred (100) percent of the business' gross receipts.

(e)   Real estate brokers shall pay an occupational tax for each principal office and each separate branch office located in the unincorporated area of the county based upon gross receipts derived from transactions with respect to property located within the unincorporated area of the county. Payment of the occupation tax shall permit the broker, the broker's affiliated associates and salespersons to engage in all of the brokerage activities described in O.C.G.A. [section] 43-40-1 without further licensing or taxing other than the state licenses issued pursuant to chapter 40 of Title 43.

(f)   For out of state businesses with no location in Georgia, occupation taxes include the gross receipts of business as defined in section 15-33 of this article titled paying occupation tax of business with no location in Georgia.

(g)   For purposes of this section, prima facie evidence of gross receipts generated during any period shall be a copy of the business' federal income tax return or an affidavit of the business' accounting firm.

(Ord. No. 95-08, § 1, 6-13-95; Ord. No. 98-10, 12-22-98)

Sec. 15-30. - Administrative and regulatory fees.

(a)   A non prorated, non refundable administrative fee set by the board of commissioners shall be required on all business occupation tax accounts for the initial start up, renewal or reopening of those accounts.

(b)   A regulatory fee will be imposed on those applicable businesses listed under O.C.G.A. section 48-13-9(b) that the county deems necessary to regulate.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-31. - Separate registration for separate locations or separate tradenames

Where a person conducts business at more than one (1) fixed location or has multiple business tradenames, each location or place and each tradename shall be considered to be separate for the purpose of the occupation tax and the gross receipts of each will be returned on a form furnished by the finance department in accordance with the provisions of this article.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-32. - Renewal returns and applications; due date; penalty for late payment.

(a)   Notwithstanding 1995 exception reporting date of gross receipts for implementation of this chapter, on or before February 1 of each subsequent year businesses liable for occupation taxes levied under this article for the year shall file with the finance department's business occupation tax section, on a form furnished by the finance department, a signed return setting forth the actual amount of the gross receipts of such business during the preceding calendar year ending December 31.

(b)   Occupational taxes on businesses continuing from the preceding year shall be due and payable on January 1 of each subsequent year. Occupational tax due from businesses continuing operation in the current year from the preceding year shall be considered delinquent if not paid by April 15 of each year. Any business failing to pay the occupational taxes and administrative fees within one hundred twenty (120) days after January 1 shall be subject to and shall pay a ten (10) percent penalty of the amount of tax or fee due and interest as provided by state law. Such penalty shall be assessed in full

on May 1 of the tax year in addition to interest on delinquent occupation taxes, regulatory fees and administrative fees.

(c)   If any person or business whose duty it is to obtain a registration in the county begins to transact or offers to transact any kind of business after said registration or occupation tax becomes delinquent, such offender shall be assessed interest according to the rate as provided by state law and penalties under the provisions of county code and shall be subject to the provisions of county code section 2-41 Titled Authority to issue summonses.

(d)   On any new business begun in the county and not subject to payment of occupational taxes to DeKalb County, failure to register the name of the business and the line or lines of business that the business conducts will be subject to the provisions of county code section 2-41 Titled Authority to issue summonses. Registration under this section is required for insuring business to be conducted complies with county codes or ordinances governing health, safety and other purposes.

(e)   Notwithstanding the foregoing, occupation taxes and administrative fees for lawyers shall be due and payable on December 31 of the year in which the tax is incurred. Any lawyer failing to pay the occupation tax and administrative fees within one hundred twenty (120) days after December 31 shall be considered delinquent and shall be subject to and shall pay a ten (10) percent penalty of the amount of tax or fee due and interest as provided by state law. Such penalty shall be assessed in full on May 1 of the year following the tax year in addition to interest on delinquent occupational taxes and administrative fees. In addition, a list of all delinquent lawyers may be sent to the State Bar of Georgia. Section 1-10 of this Code shall not apply to violations of this chapter by lawyers.

(f)   In addition to the above remedies, the finance department may issue an execution for failure to pay taxes against the person so delinquent and against such person's property for the amount of the occupational tax required to be paid for the purpose of carrying on any of the businesses enumerated in this article.

(Ord. No. 95-08, § 1, 6-13-95; Ord. No. 96-11, § 1, 6-11-96; Ord. No. 98-10, 12-22-98)

Sec. 15-33. - Paying occupation tax of business with no location in Georgia.

Registration and the assessment of an occupation tax is hereby imposed on those businesses and practitioners of professions and occupations with no location or office in the State of Georgia if the business' largest dollar volume of business in Georgia is in the unincorporated area of DeKalb County, Georgia, and the business or practitioner:

(1)   Has one (1) or more employees or agents who exert substantial efforts within the jurisdiction of unincorporated area of DeKalb County, Georgia, for the purpose of soliciting business or serving customers or clients; or

(2)   Owns personal or real property which generates income and which is located within the unincorporated area of DeKalb County, Georgia.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-34. - Professionals classified in O.C.G.A. section 48-13-9(c), Paragraphs 1 through 18.

Practitioners of professions as described in O.C.G.A. section 48-13-9(c)(1) through (18) shall elect as their entire occupation tax one (1) of the following:

(1)   The occupation tax based-on number of employees and gross receipts combined with profitability ratios as set forth in this article; or

(2)   An established fee set by the county board of commissioners in accordance with authority granted by state law. Such fee is per practitioner who is licensed by the state to provide the service, such tax to be paid at the practitioner's office or location. Practitioners paying according to this

paragraph shall pay the fee per practitioner and shall not be required to provide information relating to gross receipts or number of employees of the business or practitioner.

(3)   Any practitioner whose office is maintained by and who is employed in practice exclusively by instrumentalities of the United States, the state, a municipality or county of the state, shall not be required to register or pay an occupation tax for that practice.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-35. - Purpose and scope of tax.

The occupation tax levied herein is for revenue purposes only and is not for regulatory purposes, nor is the payment of the tax made a condition precedent to the practice of any profession, trade or calling.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-36. - Evidence of state registration required if applicable; county and state registration to be displayed.

(a)   Each person who is licensed by the Secretary of State pursuant to Title 43 of the Official Code of Georgia Annotated shall provide evidence of proper and current state licensure before the county registration may be issued.

(b)   Each person who is licensed by the state shall post the state license next to the county registration in a conspicuous place in the licensee's place of business and shall keep both the state license and the county registration there at all times while valid.

(c)   Any transient or nonresident person doing business within the county shall carry their occupational tax receipt either upon such person or in any vehicle or other conveyance which is used in such business, and such person shall exhibit it to any authorized enforcement officer of the county when so requested.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-37. - Change of location.

Any person moving from one (1) location to another shall notify the finance department of this move and the new address in writing on a form provided by the finance department prior to the day of the moving. A new receipt for the occupational tax will be issued for the new location if the new location conforms to the zoning regulations of the county.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-38. - Transferability.

Occupational receipts shall not be transferable and a transfer of ownership shall be considered in the same light as the termination of the business and the establishment of a new business. Filing a new registration application and payment of applicable fees and taxes shall be required of the new owner of the business.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-39. - Evidence of qualification required if applicable.

Any business required to obtain health permits, bonds, certificates of qualification, certificates of competency or any other regulatory matter shall first, before the issuance of county registration, show evidence of such qualification.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-40. - Inspections of books and records; audits; confidential information.

(a) The finance department through its officers, agents, employees or representatives shall have the right to inspect the books or records of any business for which returns have been made and upon demand of the finance department such books or records shall be submitted for inspection by a representative or agent of the county within thirty (30) days. Independent auditors or bookkeepers employed by the county shall be classified as agents for the purposes of this article. Failure of submission of such books and records within thirty (30) days shall be grounds for revocation of the occupation tax registration currently existing in the county. If it is determined that a deficiency exists as a result of under reporting, additional payment of occupation taxes required to be paid under this article shall be assessed the interest as provided by state law and penalties provided for by county code.

(b) Except as provided in paragraph (c) of this section, information provided by a business or practitioner of an occupation or profession for the purpose of determining the amount of occupation tax for the business or practitioner is confidential and exempt from disclosure under Article 4 of Chapter 18 of Title 50.

(c) Information provided to the county by a business or practitioner of an occupation or profession for the purpose of determining the amount of occupation tax for the business or practitioner may be disclosed to the governing authority of another local government for occupation tax purposes or pursuant to court order or for the purpose of collection of occupation tax or prosecution for failure or refusal to pay occupation tax.

(d) Nothing herein shall be construed to prohibit the publication by the county of statistics, so classified as to prevent the identification of particular reports or returns and items thereof.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-41. - Business classifications for determining tax levy.

(a) For the purpose of this article, every person engaged in business requiring the payment of occupational taxes is classified in accordance to the major line of business as defined in the Standard Industrial Classification Manual, Office of Management and Budget; and profitability classes are assigned in accordance with Statistics of Income, Business Income Tax Returns, United States Treasury Department, Internal Revenue Service. The finance department shall review assignment of businesses to profitability classes on a biannual basis and shall administratively reassign businesses as necessary to the then most accurate profitability class.

(b) Classifications by business profitability have been established by the board of commissioners and are incorporated herein by reference and adopted for use in the application of this article. All separate businesses engaged in more than one (1) business activity shall be classified on the basis of their dominant business activity at each location where business is done; except, that a person whose dominant business activity is legally exempt as defined by this article shall be classified according to such person's principal subsidiary business, if any, which is subject to the levy and assessment of occupation taxes.

(c) The occupation tax shall be determined by applying the business' gross receipts and number of employees returned to the county to the business' profitability classification established for each business type.

(d)   A copy of business classifications shall be maintained in the office of the clerk of the board of commissioners and shall be available for inspection by all interested persons.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-42. - Casual and isolated transactions.

Nothing in this article shall be interpreted to require any person who may engage in casual or isolated activity and commercial transactions, where they involve personal assets and are not the principal occupation of the individual, to pay occupational tax therefor. Street vendor, transient vendor or flea market vendor activities shall not be considered to be casual and isolated business transactions and shall be required to comply with the provisions of this article.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-43. - Exemption for disabled veterans, disabled indigent persons, certain organizations.

(a)   Persons who qualify for a state veteran's or disabled indigent person's license shall be eligible for exemption from the county occupational tax fee. Any such person claiming an exemption shall secure evidence of qualification for the exemption from the proper authority and present it to the finance department.

(b)   Organizations which are exempt from federal income taxation under section 501(c)(3) or section 501(c)(4) of the United States Internal Revenue Code shall be eligible for exemption from the county occupational tax. Any such organization claiming an exemption shall provide to the finance department a federal tax exemption letter showing the code section under which an exemption is claimed. However, with respect to any activity for which an organization otherwise entitled to an exemption under this section shall be liable for federal income tax on unrelated business income or shall be deemed to be a feeder organization under the United States Internal Revenue Code, the exemption from payment of occupational taxes shall not be available.

(c)   Notwithstanding the exemption from payment of county occupation taxes, an exempt person or business shall comply with the same laws and regulations as are required of other registered businesses.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-44. - Exclusions from article; special classifications.

(a)   Wholesale dealers in liquor, wine, beer, and malt beverages are not required to pay the business occupation taxes provided for in this article.

(b)   Registration and occupational tax payment is required from any satellite subscription television system. Satellite subscription television system means services provided to subscribers for sale where the provider of the services utilizes a master antenna type system or earth dish system designed to receive and distribute satellite television signals; particularly, a system to provide service to one (1) or more multiple unit dwellings under common ownership wherein any wiring necessary to operate the system does not cross adjacent non owned property lines and does not cross county right-of-way in the unincorporated area of the county. The provisions of this paragraph shall not apply to any person that is franchised by the board of commissioners to own and operate a cable system under the provisions of chapter 8.

(c)   Registration and occupational tax payment is required from any broadcast subscription television system. Broadcast subscription television system means services provided to subscribers for sale

where the provider of the services transmits premium programming from one (1) or multiple sources by transmitting or retransmitting programs to the public.

(d)  Any vendor or exhibitor who is a member of a group or collection of vendors or exhibitors that has come together at one (1) location for the purpose of selling arts, crafts, antiques, or other goods for a period not to exceed ten (10) consecutive days may be registered individually, or the group or collection may be registered as a "special event." Any applicant for a special event shall be considered as the promoter of the special event and shall be responsible for registration of the special event and paying the occupational taxes. Any special event group or collection of vendors or exhibitors shall comply with the same laws and regulations as required of other registered businesses, where applicable.

(e)  As part of the county's economic development incentives for encouraging location or maintaining businesses in the unincorporated area of the county, any business or practitioner may request an exception from reporting gross receipts from sales of goods or services from atypical business operations. Requests must be submitted in writing to the finance director and outline the usual business activities conducted and the usual annual gross receipts there from, the atypical sales of goods and services and total gross receipts therefrom, and the reason such exemption is requested. Exemptions under this paragraph shall not exceed ten (10) percent of the business' total annual gross receipts.

(Ord. No. 95-08, § 1, 6-13-95; Ord. No. 11-04, Pt. I, 2-22-11)

Sec. 15-45. - Denial, revocation or suspension of business occupation tax certificate.

(a)  *Grounds for denial, revocation, or suspension of business occupation tax certificate.* A business occupation tax certificate issued pursuant to any provision of this article shall be denied, revoked or suspended by the director of finance, and considered void, upon one (1) or more of the following grounds:

(1)  The original application or renewal thereof contains false or misleading information, or the applicant omitted material facts in the application;

(2)  The premises covered by the certificate are found to be in violation of any codes or ordinances of the county;

(3)  The applicant for, or holder of, the certificate is engaged in the business or occupation under a false or assumed name, or is impersonating another practitioner of a like or different name;

(4)  The applicant for, or holder of, the certificate is engaging in false, misleading, or deceptive advertising or practices;

(5)  The holder of the certificate is operating under a business or trade name not listed on the current application on file with the county;

(6)  The holder of the certificate fails to maintain the initial requirements for obtaining the certificate;

(7)  The applicant for, or holder of, a certificate is classified as, or becomes classified as, a habitual violator under Title 40, Chapter 5 of the Official Code of Georgia Annotated, or is found to be operating the business under the influence of alcohol or of illegal drugs or substances;

(8)  The applicant for, or holder of, the certificate has been convicted of or has pled guilty or *nolo contendere* to any sexual offense, the offense of false swearing, the offense of operating an adult entertainment establishment in violation of the distance requirements of Title 36, Chapter 60 of the Official Code of Georgia Annotated, or to any offense involving illegal sale of narcotics or possession or receipt of stolen property, for a period of five years prior to the filing of the application. If after having been granted a certificate, the applicant is convicted, pleads guilty or enters a plea of *nolo contendere* to any of the above offenses, said certificate shall be subject to suspension and/or revocation;

(9)  The applicant for, or holder of, the certificate fails to pay occupation taxes and administrative fees when due;

(10) The establishment has been declared a public or private nuisance or has created a threat or nuisance to public health, safety or welfare; or

(11) Any other violation of this article.

(b)  *False or misleading information.* No business occupation tax certificate shall be issued or renewed pursuant to any provisions of this article to any applicant, business or legally or organizationally related entity if within the twelve (12) months immediately preceding the filing with the department of finance of any application under this chapter the same applicant, business or legally or organizationally related entity has been denied a certificate or had a certificate revoked for any location based in whole or in part upon having furnished false or misleading information in any application or having omitted material facts in any application.

(c)  *Notice of denial, revocation or suspension of certificate.* Upon denial of an application seeking issuance or renewal of a business occupation tax certificate, or revocation or suspension of a business occupation tax certificate, the director of finance shall provide written notification of such decision to the applicant or holder of the certificate within five (5) calendar days. The written notification shall state the grounds for the denial, revocation or suspension, and shall be served via hand delivery to the applicant or holder at the business location and sending a copy of such notice via registered mail, return receipt requested, to the address listed by the applicant or holder on the application for a certificate.

(Ord. No. 95-08, § 1, 6-13-95; Ord. No. 22-03, Pt. I, 8-26-03)

Sec. 15-45.1. - Grievances regarding occupation tax assessment or classification.

For grievances regarding the occupation tax assessed or the major line of business classification, the aggrieved person or entity shall first submit in writing to the director of finance a complaint which shall set forth in reasonable detail the matters complained of. The complaint may take letter form, and it shall be the duty of the director of finance to review the complaint and issue a written reply to the taxpayer within thirty (30) calendar days from the date the complaint is received. The written reply shall state in reasonable detail the basis for the decision regarding the initial assessment and classification. Should the aggrieved person or entity desire to seek review of such a decision, or if the director of finance fails to issue a written opinion to the taxpayer within the thirty (30) calendar day time period, the taxpayer shall be entitled to appeal to the certificate review board pursuant to the procedure set forth in section 15-46.

(Ord. No. 22-03, Pt. I, 8-26-03)

Sec. 15-46. - Administration; procedure for grievances and appeals.

The DeKalb County director of finance shall administer and enforce the provisions of this article. Should an aggrieved person or entity desire to appeal a decision under this article, the following procedure shall apply:

(a)  A notice of appeal must be filed with the director of finance within fifteen (15) calendar days after receipt of the decision complained of. The notice of appeal shall be in the form of a letter, and shall clearly identify all of the objections or exceptions taken to the decision of the director of finance. The notice of appeal shall also contain an address for receipt of future notices and decisions of the certificate review board. Should the aggrieved person or entity fail to file a notice of appeal within the time allowed, the right to appeal is lost.

(b)  Upon receipt of a timely and proper notice of appeal, the director shall notify the appellant, in writing, of the date, time and place where a hearing will be held. The hearing shall be held before the certificate review board within forty-five (45) calendar days of the date the notice of appeal is filed with the

director, but no sooner than ten (10) calendar days after appellant receives notice of the hearing. The director shall transmit to the certificate review board all documents or materials constituting the record of the action or proceedings below.

(c) If the director deems it necessary that an audit of the financial books/records of appellant be conducted, the county shall notify appellant in writing of a reasonable date, time and place for the audit, which shall be conducted prior to the date of a hearing on the matter. The director may hire outside auditors for this purpose. The expense of hiring outside auditors shall be borne by the county if the position of the appellant is sustained by the audit. If not, the expense of the outside auditors shall be due and payable from appellant as part of the costs of appeal.

(d) An appeal under this section shall stay all legal proceedings with regard to collection of the occupation tax from an appellant; however, such appeal shall not preclude the county from pursuing legal proceedings to enjoin any violation of this article or of any other article of the DeKalb County Code.

(e) Certificate review board. In all hearings pursuant to this section, the following procedures shall prevail, and the proceeding shall be as informal as compatible with justice:

 (1) A certificate review board shall be convened. The certificate review board shall be composed of three (3) individuals, selected from the following positions: the deputy public works director for development, the chief of police or the deputy chief of police, the director of the department of fire and rescue services, the director of health, the director of the human resources & merit system department.

 (2) The proceeding before the certificate review board shall be recorded, and all documents and other materials considered by the certificate review board shall be preserved as the record of the proceedings. The record of the proceedings shall be preserved for not less than one hundred fifty (150) calendar days after the hearing.

 (3) Any alleged violations or misconduct levied against the appellant and scheduled for a hearing before the certificate review board shall be read completely to appellant at the commencement of the hearing, unless waived by appellant.

 (4) The certificate review board may receive evidence in support of the alleged violations or misconduct as filed against appellant. Decisions of the certificate review board are to be supported by the evidence accepted and admitted during the hearing.

 (5) The county shall bear the burden of proof. The standard of proof shall be by a preponderance of the evidence.

 (6) The order of proof shall be as follows: The county representative shall present the case-in-chief in support of the alleged violations or misconduct; the appellant may present a case-in-chief, if desired. Each party may be allowed to present one (1) case-in-rebuttal.

 (7) The appellant and county may be represented by counsel, may present evidence, and may examine and cross-examine witnesses. Additionally, members of the certificate review board are permitted to question witnesses. A party is permitted no more than fifteen (15) minutes to present that party's case-in-chief; a case-in-rebuttal is permitted no more than ten (10) minutes of presentation. Presentation of augments and evidence may be in oral or written form, except that affidavits of individuals who are unavailable for cross-examination shall not be accepted or admitted by the certificate review board nor considered by the board.

 (8) Following the presentation of evidence, the board shall issue a written decision within thirty (30) calendar days of the date of the hearing. A copy of the decision shall be mailed, via registered or certified mail, to the parties or the parties' representatives. For the appellant, the decision shall be mailed to the address provided on the notice of appeal. Should the certificate review board fail to issue a timely decision, on the thirty-first day after the date of the hearing appellant may seek review as if a decision adverse to appellant had been rendered.

 (9) The findings of the certificate review board shall be final unless a party files a petition for writ of certiorari to the superior court of DeKalb County within thirty (30) calendar days of the decision of the certificate review board.

(Ord. No. 95-08, § 1, 6-13-95; Ord. No. 22-03, Pt. I, 8-26-03)

Sec. 15-47. - Promulgation of rules, regulations.

The finance department shall have the power and authority to make and publish reasonable rules and regulations not inconsistent with this article or other laws of the county and the state, or the constitution of this state or the constitution of the United States, for the administration and enforcement of the provisions of this article and the collection of the occupational tax.

(Ord. No. 95-08, § 1, 6-13-95)

Sec. 15-48. - Requirement for public hearings.

The county shall conduct at least one (1) public hearing before adopting any ordinance or resolution regarding the occupation tax, and in any year when revenue from occupational taxes is greater than revenue from occupational taxes for the preceding year in order to determine how to use the additional revenue.

(Ord. No. 95-08, § 1, 6-13-95)

Secs. 15-49—15-70. - Reserved.

I, the undersigned, Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board meeting lawfully assembled on this ___ day of _____ And same appears in Minutes of said Board this ___ day of _____

Clerk of Commissioners
DeKalb County, Georgia

- Chapter 7 - BUILDINGS AND BUILDING REGULATIONS[1]
  - Share Link
  - Print
  - Download (docx)
  - Email
  - Compare
- ARTICLE I. - IN GENERAL
  - Share Link
  - Print
  - Download (docx)
  - Email
  - Compare

- Sec. 7-1. - Disclosure of type of unit upon sale, etc.
  - Share Link
  - Print
  - Download (docx)
  - Email
  - Compare

(a)

When permitted no person shall transfer property for sale, lease or rent for residential occupancy purposes, other than single-family detached dwellings, without the declaration of the type of unit to be sold, leased or rented being provided in writing to the purchaser, lessee or renter by the owner.

(b)

For the purpose of this section dwelling units are classified as follows:

(1)

Type 1 occupancy. "Type 1 occupancy" means a dwelling unit which is served solely by independent and self-contained plumbing, electrical and mechanical systems. The services shall be either provided directly within the dwelling unit or shall be provided to the unit from an area immediately adjacent thereto and independent from any other unit.

(2)

Type 2 occupancy. "Type 2 occupancy" means a dwelling unit where plumbing, electrical and mechanical services are, or may be, provided by common systems serving more than one (1) dwelling unit.

EXHIBIT

N

Blumberg No. 5127

(c)

In addition to written notice, the owner of any property to be sold, leased or rented, other than single-family detached dwellings, shall cause to be posted and conspicuously maintained throughout the original sale, lease or rental period, on the property affected, a sign of at least six (6) square feet indicating the type of dwelling unit with a brief listing of the pertinent provisions pertaining thereto.

(Code 1976, § 9-1021; Ord. No. 89-11, § 1(9-1021), 3-28-89)

- Sec. 7-2. - Definitions.
    - Share Link
    - Print
    - Download (docx)
    - Email
    - Compare

For the purposes of this chapter, certain terms and words are hereby defined. Where words are not herein defined, but are defined in section 1-2 and in the codes adopted pursuant to section 7-51, those words shall have the meaning as defined therein. As used in this chapter, unless the context otherwise indicates, the following words and terms shall have the meaning ascribed to them:

Adopted state codes shall mean all codes and standards adopted pursuant to Division 3 of Article II of Chapter 7 of this Code.

Board shall mean the technical board of appeals.

Building official shall mean the director of the development department or designee.

Director shall mean the director of the development department or designee.

Emergency shall mean any situation resulting in imminent danger to the public health or safety or the loss of an essential governmental service.

End user shall mean the ultimate consumer of a product, especially the one for whom a product has been designed.

Governing authority of DeKalb County shall mean the county's board of commissioners and its chief executive officer.

Independent shall mean not affiliated in any way with the applicant for the variance or any county official or employee.

Justifiable cause shall mean a reason given by the applicant or permit holder that in the opinion of the director is valid and sufficient. Justifiable cause does not include delay that

is created by the applicant or permit holder or delay that reasonably could have been avoided by the applicant or permit holder.

Ordinary repairs shall mean nonstructural repairs to a building or structure or repairs to a mechanical system, gas system, plumbing system, electrical system, and energy conservation system for which the codes specify no minimum requirements or standards or do not address the repair. Ordinary repairs do not include additions, alterations, relocations, or replacements to buildings or structures, water supplies, sewers, drains, drain leaders, gas, soil waste, vent or other similar piping, electrical systems or wiring, mechanical systems or other work for which a permit is required by the code or the building official.

Pre-qualified alternate registered engineer shall mean a registered design professional recommended by the technical board of appeals and approved by the board of commissioners for compliance with O.C.G.A. § 8-2-26 et seq., as amended.

Protective shall mean a method or material that provides the same or greater protection of health, safety, life or property as provided by the construction requirements set forth in this Code.

Registered design professional shall mean architects, civil, structural, mechanical, electrical, and plumbing engineers and others whose services require licensing by the state.

Technical codes shall mean collectively the International Building Code, International Residential Code, International Plumbing Code, International Mechanical Code, International Fuel Gas Code, National Electrical Code, International Energy Conservation Code as adopted, amended, and mandated by the State of Georgia along with amendments and local supplemental codes as adopted by DeKalb County.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

- Secs. 7-3—7-15. - Reserved.

I, the undersigned, _____ H. _____
Clerk of The Board of Commissioners, DeKalb
County, Georgia, DO HEREBY CERTIFY that the
foregoing is a true and correct copy of an ordinance
adopted by said Board meeting lawfully assembled
on this _____ day of _____
And same appears in Minutes of said Board this
day of _____
_____
Clerk of Commissioners
DeKalb County, Georgia

Sec. 7-16. - Technical board of appeals.

(a)

Appointment. There is hereby established a technical board of appeals, which shall consist of nine (9) members. The chief executive officer shall appoint two (2) members and each member of the board of commissioners shall appoint one (1) member to the technical board of appeals. The director of the development department shall serve as a non-voting ex-officio member of the technical board of appeals.

(b)

Qualifications of members. All members of the board shall be residents and homeowners in DeKalb County. All members of the board, except the citizen appointees from commission districts six and seven, shall have at least seven (7) years experience in the building industry. One (1) of the members of the board shall be a civil engineer having experience in drainage and structural issues and one (1) member shall be an architect licensed in Georgia with a minimum of seven (7) years experience in residential-home-design. Members of the board shall hold no other county office, appointed position within the county or any other county compensated position.

(c)

Filling board vacancies generally. Any vacancy on the board shall be filled in accordance with the original appointing procedure for the vacant position. Any newly appointed member shall serve for the remainder of the unexpired term.

(d)

Initial terms of members. The nine (9) board members who are appointed by virtue hereof shall hold initial terms of office as follows:

(1)

Commissioners representing districts two and three and seven shall each appoint one (1) board member who shall hold office through the last day of December, 2006;

(2)

Commissioners representing districts one, four, five and six shall each appoint one (1) board member who shall hold office through the last day of December, 2008; and

(3)

The chief executive officer of DeKalb County shall appoint two (2) board members. One (1) board member shall hold office through the last day of December 2006 and the other board member shall hold office through the last day of December 2008.

(4)

Subject to section 7-16(e), the successors to each of the initial appointments shall hold office for a period of four (4) years from the end of the previous term.

(e)

Terms of board members. Terms of each board member shall absolutely expire on the last day of the actual term in office of the appointing official or on the last day of December of the board member's four-year term, whichever comes first, regardless whether a successor has been appointed to the board member's position.

(f)

Successive terms. Members of the board may be reappointed to successive terms, but in no event shall a member be permitted to serve more than eight (8) consecutive years.

(g)

Organization, officers and rules. The board shall elect a chair, vice-chair and secretary. The persons so elected shall serve in these capacities for a term of one (1) year. No person may serve in any of these capacities for more than three (3) consecutive years. The vice-chair will preside at the meetings of the board in the chair's absence. The board shall determine its procedural rules and regulations, and otherwise take such action as is appropriate for the management of the affairs committed to its supervision. The board's rules and regulations shall be consistent with this chapter and necessary to carry out the provisions of this chapter.

(h)

Quorum. Five (5) members of the board shall constitute a quorum at any meeting and a vote of five (5) voting members shall be required to enable the board to act.

(i)

Meeting accommodations and staff support. The governing authority of the county shall provide the board with suitable office space, meeting accommodations and clerical support, as the governing authority shall deem appropriate and necessary.

(j)

Compensation for board members. The governing authority of DeKalb County shall determine compensation for members of the board.

(k)

Removal at will. The chief executive officer or the appointing member of the board of commissioners shall have authority to remove the member of the technical board of appeals appointed by such official, at will, with out without cause.

(l)

Removal for cause. Any member of the board may be removed from the board at anytime for cause by the governing authority of DeKalb County, after written notice and an opportunity to be heard within fourteen (14) days after notice. A majority vote of the full membership of the board of commissioners shall be necessary in order to remove a member from the board for cause. Cause shall include but is not limited to misconduct, incompetence, failure to attend three (3) consecutive meetings of the board, failure to attend seventy-five (75) percent or more of the board's meetings within any calendar year, conviction of any felony, or conviction of a misdemeanor related to violence or moral turpitude. In the event of resignation or removal of a member, the newly appointed member shall serve the remainder of the unexpired term.

(m)

Powers and duties. The board shall have the following powers:

(1)

To hear appeals of decisions and interpretations of the director;

(2)

To hear appeals of the director's decision related to the use of alternative materials, designs, methods of construction, equipment and appliances pursuant to section 7-31 (m);

(3)

To hear appeals of the director's decision related to unsafe conditions as regulated in section 7-40;

(4)

To hear and grant variances from the provisions of Division 3 of this chapter;

(5)

To hear and grant applications for pre-qualification of alternate registered engineers as referenced in section 7-34(i) as well as remove pre-qualification status from alternate registered engineers as the board deems appropriate in its sole discretion; and

(6)

To review proposed amendments to the land development and technical codes and provide recommendations on such amendments to the governing authority.

(n)

Application forms; filing of applications; application fees. Applications for appeals, variances, and alternate registered engineers shall be filed on forms provided by the development department and shall not be considered authorized or accepted unless complete in all respects, including the payment of any application fees. Application fees shall be established by the board of commissioners.

(o)

Appeals of the director's decisions.

(1)

Notice of appeal of a decision by the director to the board shall be in writing and filed with the director within thirty (30) calendar days after the director's decision is rendered. Appeals shall be on a form provided by the development director.

(2)

An appeal shall be sustained only upon an express written finding by the board that the director's action was based on an erroneous finding of a material fact, or that the director acted in an arbitrary manner. In exercising its powers, the board may reverse or affirm, wholly or partly, or may modify the order, requirement, decision or determination appealed from, and to that end shall have all the powers of the director from whom the appeal was taken and may issue or direct the issuance of a permit provided all requirements imposed by all applicable laws are met. The board may also remand any appeal for the receipt of additional information.

(3)

In the case of a building, structure or service system which, in the opinion of the director, constitutes an unsafe condition as that terms is used in section 7-40, the

director may, in the decision or order, limit the time for the filing of such appeals to not less than two (2) days and the director may request expedited review by the board of the appeal.

(4)

If the director's decision(s) results in a revocation or denial of the issuance of any permit or certificate authorized by this chapter, the affected applicant or permittee may request, and shall be allowed, to meet with the director within two (2) business days after the initial issuance of such order or decision. At such meeting the affected applicant or permittee shall be allowed to present any evidence or testimony to the director that the applicant deems appropriate. If such a meeting is not requested or the director does not alter the decision to revoke or deny the issuance of any permit or certificate, then the director's decision becomes final. During the pendency of any subsequent appeal to the board, the notice of appeal shall not stay enforcement of the director's decision and the applicant or permittee may not take any action, perform any act or occupy any structure that contradicts the director's revocation or denial decision in this regard.

(p)

Variances.

(1)

The owner of a building, structure or service system, or duly authorized representative, may file a request to the board to vary any provision of the technical codes in accordance with the provisions of this section on forms promulgated by the director.

(2)

In granting a variance, the board may prescribe appropriate conditions and safeguards in conformity with this Code. Violation of the conditions of a variance shall be deemed a violation of this Code.

(3)

No variance may be granted unless such variance can be granted without substantial detriment to the public good and without substantial impairment of the intent and purpose of this chapter. No variance shall be granted by the board to:

(A)

Allow any variance which conflicts with or changes any requirement established as a condition by the board of commissioners or the zoning board of appeals;

(B)

Reduce, waive or modify in any manner any minimum standards set forth in the adopted codes generally identified in section 7-51, as amended; and

(C)

Reduce, waive or modify any environmental protection measures such as tree protection and/or soil erosion and sedimentation control.

(4)

The board shall grant variances from the provisions or requirements of this chapter only upon making written findings of the following:

(A)

The strict application of the requirements of this chapter would deprive the building, structure or service system owner of rights and privileges enjoyed by other building, structure or service system owners within the county;

(B)

The requested variance does not go beyond the minimum necessary to afford relief, and does not constitute a grant of special privilege inconsistent with the limitations upon other building, structure or service system property owners within the county;

(C)

The grant of the variance will not be materially detrimental to the public welfare or injurious to the property or any improvements;

(D)

The liberal interpretation and strict application of the applicable provisions or requirements of this chapter would cause undue and unnecessary hardship;

(E)

The method or material requested is at least as protective as the method or materials required by this chapter; and

(F)

The applicant has supplied the county with an independent study or analysis by a registered design professional that shows that the method or material meets or exceeds the methods or materials required by this Code.

(q)

Procedures of the board.

(1)

Hearings open to public. All hearings of the board shall be open to the public and the agenda shall be made available at least two (2) business days prior to the meeting of the board. Matters not placed on the agenda in compliance with this section shall not be heard by the board, except for appeals involving a structure or service system that, in the opinion of the director, is unsafe, unsanitary or uninhabitable. The board shall meet every thirty (30) days.

(2)

Decisions. The board shall, in every case of an appeal of a decision or interpretation of the director or a variance request, reach a final decision within thirty (30) calendar days from the date of the final hearing. Each decision of the board shall be in writing and shall include the basis for the decision. Every decision shall be promptly file-stamped in the office of the development department and shall be available for public inspection. A copy of the decision shall be delivered by mail at the address in the notice of appeal or application for variance to the person who filed the appeal or request for a variance.

(r)

Appeals from decisions of the technical board of appeals.

(1)

Method of appeal. Any person aggrieved by a final decision of the board may seek review of such decision by petitioning the Superior Court of DeKalb County for a writ of certiorari, setting forth plainly the alleged errors. Such petition shall be filed within thirty (30) calendar days after the final decision of the board is rendered.

(2)

Notice to board. In any such petition, the board shall be designated the respondent in certiorari and DeKalb County, along with any other party required by law to be named, shall be named as the defendant(s) in certiorari. The secretary of the board shall be authorized to acknowledge service of a copy of the petition and writ for the board as respondent. Service upon the county as defendant shall be as otherwise provided by Georgia law. Within the time prescribed by Georgia law, the board shall cause to be filed with the clerk of DeKalb County Superior Court a duly certified record of the proceedings had before the board, including a transcript of the evidence heard before it, if any, and the decision of the board.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

**Editor's note—** Ord. No. 04-09, Pt. I, adopted Aug. 10, 2004, deleted former § 7-16 of the Code in its entirety and adopted new provisions as § 7-16. Former § 7-16 pertained to the development advisory board and derived from Ord. No. 89-11, § 1(9-1121), adopted March 28, 1989; and Ord. No. 95-15, § 1, adopted Nov. 28, 1995.

I, the undersigned, *Barbara H. Sanders* Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board meeting lawfully assembled on this __ day of _____, ____. And same appears in Minutes of said Board this day of _____, ____.

Clerk of Commissioners
DeKalb County, Georgia

DIVISION 2. - CODES ADMINISTRATION[3]

Footnotes:

--- (3) ---

Editor's note— Ord. No. 04-09, Pt. I, adopted Aug. 10, 2004, deleted former Art. II, Div. 2 of this chapter in its entirety and adopted new provisions as Art. II, Div. 2. Former Art. II, Div. 2, §§ 7-26—7-40 pertained to similar subject matter and derived from Ord. No. 89-11, § 1(9-1061—9-1074), adopted March 28, 1989; Ord. No. 92-37, §§ 1, 2, adopted Dec. 8. 1992; Ord. No. 00-81, § 1, adopted Nov. 14, 2000; Ord. No. 00-82, § 1, adopted Nov. 14, 2000; Ord. No. 00-83, §§ 1, 2, adopted Nov. 14, 2000; Ord. No. 21-02, Pt. I, adopted May 14, 2002; and Ord. No. 29-02, Pt. 1, adopted June 25, 2002.

Sec. 7-26. - General.

The provisions of this chapter shall apply to the construction, erection, installation, alteration, demolition, repair, relocation, replacement, addition to, use or maintenance of buildings or structures, plumbing, mechanical, gas, and electrical systems within the county. Any and all requirements of this chapter shall expressly include any and all technical codes as amended by the county pursuant to this chapter.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-27. - Applicability.

(a) *General.* The provisions of this chapter shall apply to all matters affecting or related to buildings, structures, equipment or systems as set forth in section 7-26. Where, in any specific case, different sections of this chapter specify different materials, methods of construction or other requirements, the most restrictive requirement shall govern. Where there is a conflict between a general requirement and a specific requirement, the specific requirement shall govern.

(b) *Existing installations.* Buildings, structures, plumbing, mechanical and electrical systems lawfully in existence at the time of the adoption of this ordinance shall be permitted to have their use and maintenance continued if the use, maintenance or repair is in accordance with the original design and no hazard to life, health or property is created by such building, structure or system.

(c) *Work to conform to codes.* No building, structure, system, appliance or equipment, as hereinafter specified in this division, shall be constructed, erected, installed, altered or repaired, except in conformance with the provisions of this division and this Code.

(d) *Public utility services.* The provisions of this division shall not apply to the installation, alteration or repair of services up to and including the meters where such work is performed by or is an integral part of a system owned or operated by a public utility service corporation, water department, gas company, railroad company, pipeline company, or other public utility in the exercise of its normal functions or in rendering its duly authorized service as such.

(e) *Other laws.* The provisions of this division shall not be deemed to nullify any provisions of local, state or federal law.

(f) *Referenced codes and standards.* The adopted state codes adopted pursuant to Division 3 of Article II of this chapter shall be considered part of the requirements of this division to the prescribed extent of each such adoption. Where differences occur between provisions of this chapter and referenced codes and standards, the provisions of this chapter shall govern.

(g) *Additions, alterations or repairs.* Additions, alterations, or repairs to any building, structure or system shall conform to that required for a new building, structure or system without requiring the existing building, structure or system to comply with all requirements of this chapter. Additions, alterations or repairs shall not cause an existing building, structure or system to become unsafe, unsanitary or overloaded.

(h) *Ordinary repairs.* Ordinary repairs shall be permitted in the same manner and arrangement as in the existing system, provided that such repairs or replacements are not hazardous to the public health, safety or welfare.

(i) *Change in occupant/occupancy.* It shall be unlawful to make any change in the occupant or occupancy of any building or structure that does not meet the requirements of this chapter. Prior to the issuance of any business occupation tax certificate, the finance director shall advise the building official that an application for a business occupation tax certificate has been submitted to the county for review. Prior to the issuance of the business occupation tax certificate, the building official shall inspect the building to be occupied and certify that such building or structure meets the intent of the provisions of law governing building construction for the proposed new occupant or occupancy and that such change of occupant or occupancy does not result in any hazard to the public health, safety or welfare.

(j) *Requirements not covered by Code.* Any requirements necessary for the strength, stability or proper operation of an existing or proposed building, structure or system, or for the public safety, health and general welfare, not specifically covered by this Code shall be determined by the director.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-28. - Enforcement.

(a) *Enforcement.* The development department is responsible for administration and enforcement of this chapter.

(b) *Deputies and authorized representatives.* In accordance with prescribed procedures of DeKalb County, the building official shall have the authority to appoint a deputy building official, authorized representatives, technical officers, inspectors, plan examiners and other employees. Such employees shall have powers as authorized by law and delegated by the building official.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-29. - Duties and powers of the building official.

(a) *General.* The building official is hereby authorized and directed to enforce the provisions of this chapter and the adopted state codes. The building official shall have the authority to render interpretations of this Code and the adopted state codes and to adopt policies and procedures in order to clarify the application of their provisions. Such interpretations, policies and procedures shall be in compliance with the intent and purpose of this chapter. Such policies and procedures shall not have the force and effect of law and shall not have the effect of waiving requirements specifically provided for in this Code or in the adopted state codes.

(b) *Applications and permits.* The building official shall receive applications, review construction documents and plans, issue permits for the erection, construction, alteration and demolition of buildings and structures and installation of mechanical, plumbing, gas and electrical systems, inspect the premises for which such permits have been issued and enforce compliance with the provisions of this chapter and other applicable provisions of this Code.

(c) *Notices and orders.* The building official shall issue all necessary notices or orders to ensure compliance with this chapter.

(d) *Inspections.* The building official shall make all of the required inspections, or the building official shall have the authority to accept reports of inspection by approved qualified agencies or individuals.

Reports of such inspections shall be in writing and be certified by a responsible officer of such approved agency or by the responsible individual.

(e) *Identification.* The building official, deputy or authorized representative shall carry proper identification when inspecting buildings, structures or premises in the performance of duties under this chapter.

(f) *Right of entry.* Where it is necessary to make an inspection to enforce the provisions of this chapter, or where the building official has reasonable cause to believe that there exists in a building or structure or upon a premises a condition which is contrary to or in violation of this chapter which makes the building, structure or premises unsafe, dangerous or hazardous, the building official is authorized to enter the building, structure or premises at reasonable times to inspect or to perform the duties imposed by this chapter, provided that if such building, structure or premises be occupied that credentials be presented to the occupant and entry requested. If such building, structure or premises is unoccupied, the building official shall first make a reasonable effort to locate the owner or other person having charge or control of the building, structure or premises and request entry. If entry is refused, the building official shall have recourse to the remedies provided by law to secure entry.

(g) *Department records.* The building official shall keep official records of applications received, permits and certificates issued, fees collected, reports of inspections, and notices and orders issued. Such records shall be retained for the period required by state law for retention of public records.

(h) *Approved materials, equipment, appliances and devices.* Materials, equipment, appliances and devices approved by the building official shall be constructed and installed in accordance with such approval.

(i) *Areas prone to flooding.* The building official shall not grant modifications to any provisions related to areas prone to flooding as established by the flood insurance rate map, as may hereinafter be amended, without the granting of a variance to such provisions by the board.

(j) *Alternative materials, designs, methods of construction, equipment and appliances.* The provisions of this chapter are not intended to prevent the installation of any materials or to prohibit any designs, methods of construction, equipment or appliances not specifically prescribed by this chapter, provided that any such alternatives have been approved by the building official in writing. Alternative materials, designs, methods of construction, equipment or appliances shall be approved in writing where the building official finds that the proposed design is satisfactory and complies with the intent and purpose of the provisions of this chapter, and the material, methods of work offered is, for the purpose intended, at least the equivalent of that prescribed in this chapter in quality, strength, effectiveness, fire resistance, durability and safety.

(k) *Required testing.* Whenever there is insufficient evidence of compliance with the provisions of this chapter, or evidence that a material or method does not conform to the requirements of this chapter, or in order to substantiate claims for alternative materials or methods, the building official shall have the authority to require tests as evidence of compliance to be made at no expense to the county. Such tests shall be paid for by the person seeking to rely on such alternative materials or methods.

(l) *Test methods.* Test methods shall be as specified in this chapter or by other recognized test standards. In the absence of recognized and accepted test methods, the building official shall approve the testing procedures.

(m) *Testing agency.* All tests shall be performed by an agency approved by the building official.

(n) *Test reports.* The building official shall retain reports of tests for the period required for retention of public records.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-30. - Permits.

(a) *Permit required.* A permit shall be obtained before beginning construction, erection, alteration or repair to a building or structure, mechanical system, gas system, plumbing system, electrical system, and

energy conservation system, other than ordinary repairs. Permits shall be obtained at least eight (8) hours before beginning work. Permits for emergency work shall be obtained within twenty-four (24) hours after work is commenced.

(b) *Exception to permit required.* Ordinary repairs to a single-family residential building or structure for which the wholesale cost does not exceed three thousand dollars ($3,000.00) shall not be required to obtain a permit.

(c) *Work commencing before permit issuance.* In addition to any other remedies provided by law, any person, contractor or company commencing any work on a building or structure, mechanical, gas, plumbing, or system electrical system before obtaining the required permit shall be subject to a penalty of one hundred (100) percent of the usual permit fee in addition to the required permit fee.

(d) *Work exempt from permit.* Exemptions from the permit requirements of this section shall not be deemed to grant authorization for any work to be done in any manner in violation of the provisions of this chapter or any other laws or ordinances of the county. Permits shall not be required for the following:

(1) Building:

(A) Fences not over eight (8) feet (2440 mm) high.

(B) Retaining walls which are not over four (4) feet (1219 mm) in height measured from the bottom of the footing to the top of the wall, unless supporting a surcharge or impounding Class I, II or III-A liquids.

(C) Water tanks supported directly upon grade if the capacity does not exceed five thousand (5,000) gallons (18,927 L) and the ratio of height to diameter or width does not exceed two (2) to one (1).

(D) Painting, papering, tiling, carpeting, cabinets, counter tops and similar finish work for which the wholesale cost does not exceed three thousand dollars ($3,000.00), where there has been no change in occupant or occupancy.

(E) Temporary motion picture, television and theater stage sets and scenery.

(F) Prefabricated swimming pools that are less than twenty-four (24) inches (610 mm) deep and are installed entirely above ground.

(G) Swings and other playground equipment accessory to one- and two-family dwellings.

(H) Window awnings supported by an exterior wall.

(I) Movable cases, counters and partitions not over five (5) feet nine (9) inches (1753 mm) in height.

(2) Electrical:

(A) *Repairs and maintenance.* Ordinary repairs, including the replacement of lamps or the connection of approved portable electrical equipment to approved permanently installed receptacles.

(B) *Radio and television transmitting stations.* Electrical equipment used for radio and television transmissions, but permits are required for equipment and wiring for power supply, the installation of towers and antennas.

(C) *Temporary testing systems.* The installation of any temporary system required for the testing or servicing of electrical equipment or apparatus.

(3) Gas:

(A) Portable heating appliances.

(B) Replacement of any minor component of equipment that does not alter approval of equipment or make such equipment unsafe.

(4) Mechanical:

   (A) Portable heating appliances.

   (B) Portable ventilation equipment.

   (C) Portable cooling unit.

   (D) Steam, hot or chilled water piping within any heating or cooling equipment regulated by this chapter.

   (E) Replacement of any part which does not alter its approval or make it unsafe.

   (F) Portable evaporative cooler.

   (G) Self-contained refrigeration system containing ten (10) pounds (4.54 kg) or less of refrigerant and actuated by motors of one (1) horsepower (746 W) or less.

(5) Plumbing:

   (A) The shopping of leaks in drains, water, soil, waste or vent pipe; provided, however, that if any concealed trap, drainpipe, water, soil, waste or vent pipe becomes defective and it becomes necessary to remove and replace the same with new material, such work shall be considered new work and a permit shall be obtained and inspection made as provided in this chapter.

   (B) The clearing of stoppages or the repairing of leaks in pipe, valves or fixtures, and the removal and reinstallation of water closets, provided such repairs do not involve or require the replacement or rearrangement of valves, pipes or fixtures.

(e) *Application for permit.* To obtain a permit, the applicant shall first file an application therefor in writing on a form furnished by the development department for that purpose. Such application shall:

(1) Identify and describe the work to be covered by the permit for which application is made.

(2) Describe the land on which the proposed work is to be done by street address, legal description or similar description that will readily identify and definitely locate the proposed building or structure or work.

(3) Indicate the use and occupancy for which the proposed work is intended.

(4) Be accompanied by construction plans and documents and any other information that the director may require to ascertain whether the proposed building meets the requirements of this chapter.

(5) State the valuation of the proposed work.

(6) Contain the full names, addresses and telephone numbers of the applicant/contractor and the property owner and shall be signed by the applicant/contractor and the property owner.

(7) The building official may require any additional information to be provided so that an understanding of all work to be performed can be ascertained from the permit application.

(f) *Action on application.* The building official shall examine or cause to be examined all applications for permits and amendments thereto within a reasonable time after filing but no later than sixty (60) calendar days after the filing of a complete application in conformity with this section. If the application or the construction plans or documents do not conform to the requirements of this chapter, the building official shall reject such application in writing, stating the reasons therefor. If the building official is satisfied that the proposed work conforms to the requirements of this chapter, the building official shall issue a permit therefor as soon as practicable.

(g) *Time limitation of application.* An application for a permit for any proposed work shall be deemed to have been abandoned one hundred eighty (180) days after the date of filing, unless a permit has been issued. The building official is authorized to grant up to three written extensions of time for additional periods not exceeding ninety (90) days each before such application is declared abandoned. The extension shall be requested in writing and justifiable cause demonstrated.

(h) *Validity of permit.* The issuance or granting of a permit shall not be construed to be a permit for, or an approval of, any violation of any provisions of this chapter, of any local, state or federal law or any provision of this Code. Permits presuming to give authority to violate or cancel the provisions of this chapter or other provisions of this Code shall not be valid and are void. The issuance of a permit based on construction plans and documents and other data shall not prevent the building official from requiring the correction of errors in the construction plans and documents and other data. The building official is also authorized to prevent occupancy or use of a building or structure where there exists any violation of this chapter or of any other provisions of the code, or where there exists a hazard to the health, safety and welfare of the public or the occupants of the building or structure.

(i) *Expiration of permit.* Every permit issued shall become invalid and of no force and effect if the work on the site authorized by such permit is not commenced or if no county inspection has been performed within one (1) year after its issuance, or if the work authorized on the site by such permit has been commenced and has been suspended or abandoned or no further county inspection has been performed for a period of one hundred eighty (180) days. The building official is authorized to grant one (1) written extension of the permit for a period of not more than one hundred eighty (180) days. The extension shall be requested in writing and justifiable cause demonstrated.

(j) *Suspension or revocation.* The building official is authorized to suspend or revoke a permit issued under the provisions of this chapter if the permit is issued in error or on the basis of incorrect, inaccurate or incomplete information, or in violation of any applicable provision of this Code.

(k) *Contractor change, reissuing of permit.*

   (1) No permit shall be reissued on any work or job site for which a permit already exists except after notification in writing from the owner of the change in contractor and that the new contractor is authorized by the owner to re-permit the work. Re-issuance of a permit shall make the new contractor responsible for the complete job or system and all work or code deficiencies, if any, as built, erected or installed by the previous or former contractor.

   (2) The contractor who re-permits the work or job shall pay a re-permit fee of fifty dollars ($50.00).

(l) *Placement of building permit, inspections card, and construction plans.* The building permit or copy, inspections card, and construction plans shall be kept on the site of the work until completion of the work. The inspections card shall be posted within thirty-six (36) to forty-eight (48) inches above grade facing the street or in a window of the structure under construction in a manner where it is visible from the street and if outside, in a weatherproof cover. The construction plans shall be kept on the construction site in a manner that they can be produced upon demand by the building official.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-31. - Construction plans and documents.

(a) *Submittal of plans and documents.*

   (1) Construction plans and documents, special inspection and structural observation programs, and other data shall be submitted in one (1) or more sets with each application for a permit. The construction plans and documents shall be prepared by a registered design professional. When the building official is unable to make a determination as to the grant or denial of a permit based upon the plans submitted with a permit application, the building official is authorized to require additional construction plans and documents to be prepared by the applicant or a registered design professional.

   (2) The building official is authorized to waive in writing the submission of construction plans and documents and other data required to be prepared by a registered design professional if it is found that the nature of the work applied for is such that reviewing of construction plans and documents is not necessary to obtain compliance with this chapter. In addition, construction plans and documents for single-family residential construction do not have to be prepared by a registered design professional unless required by the building official in writing.

(b) *Information on construction plans and documents.* Construction plans and documents shall be dimensioned and drawn upon suitable material. Electronic media construction plans and documents are permitted to be submitted when approved by the building official. Construction plans and documents shall be of sufficient clarity to indicate the location, nature and extent of the work proposed and show in detail that it will conform to the provisions of this Code and all other applicable laws and regulations.

(c) *Fire protection system shop drawings.* Shop drawings for the fire protection system(s) shall be submitted to indicate conformance with this chapter and the construction plans and documents and shall be approved by the building official prior to the start of system installation.

(d) *Manufacturer's installation instructions for residential installation.* Manufacturer's installation instructions, as required by the International Residential Code, shall be available on the residential job site at the time of inspection.

(e) *Exterior wall envelope.* Construction plans and documents for all buildings shall describe the exterior wall envelope in sufficient detail to determine compliance with this chapter. The construction plans and documents shall provide details of the exterior wall envelope as required, including flashing, intersections with dissimilar materials, corners, end details, control joints, intersections at roof, eaves, or parapets, means of drainage, water resistive membrane, and details around openings.

(f) *Manufacturing installation instructions.* The construction plans and documents shall include manufacturing installation instructions that provide supporting documentation that the proposed penetration and opening details described in the construction plans and documents maintain the weather resistance of the exterior wall envelope. The supporting documentation shall fully describe the exterior wall system that was tested, where applicable, as well as the test procedure used.

(g) *Site plan.* The construction plans and documents submitted with the application for a building permit shall be accompanied by a site plan approved by the development department showing to scale the size and location of new construction and existing structures on the site, distances from lot lines, the established street grades and the proposed finished grades. The site plan shall be drawn in accordance with an accurate boundary line survey. In the case of demolition, the site plan shall show the construction to be demolished and the location and size of existing structures and construction that are to remain on the site or lot. The building official is authorized to waive or modify in writing the requirement for a site plan.

(h) *Examination of construction plans and documents.* The building official shall examine or cause to be examined the accompanying construction plans and documents and shall ascertain by such examination whether the proposed construction indicated and described is in compliance with the requirements of this chapter and other pertinent provisions of this Code.

(i) *Approval of construction plans and documents.* When the building official issues a permit, the construction plans and documents shall be approved, in writing or by stamp, as being in compliance with this chapter. However, the approval of construction plans and documents and other data shall not prevent the building official from requiring the correction of errors in the construction plans and documents and other data. One (1) set of construction plans and documents so reviewed shall be retained by the building official. The other set shall be returned to the applicant, shall be kept at the site of work and shall be open to inspection by the building official.

(j) *Previous approvals.* The enactment of this ordinance shall not require changes in the construction plans and documents, construction or designated occupancy of a structure for which a lawful permit has been issued prior to enactment of this ordinance and the construction of which has been pursued and not abandoned within one hundred eighty (180) days after the effective date of this ordinance.

(k) *Phased approval.* The building official is authorized to issue a permit for the construction of foundations or any other part of a building or structure before the construction plans and documents for the whole building or structure have been submitted, provided that construction plans and documents and adequate information and detailed statements have been filed complying with pertinent requirements of this chapter. The holder of such permit for the foundation or other parts of a building or structure

shall proceed at the holder's own risk with the approved part of the building construction operation and without any assurance that a permit for the entire structure will be granted by the building official.

(l)  *Design professional in responsible charge.*

    (1)  When it is required and requested by the building official that construction plans and documents be prepared by a registered design professional, the building official shall be authorized to require the owner to engage and designate on the building permit application a registered design professional who shall act as the registered design professional in responsible charge. If the circumstances require, the owner shall designate a substitute registered design professional in responsible charge who shall perform the duties required of the original registered design professional in responsible charge. The owner shall notify the building official in writing if the registered design professional in responsible charge is changed or is unable to continue to perform the duties required by this Code.

    (2)  The registered design professional in responsible charge shall be responsible for reviewing and coordinating submittal plans and documents prepared by others, including phased and deferred submittal items, for compatibility with the design of the building.

(m)  *Deferred submittals.* For the purposes of this section, deferred submittals are defined as those portions of the design that are not submitted at the time of the application and that are to be submitted to the building official within a specified period.

    (1)  Deferral of any submittal items shall require prior approval by the building official. The registered design professional in responsible charge shall list the deferred submittals on the construction plans and documents for review by the building official.

    (2)  Submittal construction plans and documents for deferred submittal items shall be submitted to the registered design professional in responsible charge who shall review them and forward them to the building official with a notation indicating that the deferred submittal documents have been reviewed and that they have been found to be in general conformance with the design of the building. The deferred submittal items shall not be installed until their design and submittal plans and documents have been approved by the building official in writing.

(n)  *Amended construction plans and documents.* Work shall be installed in accordance with the reviewed construction plans and documents, and any changes made during construction that are not in compliance with the approved construction plans and documents shall be resubmitted by the holder of the building permit for approval as an amended set of construction plans and documents.

(o)  *Retention of construction plans and documents.* One (1) set of approved construction plans and documents shall be retained by the building official for a period of not less than one hundred eighty (180) days from date of completion of the permitted work or as required by state or local laws.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-31.1. - Requirements for construction.

(a)  A permit application for a building permit shall include a site plan. The site plan shall delineate the proposed grading for the entire site, the storm water control measures proposed to protect adjacent properties, erosion control, water quality measures, and include a tree survey and a tree protection plan.

(b)  An applicant shall also indicate on the site plan the location of the following construction-related items:

    (1)  Dumpsters or other onsite disposal equipment;

    (2)  Portable toilets;

    (3)  Onsite parking for construction vehicles;

    (4)  Construction material staging and storage; and

(5)   Borrow or stockpile areas.

(c)   Construction activity and deliveries shall be limited to:

| Monday—Friday | 7:00 a.m. to 7:00 p.m. |
|---|---|
| Saturday | 8:00 a.m. to 5:00 p.m. |

There shall be no construction activity or deliveries on Sundays, New Year's Day, Thanksgiving Day, Christmas Day, Memorial Day, July 4th or Labor Day unless such activity arises from an emergency which puts the site or neighboring property owners and their property at risk of harm or loss.

(d)   Dumpsters or any onsite waste disposal equipment may not be located on the street. If adequate traffic controls can be implemented, the planning department director or designee may approve the placement of dumpsters and onsite waste disposal equipment on a street so long as the street has a paved width greater than twenty-four (24) feet.

(e)   Portable toilets shall be located off of the right-of-way and at least fifteen (15) feet from any side property line.

(f)   Wherever possible, temporary parking shall be provided onsite and not on the street.

(g)   The distance between a retaining wall and the side property line on all single-family detached residential lots shall be equal to at least half of the distance between the side property line and the required setback line. Unless a variance is obtained pursuant to the provisions of subsection 27-787(b), newly constructed retaining walls shall not be higher than four (4) feet. However, existing retaining walls may be repaired and replaced so long as the height of the repaired or replaced wall does not increase in height over the original height of the wall.

(h)   In addition to the requirements set forth in section 14-39 of the Code of DeKalb County, the trees of six (6) inches DBH or greater located in the front yard and the rear half of the rear yard of an infill lot, as that term is defined in section 27-31, shall be preserved unless it can be demonstrated to the development director or designee in the demolition site plan that no reasonable alternatives to removal exist in order to accommodate permitted accessory structures, utilities, drainage measures, water quality improvements, and driveways.

(i)   Existing drainage patterns located along property lines shall not be adversely affected by construction of a building or any associated site work.

(j)   The applicant for construction on any lot shall be responsible for ensuring that all existing sewer services and taps from the building(s) to the street shall be inspected and verified to be in proper condition prior to connection.

(Ord. No. 05-20, Pt. I, 12-15-05; Ord. No. 06-06, Pt. I, 4-27-06; Ord. No. 09-01, 1-27-09)

Sec. 7-31.2. - Demolition permits.

(a)   A demolition site plan shall be submitted as part of the permit application package. The demolition site plan shall depict the trees, structures, and impervious surfaces to be removed; location and size of all trees greater than six (6) inches DBH; construction exits; tree-save areas; and best management practices for erosion control. Additionally, no demolition permit for a single-family detached residence shall be issued in a residential zoning district unless the applicant includes the original threshold elevation (if any) measured and certified by a licensed surveyor or engineer.

(b) Only dead, diseased, or hazardous trees, as determined by a certified arborist, may be removed pursuant to a demolition permit.

(c) An excavation site plan shall be submitted as part of the demolition permit application package when the purpose of the excavation is to locate current sewer lines in conjunction with an application for a variance from the front-door threshold elevation pursuant to section 27-749. The excavation site plan shall depict the boundaries of areas to be excavated, locations of storage areas for excavated materials, the location of structures and impervious surfaces, the location and size of all trees greater than six (6) inches DBH in the footprint of the planned excavation, tree-save areas and best management practices for erosion control.

(Ord. No. 05-20, Pt. I, 12-15-05; Ord. No. 06-06, Pt. I, 4-27-06; Ord. No. 09-01, 1-27-09)

Sec. 7-32. - Temporary structures and uses.

(a) *General.* The building official is authorized to issue a permit for temporary structures and temporary uses. Such permits shall be limited as to time of service, but shall not be permitted for more than one hundred eighty (180) days. The building official is authorized to grant one (1) written extension of ninety (90) days. The request for extension shall be in writing and shall specify the justifiable cause.

(b) *Conformance.* Temporary structures and uses shall conform to the structural strength, fire safety, means of egress, accessibility, light, ventilation and sanitary requirements of this chapter as necessary to ensure the public health, safety and general welfare.

(c) *Temporary power.* The building official is authorized to give permission to temporarily supply and use power in part of an electric installation before such installation has been fully completed and the final certificate of completion or occupancy has been issued. The part covered by the temporary certificate shall comply with the requirements specified for temporary lighting, heat or power in the National Electrical Code, as adopted in Division 3 of Article II of this chapter.

(d) *Termination of approval.* The building official is authorized to terminate such permit for a temporary structure or use and to order the temporary structure or use to be discontinued for violation of the Code or applicable state or federal law.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-33. - Permit fees; revocation.

(a) *Payment of fees.* A permit shall not be valid until the fees prescribed by law and the governing authority have been paid. No amendment to a permit shall be released to the applicant until the additional permit fee, if any, has been paid.

(b) *Schedule of permit fees.* Permit fees for buildings, structures, mechanical, gas, plumbing and electrical systems shall be determined by the governing authority of DeKalb County. The schedule of fees approved by the governing authority of DeKalb County shall be maintained by the clerk to the board of commissioners and the director shall also retain a copy available for public inspection.

(c) *Related fees.* The payment of the fee for the construction, alteration, removal or demolition for work done in connection with or concurrently with the work authorized by a building permit shall not relieve the applicant or holder of the permit from the payment of other fees that are prescribed by law.

(d) *Refunds.* The governing authority is authorized to adopt a written refund policy that applies to the refund of permit fees authorized by this chapter.

(e) *Revocation of certificates.* A certificate of occupancy, certificate of completion and/or certificate of change of tenant issued pursuant to any provision of this chapter shall be suspended or revoked by the director, and considered void, if:

(1)  The application for a certificate of occupancy contains false or misleading information, or if the applicant omitted material facts in the application;

(2)  Changes or alterations in the type of permitted use or occupancy occur without approval required by this Code;

(3)  Changes or violations of the conditions of the certificate occur without approval required by this Code;

(4)  Alterations, additions or improvements to the building, structure or systems occur without approval or without obtaining all necessary permits required by this Code;

(5)  The premises covered by the certificate are found to be in violation of any applicable provision of this Code, state or federal law or codes;

(6)  The establishment is a threat or nuisance to public health, safety or welfare.

(f)  No certificate of occupancy, certificate of completion and/or certificate of change of tenant shall be issued pursuant to any provision of this chapter to any applicant, business or legally or organizationally related entity if within twelve (12) months immediately preceding the filing of any application under this chapter the same applicant, business or legally or organizationally related entity requesting a certificate has been denied a certificate or had a certificate revoked for any location based in whole or in part upon having furnished fraudulent or untruthful information in any application or having omitted any material facts in any application.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-34. - Inspections.

(a)  *General.* Construction or work for which a permit is required shall be subject to inspection by the building official and such construction or work shall remain accessible and exposed for inspection purposes until approved. Approval as a result of an inspection shall not be construed to be an approval of a violation of the provisions of this chapter or of other applicable provisions of the Code. Inspections presuming to give authority to violate or cancel the provisions of this chapter or of other provisions of the Code shall not be valid. It shall be the duty of the permit applicant to cause the work to remain accessible and exposed for inspection purposes. Neither the building official nor the county shall be liable for any expense entailed in the removal of any material required to allow inspection.

(b)  *Preliminary inspection.* Before issuing a permit, the building official is authorized to examine buildings, structures and sites for which an application has been filed.

(c)  *Required inspections.* The building official, upon notification, shall make the inspections set forth as follows:

(1)  *Building.*

(A)  *Foundation and slab inspection* : To be made after trenches are excavated, forms are erected, and reinforcement is installed but before concrete is put in place. The appropriate silt and erosion control measures must be in place and functional.

(B)  *Damproofing inspection:* To be made prior to backfill of crawl space or basement foundation walls.

(C)  *Pre-cladding/frame inspection:* To be made after the roof, wall bracing, windows, doors and moisture barrier are installed and prior to placement of exterior cladding. Rough inspections on trades need not be complete for pre-cladding inspection.

(D)  *Frame/insulation inspection:* To be made after wiring, piping, chimneys, duct and vents to be concealed are in place and all rough inspections approved, fire blocking is in place and the insulation in walls and inaccessible ceilings is installed. Insulation values must meet documents submitted with permit application.

    (E)  *Final inspection:* To be made after the building or structure is completed in compliance with this Code prior to issuance of the certificate of occupancy.

(2)  *Electrical.*

    (A)  *Underground and slab inspection:* To be made after trenches or ditches are excavated, forms are erected, conduit or cable are installed, and before any backfill or concrete is put in place.

    (B)  *Rough-in inspection:* To be made after the roof, framing, fire blocking, bracing, and wiring are in place and prior to the installation of insulation and wall and ceiling membranes.

    (C)  *Final inspection:* To be made after the building or structure is complete, all required electrical outlets, switches and fixtures are in place and properly connected or protected, and the building or structure is ready for occupancy.

(3)  *Plumbing.*

    (A)  *Underground and slab inspection:* To be made after trenches or ditches are excavated, forms are erected, piping installed and before any backfill or concrete is put in place. The appropriate silt and erosion control measures must be in place and functional.

    (B)  *Rough-in inspection:* To be made after the roof, framing, fire blocking and bracing are in place and all water, soil, waste and vent piping is complete and prior to the installation of wall and ceiling membranes.

    (C)  *Final inspection:* To be made after the building is complete, and all plumbing fixtures and appliances are in place and properly connected, and the structure is ready for occupancy.

    (D)  *Testing:* Plumbing work and systems shall be tested as required in Section 312 of the Standard Plumbing Code. Tests shall be made by the permit holder and observed by the building official.

(4)  *Mechanical.*

    (A)  *Underground and slab inspection:* To be made after trenches or ditches are excavated, forms are erected, underground duct and fuel piping is installed and before any backfill and concrete is put in place.

    (B)  *Rough-in inspection:* To be made after the roof, framing, fire blocking and bracing are in place and all duct and fuel piping to be concealed are complete and prior to the installation of wall and ceiling membranes.

    (C)  *Final inspection:* To be made after the building is complete, the mechanical system and appliances are in place and properly connected and the structure is ready for occupancy.

(5)  *Gas.*

    (A)  *Rough-in inspection:* To be made after all piping authorized by the permit has been installed and before any such piping has been covered and concealed or any fixtures or appliances have been connected.

    (B)  *Final piping inspection:* To be made after all piping authorized by the permit has been installed, after all portions which are to be covered or concealed by wall and ceiling membranes, plastering, stone or brickwork have been so concealed, and before any fixtures or gas appliances have been connected. Log lighters shall be permitted separately and inspected.

    (C)  *Testing:* This inspection shall include a gas pressure test.

    (D)  *Final inspection:* To be made on all new gas work authorized by the permit and such portions of existing systems as may be affected by the new work or any changes, to insure compliance with the requirements of this chapter and to assure that the installation and construction of the gas system is in accordance with reviewed plans.

(d) *Residential floodplain inspections.* For construction permitted in areas prone to flooding as established by Table R301.2(1) of the International Residential Building Code, upon placement of the lowest floor, including basement, and prior to further vertical construction, the building official shall require submission of a certification of the elevation of the lowest floor, including basement, prepared by a registered professional engineer or land surveyor, as required in Section R327 of the International Residential Building Code.

(e) *Fire-resistant penetrations.* Protection of joints and penetrations in fire-resistance-rated assemblies shall not be concealed from view until inspected and approved.

(f) *Other inspections.* In addition to any other inspections, the building official is authorized to make or require other inspections of any construction work to ascertain compliance with the provisions of this chapter and other applicable provisions of the code that are enforced by the development department.

(g) *Residential fire-resistance-rated construction inspections.* Where fire-resistance-rated construction is required between dwelling units or due to the location on the property, the building official shall require an inspection of such construction after all lathing and/or wallboard is in place, but before any plaster is applied, or before wallboard joints and fasteners are taped and finished.

(h) *Inspection agencies.* The building official is authorized to request and accept reports of approved inspection agencies, provided such agencies satisfy the requirements of this division.

(i) *Pre-qualified alternate registered engineer inspections.*

(1) When it is evident that the county cannot provide an inspection service of construction covered by this chapter within two (2) business days of receiving a valid written request for an inspection, then, in lieu of an inspection by inspections personnel employed by the county, any person, firm, or corporation engaged in a construction project which requires an inspection, shall have the option of retaining, at their own expense, a pre-qualified alternate registered professional engineer who holds a certificate of registration issued under Chapter 15 of Title 43 of the Official Code of Georgia, and who is not an employee or otherwise affiliated with or financially interested in such person, firm, or corporation, to provide the required inspection. Pre-qualified alternate registered professional engineers shall conduct inspections in accordance with all applicable provisions of this Code and state law, including, but not limited to O.C.G.A. § 8-2-26, as amended.

(2) The county shall provide for the pre-qualification of alternate registered engineers who may perform inspections pursuant to this section. A pre-qualified alternate registered engineer inspector who personally makes the inspection, shall hold, in addition to the certificate registration required under Chapter 15 International Code Council/ICC of Title 43 of the Official Code of Georgia, a certification that matches his or her area of expertise. Pre-qualified alternate registered engineers may provide inspections in their scope of expertise providing they hold the aforementioned certifications that match their expertise. In lieu of personally holding an International Code Council certification, a registered engineer may employ technicians who hold the required appropriate International Code Council certifications to actually make the inspections. These employees shall also be pre-qualified by the county. Inspection reports submitted to the county shall contain both the certified technician's signature and the signature and seal of the pre-qualified alternate registered engineer and their dates of certification.

(3) Pre-qualified alternate registered engineer inspections and reports shall be accepted only from persons or firms who have been pre-qualified by the board. The requirements, procedures, application forms and report forms shall be as adopted by the board. Applications for approval as a pre-qualified alternate registered engineer inspector may be obtained from the development department.

(j) *Inspections requests.* It shall be the duty of the holder of the permit or their duly authorized agent to notify the building official when work is ready for inspection. It shall be the duty of the permit holder to provide safe access to and a safe means for inspection of such work for any inspections that are required by this chapter.

(k) *Approval required.* Work shall not be done beyond the point indicated in each successive inspection without first obtaining the approval of the building official. The building official, upon notification, shall

make the requested inspections and shall either indicate the portion of the construction that is satisfactory as completed or shall notify the permit holder or an agent of the permit holder wherein the same fails to comply with this Code. Any portions that do not comply shall be corrected and such portion shall not be covered or concealed until authorized by the building official.

(l) *Re-inspection fee.* Re-inspection fees shall be required in accordance with the fee schedule as adopted by the governing authority when work performed is required to be re-inspected due to the following reasons:

    (1) The re-inspection is not approved due to a failure to correct a previously noted code violation on a prior inspection;

    (2) The job is not ready for inspection when an inspection is requested and performed;

    (3) The building or structure is not accessible and inspection cannot be performed;

    (4) Work to be inspected has been covered or concealed and proper inspection cannot be performed; or

    (5) Prior issuance of a stop work order requires re-inspection.

(m) *Right-of-entry.* Inspections required under the provisions of this chapter shall be made by the building official or designee. Upon presentation of proper credentials, the building official or designee may enter the premises between 8:00 a.m. and 7:00 p.m. to perform any duty imposed by this chapter provided that the building official or designee has consent to enter the premises or has obtained and presents an inspection warrant as described in this chapter.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-35. - Certificates of occupancy, tenancy.

(a) *Required.* No building or structure or portion thereof shall be occupied or a change made in the type of occupancy or the nature of the use of an existing building or part thereof until after an appropriate certificate as required by this section has been issued.

(b) *Certificate of occupancy.*

    (1) *Issuance.* A certificate of occupancy shall not be issued by the building official until the building, structure and intended use complies with all applicable requirements of the zoning ordinance, all construction is complete and all required final building, plumbing, mechanical, gas, electric, fire, health, vegetation protection and site drainage inspections have been performed and approved.

    (2) *Scope.* The certificate of occupancy certifies that all final inspections have been completed and the structure has been erected, to the best of the county's knowledge, in compliance with applicable Code requirements at the time of the issuance of the certificate. However, issuance of a certificate of occupancy shall not excuse the builder, contractor, tenant, or property owner from liability for any violation of the Code or any other applicable laws. Occupancy shall be limited to the area or portion of a building or structure defined by the building permit for which the certificate of occupancy is issued.

(c) *Temporary certificate of occupancy.*

    (1) *Scope.* A temporary certificate of occupancy may be issued for non-residential buildings or portions thereof for a specified period of time when it has been determined by the building official or designee that no outstanding Code violations or deficiencies exist and the building may be safely occupied for the use and time requested. A request for a temporary certificate of occupancy shall be made on such form as prescribed by the building official.

    (2) *Issuance.* A temporary certificate of occupancy shall be issued for stated purposes only when construction has not been fully completed and all final inspections have not been performed.

   (3)  *Revocation.* A temporary certificate of occupancy may be revoked at the option of the building official for any and/or all of the following reasons:

      (A)  Violation of any building, plumbing, mechanical, electrical, fire safety or site development codes or regulations.

      (B)  Failure to complete any stage of construction and/or site improvements required by the building official in a timely manner.

      (C)  Unauthorized occupancy or use of any part or portion of the building or structure other than the area or portion for which a temporary certificate of occupancy has been granted.

      (D)  Any other conditions that may affect the health, safety and welfare of persons or property.

(d)  *Certificate of completion.* A certificate of completion shall be issued upon satisfactory completion of a building, structure, and/or plumbing, mechanical, gas or electrical system, when a certificate of occupancy is not required. The certificate of completion does not grant authority to occupy a building or structure or change the type of occupancy or nature of use prior to the issuance of a certificate of occupancy.

(e)  *Certificate of change of tenant.*

   (1)  *Scope.* A certificate of change of tenant shall be required whenever there is a change of tenant occupancy in any non-residential building, structure or use and no construction, alterations, improvements or repairs to the building, structure, plumbing, mechanical, gas or electrical systems have been or are to be made. The new tenant or building owner shall be required to submit current as-built floor and fixture plans for review and complete a repair/improvement declaration. Upon approval and payment of a change of tenant fee and satisfactory inspection to determine compliance with the submitted and approved floor and fixture plan, repair/improvement declaration, and applicable sections of this chapter, a certificate of change of tenant shall be issued.

   (2)  *Permits required.* If the change of tenant involves any construction, alterations, improvements or repairs to the building, plumbing, mechanical, gas or electrical systems, all necessary permits required by this chapter shall be obtained by licensed qualified contractors and all necessary inspections shall be performed by the building official before a change of tenant, or if required, a new certificate of occupancy is issued.

(f)  *Contents of certificates.* Certificates shall contain the following:

   (1)  The building permit number (or in the case of a certificate of completion, the appropriate trade permit number).

   (2)  The address of the structure.

   (3)  The name and address of the owner.

   (4)  A description of that portion of the structure for which the certificate is issued.

   (5)  A statement that the described portion of the structure has been inspected for compliance with the requirements of this chapter.

   (6)  The name of the building official.

   (7)  The edition of the code under which the permit was issued.

   (8)  If non-residential, the use and occupancy, in accordance with the provisions of Chapter 3 of the International Building Code.

   (9)  If non-residential, the type of construction as defined in Chapter 6 of the International Building Code.

  (10)  If non-residential, the design occupant load.

  (11)  If an automatic sprinkler is provided, whether the sprinkler system is required.

(12) Any special stipulations and conditions of the building permit.

(g) *Revocation of certificates.* The building official or designee may revoke certificates of occupancy, certificates of completion, and certificates of change of tenant issued under provisions of this chapter, where it is shown that there have been either one or more of the following:

(1) Changes or alterations in construction, type of permitted use or occupancy without written approval by the building official or designee.

(2) Changes or violations of the conditions of the certificate without written approval by the building official or designee.

(3) Alterations, additions, or improvements to the building, structure, or systems without permits and inspections required by this chapter.

(4) Violation of any zoning, building, plumbing, mechanical, electrical, fire safety or site development codes or regulations.

(5) Any condition that may affect the building, structure or service system which, in the opinion of the director, renders the building, structure or service system unsafe, dangerous or uninhabitable.

(6) After a certificate has been revoked, a valid certificate shall not be issued until all violations, changes, alterations, additions or improvements meet all requirements of this chapter as determined by the building official.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-36. - Utility service connections.

(a) *Connection of service utilities.* No person shall make connections from a utility, source of energy, fuel or power to any building or system that is regulated by this chapter for which a permit is required, until approved by the building official.

(b) *Permanent electrical service connection.* Permanent electrical service connection and meter shall not be authorized until all required final building, plumbing, mechanical, gas, electrical, drainage, vegetation, fire and health inspections have been performed and approved by the appropriate county or state department or official.

(c) *Permanent gas service connection.* Permanent gas service connection and meter shall not be authorized until the gas supply house line has been tested, inspected and approved and all appliance and equipment connections have been inspected and approved.

(d) *Temporary electrical and gas service connections.* Temporary electrical and gas service and meter connections may be authorized for a specified period of time when the system has been inspected and found to be safe for the connections and use authorized. Such temporary service connections shall be authorized only for the following reasons:

(1) Testing of appliances and equipment.

(2) To provide heat during the winter months to prevent freeze damage to water systems and equipment and including, but not limited to, installation of wallpaper or painting.

(3) Temporary occupancy of the building or structure only for the training of employees or stocking of merchandise.

(4) Single-tenant occupancy buildings and multi-tenant occupancy buildings for which temporary service connections have been authorized shall not be allowed access by the general public for business activity other than those allowed in subsections (1), (2), and (3) above.

(5) Application for temporary service connections and meters shall be made on such forms as prescribed by the director.

(e) *Authority to disconnect utility services.* The building official shall have the authority to authorize disconnection of utility service to the building, structure or system regulated by this chapter in case of an emergency, where necessary, to eliminate an immediate danger to life or property. Where possible, the owner and occupant of the building, structure or service system shall be notified of the decision to disconnect utility service prior to taking such action. If not notified prior to disconnecting, the owner or occupant of the building, structure or service system shall be notified in writing, as soon as practical thereafter.

(f) *Connection after order to disconnect.* No person shall make connections from any energy, fuel, power supply or water distribution system or supply energy, fuel or water to any equipment regulated by this chapter that has been disconnected or ordered to be disconnected by the building official or the use of which has been ordered to be discontinued by the building official until the building official authorizes the reconnection and use of such equipment.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-37. - Violations, remedies and penalties.

(a) *Unlawful acts.* It shall be unlawful for any person, firm or corporation to erect, construct, alter, extend, repair, move, remove, demolish or occupy any building, structure, system or equipment regulated by this chapter, or cause same to be done, in conflict with or in violation of any of the provisions of this chapter or other applicable provisions of this Code.

(b) *Notice of violation.* The building official is authorized to serve a notice of violation or order on the person responsible for the erection, construction, alteration, extension, repair, moving, removing, demolition, or occupancy of a building or structure, system or equipment in violation of the provisions of this chapter, or in violation of a permit or certificate of occupancy under the provisions of this chapter. Such notice or order shall direct the discontinuance or correction of the illegal action or condition and the abatement of the violation.

(c) *Penalties.* Any person failing to discontinue, correct or abate the violation of this chapter as ordered by the building official in the notice shall be subject to issuance of a court citation to appear in the recorder's court of DeKalb County to answer a charge(s) of violation(s) of this chapter and upon conviction shall be subject to a fine and/or imprisonment in accordance to section 1-10 of the Code. Where any offense continues from day to day, each day's continuance thereof shall be deemed a separate offense.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-38. - Stop work order.

(a) *Authority.* Whenever the building official finds any work regulated by this chapter being performed in a manner contrary to the provisions of this chapter or in a dangerous or unsafe manner, the building official is authorized to issue a stop work order.

(b) *Issuance.* The stop work order shall be in writing and shall be given to the owner of the property involved, or to the owner's agent, or to the person doing the work. Upon issuance of a stop work order, the cited work shall immediately cease. The stop work order shall state the reason for the order, and the conditions under which the cited work will be permitted to resume.

(c) *Unlawful continuance.* Any person who shall continue any work after having been served with a stop work order, except such work as that person is directed to perform to correct a violation or an unsafe condition, shall be subject to issuance of a court citation to appear in the recorder's court of DeKalb County and upon conviction shall be subject to a fine and/or imprisonment in accordance with section 1-10 of the Code. Where any offense continues from day to day, each day's continuance thereof shall be deemed a separate offense.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-39. - Inspection warrants.

(a)   The building official, in addition to other procedures provided by law, may obtain an inspection warrant under the conditions specified in this section. The warrant shall authorize the building official to conduct a search or inspection of property without the consent of the person whose property is to be searched or inspected, under the conditions set out in this section.

(b)   Inspection warrants may be issued by any judge of the recorder's court when the issuing judge is satisfied that all of the following conditions are met:

   (1)   The person seeking the warrant must establish under oath or affirmation that the property to be inspected is to be inspected as a part of a legally authorized program of inspection which includes that property, or that there is probable cause for believing that there is a condition, object, activity, or circumstance which legally justifies such an inspection of that property;

   (2)   The issuing judge determines that the issuance of the warrant is authorized by this division and all other applicable law;

   (3)   The warrant is attached to the affidavit required to be made in order to obtain the warrant;

   (4)   The warrant describes, either directly or by reference to the affidavit, the property upon which the inspection is to occur and is sufficiently accurate that the executor of the warrant and the owner or possessor of the property can reasonably determine from it the property for which the warrant authorizes a search or inspection;

   (5)   The warrant indicates the conditions, objects, activities, or circumstances which the search or inspection is intended to check or reveal; and

   (6)   The warrant refers, in general terms, to the provisions of the Code or state law sought to be enforced.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Sec. 7-40. - Unsafe conditions.

(a)   *Conditions.* Structures or existing equipment that are or hereafter become unsafe, uninhabitable, or which constitute a fire hazard, or are otherwise dangerous to human life or the public welfare, shall be deemed an unsafe condition. Structures that are deemed an unsafe condition shall be taken down and removed or made safe, as the building official deems necessary unless the notice of an unsafe condition is appealed to the board in accordance with the requirements set forth in section 7-16.

(b)   *Notice.* If an unsafe condition is found, the building official shall serve on the owner, agent or person in control of the building, structure or system found to be unsafe, a written notice that describes the condition deemed unsafe and specifies the required repairs or improvements to be made to abate the unsafe condition, or that requires the unsafe structure to be demolished within a stipulated time. Such notice shall require the person thus notified to declare immediately to the building official written acceptance or rejection of the terms of the notice.

(c)   *Method of service.* Such notice shall be deemed properly served if a copy thereof is (a) delivered to the owner personally; (b) sent by certified or registered mail addressed to the owner at the owner's last known address with the return receipt requested. If the certified or registered letter is returned showing that the letter was not delivered, a copy thereof shall be posted in a conspicuous place on or about the building or structure affected by such notice. Service of such notice in the foregoing manner upon the owner's agent or upon the person responsible for the building or structure shall constitute service of notice upon the owner.

(d) *Restoration.* The building, structure, system or equipment determined to be unsafe by the building official is permitted to be restored to a safe condition. To the extent that repairs, alterations, or additions are made or a change of occupancy occurs during the restoration of the building, structure, system or equipment, such repairs, alterations or additions or change of occupancy shall comply with the requirements of this chapter.

(Ord. No. 04-09, Pt. I, 8-10-04; Ord. No. 05-09, Pt. I, 7-26-05)

Secs. 7-41—7-50. - Reserved.

I, the undersigned, _____ Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board/meeting lawfully assembled on this ___ day of _____ ____ ; as amended

And same appears in Minutes of said Board this ___ day of _____ ____

_____
Clerk of Commissioners
DeKalb County, Georgia

Sec. 4.2.32. - Late-night establishments and night clubs.

A.

The regulations that follow regarding late-night establishments and nightclubs are intended to afford protection to residential uses and other uses so as to protect the public health, safety, and welfare while respecting and providing adequate opportunities for nightlife in the county.

B.

Late-night establishments and nightclubs shall be subject to all of the following standards:

1.

Parking facilities within a lot may be shared in accordance with article 6, parking.

2.

Valet parking shall not be used to satisfy the requirement to meet applicable parking standards.

3.

Methods of traffic circulation, ingress and egress shall be consistent with best management practices as approved by the transportation division of the county's public works department.

4.

Noise from the proposed use shall be contained within the subject retail center units or standalone structures. The facility shall comply with chapter 16, article VII, DeKalb County Noise Ordinance.

C.

No late night establishment or night club boundary line shall be located within one thousand five hundred (1,500) feet from the boundary line of property zoned for residential use without the issuance of a special land use permit (SLUP). A late-night establishment or night club is not required to obtain a special land use permit when their closest residential neighbor is on the opposite side of an interstate highway.

D.

Every special land use permit application for a late-night establishment or nightclub shall include a scaled drawing of the location of the proposed premises, showing the distance measured in feet from the boundary line of the property proposed to be used as a late-night establishment or nightclub to the boundary line of property zoned for residential use. Such drawing shall be certified by a land surveyor or professional engineer registered in the State of Georgia. For the purposes of this section, distance shall be measured in feet as follows:

1.

From the property line of the land upon which the late-night establishment or nightclub is located;

EXHIBIT

0

Blumberg No. 5137

2.

To the property line of the land which is zoned for a residential use;

3.

Along a straight line which describes the shortest distance between the two (2) property lines (i.e., "as the crow flies").

E.

Any late-night establishment or nightclub operating pursuant to a validly issued business and liquor license issued prior to the effective date of Ordinance No. 08-20, November 18, 2008, shall be a legal nonconforming use as defined in article 9. No late-night establishment or nightclub currently operating under a valid license issued prior to the effective date set forth in this section shall be required to secure a special land use permit from the board of commissioners in order to continue operation. Such establishments shall be required to comply with the applicable provisions of article 4, division 5 [sic] of this chapter regarding cessation, expansion, movement, enlargement or other alteration of the late-night establishment or nightclub. If a licensee is operating a legal nonconforming late-night establishment or nightclub at a particular location pursuant to this zoning ordinance, and such license is revoked, upon revocation, the legal nonconforming status of the licensee at that particular location shall be terminated

( Ord. No. 15-06 , 8-25-2015)

I, the undersigned, Barbara H. Sandler, Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board/meeting lawfully assembled on this 25 day of _____ 2017

And same appears in Minutes of said Board this day of _____

Clerk of Commissioners
DeKalb County, Georgia

- Sec. 7.5.2. - Appeals of decisions of administrative officials.
  - o Share Link
  - o Print
  - o Download (docx)
  - o Email
  - o Compare

A.

General power. The zoning board of appeals shall have the power and duty to hear and decide appeals where it is alleged by the appellant that there is error in any final order, requirement, or decision made by an administrative official based on or made in the enforcement of this zoning ordinance or as otherwise authorized by local law or the Code of DeKalb County as Revised 1988. Administrative officials must make final decisions covered by this section within one hundred eighty (180) days of receipt of all necessary information to make such decision. A failure to act prior to the passage of one hundred eighty (180) days shall not be construed to be a final order, requirement or decision within the meaning of this division. If a decision is not made by the one hundred eighty-first day, the requested decision is deemed denied, and becomes appealable. All such appeals shall be heard and decided following the notice requirements of section 7.2.4, and pursuant to the following criteria and procedural requirements.

B.

Appeals of decisions of administrative officials. Appeals of decisions of administrative officials may be filed by (1) any person aggrieved by; (2) any elected member of the DeKalb County Governing Authority affected by; or (3) an owner of property within two hundred fifty (250) feet of the nearest property line of the property that is the subject of any final order, requirement, or decision of an administrative official, based on or made in the enforcement of this zoning ordinance, or as otherwise authorized by local law or the Code of DeKalb County as Revised 1988. by filing with the secretary of the zoning board of appeals an application for appeal, specifying the grounds thereof, within fifteen (15) days after the action was taken by the official that is the subject of the appeal.

C.

Appeal stays all legal proceedings. An appeal of a decision of an administrative official stays all legal proceedings in furtherance of the action or decision appealed from unless the official from whom the appeal is taken certifies to the zoning board of appeals, after notice of appeal has been filed, that by reason of facts stated in the certificate, a stay would, in that official's opinion, cause imminent peril to life or property. In such a case, legal proceedings shall be stayed only pursuant to a restraining order granted by a court of competent jurisdiction directed to the officer from whom the appeal is taken and on due cause shown.

D.

EXHIBIT

P

Blumberg No. 5137

Appeal stays land disturbance or construction activity in certain situations. If the action or decision appealed from permits land disturbance or construction activity to commence or continue on residentially zoned property, the appeal stays the land disturbance or construction activity until the zoning board of appeals issues a decision on the appeal. Thereafter, land disturbance or construction activity in such cases shall only be stayed by an order from a court of competent jurisdiction. In all cases involving non-residentially zoned property, the appeal to the zoning board of appeals does not stay land disturbance or construction activity; such activity shall only be stayed by an order from a court of competent jurisdiction.

E.

[Order granted by court.] Thereafter, in such situations land disturbance or construction activity shall only be stayed by an order granted by a court of competent jurisdiction.

F.

Time of hearing. The zoning board of appeals shall fix a reasonable time for the hearing of the appeal and give notice thereof pursuant to the requirements of section 7.2.4 as well as written notice to the appellant. Any party may appear at the hearing in person, by an agent, by an attorney, or by the submission of written documentation.

G.

Decision of the zoning board of appeals. Following the consideration of all testimony, documentary evidence, and matters of record, the zoning board of appeals shall make a determination on each appeal and shall issue a written decision explaining the reasons for its decision. The zoning board of appeals shall decide the appeal within a reasonable time, but in no event more than sixty (60) days from the date of the hearing. An appeal shall be sustained only upon an expressed finding by the zoning board of appeals that the administrative official's action was based on an erroneous finding of a material fact, erroneously applied the zoning ordinance to the facts, or that the administrative official acted in an arbitrary manner. In exercising its powers, the zoning board of appeals may reverse or affirm, wholly or partly, or may modify the order, requirement, decision or determination appealed from, and to that end shall have all the powers of the administrative official from whom the appeal was taken and may issue or direct the issuance of a permit, provided all requirements imposed by any applicable laws are met.

( Ord. No. 15-06 , 8-25-2015)

I, the undersigned, Barbara H. Sanders Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board meeting lawfully assembled on this 25 day of August 2015

And same appears in Minutes of said Board this day of

Clerk of Commissioners
DeKalb County, Georgia

DIVISION 2. - ESTABLISHMENTS LICENSED FOR ON-PREMISES CONSUMPTION OF DISTILLED SPIRITS[5]

Footnotes:
--- (5) ---

**Cross reference—** Food service establishments, § 13-281.

**State Law reference—** Local regulation of sale of distilled spirits by the drink, O.C.G.A. § 3-4-110.

Sec. 4-126. - Hours of sale and operation.

Distilled spirits shall be sold and delivered to the customer for consumption on the premises during the following hours:

(a)

Monday through Friday hours are from 9:00 a.m. until 3:55 a.m. of the following day.

(b)

Saturday hours are from 9:00 a.m. until 2:55 a.m. on Sunday.

(c)

Sunday hours are from 12:30 p.m. until 2:55 a.m. on Monday as permitted by section 4-128.

Sales and deliveries during all other hours are prohibited. There shall be no consumption on the premises after prohibited hours have been in effect for one-half (½) hour. All licensed establishments must close their premises to the public and clear their premises of patrons within one (1) hour after the time set by this chapter for discontinuance of the sale of alcoholic beverages on the premises and shall not reopen their premises to the public until 9:00 a.m. or thereafter.

(Code 1976, § 7-2043; Ord. No. 89-14, § 1, 4-11-89; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 10-12, Pt. I, 6-22-10)

Sec. 4-127. - Employees.

The following provisions apply to all establishments holding a license for consumption of beer, wine distilled spirits on the premises:

(1)

An employee shall meet the same character requirements as set forth in the general ordinances for the licensee, except for the residency requirements.

(2)

No person shall be employed by an establishment holding a license under this chapter until such person has been fingerprinted or cleared by the police department and a permit issued indicating that

EXHIBIT

Q

Blumberg No. 5137

such person is eligible for employment. The permit issued to a person under this section shall be either of the following:

a.

Alcoholic beverage permit, which shall be issued only to a person who must be eighteen (18) years of age or older and who sells, serves or dispenses alcoholic beverages.

b.

Nonalcoholic beverage permit, which shall be issued to a person whose employment includes but is not limited to host, hostess, doorperson and bouncer.

(3)

No permit shall be issued until such time as a signed application has been filed with the police department and a search of the criminal record of the applicant completed. The application shall include the applicant's name, all of the applicant's aliases and/or any other name by which the applicant has ever been known, address, telephone number, the applicant's social security number, the date of birth with written proof thereof, and prior arrest record of applicant, though the fact of an arrest record shall be used for investigative purposes only and shall give rise to no presumption or inference of guilt. Due to the inclusion of arrest information, these applications shall be regarded as confidential and shall not be produced for public inspection without a court order.

(4)

The police department shall have a complete and exhaustive search made relative to any police record of the person fingerprinted or cleared. If there is no record of a violation of this division, the police department shall issue a permit to the employee, stating that the person fingerprinted or cleared is eligible for employment. If it is found that the person fingerprinted is not eligible for employment, the police department shall not issue a permit to the employee.

(5)

All permits issued through administrative error or through an error in completion of a background investigation can be terminated by the police department or the finance department.

(6)

This section does not apply to employees whose duties are limited solely to those of a busperson, cook or dishwasher.

(7)

No licensee under this chapter shall allow any employee required to hold a permit to work on the licensed premises unless the licensee has on file, on the premises, the current, valid permit of each such employee.

(8)

If any permitholder leaves the employ of a licensed establishment, the licensee shall immediately surrender the permit to the police department.

(9)

All permits issued hereunder remain the property of the county, and shall be produced for inspection upon the demand of the police department.

(10)

It shall be the responsibility of each licensee to provide all new employees at the time of their employment, and all employees annually, with an orientation and training on the DeKalb County Alcoholic Beverage Ordinance. Failure of the employee to participate shall not be a defense for an employer whose worker or agent violates any provisions of this ordinance; and provided that a licensee shall keep a record of such orientation and training, which shall be subject to inspection by DeKalb County.

(Code 1976, § 7-2045; Ord. No. 94-03, § 3, 2-8-94; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 00-21, Pt. 1, §§ XV, XVI, 3-14-00; Ord. No. 01-12, Pt. I, 6-26-01; Ord. No. 11-02, Pt. I, § 1, 11-27-01)

Sec. 4-128. - Sunday sales.

(a)

Licensed establishments deriving a minimum of sixty (60) percent of their total annual gross food and beverage sales from the sale of prepared meals or food, or licensed establishments deriving at least sixty (60) percent of their total annual income from the rental of rooms for overnight lodging, are authorized to apply for a Sunday sales permit to sell and serve alcoholic beverages, malt beverages and wine by the drink from 12:30 p.m. on Sunday until 2:55 a.m. of the following Monday. Failure to adhere to these standards shall result in the automatic revocation or denial of a Sunday sales permit by the finance department.

(b)

Applicants for a Sunday sales permit shall complete a form and affidavit furnished by the finance department. The finance department may, at anytime, require that the licensee obtain an audit prepared by a certified public accountant, at the licensee's expense, to ensure compliance. If an audit reveals that incorrect, incomplete or misleading information was submitted on and/or with the Sunday sales form and/or affidavit, then, the permit shall be automatically revoked by the finance department. No later than March 31st of the license year, licensee shall submit a report on monthly sales by category for the prior calendar year.

(c)

All annual permit renewals shall be filed with the finance department not later than November 30 of the year preceding the license year for which the permit is to be issued. All renewals are subject to audit prior to being renewed to ensure compliance with this chapter.

(d)

Sunday sales permits may be granted for the full calendar year or for the number of months remaining in the calendar year. The permit fee shall be prorated based on the number of months remaining in the calendar year; partial months shall be counted as a full month. Fees are not refundable and permits shall not be transferable.

(e)

Establishments which qualify for a Sunday sales license are authorized to apply for a temporary Sunday sales permit if they desire to open for special events or holidays. The temporary permit shall be valid for one (1) calendar month and partial months shall be counted as a full month. Licensees must apply thirty (30) days in advance of the issuance date.

(Code 1976, § 7-2046; Ord. No. 93-05, § 1, 3-9-93)

**State Law reference—** Local authorization and regulation of Sunday sales, O.C.G.A. § 3-3-7.

Sec. 4-129. - Open area and patio sales.

No consumption and/or sale of distilled spirits shall be allowed in open areas and patios unless first permitted and approved by the finance department. The department shall prepare such appropriate regulations as to ensure the safe and orderly operation of these establishments, including but not limited to regulations pertaining to maximum capacity, ingress and egress.

(Code 1976, § 7-2047; Ord. No. 98-04, Pt. 1, 4-30-98)

Secs. 4-130—4-145. - Reserved.
DIVISION 3. - ESTABLISHMENTS LICENSED FOR ON-PREMISES CONSUMPTION OF BEER AND WINE[6]

Footnotes:
--- (**6**) ---

**Cross reference—** Food service establishments, § 13-281 et seq.


Sec. 4-146. - Types of retail establishments.

(a)

No beer or wine shall be sold for consumption on the premises where sold except in eating establishments having a full-service kitchen prepared to serve food every hour they are open. These establishments must be located in zoning districts which permit restaurants and drive-in restaurants as conforming uses or where these eating establishments are incidental to a hotel or motel.

(b)

A golf course within a planned development, as authorized by the 1970 zoning ordinance, as amended, a stadium facility during the playing of professional athletic competitions, and a licensed or leased athletic complex within a park owned by DeKalb County, may be issued a beer and wine consumption-on-the-premises license without meeting the full-service kitchen requirement. No

license may be issued for use at a park or stadium at which the consumption of alcohol is not permitted under sections 19-30(c) or 4-101.1 of this Code.

(Code 1976, § 7-2061; Ord. No. 97-09, § 1, 5-13-97; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 99-07, Pt. 1, 2-23-99)

Sec. 4-147. - Hours of sale and operation.

Beer and/or wine shall be sold and delivered to the customer for consumption on the premises only during the following hours:

(a)

Monday through Friday hours are from 9:00 a.m. until 3:55 a.m. of the following day.

(b)

Saturday hours are from 9:00 a.m. until 2:55 a.m. on Sunday.

(c)

Sunday hours are from 12:30 p.m. until 2:55 a.m. on Monday as permitted by section 4-149.

Sales and deliveries during all other hours are prohibited. There shall be no consumption on the premises after prohibited hours have been in effect for one-half (½) hour. All licensed establishments must close their premises to the public and clear their premises of patrons within one (1) hour after the time set by this chapter for discontinuance of the sale of alcoholic beverages on the premises and shall not reopen their premises to the public until 9:00 a.m. or thereafter.

(Code 1976, § 7-2063; Ord. No. 89-14, § 2, 4-11-89; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 10-12, Pt. I, 6-22-10)

Sec. 4-148. - Employees.

The following provisions apply to all establishments holding a license for consumption of beer and/or wine on the premises:

(1)

An employee shall meet the same character requirements as set forth in the general ordinances for the licensee, except for the residency requirements.

(2)

No person shall be employed by an establishment holding a license hereunder until such person has been fingerprinted or cleared by the police department and a permit issued indicating that such person is eligible for this employment. The permit issued to a person under this section shall be either of the following:

a.

Alcoholic beverage permit, which shall be issued only to a person who must be eighteen (18) years of age or older and who sells, serves or dispenses alcoholic beverages.

b.

Nonalcoholic beverage permit, which shall be issued to a person whose employment includes but is not limited to host, hostess, doorperson and bouncer.

(3)

No permit shall be issued until such time as a signed application has been filed with the police department and a search of the criminal record of the applicant completed. The application shall include, but shall not be limited to, the name, date of birth and prior arrest record of the applicant, though the fact of an arrest record shall be used for investigative purposes only, and shall give rise to no presumption or inference of guilt. Due to the inclusion of arrest information, these applications shall be regarded as confidential and shall not be produced for public inspection without a court order.

(4)

The police department shall have a complete and exhaustive search made relative to any police record of the person fingerprinted or cleared. If there is no record of a violation of this division, the department shall issue a permit to the employee, stating that the person is eligible for employment. If it is found that the person fingerprinted or cleared is not eligible for employment, the department shall not issue a permit to the employee.

(5)

All permits issued through administrative error or through an error in completion of a background investigation may be terminated by the finance department or the police department.

(6)

This section does not apply to employees whose duties are limited solely to those of a busperson, cook or dishwasher.

(7)

No licensee shall allow any employee required to hold a permit to work on the licensed premises unless the licensee has on file, on the premises, the current, valid permit of each such employee.

(8)

If any permitholder leaves the employ of a licensed establishment, the licensee shall immediately surrender the permit to the police department.

(9)

All permits issued hereunder remain the property of the county and shall be produced for inspection upon the demand of the police department.

(Code 1976, § 7-2064; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 11-02, Pt. I, § 1, 11-27-01)

Sec. 4-149. - Sunday sales.

(a)

Licensed establishments deriving a minimum of sixty (60) percent of their total annual gross food and beverage sales from the sale of prepared meals or food, or licensed establishments deriving at least sixty (60) percent of their total annual gross income from the rental of rooms for overnight lodging, are authorized to apply for a Sunday sales permit to sell and serve alcoholic beverages by the drink from 12:30 p.m. on Sunday until 2:55 a.m. of the following Monday. Failure to adhere to these standards shall result in the automatic revocation or denial of a Sunday sales permit by the finance department.

(b)

Applicants for a Sunday sales permit shall complete a form and affidavit furnished by the finance department. The finance department may, at anytime, require that the licensee obtain an audit prepared by a certified public accountant, at the licensee's expense, to ensure compliance. If an audit reveals that incorrect, incomplete or misleading information was submitted on and/or with the Sunday sales form and/or affidavit, then, the permit shall be automatically revoked by the finance department. No later than March 31st of the license year, licensee shall submit a report on monthly sales by category for the prior calendar year.

(c)

All annual permit renewals shall be filed with the finance department not later than November 30 of the year preceding the license year for which the permit is to be issued. All renewals are subject to audit prior to being renewed to ensure compliance with this chapter.

(d)

Sunday sales permits may be granted for the full calendar year or for the number of months remaining in the calendar year. The permit fee shall be prorated based on the number of months remaining in the calendar year; partial months shall be counted as a full month. Fees are not refundable and permits shall not be transferable.

(e)

Establishments which qualify for a Sunday sales license are authorized to apply for a temporary Sunday sales permit if they desire to open for special events or holidays. The temporary permit shall be valid for one (1) calendar month and partial months shall be counted as a full month. Licensees must apply thirty (30) days in advance of the issuance date.

(Code 1976, § 7-2065; Ord. No. 93-05, § 1, 3-9-93; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-150. - Open area and patio sales.

No consumption and/or sale of beer and wine shall be allowed in open areas and patios unless first permitted and approved by the finance department. The department shall prepare such appropriate regulations as to ensure the safe and orderly operation of these establishments, including, but not limited to, regulations pertaining to maximum capacity, ingress and egress.

(Code 1976, § 7-2066; Ord. No. 98-04, Pt. 1, 4-30-98)

Secs. 4-151—4-160. - Reserved.

Sec. 4.2.32. - Late-night establishments and night clubs.

A.

The regulations that follow regarding late-night establishments and nightclubs are intended to afford protection to residential uses and other uses so as to protect the public health, safety, and welfare while respecting and providing adequate opportunities for nightlife in the county.

B.

Late-night establishments and nightclubs shall be subject to all of the following standards:

1.

Parking facilities within a lot may be shared in accordance with article 6, parking.

2.

Valet parking shall not be used to satisfy the requirement to meet applicable parking standards.

3.

Methods of traffic circulation, ingress and egress shall be consistent with best management practices as approved by the transportation division of the county's public works department.

4.

Noise from the proposed use shall be contained within the subject retail center units or standalone structures. The facility shall comply with chapter 16, article VII, DeKalb County Noise Ordinance.

C.

No late night establishment or night club boundary line shall be located within one thousand five hundred (1,500) feet from the boundary line of property zoned for residential use without the issuance of a special land use permit (SLUP). A late-night establishment or night club is not required to obtain a special land use permit when their closest residential neighbor is on the opposite side of an interstate highway.

D.

Every special land use permit application for a late-night establishment or nightclub shall include a scaled drawing of the location of the proposed premises, showing the distance measured in feet from the boundary line of the property proposed to be used as a late-night establishment or nightclub to the boundary line of property zoned for residential use. Such drawing shall be certified by a land surveyor or professional engineer registered in the State of Georgia. For the purposes of this section, distance shall be measured in feet as follows:

1.

From the property line of the land upon which the late-night establishment or nightclub is located;

2.

To the property line of the land which is zoned for a residential use;

3.

Along a straight line which describes the shortest distance between the two (2) property lines (i.e., "as the crow flies").

E.

Any late-night establishment or nightclub operating pursuant to a validly issued business and liquor license issued prior to the effective date of Ordinance No. 08-20, November 18, 2008, shall be a legal nonconforming use as defined in article 9. No late-night establishment or nightclub currently operating under a valid license issued prior to the effective date set forth in this section shall be required to secure a special land use permit from the board of commissioners in order to continue operation. Such establishments shall be required to comply with the applicable provisions of article 4, division 5 [sic] of this chapter regarding cessation, expansion, movement, enlargement or other alteration of the late-night establishment or nightclub. If a licensee is operating a legal nonconforming late-night establishment or nightclub at a particular location pursuant to this zoning ordinance, and such license is revoked, upon revocation, the legal nonconforming status of the licensee at that particular location shall be terminated

( Ord. No. 15-06 , 8-25-2015)

I, the undersigned Barbara H. Sander Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board meeting lawfully assembled on this 25 day of ____ , ____

And same appears in Minutes of said Board this day of ____ , ____.

Clerk of Commissioners
DeKalb County, Georgia

## DIVISION 2. - LICENSES

### Sec. 4-46. - Required.

(a)

It shall be unlawful for any person to sell or possess for the purpose of sale any alcoholic beverage without a license from the county to sell or possess for sale alcoholic beverages, or to sell or make deliveries beyond the boundaries of the premises covered by the license.

(b)

The county license shall not be valid without current state license(s).

(c)

A retail establishment shall not have alcoholic beverages on the sales floor or in cooler unless the establishment has a current county alcoholic beverage license.

(Code 1976, § 7-2003; Ord. No. 98-04, Pt. 1, 4-30-98)

### Sec. 4-47. - Sale in unincorporated area of county; scope of license.

(a)

Alcoholic beverages may be sold in the unincorporated area of the county under a license granted by the board of commissioners upon the terms and conditions provided.

(b)

All licenses herein shall be a mere grant or privilege to carry on the business during the term of the license subject to all terms and conditions imposed by this Code and state law.

(c)

All licenses hereunder shall have printed on the front these words: "This license is a mere privilege subject to be revoked and annulled, and is subject to any future ordinances which may be enacted."

(Code 1976, § 7-2001; Ord. No. 98-04, Pt. 1, 4-30-98)

### Sec. 4-48. - Separate license for each location.

A separate application for an alcoholic beverage license must be made for each location and a separate license must be issued.

(Code 1976, § 7-2005; Ord. No. 98-04, Pt. 1, 4-30-98)

### Sec. 4-49. - Application.

(a)

All persons or entities desiring to sell alcoholic beverages shall make application on the form prescribed by the finance department.

(b)

The application shall include but not be limited to the following:

(1)

The name and address of the applicant;

(2)

The proposed business to be carried on;

(3)

If a partnership, the names and residence addresses of the partners;

(4)

If a corporation, the names and addresses of the officers;

(5)

The name and address of the agent for service of process;

(6)

The name and address of the manager;

(7)

The names and addresses of all stockholders holding more than ten (10) or more percent or of any class of corporate stock, or any other entity having a financial interest in each entity which is to own or operate the establishment; and

(8)

Such other information as may be required by the finance department and/or the police department. If the manager changes, the applicant must furnish the finance department and the police department with the name and address of the new manager and other information as is requested within ten (10) days of such change.

(c)

All applications for a package liquor license, both original and renewals, must be accompanied by a full and complete statement relative to any and all interest in retail liquor stores. This shall include names and addresses of all persons possessing a legal ownership in the subject establishment, together with any interest that each person or that any family member of each person has in any other retail liquor store located in the county or any other place; the ownership of the land and building where such retail business is operated; the amount of rental paid for the land and building, the manner in

which such rental is determined, and to whom and at what intervals the rental is paid; the names and addresses, by affidavit from the owner, lessor or sublessor of the land and building, of all persons having any whole, partial, beneficial or other legal interest in and to the land and building on and in which the retail liquor store is located; and any other information called for by the finance department to ensure compliance with the provisions of this division. Any change in relationship herein declared must be filed when made with the finance department and failure to so file within a period of ten (10) days after this change is made shall be grounds for the county to cancel the license.

(d)

All applicants shall furnish all data, information and records requested of them by the finance department or the police department and failure to furnish this data, information and records within thirty (30) days from the date of the request shall automatically dismiss, with prejudice, the application. By filing an application, applicants agree to produce for oral interrogation any person requested by the finance department or the police department and considered as being important in the ascertainment of the facts relative to the license. The failure to produce the person within thirty (30) days after being requested shall result in the automatic dismissal, with prejudice, of the application. An application shall not be considered complete until the applicant has furnished all data, information and records requested of them by the finance department or the police department.

(e)

All applications shall be sworn to by the applicant before a notary public or other officer authorized to administer oaths.

(f)

In all instances in which an application is denied or dismissed with prejudice under the provisions of this section, the applicant may not reapply for a license for at least one (1) year from the final date of such denial.

(g)

The finance department shall provide written notice to any applicant whose application is denied under the provisions of this chapter within thirty (30) days of filing a properly completed application. Such written notification shall set forth in reasonable detail the reasons for such denial and shall advise the applicant of the right to appeal to the alcohol beverage review board under the provisions of this division within fifteen (15) days from date of notice.

(Code 1976, §§ 7-2007, 7-2146; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 00-21, Pt. 1, §§ II, III, 3-14-00; Ord. No. 11-02, Pt. I, § 1, 11-27-01)

Sec. 4-50. - Persons eligible.

(a)

No license for the sale of alcoholic beverages shall be granted to any person or entity, where the majority of stock or partnership interests are controlled by individual(s) who are not citizens of the United States or aliens lawfully admitted for permanent residence. If, an entity is owned by other entities, then this requirement shall apply to the majority stockholders of the other entities to insure that a license is not granted to an ineligible person or entity.

(b)

No license for the sale of alcoholic beverages shall be granted to any person that has not attained the age of eighteen (18).

(c)

No retailer or consumption on premises license for the sale of distilled spirits shall be granted where the applicant is not a resident of the county or municipality within the state where the sales of distilled spirits is authorized.

(d)

If the applicant is a corporation or partnership, the provisions of this section shall apply to all stockholders with ownership of ten (10) or more percent, corporate officers and all partners. Where the majority stockholder is not an individual, the license shall be issued to jointly to the corporation and local manager of the business or to the registered agent designated pursuant to section 4-27. In the case of a partnership, the license shall be issued to the partner(s) with the highest ownership percentage. In the case of a sole proprietorship, the sole proprietor shall be the applicant and the licensee.

(e)

No license for the sale of alcoholic beverages shall be granted to any person, or the spouse of any person, who has been convicted under any federal, state or local law of any felony within the last ten (10) years, has been on felony probation or parole within the last five (5) years, or released from prison on felony charges within the last five (5) years prior to filing an application. The term conviction includes any adjudication of guilt or a plea of guilty or nolo contendere or the forfeiture of a bond when charged with a crime.

(f)

No license for the sale of alcoholic beverages shall be granted to any person, or the spouse of any person, who has been convicted under any federal, state or local law of any misdemeanor involving moral turpitude within ten (10) years prior to filing an application. The term "conviction" includes any adjudication of guilt or a plea of guilty or nolo contendere or the forfeiture of a bond when charged with a crime. The term "moral turpitude" shall include any violation that involves gambling, drugs, or a driving while intoxicated conviction in less than five (5) years from a prior driving while intoxicated conviction, and sale of alcohol with the exception of any violations of sections 4-106 or 4-108.

(g)

It shall be unlawful for any county employee of a department regulating alcoholic beverages, or the employee's spouse or minor children, to have any whole, partial or beneficial interest in any license to sell alcoholic beverages in the county.

(h)

No license for the sale of alcoholic beverages shall be granted to any person who has had any license issued under the police powers of the county previously revoked within two (2) years prior to the filing of the application.

(i)

No license for the sale of alcoholic beverages shall be granted to any person or entity that has violated this Code section within one (1) year prior to the filing of the application for such license.

(j)

The finance department may decline to issue a license when any person having any interest in the operation of such place of business or control over such place of business does not meet the same character requirements as set forth in this article for the licensee.

(k)

The inability of the finance department or the police department to verify any statement or information required to be disclosed or to be able to adequately conduct a full investigation of an applicant or a place of business due to foreign background, ties or interest or for any reason beyond the finance department or the police department's control shall be, in addition to all other grounds, cause for dismissal of any license, with prejudice and if any license has been granted shall be cause for revocation of the license.

(Code 1976, § 7-2010(a)—(i); Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 00-21, Pt. 1, §§ IV—VI, 3-14-00; Ord. No. 11-02, Pt. I, § 1, 11-27-01)

Sec. 4-51. - Issuance of license and employee permits; adult entertainment employee permits; employee permit fees.

(a)

Before a license shall be granted under this division, the applicant shall comply with all rules and regulations adopted by the board of commissioners regulating the sale of alcoholic beverages and each applicant for a license to sell alcohol shall pay a license fee in the amount to be established by action of the board of commissioners.

(b)

A license will be issued or the issuance of a license will be denied within thirty (30) days after submission of a properly completed application. If a license is not issued or denied within the time frame specified herein, the license shall be automatically approved.

(c)

All employees of any licensed establishment must hold a permit. A permit fee shall be paid prior to the issuance of the permit the amount of which shall be established by action of the board of commissioners. The conditions and procedures governing the issuance of alcohol permits for employees are set forth herein and in sections 4-127, 4-148 and 4-163 of this Code.

(d)

Any employee permit identified in this article will be issued or the issuance of a permit will be denied within thirty (30) days after submission of a properly completed application. A permit shall be valid

for twelve (12) months from the date of issuance. If a permit is not issued or denied within the time frame specified herein, the permit shall be automatically approved.

(e)

Employees employed in an adult entertainment establishment where alcohol is consumed, whether for compensation or otherwise, shall be required to have a permit in addition to the alcohol permit provided for in section 4-51(c). A permit fee shall be paid prior to the issuance of the permit in the amount to be established by action of the board of commissioners. The amount of that fee may vary for different categories of employee. The categories of adult entertainment employee permit, shall include, but are not limited to, dancers/performer, bartender/waiter, bouncer and others. Permits issued to dancers/entertainers and bartenders/waiters shall authorize the holder to work in such capacity in any adult entertainment establishment in the county. Accordingly, the fee for such category of employee will be fixed at a higher rate. For the purpose of this article, independent contractors, such as entertainers, employed or hired by an adult entertainment establishment, shall be licensed as employees regardless of the business relationship with the owner or licensee of any adult entertainment establishment. Each independent contractor shall be required to have and maintain his or her separate business license. Notwithstanding, this provision shall not apply to an independent contractor who performs accounting, legal, administrative, repair, or maintenance services for licensee.

(f)

Employees of adult entertainment establishments shall not be less than eighteen (18) years of age. No person requiring a permit may be employed by or work in an establishment as defined in Article I until such person has filed an application, paid the fee for and obtained a work permit from the police department.

(1)

No person shall be employed in any capacity whatsoever, including but not limited to performers, entertainers, waiters, bouncers, bartenders, discjockeys, and musicians who has been convicted in this or any other county or state or in any federal court within five (5) years immediately prior to the application for employment for soliciting for prostitution, keeping a disorderly place, illegally dealing in narcotics, sex offenses or any charge relating to the manufacture or sale of intoxicating liquors or any felony or misdemeanor of moral turpitude, or for whom any outstanding warrant exists on which service has not been perfected. "Be employed" shall include all work done or services performed while in the scope of employment on the premises and elsewhere than on the premises, for compensation or otherwise. Notwithstanding, this provision shall not apply to an independent contractor who performs accounting, legal, administrative, repair or maintenance services for the licensee.

(2)

No person requiring a permit may be employed or work in any adult entertainment establishment until such person has filed an application, paid the fee for and obtained a work permit from the police department.

(3)

An application for a permit shall include the applicant's legal name, all of the applicant's aliases and/or any other name by which the applicant has ever been known, address, business name and address, date of birth with written proof thereof, and prior arrest record of the applicant. The police department shall make a complete search relative to any police record of the applicant. If there is no record of a violation of this section of the Code, or of any other section of the Code, the police department shall issue a permit to the applicant.

(4)

Any permit for employment issued hereunder shall expire twelve (12) months from the date of issuance unless earlier revoked or suspended. The police department may prescribe reasonable fees for certifying the eligibility for employment.

(5)

Employees holding permits issued pursuant to this chapter shall at all times during their working hours have said permits available for inspection at the premises.

(6)

Employees shall provide their employer with a legible copy of the same which copy shall be maintained by the employer as part of its business records.

(Code 1976, § 7-2018; Ord. No. 00-21, Pt. 1, § VII, 3-14-00; Ord. No. 01-12, Pt. I, 6-26-01)

**State Law reference—** License fees authorized and limitations thereon, O.C.G.A. §§ 3-4-50, 3-5-42.

Sec. 4-52. - Expiration; renewal.

(a)

All licenses granted under this division shall expire on December 31 of each year. A licensee who desires to renew the license shall file application, with the requisite fee heretofore provided, with the finance department on the form provided for renewal of the license for the ensuing year. All applications for renewal will be reviewed by the finance department. Licensees do not have a right to automatic renewal and must be in compliance with all rules and regulations for the granting of licenses. Applications for renewal must be filed before November 30 of each year; otherwise penalties and interest will be assessed. No renewal license shall be granted after December 31, but such application shall be treated as an initial application and the applicant shall be required to comply with all rules and regulations for the granting of licenses as if no previous license had been held.

(b)

All licenses granted under this division shall be for the full calendar year or for the number of months remaining in the calendar year. License fees shall be prorated based on the number of months remaining in the calendar year; partial months shall be counted as a full month. License fees are not refundable.

(c)

Any person renewing any license issued under this division who pays the required fee or any portion thereof after the date set by law for such payment shall pay, in addition to the annual fee, a late-payment penalty in addition to an assessment of interest at the rate specified by section 2-112.

(d)

Failure to fully complete the renewal application, as required by the finance department will delay the renewal. The failure to furnish complete information within thirty (30) days after being requested shall result in automatic denial of the renewal.

(Code 1976, § 7-2017; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-53. - Transferability.

(a)

No license for the sale of alcoholic beverages shall be transferable, except as otherwise provided in this section.

(b)

In case of the death of the licensee, the establishment shall be allowed to continue to sell alcoholic beverages for a period of thirty (30) days from the date of death, or until expiration of the license, or until approval of a new license, whichever occurs first, provided however that the finance department must be notified of the licensee's death within ten (10) days of the death or the license shall automatically terminate on the eleventh day following the death of the licensee.

(c)

If a license in surrendered, or a licensee severs the association with the licensed establishment, the establishment may continue to sell alcoholic beverages for a period of thirty (30) days from the date of surrender, or from the date determined to be the date of severance, provided however that the finance department must be notified of the change within ten (10) days of the severance or the license shall automatically terminate on the eleventh day following the date of the severance. Upon issuance of a new license, the authorization to sell under the previous license shall be revoked by operation of law. No additional license fees shall be required during the period for which the original license was issued.

(d)

Nothing in this section shall prohibit one (1) or more of the partners in the partnership holding a license to withdraw from the partnership in favor of one (1) or more of the partners who were partners at the time of the issuance of the license. This section shall not prohibit transfer of stock between persons who held stock in the corporate owner at the time of issuance of the license; nor shall it prohibit transfers of stock which do not result in any person increasing stock holdings to a total of ten (10) or more percent of any class of corporate stock, or any other entity having a financial interest in the entity.

(e)

Should a transfer of location be approved, with no change of ownership of the business, the license fee paid for the old location shall be applied to the new location.

(f)

Except as provided above, any change in the ownership of any entity owning a licensed establishment shall cancel and revoke any license issued under this division automatically, without the necessity of a hearing.

(g)

Violation of this section shall result in revocation of the license being used and a fine of one thousand dollars ($1,000.00) each on the new ownership and the old ownership. No license will be issued to the old or the new owner in the county for one (1) year from the date of the violation.

(Code 1976, § 7-2006; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 00-21, Pt. 1, §§ VIII, IX, 3-14-00)

Sec. 4-54. - Display.

The county alcoholic beverage license shall at all times be kept plainly exposed to view at the place of business of the licensee. The finance director or designee shall ensure that all licenses for on-premises consumption of alcoholic beverages show:

(1)

Any special land use permit conditions imposed by the board of commissioners for the establishment,

(2)

The allowed hours of operation for the location and

(3)

Written notice to the licensee that the license with the hours of operation must be posted in a public and conspicuous place within the licensee's establishment.

(Code 1976, § 7-2004; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 09-04, Pt. I, 2-10-09)

Sec. 4-55. - Suspension or revocation.

(a)

A license issued pursuant to the provisions of this division shall be suspended or revoked by the finance department if the licensee furnishes fraudulent or untruthful information in the original, renewal or transfer application for a license or omits information required in the original, renewal or transfer application for a license and for failure to pay all fees, taxes or other charges imposed under the provisions of this chapter.

(b)

Whenever the state revokes any permit or license to sell alcoholic beverages, the county license shall thereupon be automatically revoked. The police department, upon notice of such revocation from the

finance department, shall take the necessary steps to see that signs are removed and that all alcoholic beverage sales cease.

(c)

Any licensed establishment that is found to be in violation of section 4-104 shall be subject to immediate license revocation in addition to all other penalties.

(d)

The finance department shall revoke the Sunday sales license of any licensee where the establishment has been found in violation of the Sunday sales ordinance.

(e)

The finance department shall revoke the license of any licensee where the licensee has sold alcoholic beverages at a time other than the time permitted by the license.

(f)

The finance department shall revoke the license of any licensee whose license has been suspended three (3) or more times in any consecutive twenty-four-month period.

(g)

The finance department shall revoke the license for any premises where alcoholic beverages have been sold or distributed during a period of suspension.

(h)

The finance department may suspend or revoke the license of any establishment which does not meet the licensing qualifications set forth in this division at any time such knowledge becomes known to it.

(i)

An act or omission of a licensee, majority stockholder, general or managing partner, or employee of the licensee or licensed establishment which constitutes a violation of federal or state law or of any provision of this chapter will subject the licensee to suspension or revocation of the license in accordance with the provisions of this division when evidence is submitted to the finance department that the act or omission did occur, regardless of whether any criminal prosecution or conviction ensues. In the case of a violation by an employee, the licensee may submit evidence to the finance department that the acts of the employee were not known to or under reasonable circumstances should not have been known to the licensee, were not condoned by the licensee, and that the licensee has established practices or procedures to prevent the violation from occurring, and that the licensee has not failed to properly train or supervise employees to prevent the violation from occurring.

(j)

Subject to the provisions of this chapter, a violation of sections 4-106 or 4-108 by a licensee, majority stockholder, general or managing partner or employee of the licensee or licensed establishment shall result in the following action by the finance department:

(1)

The first violation shall result in license suspension for a period of not less than two (2) days, which shall be scheduled to include a Friday and Saturday.

(2)

The second violation within a consecutive twenty-four (24) month period shall result in license suspension for a period of not less than ten (10) days which shall be scheduled to begin on a Friday.

(3)

The third violation within a consecutive twenty-four (24) month period shall result in license revocation.

(k)

The finance department shall revoke the license of any licensee where the establishment has been declared a public nuisance or has created a danger to public safety as determined by the police department.

(Code 1976, § 7-2022; Ord. No. 92-28, § 1, 9-8-92; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 11-02, Pt. I, § 1, 11-27-01)

Sec. 4-56. - Alcoholic beverage review board.

(a)

There is established an alcoholic beverage review board which shall have the following duties:

(1)

To hear appeals from decisions of the finance department denying the issuance or renewal of any license pertaining to the sale of alcoholic beverages in the county;

(2)

To hear appeals from the decisions of the finance department revoking or suspending any license pertaining to the sale of alcoholic beverages in the county;

(3)

To hear appeals from the decisions of the police department denying the issuance of permits pertaining to employment in a licensed establishment;

(4)

To hear appeals from the decisions of the police department revoking or suspending an employee permit to an employee of a licensed establishment.

(b)

The alcoholic beverage review board shall be composed of the deputy public works director for development, the deputy director for finance, the chief of police, the director of the department of fire and rescue services, and the health director, or their designees. The deputy director for finance or his designee shall not sit as a member of the alcohol beverage review board when the hearing relates to a license or permit issued by the finance department. The chief of police or his designee shall not sit as a member of the alcohol beverage review board when the hearing relates to a permit issued by the police department.

(Code 1976, § 7-2023; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 01-12, Pt. I, 6-26-01; Ord. No. 11-02, Pt. I, § 5, 11-27-01)

Sec. 4-57. - Hearings.

(a)

No license or permit under Articles II and III shall be denied, suspended or revoked without the opportunity for a hearing as hereinafter set forth, provided however that upon conviction or plea of nolo contendere by a court of competent jurisdiction that results in the suspension or revocation of a license or permit, the license or permit shall be deemed immediately revoked or suspended by the alcoholic beverage review board appealable pursuant to subsection (f).

(b)

The issuing department shall provide written notice to the applicant or licensee of the decision to deny, suspend or revoke the license or permit. Such written notification shall notify the applicant or licensee of the right of appeal. Any applicant or licensee who is aggrieved or adversely affected by a final action of the issuing department may have a review thereof by appeal to the alcoholic beverage review board. Such appeal shall be by written petition filed with the county within fifteen (15) days after the final decision or action by the county.

(c)

A hearing shall be conducted on each appeal within thirty days of the date of filing with the issuing department, unless a continuance of such date is agreed to by the appellant and the issuing department. The appellant at such hearing shall have the right to be represented by an attorney at the expense of the appellant, and to present evidence and cross-examine witnesses.

(d)

The findings of the alcoholic beverage review board shall be forwarded to the relevant issuing department at the conclusion of the hearing. The issuing department shall have the duty to notify the appellant of the action of the action of the alcoholic beverage review board.

(e)

The findings of the alcoholic beverage review board shall not be set aside unless found to be any of the following:

(1)

Contrary to law or ordinances;

(2)

Unsupported by substantial evidence on the record as a whole;

(3)

Unreasonable.

(f)

The findings of the alcoholic beverage review board shall be final unless appealed within thirty (30) days of the date of the findings by certiorari to the superior court of the county.

(Code 1976, § 7-2024; Ord. No. 98-04, Pt. 1, 4-30-98; Ord. No. 01-12, Pt. I, 6-26-01)

Sec. 4-58. - Service of notices.

For the purpose of this section, notice shall be deemed delivered when personally served or, when served by mail, within three (3) days after the date of deposit in the United States mail.

(Code 1976, § 7-2025; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-59. - Consumption sales only.

Persons holding a license to sell distilled spirits for consumption on the premises shall not be permitted to sell liquor by the package or bottle, except as provided in section 4-191.

(Code 1976, § 7-2044; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-60. - Fee deposit and investigative and administrative costs.

(a)

Each application for a license to sell distilled spirits for consumption on the premises shall be accompanied by a certified check for the full amount of the license fee, together with a separate check or cash in the amount established by the board of commissioners, a copy of which is on file in the office of the clerk of the board of commissioners, to defray investigative and administrative costs. If the application is denied and the license refused, or if the applicant is denied a state license, the deposit representing the license fee shall be refunded, but the sum paid for investigation and administrative costs shall be retained.

(b)

Each application for a license to sell beer and wine for on-premises consumption shall be accompanied by a certified check for the full amount of the license fee, together with a separate check or cash in the amount established by action of the board of commissioners, a copy of which is on file in the office of the clerk of the board of commissioners to defray investigative and administrative costs. If the application is denied and the license refused, or if the applicant withdraws the application prior to its being issued, the license fee shall be refunded but the sum paid for investigation and administrative costs shall be retained.

(c)

Each application for a license as a private club shall be accompanied by a certified check for the full amount of the license fee, together with a separate check or cash in the amount established by the board of commissioners, a copy of which is on file in the office of the clerk of the board of commissioners, to defray investigative and administrative costs. If the application is denied and the license refused, or if the applicant is denied a state license, the deposit representing the license fee shall be refunded, but the sum paid for investigation and administrative cost shall be retained.

(d)

Each application for a license to sell distilled spirits by the package shall be accompanied by a certified check for the full amount of the license fee, together with a separate check or cash in the amount established by action of the board of commissioners, a copy of which is on file in the office of the clerk of the board of commissioners, to defray investigative and administrative costs. If the application is denied and the license refused or if the applicant is denied a state license, the deposit representing the license fee shall be refunded, but the sum paid for investigation and administrative costs shall be retained.

(e)

Each application for a license to sell beer and wine by the package shall be accompanied by a certified check for the full amount of the license fee, together with a separate check or cash in the amount established by the board of commissioners, a copy of which is on file in the office of the clerk of the board of commissioners, to defray investigative and administrative costs. If the application is denied and the license refused, or if the applicant withdraws the application prior to issuance of the license, the license fee shall be refunded but the sum paid for investigation and administrative costs shall be retained.

(Code 1976, §§ 7-2042, 7-2062, 7-2084, 7-2146, 7-2164; Ord. No. 98-04, Pt. 1, 4-30-98)

Secs. 4-61—4-70. - Reserved.

DIVISION 3. - TAX ON SALES BY THE DRINK[3]

Footnotes:
--- (3) ---

**State Law reference—** Local excise tax on sale of distilled spirits by the drink, O.C.G.A. § 3-4-131 et seq.


Sec. 4-71. - Definitions.

The following words, terms and phrases, when used in this division, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

Agent means that person designated by a licensee in the application for a permit to sell alcoholic beverages by the drink in the county.

Alcoholic beverage means any beverage containing alcohol obtained by distillation including rum, whiskey, gin and other spirituous liquors by whatever name called; but not including malt beverages, fermented wines or fortified wines.

Drink means any alcoholic beverage served for consumption on the premises which may or may not be diluted by any other liquid.

Licensee means any person who holds a license or permit from the county to sell alcoholic beverages by the drink.

Monthly period means the calendar month of the year.

Person means an individual, firm, partnership, joint venture, association, social club, fraternal organization, joint stock company, corporation, nonprofit corporation or cooperative nonprofit membership, estate, trust, business trust, receiver, trustee, syndicate or any other group or combination acting as a unit, the plural as well as the singular number, excepting the United States of America, the state and any political subdivision of either thereof upon which the county is without power to impose the tax herein provided.

Purchase price means the consideration received for the sale of alcoholic beverages by the drink valued in money, whether received in cash or otherwise, including all receipts, cash, credits and property or services of any kind or nature, and also the amount for which credit is allowed by the licensee to the purchaser, without any deduction therefrom whatsoever.

Purchaser means any person who orders and gives present or future consideration for any alcoholic beverage by the drink.

Tax means the tax imposed by this division.

(Code 1976, § 3-4001; Ord. No. 98-04, Pt. 1, 4-30-98)

**Cross reference**— Definitions and rules of construction generally, § 1-2.

Sec. 4-72. - Imposed; rate.

There is imposed and levied upon every sale of an alcoholic beverage purchased by the drink in the county a tax in the amount of three (3) percent of the purchase price of such beverage.

(Code 1976, § 3-4002; Ord. No. 98-04, Pt. 1, 4-30-98)

**State Law reference**— Maximum tax rate, O.C.G.A. § 3-4-131.

Sec. 4-73. - Purchaser's receipt; credit or deferred payment.

Every licensee for the sale of alcoholic beverages by the drink operating a place of business in the county shall maintain detailed sales records indicating each transaction by beverage and food served, its price and total. Where the charges for food and drink are satisfied by credit or deferred payment, the payment of the tax to the licensee may be deferred in a like manner; however, the licensee shall be liable therefor at the time and to the extent that such credits are incurred.

(Code 1976, § 3-4003; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-74. - Liability for tax; authority to collect.

Every licensee or the licensee's agent shall collect the tax herein imposed from purchasers of alcoholic beverages by the drink sold within the licensee's licensed premises. Such licensee or agent shall furnish such information as may be requested by the finance department to facilitate the collection of the tax.

(Code 1976, § 3-4004; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-75. - Determinations, returns and payments.

(a)

Due date of taxes. All taxes collected by any licensee or agent under this division shall be due and payable to the finance department monthly on or before the twentieth day of every month next succeeding each respective monthly period.

(b)

Return; limit of filing; persons required to file; execution. On or before the twentieth day of the month following each monthly period, a return for the preceding monthly period shall be filed with the finance department in such form as the finance department may prescribe by every licensee or agent liable for the payment of tax.

(c)

Contents of return. All returns shall show the gross receipts from the sale of alcoholic beverages by the drink, amount of tax collected or authorized due for the related period, and such other information as may be required by the finance department.

(d)

Delivery of return and readmittance. The person required to file the return shall deliver the return, together with the remittance of the net amount of tax due to the finance department.

(e)

Collection fee allowed operators. Operators collecting the tax shall be allowed a percentage of the tax due and accounted for and shall be reimbursed in the form of a deduction in submitting, reporting and paying the amount due, if such amount is not delinquent at the time of payment. The rate of the deduction shall be the same rate authorized for deductions from state tax under O.C.G.A. tit. 48, chap. 8, art. 1 [§ 48-8-1 et seq.].

(Code 1976, § 3-4005; Ord. No. 98-04, Pt. 1, 4-30-98)

**State Law reference—** Similar provisions, O.C.G.A. § 3-4-132; rate of deduction established, O.C.G.A. § 48-8-50.

Sec. 4-76. - Deficiency determinations.

(a)

Recomputation of tax. If the finance department is not satisfied with the return or returns of the tax or the amount of the tax to be paid to the finance department by any person, it may compute and determine the amount required to be paid upon the basis of any information within its possession or that may come into its possession. One (1) or more than one (1) deficiency determination may be made of the amount due for one (1) or more than one (1) monthly period.

(b)

Interest on deficiency. The amount of the determination, exclusive of penalties, shall bear interest at the rate specified by section 2-112. Interest shall be assessed for each month or fraction thereof from the close of the monthly period in which the amount or any portion thereof should have been returned until the date of payment.

(c)

Offsetting of overpayments. In making a determination, the finance department may offset overpayments, for another period, against penalties, and against the interest on underpayments. The interest on overpayments shall be computed in the manner set forth in section 4-77, subsection (c).

(d)

Penalty for negligence or disregard of rules and regulations. If any part of the deficiency for which a deficiency determination has been made is due to negligence or disregard of rules and regulations, the penalty amount specified in section 2-112 shall be added to the amount of the deficiency.

(e)

Penalty for fraud or intent to evade. If any part of the deficiency for which a deficiency determination is made is due to fraud or an intent to evade any provision of this division or other authorized rules and regulations, a penalty of twenty-five (25) percent of the deficiency shall be added thereto.

(f)

Notice of determination. The finance department shall give to the licensee written notice of the determination. The notice may be served personally or by mail; if by mail, such service shall be pursuant to O.C.G.A. § 9-11-4 and shall be addressed to the licensee at the licensee's address as it appears in the records of the county. In case of service by mail of any notice required by this division, the service is complete at the time of deposit in the United States Post Office.

(g)

Time within which notice of deficiency determination to be mailed. Except in the case of fraud, intent to evade this division or authorized rules or regulations, or failure to make a return, every notice of a deficiency determination shall be mailed within three (3) years after the twentieth day of every month following the monthly period for which the amount is proposed to be determined, or within three (3) years after the return is filed, whichever period expires last.

(Code 1976, § 3-4006; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-77. - Determination if no return made.

(a)

Estimate of gross receipts. If any licensee fails to make a return, the finance department shall make an estimate of the amount of the gross receipts of the licensee or, as the case may be, of the amount of the total sales in the county which are subject to the tax. The estimate shall be made for the period or periods in respect to which the licensee failed to make the return and shall be based upon any information which is in or may come into the possession of the finance department. Upon the basis of this estimate, the finance department shall compute and determine the amount required to be paid the county, adding to the sum thus determined a penalty equal to ten (10) percent thereof. One (1) or more determinations may be made for one (1) or for more than one (1) period.

(b)

Manner of computation; offsets; interest. In making a determination, the finance department may offset overpayments for a period or penalties against penalties and/or interest on underpayments. The interest on underpayments shall be computed in the manner set forth in subsection (c) of this section.

(c)

Interest on amount found due. The amount of the determination, exclusive of penalties, shall bear interest at the rate specified in section 2-112. Interest shall be assessed for each month, or fraction thereof from the close of the monthly period in which the amount or any portion thereof should have been returned until the date of payment.

(d)

Penalty for fraud or intent to evade. If the failure to file a return is due to fraud or an intent to evade this division or rules and regulations, penalties shall be assessed in accordance with section 2-112.

(e)

Notice; manner of service. Promptly after making a determination, the finance department shall give to the person written notice to be served personally or by mail in the manner prescribed for service of notice of a deficiency determination.

(Code 1976, § 3-4007; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-78. - Penalties and interest for failure to pay tax.

Any licensee who fails to pay the tax to the county, or fails to pay any amount of such tax required to be collected and paid to the county, within the time required, shall pay a penalty of ten (10) percent of the tax, or amount of the tax, in addition to the tax or amount of the tax, plus interest on the unpaid tax or any portion thereof as set forth in section 4-77, subsection (c).

(Code 1976, § 3-4008; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-79. - Collection of tax; security deposit; refunds.

(a)

The finance department, whenever deemed necessary to ensure compliance with this division, may require any person subject hereto to deposit such security as the department may determine. The amount of the security shall be fixed by the department, shall be the greater of twice the person's estimated average liability for the period for which the return was filed, determined in such a manner as the department deems proper, or ten thousand dollars ($10,000.00). The amount of the security may be increased by the department subject to the limitations herein provided. The department may sell the security at public auction, with the approval of the board of commissioners, if it becomes necessary to do so in order to recover any tax or any amount required to be collected, interest or penalty due. Notice of the sale may be served upon the person who deposited the security personally or by mail; if by mail, service shall be made in the manner prescribed for service of a notice of a deficiency determination, and shall be addressed to the person at the person's address as it appears in the records of the department. Upon any sale, any surplus above the amounts due shall be returned to the person who deposited the security.

(b)

If any person is delinquent in the payment of the amount required to be paid, or if a determination has been made against the person which remains unpaid, the finance department may, not later than three (3) years after the payment became delinquent, give notice thereof by registered mail to all persons in the county having in their possession or under their control any credits or other personal property belonging to the delinquent, or owing any debts to the delinquent. After receiving the notice, the persons so notified shall neither transfer nor make any other disposition of the credits, other personal property or debts in their possession or under their control at the time they receive the notice until the finance department consents to a transfer or disposition or until twenty (20) days elapse after the receipt of the notice. All persons so notified shall within five (5) days after receipt of the notice advise the finance department of all these credits, other personal property, or debts in their possession, under their control or owing by them.

(c)

At any time within three (3) years after any tax or any amount of tax required to be collected becomes due and payable and at any time within three (3) years after the delinquency of any tax or any amount of tax required to be collected, the finance department may bring an action in the courts of this state, or any other state, or of the United States in the name of the county to collect the amount delinquent together with penalties and interest, court fees, filing fees, attorney's fees and other legal fees incident thereto.

(d)

If any operator liable for any amount under this division sells out the business or quits the business, the successors or assigns shall withhold sufficient of the purchase price to cover the tax liability until the former owner produces a receipt from the finance department showing that same has been paid or a certificate stating that no amount is due.

(e)

If the purchaser of a business fails to withhold the purchase price as required, the purchaser becomes personally liable for the payment of the amount required to be withheld to the extent of the purchase price, valued in money. Within thirty (30) days after receiving a written request from the purchaser for a certificate, the finance department shall either issue the certificate or mail notice to the purchaser

at the purchaser's address as it appears on the records of the finance department of the amount that must be paid as a condition of issuing the certificate. The time within which the obligation of a successor may be enforced shall start to run at the time the operator sells out the business or at the time that the determination against the operator becomes final, whichever event occurs later.

(f)

Whenever the amount of any tax, penalty or interest has been paid more than once, or has been erroneously or illegally collected or received by the county under this division, it may be offset as provided in section 4-76, subsection (c), or it may be refunded, provided a verified claim in writing therefor, stating the specific ground upon which the claim is founded, is filed with the finance department within three (3) years from the date of payment. The claim may be audited and shall be made on forms provided by the finance department. If the claim is approved by the finance department and the board of commissioners, the excess amount collected or paid may be refunded or may be credited on any amounts then due and payable from the person from whom it was collected or by whom paid, and the balance may be refunded to this person, or such person's administrators or executors.

(Code 1976, § 3-4009; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-80. - Administration.

(a)

The finance department shall administer and enforce the provisions of this division.

(b)

The finance department may make and publish reasonable rules and regulations not inconsistent with this division or other laws of the county and the state, or the constitution of this state or the United States for the administration and enforcement of the provisions of this division and the collection of taxes hereunder.

(c)

Every licensee for the sale of alcoholic beverages by the drink in this county to a person shall keep such records, receipts, invoices and other pertinent papers in such form as the finance department may require.

(d)

The finance department may examine the books, papers, records, financial reports, equipment and other facilities of any licensee liable for the tax, in order to verify the accuracy of any return made, or if no return is made by the licensee, to ascertain and determine the amount required to be paid.

(e)

In administration of the provisions of this division, the finance department may require the filing of reports by any person or class of persons having possession or custody of information relating to sales of alcoholic beverages which are subject to the tax. The reports shall be filed with the finance

department when required by the department and shall set forth the price charged for each sale, the date of each sale and such other information as the department may require.

(f)

The finance department shall not make known in any manner the business affairs, operations or information obtained by an audit of books, papers, records, financial reports, equipment and other facilities of any licensee or any other person visited or examined in the discharge of official duty, or the amount or source of income, profits, losses, expenditures or any particular thereof, set forth or disclosed in any return, or to permit any return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person not having such administrative duty under this division, except in the case of judicial proceedings or other proceedings necessary to collect the tax hereby levied and assessed. Successors, receivers, trustees, executors, administrators, and assignees, if directly interested, may be given information as to the items included in the measure and amount of unpaid tax or amounts of tax required to be collected, interest and penalties.

(Code 1976, § 3-4010; Ord. No. 98-04, Pt. 1, 4-30-98)

Sec. 4-81. - Revocation or suspension of license.

The failure to timely pay the tax imposed by this division for three (3) consecutive months or four (4) times in a twelve-month period shall render the dealer or person liable therefor subject to suspension of the alcoholic beverage license for ten (10) consecutive days beginning on a Friday. The failure to timely pay the tax imposed by this section six (6) times within a twelve-month period shall render the dealer or person liable therefor subject to revocation of the alcoholic beverage license.

(Code 1976, § 3-4011)

Sec. 4-82. - No county excise tax in municipalities.

No excise tax shall be imposed, levied and collected in any portion of the county wherein such tax is being imposed, levied and collected by a municipality within the county.

(Code 1976, § 3-4012)

Secs. 4-83—4-100. - Reserved.
Sec. 4.2.32. - Late-night establishments and night clubs.

A.

The regulations that follow regarding late-night establishments and nightclubs are intended to afford protection to residential uses and other uses so as to protect the public health, safety, and welfare while respecting and providing adequate opportunities for nightlife in the county.

B.

Late-night establishments and nightclubs shall be subject to all of the following standards:

1.

Parking facilities within a lot may be shared in accordance with article 6, parking.

2.

Valet parking shall not be used to satisfy the requirement to meet applicable parking standards.

3.

Methods of traffic circulation, ingress and egress shall be consistent with best management practices as approved by the transportation division of the county's public works department.

4.

Noise from the proposed use shall be contained within the subject retail center units or standalone structures. The facility shall comply with chapter 16, article VII, DeKalb County Noise Ordinance.

C.

No late night establishment or night club boundary line shall be located within one thousand five hundred (1,500) feet from the boundary line of property zoned for residential use without the issuance of a special land use permit (SLUP). A late-night establishment or night club is not required to obtain a special land use permit when their closest residential neighbor is on the opposite side of an interstate highway.

D.

Every special land use permit application for a late-night establishment or nightclub shall include a scaled drawing of the location of the proposed premises, showing the distance measured in feet from the boundary line of the property proposed to be used as a late-night establishment or nightclub to the boundary line of property zoned for residential use. Such drawing shall be certified by a land surveyor or professional engineer registered in the State of Georgia. For the purposes of this section, distance shall be measured in feet as follows:

1.

From the property line of the land upon which the late-night establishment or nightclub is located;

2.

To the property line of the land which is zoned for a residential use;

3.

Along a straight line which describes the shortest distance between the two (2) property lines (i.e., "as the crow flies").

E.

Any late-night establishment or nightclub operating pursuant to a validly issued business and liquor license issued prior to the effective date of Ordinance No. 08-20, November 18, 2008, shall be a legal nonconforming use as defined in article 9. No late-night establishment or nightclub currently operating under a valid license issued prior to the effective date set forth in this section shall be required to secure a special land use permit from the board of commissioners in order to continue

DeKalb County, GA Code of Ordinances                                    Page 23 of 23

operation. Such establishments shall be required to comply with the applicable provisions of article 4, division 5 [sic] of this chapter regarding cessation, expansion, movement, enlargement or other alteration of the late-night establishment or nightclub. If a licensee is operating a legal nonconforming late-night establishment or nightclub at a particular location pursuant to this zoning ordinance, and such license is revoked, upon revocation, the legal nonconforming status of the licensee at that particular location shall be terminated

( Ord. No. 15-06 , 8-25-2015)

I, the undersigned, _____ Clerk of The Board of Commissioners, DeKalb County, Georgia, DO HEREBY CERTIFY that the foregoing is a true and correct copy of an ordinance adopted by said Board meeting lawfully assembled on this _____ day of _____ 2015

And same appears in Minutes of said Board this day of _____ , 2017

Clerk of Commissioners
DeKalb County, Georgia